**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HUAWEI TECHNOLOGIES CO., LTD., | |
| Plaintiff, | Case No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| L3HARRIS TECHNOLOGIES, INC., | |
| Defendant. | |

## CLAIM FOR PATENT INFRINGEMENT

1.      Plaintiff Huawei Technologies Co., Ltd. ("Huawei") files this complaint for Patent Infringement against L3Harris Technologies, Inc. ("Harris") and alleges as follows:

## NATURE OF THE ACTION

2.      This is an action brought by Huawei against Harris for infringement of U.S. Patent Nos. 7,439,969 ("the '969 Patent"), 9,072,011 ("the '2011 Patent"), 9,655,011 ("the '5011 Patent"), 8,270,371 ("the '371 Patent"), and 9,215,624 ("the '624 Patent") (collectively, "the Asserted Patents").

## THE PARTIES

3.      Huawei Technologies Co., Ltd. is a Chinese company with a place of business at Huawei Industrial Base (Shenzhen Campus), Bantian, Longgang District, Shenzhen 518129, People's Republic of China.

4.      Founded in 1987 in Shenzhen, China, Huawei has become a global leader of information and communication technology ("ICT") solutions.  Continuously innovating to meet customer need, Huawei is committed to enhancing customer experience and creating maximum value for telecommunications carriers, enterprises, and consumers.  Huawei's telecom network

equipment, IT products and solutions, and smart devices are currently deployed and used in more than 170 countries and regions and serve over one-third of the world's population.  Huawei currently employs 180,000 employees globally.

5.      Huawei is a leader in research, innovation, and implementation of future networks, focusing on current customer needs, as well as long-term technology research and standardization.  Huawei has invested substantially in research and development to become and maintain its global leadership in 4G, 5G, and other wireless communications technology.  Huawei has assembled a global team of approximately 80,000 employees working on research and development, located in 36 joint innovation centers and 14 R&D centers around the world.

6.      Huawei's innovations are central to important, cutting-edge technologies, including ultrabroadband solutions, such as LTE wireless networks.  As a result of Huawei's substantial dedication to R&D in the telecommunications industry over the past three decades, Huawei has witnessed and contributed to the evolution of telecommunication networks from the Wire Link Age, into the Wireless Age, and developing from 2G to 3G to 4G, with current progress toward 5G.  Over the course of this evolution, Huawei has been responsible for several of the industry's notable achievements and milestones.

7.      Huawei actively participates in and drives core telecommunications standards in leading technical organizations, such as 3GPP, IEEE, IETF, ITU-T, GSMA, ETSI, CCSA, IMTC, SIP Forum, MSF, NGMN, OMA, and 3GPP2.  Huawei is a member of 400 Standard Setting Organizations ("SSOs"), industry alliances, and open source communities.  Thousands of contributions submitted by Huawei were approved by these organizations.  In addition, Huawei has obtained dozens of leadership positions in these core network technology related SSOs, such as chairs, rapporteurs, and editors.

8.      Huawei has led the development of technologies that improve the individuation and reliability of wireless networks, while reducing the operating costs and improving the efficiency of wireless networks.  These technologies enable, for example, efficient initial access to a wireless network, improving multicast communications over a wireless network, and improving the efficiency and variety of charging solutions.  These features can be and generally are implemented on various networking products or software components, including, but not limited to, mobile devices such as User Equipment ("UE"), base stations such as an Evolved Node B ("eNodeB"), and Evolved Packet Core ("EPC") components such as a Mobility Management Entity ("MME").

9.      Harris is a Delaware corporation duly organized and existing under the laws of the State of Delaware with its principal place of business at 1025 West NASA Boulevard, Melbourne, Florida.

## JURISDICTION AND VENUE

10.      This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11.      This Court has general and specific jurisdiction over Harris at least because Harris is at home in the State of Delaware, where it is incorporated.

12.      Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) at least because Harris resides in this judicial District.  Harris is incorporated in the State of Delaware.

## HUAWEI PATENTS

13.      United States Patent No. 7,439,969 ("the '969 Patent"), titled "Single Gesture Map Navigation Graphical User Interface for a Thin Client," was duly and lawfully issued on

October 21, 2008.  Huawei is the owner of all right, title, and interest in the '969 Patent.  A true and correct copy of the '969 Patent is attached hereto as Exhibit 1.

14.    The claims of the '969 Patent are not directed to basic tools of scientific and technological work, fundamental economic practices, or the use of an abstract mathematical formula.

15.    Rather, the '969 Patent is directed to methods and systems for navigating a map user interface on a thin-client device.  The '969 Patent addresses specific technical problems arising out of the field of touchscreen interfaces for handheld devices.  For example, the '969 Patent addresses technical problems where the thin-client device needs to properly interpret user inputs to navigate a map.  The '969 Patent claims solve this technical problem through a technical solution. For example, the '969 Patent's disclosure of distinguishing between a tap and a drag and of controlling the map interface accordingly provides a solution to the technical problems identified.

16.    The technology recited in the claims of the '969 Patent provides an inventive concept and does not claim an abstract idea.  Due to the inventive combination of elements, the claimed invention achieves many benefits over prior art systems and methods, including the benefits noted above.  *See, e.g.*, '969 Patent at 4:8-5:13.

17.    The technological improvements described and claimed in the '969 Patent were not conventional or generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings in the art at that time.  The claims of the '969 Patent cover more than just the performance of well-understood, routine, or conventional activities known in the art.  For example, claim 1 of the '969 Patent is directed to a particular

method of navigating a graphical map interface on a thin-client device using a particular set of gesture interpretation rules.

18.    United States Patent No. 9,072,011 ("the '2011 Patent"), titled "Communication System, Network Handover Processing Method and Apparatus," was duly and lawfully issued on June 30, 2015.  Huawei is the owner of all right, title, and interest in the '2011 Patent.  A true and correct copy of the '2011 Patent is attached hereto as Exhibit 2.

19.    United States Patent No. 9,655,011 ("the '5011 Patent"), titled "Communication System, Network Handover Processing Method and Apparatus," was duly and lawfully issued on May 16, 2017.  The '5011 Patent is a continuation of the '2011 Patent, to which it claims priority and shares a common specification.  Huawei Technologies Co., Ltd., is the owner of all right, title, and interest in the '5011 Patent.  A true and correct copy of the '5011 Patent is attached hereto as Exhibit 3.

20.    The claims of the '2011 and '5011 Patents are not directed to basic tools of scientific and technological work, fundamental economic practices, or the use of an abstract mathematical formula.

21.    Rather, the '2011 and '5011 Patents address problems and shortcomings in the wireless communication field, and particularly with respect to network handover.  For example, the '2011 and '5011 Patents describe how their inventions increase handover efficiency and save resources if a radio link failure occurs in a handover process, a problem rooted in wireless cellular networks.  In conventional systems, for example, a source evolved nodeB (S-eNB) sends a handover request message to the target evolved nodeB (T-eNB), and the T-eNB sends a handover request ACK back to the S-eNB.  '2011 Patent at 1:41-65; '5011 Patent at 1:45-2:2.  The S-eNB then sends a handover command message, and the user

equipment (UE) sends a handover confirmation message to the T-eNB.  '2011 Patent at 1:66-2:5; '5011 Patent at 2:3-10.  If the radio link between the UE and the S-eNB fails, then the UE changes the state of the UE from active to idle during the subsequent handover, causing a delay in the operation of the UE.

> In the above [prior art] handover preparation process, if the radio link between the S-eNB and the UE fails, the UE changes the state during the subsequent handover. As a result, the handover is delayed and the system resources are wasted.

'2011 Patent at 2:20-23; '5011 Patent at 2:24-27.

22.    The '2011 and '5011 Patents specify a technological solution to this problem.  For example, the '2011 and '5011 Patents describe the T-eNB storing identity information and the UE connecting directly to the T-eNB when the UE has a radio link failure with the S-eNB in order to avoid delays and reduce time in the inactive state.

> During the handover preparation in an evolved network, if a radio link failure occurs between the S-eNB and the UE, the UE detects a cell with better signal quality and sends a cell update message to the T-eNB corresponding to the cell. The ID information allocated by the S-eNB may be carried in the cell update message or other RRC layer access messages sent to the T-eNB. Alternatively, the cell update cause value may be carried in the cell update message or other RRC layer access messages to the T-eNB. The T-eNB checks whether identity information, matching the received identity information sent from the UE, is available in the T-eNB, if identity information is available in the T-eNB, it indicates that the context of the UE does exist in the T-eNB. In this case, the T-eNB delivers the relevant radio parameter information, security parameter, and C-RNTI to the UE. The handover process is continued.

'2011 Patent at 3:39-54; '5011 Patent at 3:43-58.  In one embodiment:

> [T]he handover request message that the S-eNB sends to the candidate T-eNBs carries the ID information allocated for the UE by the S-eNB. The cell update message that the UE sends after the radio link between the UE and the S-eNB fails also carries the ID information allocated for the UE by the S-eNB. The new T-eNB receiving the cell update message judges whether identity information, matching the received identity information sent from the UE, is available in the T-eNB. If the identity information is available in the T-eNB, the new T-eNB is the candidate T-eNB selected by the UE during the handover preparation, and the

context of the UE is already stored. Thus, the T-eNB does not need to obtain the context from the S-eNB, and the handover delay is reduced. The UE can stay in the active state, instead of changing from the active state to the idle state and then changing back to the active state. Thus the state change times are reduced and the system resources are saved.

'2011 Patent at 4:61-5:10; '5011 Patent at 5:4-21.

23.    The technology recited in the claims of the '2011 and '5011 Patents specifies how handover preparation steps, including a T-eNB receiving first identity information allocated to the UE in advance of a radio link failure between the UE and the S-eNB, reduce the time that the UE is in an "idle" state, and therefore reduces handover delay—a result that overrides the routine and conventional sequence of UE handover in a wireless network.  For example, instead of the S-eNB sending a "handover command message" to the UE directing the UE to connect with the T-eNB ('2011 Patent at 1:66-2:2; '5011 Patent at 2:3-6), which requires an active connection between the S-eNB and UE, as a wireless network operating in the normal, expected manner would do, in the claimed handover process, the S-eNB provides the necessary information for handover to the T-eNB, allowing the UE to connect to the T-eNB even when radio link failure between the UE and the S-eNB has occurred.

24.    United States Patent No. 8,270,371 ("the '371 Patent"), titled "Method and apparatus for non-access stratum message processing during handover in evolved network," was duly and lawfully issued on September 18, 2012.  Huawei is the owner of all right, title, and interest in the '371 Patent.  A true and correct copy of the '371 Patent is attached hereto as Exhibit 4.

25.    United States Patent No. 9,215,624 ("the '624 Patent"), titled "Method and apparatus for non-access stratum message processing during handover in evolved network," was duly and lawfully issued on December 15, 2015.  The '624 Patent is a continuation of the

same parent application as the '371 Patent and shares a substantially common specification with the '371 Patent.  Huawei is the owner of all right, title, and interest in the '624 Patent.  A true and correct copy of the '624 Patent is attached hereto as Exhibit 5.

26.    The claims of the '371 and '624 Patents are not directed to basic tools of scientific and technological work, fundamental economic practices, or the use of an abstract mathematical formula.

27.    Rather, the claims of the '371 and '624 Patents are directed to methods and systems for communicating control information within a mobile communications network, for example, during a handover procedure when a mobile terminal transitions from a source base station (*e.g.*, S-eNB) to a target base station (*e.g.*, T-eNB).  The '371 and '624 Patents address a problem where the control information in the form of one or more Non-Access Stratum ("NAS") messages may be lost when the mobile terminal transitions from the S-eNB to the T-eNB.  The '371 and '624 Patent claims state that, when a S-eNB is unable to deliver a NAS message to a mobile terminal, the S-eNB includes the NAS message and cause information (*e.g.*, a cause value) indicating the reason for the non-delivery in a message to a mobility management device (*e.g.*, mobility management entity ("MME")) that initiated the transfer of the NAS message.

28.    The claims of the '371 and '624 Patents address a situation when a NAS message is not delivered to a mobile device, *e.g.*, user equipment ("UE") in a mobile communications system *e.g.*, when the UE is transitioning from a S-eNB to a T-eNB.  The claimed solutions of the '371 and '624 Patents offer multiple benefits including improved user experience when the user is moving between base stations, or at the periphery of a base station's service area, and a reduction in the complexity of MMEs.  Because the claims of the '371 and '624 Patents

improve the delivery of a NAS message to UEs, they reduce dropped calls and connection

failures, thereby resulting in higher data throughput.  Because the claims of the '371 and '624

Patents can reduce the requirement of a NAS Layer of an MME to track whether NAS

messages sent by the MME have been successfully delivered to a user equipment, the

implementation of the MME requires less memory and is less complex.

29.    The claimed solutions of the '371 and '624 Patents specify how the S-eNB

communicates important control information (*e.g.*, in the form of a NAS message) back to an

MME, thereby improving the efficiency of the network and avoiding unwanted retransmission

of a NAS message to the UE—a result that overrides the routine and conventional manner of

handling undelivered NAS messages within a wireless network.  For example, instead of the S-

eNB merely sending back a response to an MME without sending the NAS message and a

cause value indicating a non-delivery of the NAS message, which would require the MME to

keep track of NAS messages it sends, as a wireless network operating in the normal, expected

manner would do, in the claimed procedure, the S-eNB sends the NAS message back to the

MME with the cause value indicating the non-delivery of the NAS message when the NAS

message cannot be delivered.

30.    The claimed solution of the '371 and '624 Patents address a problem rooted in

LTE network technology: how to allow transmission of a NAS message to a UE if the NAS

message is not delivered during a transition of the UE from a S-eNB to a T-eNB.  The '371 and

'624 Patents explain, for example, that:

> [I]n the solution for NAS message processing in the conventional art, the EPC
> cannot be informed timely if the handover fails, that is, the UE returns to an S-
> eNB service area  again, and as a result, the EPC cannot correctly send the NAS
> message to the UE.

'371 Patent at 2:39-43; '624 Patent at 2:39-43. The '371 and '624 Patent claims provided a solution whereby the S-eNB that was unable to deliver the NAS message to the UE, transmits the NAS message back to the MME with a cause value that indicates failure to deliver the NAS message. The MME would then retransmit the NAS to the respective eNB to which the UE connects. The '371 and '624 Patents state, for example:

> The message which indicates that the UE is being handed over is a direct transfer failure message or a direct transfer response message containing a cause value and the NAS message that fails to be sent.

'371 Patent at 2:58-61; '624 Patent at 2:58-61.

## HARRIS'S INFRINGING PRODUCTS AND ACTIVITIES

31.  On information and belief, Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States numerous products compliant with 4G LTE mobile communication systems ("LTE Products"). These products include mobile communication devices capable of connecting to an LTE communications network, and equipment supporting the infrastructure of an LTE communications network, including base stations (*e.g.* eNodeBs, eNBs) and evolved packet core (EPC) components, such as MMEs.

32.  On information and belief, Harris's mobile communication LTE products include XL Radios, Tactical 4G LTE Radios, and Vehicle Based Radios. Harris advertises that its XL Radios, including the XL-185P Single Band Portable Radio, and XL-200P Multiband Portable Radio, support LTE functionality. *See*

https://www.harris.com/sites/default/files/downloads/product_line/xl-family-portable-radios-brochure.pdf. Harris advertises that Vehicle Based Radios, including the TM9300-DMR and TM9400 P25, provide connectivity through Broadband (LTE). *See*

https://www.harris.com/sites/default/files/unified-vehicle-network-computing-platform.pdf.

Harris advertises that its Tactical 4G LTE radios support LTE. *See*

https://www.harris.com/solution-grouping/tactical-4g-lte-radios.  Harris has stated that mobile

devices such as the RF-3590 LTE Tablet are compliant with LTE.  *See*

https://www.harris.com/press-releases/2012/02/harris-corporation-introduces-ruggedized-

tablet-for-defense-and-public-safety.

33.    On information and belief, Harris provides a Voice, Interoperability, Data and

Access (VIDA) services platform that provides access through LTE broadband networks.  *See*

https://www.harris.com/product-line/vida-voice-interoperability-data-and-access-services-

platform.

34.    Upon information and belief, Harris uses eNBs and EPC components compliant

with LTE, manufactured by Nokia and Cisco.  For example, Harris uses Nokia's Flexi

Multiradio 10 BTS, which is capable of supporting LTE.

35.    Upon information and belief, Harris makes, uses, sells, and/or offers to sell in the

United States, and/or imports into the United States cellular site simulator devices compliant

with 4G LTE communications networks.  For example, the manual for the Gemini describes

support for LTE.  *See* https://www.documentcloud.org/documents/3105793-Gemini-3-3-

Quick-Start-Guide.html#document/p1

36.    Upon information and belief, Harris makes, uses, sells, and/or offers to sell in the

United States the Harris BeOn® solution, the BeOn Android Client, and/or the BeOn iOS

Client (collectively, the "BeOn solution").  The BeOn solution is available on Android™,

Windows® PC, and iOS™ platforms and supports geographic mapping utilizing Google®

Mapping data.  *See* Harris's BeOn® Group Communications Services User Manual ("BeOn

Manual," available at https://www.harris.com/sites/default/files/downloads/solutions/beon-

android-ptt-group-communications-user-manual-english2.pdf) at 10.  The BeOn solution

allows navigation through the map using, for example, an Android device's touch interface.

37.    As detailed below, Harris has used and is using Huawei's patented technology

without license.

**FIRST COUNT**
**<u>INFRINGEMENT OF U.S. PATENT NO. 7,439,969</u>**

38.    Huawei realleges and incorporates by reference the allegations set forth in the

foregoing paragraphs.

39.    Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports

into the United States products that directly infringe the '969 Patent, including, but not limited

to, the Harris BeOn® solution, the BeOn Android Client, and/or the BeOn iOS Client

(collectively, the "'969 Accused Products").  Harris's '969 Accused Products infringe one or

more claims of the '969 Patent, including, without limitation, claim 1 of the '969 Patent.

40.    As an example, the '969 Accused Products perform a method for map navigation

using a graphical user interface on a thin client.  For example, the BeOn Manual describes the

ability to perform "Free Form Map Navigation; user can pan and zoom freely."  *See, e.g.*,

BeOn Manual at 15.

41.    The '969 Accused Products display a map on a display screen of a thin client.

*See, e.g.*, BeOn Manual at 35.



**Figure 4-6: Access the Layer and Asset Menu**

42.    A user may use a stylus with the '969 Accused products for single-gesture inputs, such as a drag of the stylus across the display screen, and the interface can distinguish between different gestures.  *See, e.g.*,

http://developer.android.com/reference/android/view/ViewConfiguration.html#getScaledTouch Slop(); https://developer.android.com/training/gestures/movement.html ("To help apps distinguish between movement-based gestures (such as a swipe) and non-movement gestures (such as a tap), Android includes the notion of 'Touch Slop.'  Touch Slop refers to the distance in pixels a user's touch can wander before it is interpreted as a movement-based gesture.").

43.    The '969 Accused Products can distinguish between movement-based gestures and non-movement based gestures using the distance in pixels a user's touch has moved.  *See, e.g.*,

http://developer.android.com/reference/android/view/ViewConfiguration.html#getScaledTouch Slop(); https://developer.android.com/training/gestures/movement.html ("To help apps distinguish between movement-based gestures (such as a swipe) and non-movement gestures (such as a tap), Android includes the notion of 'Touch Slop.'  Touch Slop refers to the distance in pixels a user's touch can wander before it is interpreted as a movement-based gesture.").

44.     If the stylus has been dragged a minimum distance, then, in response to the drag, the '969 Accused Products pan the map in accordance with the drag such that the map is shifted to a new center view.  For example, the BeOn Manual describes the ability to perform "Free Form Map Navigation; user can pan and zoom freely."  *See, e.g.*, BeOn Manual at 15. Upon further information and belief, panning within the '969 Accused Products does not permit the edge of the map to pan beyond a center of a view.

45.     By making, using, offering for sale, and/or selling products in the United States, including, but not limited to, the '969 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more claims of the '969 Patent, including, without limitation, claim 1, pursuant to 35 U.S.C. § 271(a).

46.     Harris also infringes the '969 Patent under 35 U.S.C. § 271(b) & (c).

47.     Harris knowingly encourages and intends to induce infringement of the '969 Patent by making, using, offering for sale, and/or selling products in the United States, including, but not limited to, the '969 Accused Products, with knowledge and specific intention that such products will be used by Harris or its customers in a manner that infringes the '969 Patent, as shown by the BeOn Manual referenced above.

48.     Harris also contributes to the infringement of the '969 Patent.  Harris makes, uses, sells, and/or offers to sell products in the United States, including, but not limited to, the '969 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '969 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

49.  Harris has had knowledge of the '969 Patent at least by virtue of the filing of this Complaint.

50.  Harris's infringement of the '969 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284, 285.

51.  As a result of Huawei's infringement of the '969 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

**SECOND COUNT**
**INFRINGEMENT OF U.S. PATENT NO. 9,072,011**

52.  Huawei realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

53.  Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '2011 Patent, including, but not limited to, Harris's Tactical 4G LTE Radios and any other Harris base station/eNB products practicing the LTE standard (collectively, the "'2011 Accused Products").  Harris's '2011 Accused Products infringe one or more claims of the '2011 Patent, including, without limitation, claim 8 of the '2011 Patent.

54.  For example, the '2011 Accused Products include an eNB that operates in an LTE network. The eNB is capable of being a target eNB by receiving a Handover Request Message containing a HandoverPreparationInformation message to transfer Evolved Universal Terrestrial Radio Access ("E-UTRA") Radio Resource Control ("RRC") information used by the target eNB during handover preparation.  *See, e.g.*, 3GPP TS 36.331 v8.5.0 at 180; 3GPP TS 36.423 v8.5.0 at 23-24.

55.     The '2011 Accused Products receive the Handover Request Message containing the HandoverPreparationInformation message at a communication interface from a source eNB.  The HandoverPreparationInformation message includes the sourceUE-Identity (C-RNTI) allocated to the user equipment by the source eNB and sourcePhysCellID (PhysCellID). *See, e.g.*, 3GPP TS 36.331 v8.5.0 at 180-83; 3GPP TS 36.423 v8.5.0 at 23-24.

56.     The '2011 Accused Products include a receiver that receives from the user equipment an RRCConnectionReestablishmentRequest message when the user equipment detects a radio link failure.  *See, e.g.*, 3GPP TS 36.331 v8.5.0 at 43-45, 50.  The RRCConnectionReestablishmentRequest message includes the C-RNTI allocated to the user equipment in the source cell and the physCellID of the source cell.  *Id.*

57.     The '2011 Accused Products include a processor that determines whether the C-RNTI and physCellID received from the user equipment match the C-RNTI and physCellID received from the source eNB.  When they match, the '2011 Accused Products allocate one or more parameters to the user equipment in an RRCConnectionReestablishment message.  3GPP TS 36.331 v8.5.0 at 43-45, 90.

58.     The '2011 Accused Products include a transmitter configured to send the RRCConnectionReestablishment message containing the one or more parameters to the UE. 3GPP TS 36.331 v8.5.0 at 43-45, 90.

59.     By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including, but not limited to, the '2011 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more claims of the '2011 Patent, including, without limitation, claim 8, pursuant to 35 U.S.C. § 271(a).

60.     Harris also infringes the '2011 Patent under 35 U.S.C. § 271(b) & (c).

61.     Harris knowingly encourages and intends to induce infringement of the '2011 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including, but not limited to, the '2011 Accused Products, with knowledge and specific intention that such products will be used by Harris or its customers in a network that infringes the '2011 Patent. For example, Harris expressly advertises that its products can be used for LTE communications, and are "ideal" for various uses. *See, e.g.*, https://www.harris.com/solution-grouping/tactical-4g-lte-radios.  On information and belief, Harris also trains its customers in the use of the '2011 Accused Products.

62.     Harris also contributes to the infringement of the '2011 Patent. Harris makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including, but not limited to, the '2011 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '2011 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

63.     Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents essential to the LTE standard and Huawei's December 21, 2018 email identifying the '5011 Patent, in the same family as the '2011 Patent, explicitly.  Upon information and belief, Harris knew of the '2011 Patent or was willfully blind to the '2011 Patent.  Also, Harris has had knowledge of the '2011 Patent at least by virtue of the filing of this Complaint.

64.    Harris's infringement of the '2011 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284, 285.

65.    As a result of Harris's infringement of the '2011 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

**THIRD COUNT**
**INFRINGEMENT OF U.S. PATENT NO. 9,655,011**

66.    Huawei realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

67.    Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '5011 Patent, including, but not limited to, Harris's Tactical 4G LTE Radios and any other Harris base station/eNB products practicing the LTE standard (collectively, the "'5011 Accused Products").  Harris's '5011 Accused Products infringe one or more claims of the '5011 Patent, including, without limitation, claim 8 of the '5011 Patent.

68.    For example, the '5011 Accused Products include an eNB that operates in an LTE network. The eNB is capable of being a target eNB by receiving a Handover Request Message containing a HandoverPreparationInformation message to transfer Evolved Universal Terrestrial Radio Access ("E-UTRA") Radio Resource Control ("RRC") information used by the eNB during handover preparation.  *See, e.g.*, 3GPP TS 36.331 v8.5.0 at 180; 3GPP TS 36.423 v8.5.0 at 23-24.

69.    The '5011 Accused Products receive the Handover Request Message containing the HandoverPreparationInformation message at a communication interface from a source

eNB.  The HandoverPreparationInformation message includes the sourceUE-Identity (C-RNTI), allocated to the user equipment by the source eNB, and sourcePhysCellID (PhysCellID).  *See, e.g.*, 3GPP TS 36.331 v8.5.0 at 180-83; 3GPP TS 36.423 v8.5.0 at 23-24.

70.    The '5011 Accused Products include a receiver that receives from the user equipment an RRCConnectionReestablishmentRequest message.  *See, e.g.*, 3GPP TS 36.331 v8.5.0 at 43-45.  The RRCConnectionReestablishmentRequest message includes the C-RNTI allocated to the user equipment in the source cell and the physCellID of the source cell.  *Id.*

71.    The '5011 Accused Products include a processor that determines whether the C-RNTI and physCellID received from the user equipment match the C-RNTI and physCellID received from the source eNB.  The '5011 Accused Products allocate one or more parameters to the user equipment in an RRCConnectionReestablishment message.  3GPP TS 36.331 v8.5.0 at 43-45, 90.

72.    The '5011 Accused Products include a transmitter configured to send the RRCConnectionReestablishment message containing the one or more parameters to the UE. 3GPP TS 36.331 v8.5.0 at 43-45, 90.

73.    By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including, but not limited to, the '5011 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more claims of the '5011 Patent, including, without limitation, claim 8, pursuant to 35 U.S.C. § 271(a).

74.    Harris also infringes the '5011 Patent under 35 U.S.C. § 271(b) & (c).

75.    Harris knowingly encourages and intends to induce infringement of the '5011 Patent by making, using, offering for sale, and/or selling products in the United States, and/or

importing them into the United States, including, but not limited to, the '5011 Accused Products, with knowledge and specific intention that such products will be used by Harris or its customers in a network that infringes the '5011 Patent.  For example, Harris expressly advertises that its products can be used for LTE communications, and are "ideal" for various uses.  *See, e.g.*, https://www.harris.com/solution-grouping/tactical-4g-lte-radios. On information and belief, Harris also trains its customers in the use of the '5011 Accused Products.

76.    Harris also contributes to the infringement of the '5011 Patent. Harris makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including, but not limited to, the '5011 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '5011 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

77.    Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents essential to the LTE standard, and Huawei's December 21, 2018 email identifying the '5011 Patent explicitly.  Upon information and belief, Harris knew of the '5011 Patent or was willfully blind to the '5011 Patent.  Also, Harris has had knowledge of the '5011 Patent at least by virtue of the filing of this Complaint.

78.    Harris's infringement of the '5011 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284, 285.

79.   As a result of Harris's infringement of the '5011 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

**FOURTH COUNT**
**INFRINGEMENT OF U.S. PATENT NO. 8,270,371**

80.   Huawei realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

81.   Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '371 Patent, including, but not limited to, Harris's Tactical 4G LTE Radios,any other Harris base station/eNB products practicing the LTE standard, and any Harris MME products practicing the LTE standard (collectively, the "'371 Accused Products").  Harris's '371 Accused Products infringe one or more claims of the '371 Patent, including, without limitation, claim 1 of the '371 Patent.

82.   For example, on information and belief, Harris's '371 Accused Products can operate as source eNBs and receive a direct-transfer message including a downlink NAS transport message, from a MME.  *See, e.g.*, 3GPP TS 36.300 v8.8.0 at § 19.2.2.6; 3GPP TS 36.413 v8.8.0 at § 8.6.2.2.  The '371 Accused Products send to the MME a reply including the NAS message and a cause value indicating the NAS message has not been sent to the UE because of the handover of the UE.  *See, e.g.*, 3GPP TS 36.300 v8.8.0 at § 19.2.2.6; 3GPP TS 36.413 v8.8.0 at §§ 8.6.2.4, 9.1.7.4, 9.2.1.3.

83.   By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including, but not limited to, the '371 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more

claims of the '371 Patent, including, without limitation, claim 1, pursuant to 35 U.S.C. § 271(a).

84.   Harris also infringes the '371 Patent under 35 U.S.C. § 271(b) & (c).

85.   Harris knowingly encourages and intends to induce infringement of the '371 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including, but not limited to, the '371 Accused Products, with knowledge and specific intention that such products will be used by Harris or its customers in a network that infringes the '371 Patent.  For example, Harris expressly advertises that its products can be used for LTE communications, and are "ideal" for various uses.  *See, e.g.*, https://www.harris.com/solution-grouping/tactical-4g-lte-radios.  On information and belief, Harris also trains its customers in the use of the '371 Accused Products.

86.   Harris also contributes to the infringement of the '371 Patent. Harris makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including, but not limited to, the '371 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '371 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

87.   Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents essential to the LTE standard and Huawei's December 21, 2018 email identifying the '371 Patent explicitly.  Upon information and belief, Harris knew of the '371 Patent or was willfully blind to the '371 Patent.  Also, Harris has had knowledge of the '371 Patent at least by virtue of the filing of this Complaint.

88.    Harris's infringement of the '371 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284, 285.

89.    As a result of Harris's infringement of the '371 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

## FIFTH COUNT
## INFRINGEMENT OF U.S. PATENT NO. 9,215,624

90.    Huawei realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

91.    Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '624 Patent, including, but not limited to, Harris's Tactical 4G LTE Radios, any other Harris base station/eNB products practicing the LTE standard, and any Harris MME products practicing the LTE standard (collectively, the "'624 Accused Products").  Harris's '624 Accused Products infringe one or more claims of the '624 Patent, including, without limitation, claim 1 of the '624 Patent.

92.    For example, on information and belief, Harris's '624 Accused Products can operate as source eNBs and receive a direct-transfer message including a downlink NAS transport message, from a MME.  *See, e.g.*, 3GPP TS 36.300 v8.8.0 at § 19.2.2.6; 3GPP TS 36.413 v8.8.0 at § 8.6.2.2.  The '624 Accused Products send to the MME a reply including the NAS message and a cause value indicating the NAS message has not been sent to the UE because of the handover of the UE.  *See, e.g.*, 3GPP TS 36.300 v8.8.0 at § 19.2.2.6; 3GPP TS 36.413 v8.8.0 at §§ 8.6.2.4, 9.1.7.4, 9.2.1.3.

93.     By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including, but not limited to, the '624 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more claims of the '624 Patent, including without limitation claim 1, pursuant to 35 U.S.C. § 271(a). In addition, upon information and belief, Harris sets up networks including both eNB products and MME products that operate in accordance with at least claim 1 of the '624 Patent.

94.     Harris also infringes the '624 Patent under 35 U.S.C. § 271(b) & (c).

95.     Harris knowingly encourages and intends to induce infringement of the '624 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including, but not limited to, the '624 Accused Products, with knowledge and specific intention that such products will be used by Harris or its customers in a network that infringes the '624 Patent.  For example, Harris expressly advertises that its products can be used for LTE communications, and are "ideal" for various uses.  *See, e.g.*, https://www.harris.com/solution-grouping/tactical-4g-lte-radios.  On information and belief, Harris also trains its customers in the use of the '624 Accused Products.

96.     Harris also contributes to the infringement of the '624 Patent. Harris makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including, but not limited to, the '624 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '624 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

97.     Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents

essential to the LTE standard and Huawei's December 21, 2018 email identifying the '371 Patent, in the same family as the '624 Patent, explicitly.  Upon information and belief, Harris knew of the '624 Patent or was willfully blind to the '624 Patent.  Also, Harris has had knowledge of the '624 Patent at least by virtue of the filing of this Complaint.

98.    Harris's infringement of the '624 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284, 285.

99.    As a result of Harris's infringement of the '624 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and D. Del. LR 38.1, Huawei hereby demands a trial by jury of all issues so triable in this action.

## PRAYER FOR RELIEF

Huawei respectfully requests this Court grant relief as follows:

1.    Judgment that Harris has infringed one or more claims of each of the Asserted Patents in this litigation pursuant to 35 U.S.C. §§ 271(a), 271(b), 271(c), and/or 271(g) and that Harris is liable for damages caused by such infringement;

2.    A judicial determination of the conditions for future infringement such as an ongoing royalty;

3.    Judgment requiring Harris to make an accounting of damages resulting from Harris's infringement of the Asserted Patents;

4.     Judgment awarding Huawei its damages resulting from Harris's infringement of the Asserted Patents, and increasing such damages pursuant to 35 U.S.C. § 284 because of the willful and deliberate nature of Harris's conduct;

5.     Judgment requiring Harris to pay Huawei's costs and expenses, along with pre-judgment and post-judgment interest, for Harris's infringement of each of the Asserted Patents;

6.     An order that this case is "exceptional" pursuant to 35 U.S.C. § 285 and awarding Huawei its costs, expenses, and reasonable attorneys' fees under 35 U.S.C. § 285 and all other applicable statutes and rules in common law that would be appropriate, with pre- and post-judgment interest thereon; and

7.     Grant to Huawei such other and further relief as the Court deems just and proper.

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Of Counsel:

Kevin J. Post
Alexander E. Middleton
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000
kevin.post@ropesgray.com
alexander.middleton@ropesgray.com

James R. Batchelder
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
(650) 617-4000
james.batchelder@ropesgray.com

*Anne Shea Gaza*

Adam W. Poff (No. 3990)
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
agaza@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff*

01:24714230.1