IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HUAWEI TECHNOLOGIES CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-1306-MN |
| | ) | |
| L3HARRIS TECHNOLOGIES, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## <u>L3HARRIS TECHNOLOGIES, INC.'S ANSWER AND COUNTERCLAIMS</u>

Defendant L3Harris Technologies, Inc. ("L3Harris" or "Harris") hereby responds to

Plaintiff Huawei Technologies Co. Ltd.'s ("Huawei" or "Plaintiff") complaint (Dkt. 1) as

follows:

1. To the extent a response to paragraph 1 is required, L3Harris admits that

Huawei's claims purport to seek the stated relief.

## <u>NATURE OF ACTION</u>

2. To the extent a response to paragraph 2 is required, L3Harris admits that

Huawei's claims purport to seek the stated relief.

## <u>PARTIES</u>

3. L3Harris, on information and belief, admits the allegations in paragraph 3.

4. L3Harris is without knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 4 and therefore denies the same.

5. L3Harris is without knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 5 and therefore denies the same.

6.      L3Harris is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 and therefore denies the same.

7.      In response to paragraph 6, Harris admits that, on information and belief, Huawei Technologies Co., Ltd. is a member of ETSI and 3GPP.  Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 7 and therefore denies the same.

8.      L3Harris is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 and therefore denies the same.

9.      Admitted.

## JURISDICTION AND VENUE

10.      In response to paragraph 10, L3Harris admits that Huawei alleges claims that purport to invoke this Court's subject matter jurisdiction under 28 U.S.C. §§ 1331, and 1338(a). L3Harris denies that Huawei is entitled to any relief.  Except as expressly admitted, L3Harris denies the remaining allegations of paragraph 10.

11.      In response to paragraph 11, L3Harris responds that it will not challenge personal jurisdiction for purposes of this action.  Except as expressly admitted, L3Harris denies the remaining allegations of paragraph 11.

12.      L3Harris admits that it is incorporated in the State of Delaware.  In response to paragraph 12, L3Harris responds that it will not challenge venue for purposes of this action. Except as expressly admitted, L3Harris denies the remaining allegations of paragraph 12.

## HUAWEI PATENTS

13.      In response to paragraph 13, L3Harris admits that Exhibit 1 filed at Dkt. 1-1 purports to be a true and correct copy of United States Patent No. 7,439,969 ("the '969 Patent"),

titled "Single Gesture Map Navigation Graphical User Interface for a Thin Client."   L3Harris admits that the copy of the '989 Patent attached as Exhibit 1 states on its face that it was issued by the USPTO on October 21, 2008.  L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 13, and therefore denies the same.

14.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent an answer is required, L3Harris denies the allegations of paragraph 14.

15.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '969 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, L3Harris denies the allegations of paragraph 15.

16.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '969 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, L3Harris denies the allegations of paragraph 16.

17.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '969 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, L3Harris denies the allegations of paragraph 17.

18.     In response to paragraph 18, L3Harris admits that Exhibit 2 filed at Dkt. 1-2 purports to be a true and correct copy of United States Patent No. 9,072,011 ("the '2011 Patent"), titled "Communication System, Network Handover Processing Method and Apparatus." L3Harris admits that the copy of the '2011 Patent attached as Exhibit 2 states on its face that it was issued by the USPTO on June 30, 2015.  L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 18, and therefore denies the same.

19.     In response to paragraph 19, L3Harris admits that Exhibit 3 filed at Dkt. 1-3 purports to be a true and correct copy of United States Patent No. 9,655,011 ("the '5011 Patent"), titled "Communication System, Network Handover Processing Method and Apparatus." L3Harris admits that the copy of the '2011 Patent attached as Exhibit 3 states on its face that it was issued by the USPTO on May 16, 2017 and that it is a "Continuation of application No. 13/797,587, filed on Mar. 12, 2013, now Pat. No. 9,072,011."  L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 19, and therefore denies the same.

20.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent an answer is required, L3Harris denies the allegations of paragraph 20.

21.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '2011 Patent or '5011 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, L3Harris denies the allegations of paragraph 21.

22.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '2011 Patent or '5011 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, L3Harris denies the allegations of paragraph 22.

23.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '2011 Patent or '5011 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, L3Harris denies the allegations of paragraph 23.

24.     In response to paragraph 24, L3Harris admits that Exhibit 4 filed at Dkt. 1-4 purports to be a true and correct copy of United States Patent No. 8,270,371 ("the '371 Patent"), titled "Method and apparatus for non-access stratum message processing during handover in evolved network."   L3Harris admits that the copy of the '371 Patent attached as Exhibit 4 states on its face that it was issued by the USPTO on September 18, 2012.  L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 24, and therefore denies the same.

25.     In response to paragraph 25, L3Harris admits that Exhibit 5 filed at Dkt. 1-5 purports to be a true and correct copy of United States Patent No. 9,215,624 ("the '624 Patent"), titled "Method and apparatus for non-access stratum message processing during handover in evolved network."   L3Harris admits that the copy of the '624 Patent attached as Exhibit 5 states on its face that it was issued by the USPTO on December 15, 2015 and that it is a "Continuation of application No. 12/704,906, filed on Feb. 12, 2010, now Pat. No. 8,665,820."  L3Harris is

without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 25, and therefore denies the same

26.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent an answer is required, L3Harris denies the allegations of paragraph 26.

27.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '371 Patent or '624 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, L3Harris denies the allegations of paragraph 27.

28.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '371 Patent or '624 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, L3Harris denies the allegations of paragraph 28.

29.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '371 Patent or '624 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, L3Harris denies the allegations of paragraph 29.

30.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '371 Patent or '624 Patent, L3Harris responds that the patent is the best source of the full content and denies the allegations

to the extent they do not accurately represent the patent's full content and context. To the extent any further answer is required, L3Harris denies the allegations of paragraph 30.

## HARRIS'S ALLEDEGLY INFRINGING PRODUCTS AND ACTIVITIES

31. L3Harris admits that it has produced for certain worldwide markets certain products that may, in certain configurations, communicate with a LTE communications network. L3Harris further responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31 and therefore denies the same.

32. L3Harris admits that it has produced for certain worldwide markets certain products that may, in certain configurations, communicate with an LTE communications network. L3Harris further responds that to the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context. This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32 and therefore denies the same.

33. L3Harris admits that it has produced for certain worldwide markets a product described as the Voice, Interoperability, Data and Access (VIDA) services platform. L3Harris further responds that to the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents'

full content and context.  L3Harris denies that the Voice, Interoperability, Data and Access (VIDA) services platform provides access through LTE broadband networks, including because any such access would be provided, if at all, by third parties.

34.     L3Harris admits that it has produced for certain worldwide markets certain products that may, in certain configurations, communicate with an LTE communications network, including certain components manufactured and sold by third parties.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 34 and therefore denies the same.

35.     L3Harris admits that it has produced for certain worldwide markets certain products that may, in certain configurations, communicate with an LTE communications network.  L3Harris further responds that to the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 and therefore denies the same.

36.     L3Harris admits that it has produced for certain worldwide markets a product described as the BeOn solution.  L3Harris further responds that to the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the

documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context. This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36 and therefore denies the same.

37.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent an answer is required, L3Harris denies the allegations of paragraph 37.

## FIRST COUNT
## ALLEGED INFRINGEMENT OF U.S. PATENT NO. 7,439,969

38.     L3Harris realleges and incorporates by reference the responses in the foregoing paragraphs.

39.     L3Harris admits that it has produced for certain worldwide markets a product described as BeOn. L3Harris further responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 39 and therefore denies the same. To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

40.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context. This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple

different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 40 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

41.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 41 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

42.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 42 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

43.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 43 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

44.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 44 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

45.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

46.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

47.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

48.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

49.     This paragraph contains legal conclusions that require no answer.  L3Harris admits that the Complaint mentions and attaches the '969 Patent.

50.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

51.     L3Harris admits that Huawei purports to seek recovery of monetary damages through this action.  Otherwise Harris denies the allegations in paragraph 51.

## SECOND COUNT
## ALLEGED INFRINGEMENT OF U.S. PATENT NO. 9,072,011

52.     L3Harris realleges and incorporates by reference the responses in the foregoing paragraphs.

53.     L3Harris responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 53 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

54.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no

12

answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 54 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

55.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 55 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

56.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 56 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

57.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 57 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

58.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 58 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

59.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

60.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

61.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

62.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

63.     L3Harris admits that on December 5, 2018, Huawei sent L3Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE.  L3Harris further admits that on December 21, 2018, Huawei sent L3Harris's licensing representative a list of patents which included a listing of the '5011 patent.  This paragraph contains legal conclusions that require no answer and/or allegations for which L3Harris is without knowledge or information sufficient to form a belief as to truth and therefore denies the allegations.  To the extent an answer is required, L3Harris denies the allegations of this paragraph.

64.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

65.     L3Harris admits that Huawei purports to seek recovery of monetary damages through this action.  Otherwise Harris denies the allegations in paragraph 65.

### THIRD COUNT
### ALLEGED INFRINGEMENT OF U.S. PATENT NO. 9,655,011

66.     L3Harris realleges and incorporates by reference the responses in the foregoing paragraphs.

67.     L3Harris responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 67 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

68.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 68 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

69.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 69 and therefore denies

the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

70.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 70 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

71.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 71 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

72.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents'

full content and context.  This paragraph further contains legal conclusions that require no

answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple

different interpretations, and as a result, L3Harris is without knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in paragraph 72 and therefore denies

the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this

paragraph.

73.     This paragraph contains legal conclusions that require no answer.  To the extent

an answer is required, L3Harris responds as follows:  Denied.

74.     This paragraph contains legal conclusions that require no answer.  To the extent

an answer is required, L3Harris responds as follows:  Denied.

75.     To the extent the allegations in this paragraph quote from or characterize the

referenced documents, L3Harris responds that the documents are the best source of the full

content and denies the allegations to the extent they do not accurately represent the documents'

full content and context.  This paragraph contains legal conclusions that require no answer.  To

the extent an answer is required, L3Harris responds as follows:  Denied.

76.     This paragraph contains legal conclusions that require no answer.  To the extent

an answer is required, L3Harris responds as follows:  Denied.

77.     L3Harris admits that on December 5, 2018, Huawei sent L3Harris's licensing

representative a presentation stating that Huawei had unidentified patents relating to LTE.

L3Harris further admits that on December 21, 2018, Huawei sent L3Harris's licensing

representative a list of patents which included a listing of the '5011 patent.  This paragraph

contains legal conclusions that require no answer and/or allegations for which L3Harris is

without knowledge or information sufficient to form a belief as to truth and therefore denies the

allegations.  To the extent an answer is required, L3Harris denies the allegations of this paragraph.

78.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

79.     L3Harris admits that Huawei purports to seek recovery of monetary damages through this action.  Otherwise Harris denies the allegations in paragraph 79.

## FOURTH COUNT
## ALLEGED INFRINGEMENT OF U.S. PATENT NO. 8,270,371

80.     L3Harris realleges and incorporates by reference the responses in the foregoing paragraphs.

81.     L3Harris responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 81 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

82.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 82 and therefore denies

the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

83.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

84.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

85.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

86.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

87.     L3Harris admits that on December 5, 2018, Huawei sent L3Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE. L3Harris further admits that on December 21, 2018, Huawei sent L3Harris's licensing representative a list of patents which included a listing of the '371 patent.  This paragraph contains legal conclusions that require no answer and/or allegations for which L3Harris is without knowledge or information sufficient to form a belief as to truth and therefore denies the allegations.  To the extent an answer is required, L3Harris denies the allegations of this paragraph.

88.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

89.     L3Harris admits that Huawei purports to seek recovery of monetary damages through this action.  Otherwise Harris denies the allegations in paragraph 89.

## FIFTH COUNT
## ALLEGED INFRINGEMENT OF U.S. PATENT NO. 9,215,624

90.     L3Harris realleges and incorporates by reference the responses in the foregoing paragraphs.

91.     L3Harris responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 91 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

92.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, L3Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 92 and therefore denies the same.  To the extent an answer is required, L3Harris denies the remaining allegations of this paragraph.

93.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

94.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

95.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, L3Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

96.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

97.     L3Harris admits that on December 5, 2018, Huawei sent L3Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE. L3Harris further admits that on December 21, 2018, Huawei sent L3Harris's licensing representative a list of patents which included a listing of the '371 patent.  This paragraph contains legal conclusions that require no answer and/or allegations for which L3Harris is without knowledge or information sufficient to form a belief as to truth and therefore denies the allegations.  To the extent an answer is required, L3Harris denies the allegations of this paragraph

98.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, L3Harris responds as follows:  Denied.

99.     L3Harris admits that Huawei purports to seek recovery of monetary damages through this action.  Otherwise Harris denies the allegations in paragraph 99.

### RESPONSE TO HUAWEI'S JURY TRIAL DEMAND

Huawei's demands for a trial by jury does not state any allegation that requires a response by L3Harris.

### RESPONSE TO HUAWEI'S PRAYER FOR RELIEF

In response to Huawei's prayer for relief, L3Harris denies that Huawei is entitled to any relief sought in its claims.

### AFFIRMATIVE DEFENSES

100.    Pursuant to Federal Rule of Civil Procedure 8(c), L3Harris alleges and asserts the following defenses in response to the allegations in Huawei's Complaint, undertaking the burden of proof only as to those defenses required by law, regardless of how such defenses are denominated herein.  To the extent each of its defenses relate to specific L3Harris counterclaims on the same or similar issues, L3Harris repeats and incorporates by reference the allegations contained in those counterclaims as if fully set forth with respect to those defenses.  L3Harris reserves the right to assert any other defenses and counterclaims as discovery progresses.

### FIRST AFFIRMATIVE DEFENSE
### (FAILURE TO STATE A CLAIM)

101.    Huawei's Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
### (STANDING)

102.    Huawei entities lack standing to bring suit for alleged patent infringement.

### THIRD AFFIRMATIVE DEFENSE
### (INVALIDITY)

103.    U.S. Patent Nos. 7,439,969 ("the '969 Patent"), 9,072,011 ("the '2011 Patent"), 9,655,011 ("the '5011 Patent"), 8,270,371 ("the '371 Patent"), and 9,215,624 ("the '624 Patent") (collectively, "the Huawei Asserted Patents") are invalid, void and/or unenforceable for failure to comply with one or more of the conditions for patentability set forth in Title 35 of the United

States Code, including without limitation, for example, Sections 101, 102, 103, 112, 116, and/or 132.

## FOURTH AFFIRMATIVE DEFENSE
## (NON-INFRINGEMENT)

104.    L3Harris does not infringe and has not infringed, induced infringement of, or contributed to infringement of any valid and enforceable claim of Huawei's Asserted Patents, literally or under the doctrine of equivalents, willfully or otherwise.

## SIXTH AFFIRMATIVE DEFENSE
## (PROSECUTION HISTORY ESTOPPEL)

105.    Huawei is estopped, based on statements, representations, and admissions made during prosecution of the applications that led to the Huawei Asserted Patents, from asserting any interpretation of the claims of those patents that would be broad enough to cover any accused equipment or methods alleged to infringe those patents, either literally or under the doctrine of equivalents.

## SEVENTH AFFIRMATIVE DEFENSE
## (EQUITABLE DEFENSES)

106.    Huawei's claims are barred, either whole or in part, by the doctrine of laches, waiver, estoppel, patent misuse, and/or unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE
## (STATUTORY LIMITATION ON DAMAGES)

107.    Any claim by Huawei for damages is limited by 35 U.S.C. §§ 252, 286, 287, or 307.  Huawei is barred by 35 U.S.C. § 288 from recovering costs associated with this action.

## NINTH AFFIRMATIVE DEFENSE
## (NO WILLFUL INFRINGEMENT)

108.     Huawei is not entitled to enhanced damages under 35 U.S.C. § 284 because Huawei has failed to meet, and cannot meet as a matter of law, the requirements for willful infringement.

## TENTH AFFIRMATIVE DEFENSE
## (STATUTORY LIMITATION)

109.     To the extent certain equipment or software accused of infringing the Huawei Asserted Patents are used by and/or manufactured for the United States Government, Huawei's claims involving L3Harris equipment or software supplied to the Government and for authorized Foreign Military Sales may not be pursued in this Court and are subject to other limitations pursuant to 28 U.S.C. § 1498.

## ELEVENTH AFFIRMATIVE DEFENSE
## (NON-COMPLIANCE WITH SSO UNDERTAKINGS AND OBLIGATIONS)

110.     Huawei's claims for relief are limited and/or barred, in whole or in part, by its undertakings and obligations to standards-setting organizations.

## TWELFTH AFFIRMATIVE DEFENSE
## (CONTRACTUAL LIMITATION ON DAMAGES – FRAND)

111.     Huawei's claims for monetary relief are limited by its obligation to license the Huawei Asserted Patents on fair, reasonable, and non-discriminatory terms.

## THIRTEENTH AFFIRMATIVE DEFENSE
## (PATENT EXHAUSTION AND LICENSE)

112.     Upon information and belief, Huawei's claims for relief are barred, in whole or in part, as a result of patent exhaustion and/or a license to the Huawei Asserted Patents.  To the extent L3Harris's vendors or partners have entered into patent license agreements with Huawei,

Harris's use of network equipment or software from those vendors or partners during the terms of those agreements is authorized under those agreements.

## FOURTEENTH AFFIRMATIVE DEFENSE
## (NON-COMPLIANCE WITH LICENSING OBLIGATION)

113.    Huawei's claims for relief are barred, in whole or in part, by its failure to comply with its obligation to offer to license the Huawei Asserted Patents on FRAND terms, including its refusal to offer licensing terms for each of the Huawei Asserted Patents.

## FIFTEENTH AFFIRMATIVE DEFENSE
## (UNENFORCEABILITY)

114.    One or more of Huawei's Asserted Patents are unenforceable against L3Harris under the equitable doctrines of estoppel, waiver, implied waiver, patent misuse, unclean hands, or other equitable doctrines.

115.    Upon information and belief, Huawei's actions, including but not limited to those set forth herein regarding Huawei's breach of what—according to Huawei's own admissions— are its FRAND commitments, equitably estop Huawei from asserting, and/or constitute waiver or implied waiver of, any rights to enforce any allegedly standard-essential patents against any entity allegedly practicing the standard, including L3Harris.

116.    Huawei's actions, including but not limited to those set forth herein regarding Huawei's breach of what—according to Huawei's own assertions—are its FRAND commitments, render Huawei's allegedly standard-essential patents unenforceable on grounds of unclean hands (or other equitable doctrines) against any entity allegedly practicing the standard, including Harris.

117.    Huawei is a member of, and an active participant in, standards setting organizations such as 3GPP and ETSI.  Dkt. 1 at ¶ 7.  On information and belief, Huawei did not

disclose the '2011, '5011, '371, and '624 Huawei Asserted Patents in compliance with the policies and practices of the associated standard setting organizations, to which Huawei was subject and obligated.

118.    Huawei admits that it is obligated to license its LTE standard essential patent portfolio (allegedly including the '2011, '5011, '371, and '624 Huawei Asserted Patents ("Huawei LTE Asserted Patents")) on FRAND terms.  E.D. Tex. Case No. 2:18-cv-00439-JRG, Dkt. 68 at 1 (". . . Huawei readily acknowledges that its patents are subject to FRAND obligations . . .").

119.    Harris was and remains a willing licensee, to the extent the Huawei LTE Asserted Patents are valid, enforceable, and infringed standard-essential patents.  As detailed in the pleadings of E.D. Tex. Case No. 2:18-cv-00439-JRG, Huawei sought to enter licensing negotiations with L3Harris concerning its Huawei's LTE and PoE standard essential patent portfolios, including by letter of March 31, 2019.   E.D. Tex. Case No. 2:18-cv-00439-JRG, Dkt. 56 at ¶ 36.  L3Harris responded to Huawei's March 31, 2019 letter on April 3, 2019, stating a willingness to include discussion of Huawei's patents in ongoing discussions.  *Id.*, Dkt. 72 at ¶ 36.  L3Harris further arranged a phone call with Huawei representatives and further responded on April 12, 2019 that L3Harris would provide more details concerning Huawei's March 31, 2019 letter.  *Id.*  On April 22, 2019, L3Harris emailed Huawei to ask if they could set up a call that week.  Huawei did not respond.  *Id.*  Instead, Huawei asserted its counterclaims for infringement of four allegedly standard-essential LTE patents on April 26, 2019.  *Id.*  Huawei asserted those counterclaims despite Harris's good faith responses and without having communicated specific offered FRAND license terms.  *Id.*  Responding to Huawei's surprise counterclaims, L3Harris stated again that it was a willing licensee.  *Id.* at ¶ 188.

120.    Huawei's Eastern District of Texas infringement counterclaims were severed into a separate action for trial purposes and were re-filed as a Complaint under a separate docket number on June 21, 2019.  E.D. Tex. Case No. 2:19-cv-00222-JRG, Dkt. 4.  Three weeks later, on July 12, 2019, Huawei filed the present action, asserting four additional allegedly standard-essential LTE patents.  Huawei filed the present action despite L3Harris's good faith responses and assurances that it was a willing licensee, and without Huawei having communicated specific offered FRAND license terms.

121.    Filing counterclaims for infringement against a willing licensee without having communicated terms of a FRAND offer breached Huawei's obligations and constituted standard-setting misconduct.  Further filing the present action against a willing licensee without having communicated terms of a FRAND offer breached Huawei's obligations and constituted standard-setting misconduct.  Further facts detailing Huawei's standard-setting misconduct are given below with respect to Harris's counterclaims.

122.    The described actions and conduct by Huawei constitute standard-setting misconduct, threatening continued harm to L3Harris and relevant third-parties, rendering the patents unenforceable.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (NO INJUNCTIVE RELIEF)

123.    Huawei's remedies at law are adequate, and its alleged injury is not immediate or irreparable, such that equitable relief would be inappropriate for any determined infringement of Huawei's Asserted Patents.  Further, according to Huawei's admissions, it has made binding commitments to license Huawei's Asserted Patents on FRAND terms and conditions, thereby knowingly surrendering its right to injunctive or other exclusionary relief.  By virtue of not

having offered L3Harris, a willing licensee, a license on FRAND terms and conditions, Huawei

has no legal right to injunctive relief.

## L3HARRIS TECHNOLOGIES, INC.'S COUNTERCLAIMS

Defendant and Counterclaimant L3Harris Technologies, Inc. ("L3Harris" or "Harris")

hereby asserts the following counterclaims in response to the Complaint filed by Huawei

Technologies Co. Ltd. ("Huawei") (Dkt. 1) as follows:

## PARTIES

124.     In its Complaint, Huawei avers that Huawei Technologies Co. Ltd. is a Chinese

company with a place of business at Huawei Industrial Base (Shenzhen Campus), Bantian,

Longgang District, Shenzhen 518129, People's Republic of China.

125.     On information and belief, Huawei Technologies Co. Ltd. is a parent company to

Huawei Device Co., Ltd., Huawei Technologies USA, Inc., and Huawei Device USA, Inc.  *See*

E.D. Tex. Case No. 2:18-cv-00439-JRG, Dkt. 32 at 1-2.

126.     L3Harris Technologies, Inc. is a Delaware corporation duly organized and

existing under the laws of the state of Delaware with its principal place of business at 1025 West

NASA Boulevard, Melbourne, Florida.

## JURISDICTION AND VENUE

127.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§

1331, 1338(a), 1338(b), 1367 as L3Harris counterclaims against Huawei pursuant to the patent

laws of the United States, Title 35, United States Code, and the Declaratory Judgment Act, 28

U.S.C. §§ 2201 and 2202. An actual, substantial and continuing justiciable controversy exists

between L3Harris and Huawei based on Huawei having filed its Complaint alleging infringement

of the Huawei Asserted Patents.

128.    Huawei has submitted to personal jurisdiction of this Court through the filing of its Complaint against L3Harris, and is additionally subject to personal jurisdiction of this Court due to its presence in, and systematic contact with this judicial district.

129.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b), (c), (d) and 1400(b), including because Huawei is a foreign corporation and "a defendant not resident in the United States may be sued in any judicial district" under 28 U.S.C. § 1391(c)(3).

## STANDARDS SETTING ORGANIZATIONS

130.    Standard development organizations and/or Standards Setting Organizations ("SSOs") are any organizations (e.g., Third Generation Partnership Project or 3GPP, or European Telecommunications Standards Institute or ETSI) which are active in the development of standards.  Standards play an important role in the development of wireless data and telecommunications.  Standards facilitate the development, improvement, and advancement of technology and products that interoperate with one another.

131.    Industry standards are typically drafted by members of a standard's organization as a matter of consensus.

132.    Because standardization promotes a market-wide use of SEPs, patent owners are incentivized to propose technologies covered by their patent rights such that every implementer who wishes to utilize interoperability must take a license to their patents to avoid infringement liabilities.

133.    Once a standard has been adopted, patents that are essential to the adopted standard, *i.e.*, those that claim technologies selected by the participants in the standards development process for inclusion in a standard, gain undue significance that they would not have had but for the adoption of the standard.

134.    The inclusion of patented technology into a standard enables the holders of the patented technology essential to the standard, if not otherwise constrained, to extract monopoly rents from implementers of a standard and/or prevent others from implementing the standard by refusing to license the patents on terms that would enable its implementation.

135.    In order to reduce the likelihood that implementers of standards will be subject to abusive practices by patent holders, SSOs have adopted rules, policies, and procedures that control the disclosure and licensing of patents that implementers may require in order to practice the standard under consideration.  These rules, policies, and/or procedures are set out in the intellectual property rights policies ("IPR policies") of the SSOs.  IPR policies generally require patent owners of essential patents to commit to license those patents on fair, reasonable, and non-discriminatory terms ("FRAND").  These FRAND terms are intended to prevent patent owners of essential patents from acquiring too much of the market power that would otherwise be inherent in owning an essential patent.

136.    It is important for SSOs to consider whether an entity that claims rights over a proposed technology has committed to make that technology available on FRAND terms and conditions.

137.    IPR policies facilitate an informed comparison of the members of the SSOs and their technologies.

**ETSI AND 3GPP STANDARDS BODIES AND IPR POLICIES**

138.    ETSI is an independent, non-profit SSO that produces globally-accepted standards for the telecommunications industry.  ETSI has more than 700 members from more than 60 countries across five continents.  In addition to its own activities, ETSI is also one of the SSOs that are organizational partners of the 3rd Generation Partnership Project ("3GPP"), which exists

to unite the SSOs in the development of worldwide standards for the telecommunications industry. Together, ETSI and its members have developed common technical standards that often become mandatory as, in some cases, national or international regulatory bodies require adherence to particular ETSI standards.  3GPP produces and maintains the world's most widely adopted cellular standards such as the Long Term Evolution ("LTE") standard.

139.    3GPP develops these standards through an open voluntary consensus-based process.

140.    Mobile standards, such as for third-generation ("3G") technologies and fourth generation ("4G") technologies, consist of voluminous sets of requirements and protocols that must be followed for mobile devices to connect to the mobile network.

141.    On information and belief, Huawei employees participate in 3GPP standardization, at least in part, through Huawei's membership in ETSI.

142.    ETSI recognizes that standards rely on technical contributions from various sources that may contain patented technologies and other protected rights which are commonly known as Intellectual Property Rights ("IPRs").

143.    3GPP produces technical specifications that are adopted as standards by Organizational Partners, such as ETSI.   3GPP was created to oversee work on global 3G cellular specifications and has subsequently worked on creating 4G specifications.  The 3GPP Organizational Partners agreed that members of a particular Organizational Partner would be bound by the IPR policy of that Organizational Partner when participating at 3GPP.

144.    ETSI has adopted an Intellectual Property Rights ("IPR") Policy, incorporated as Annex 6 of the ETSI Rules of Procedure.   The ETSI IPR Policy is governed by the laws of France, and provides that "[a]ny right granted to, and any obligation imposed on, a MEMBER

33

which derives from French law and which are not already contained in the national or

supranational law applicable to that MEMBER is to be understood as being of solely a

contractual nature."

145.     Among other requirements, the ETSI IPR Policy imposes on members an

obligation to disclose patents and patent applications to ETSI and its members that a member

believes are or may become essential to an ETSI standard.  Once such a disclosure is made, the

member is requested to submit an irrevocable undertaking confirming its willingness to license the

IPRs it has disclosed on FRAND terms and conditions.

146.     Specifically, Clause 4.1 of the ETSI IPR Policy provides as follows regarding the

disclosure obligation at ETSI:

> Subject to Clause 4.2 below, each MEMBER shall use its
> reasonable endeavors, in particular during the development of
> a STANDARD or TECHNICAL SPECIFICATION where it
> participates, to inform ETSI of ESSENTIAL IPRs in a timely
> fashion. In particular, a MEMBER submitting a technical
> proposal for a STANDARD or TECHNICAL
> SPECIFICATION shall, on a bona fide basis, draw the
> attention of ETSI to any of that MEMBER's IPR which might
> be ESSENTIAL if that proposal is adopted.

147.     In its second sentence, Clause 4.1 imposes a "particular" requirement on members

submitting a technical proposal to disclose the existence of any potentially essential IPR before

the proposal is adopted.

148.     The disclosure requirement under Clause 4.1 of the ETSI IPR Policy is intended to

ensure that when ETSI members (or participants at 3GPP) are deciding upon the functionality to

include in a standard specification, they have an understanding of the existence of IPR that may

potentially be implicated by the standard.    This knowledge allows members to make choices

about the standard with a better understanding of the consequences of their choices for

34

implementation of the standard.  ETSI and its members rely on the safeguards of the disclosure and FRAND licensing obligation to ensure the viability and commercial potential of the standards adopted by ETSI.

149.     The ETSI IPR Policy further requests that SEP owners submit an irrevocable written undertaking that they are prepared to grant irrevocable licenses on "fair, reasonable, and non-discriminatory" or FRAND terms and conditions.  Clause 6.1 states*:*

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:
>
> ● MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
> ● sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
> ● repair, use, or operate EQUIPMENT; and
> ● use METHODS.
>
> The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

150.     ETSI's IPR Policy was designed to benefit all ETSI members, as well as all other parties that implement an ETSI standard.  In particular, the Policy described in Clause 3.1 that it has the objective to "reduce the risk" to those implementing the standards or other technical specifications "that investment in the preparation, adoption and application of the STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."

151.     Through disclosure of potentially essential IPRs and obtaining FRAND commitments for them, ETSI is able to include technology in its standards that may be covered by IPRs with confidence that hold-up tactics by owners of declared SEPs will not undermine the subsequent widespread adoption of the standards.  If a FRAND undertaking is not made, the IPR Policy provides ETSI an opportunity, during the development of the standard, to ensure that the standard avoids the patent or patent application in question.

## HUAWEI DISCLOSURES TO 3GPP

152.     L3Harris is informed and believes that Huawei is a member of, and an active participant in, standards setting organizations such as 3GPP and ETSI.  Huawei Complaint at ¶ 7. Huawei admits that it is obligated to license its LTE standard essential patent portfolio (allegedly including the '2011, '5011, '371, and '624 Huawei Asserted Patents) on FRAND terms.  Case No. 2:18-cv-00439-JRG, Dkt. 68 at 1 (". . . Huawei readily acknowledges that its patents are subject to FRAND obligations . . .").

153.     Huawei violated its obligation as a member of ETSI to timely disclose the '2011, '5011, '371, and '624 Huawei LTE Asserted Patents (or patents or patent applications within the same families) in accordance with the requirements of the ETSI IPR Policy.

154.     As early as 1994, Clause 4.1 of the Policy required that "[e]ach MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted."

155.     Huawei was bound by the ETSI IPR Policy during its participation at ETSI and also at the 3rd Generation Partnership Project (3GPP), of which ETSI is an organizational

member.  ETSI and its members rely on the disclosure requirements to safeguard the standard-setting process and ensure that decisions regarding what technology to standardize are made with an understanding of the potential implications for those decisions on licensing patents that may be claimed essential to those technologies.

156.    Huawei failed to disclose the existence of its Huawei LTE Asserted Patents or family members of its Huawei LTE Asserted Patents during the standardization of cellular standards at ETSI and 3GPP, while participating in the development of technologies that it apparently believed were covered by patents now asserted against Harris.

157.    Huawei's failure to timely disclose IPRs constitutes at least a waiver of its rights to enforce any claimed-essential patents against any entity practicing the standard and renders the patents unenforceable.  Alternatively, this conduct estops Huawei from asserting the patents and/or bars Huawei's infringement claims through the doctrine of unclean hands.

## '2011 PATENT AND '5011 PATENT

158.    On March 12, 2013 Huawei filed U.S. patent application 13/797,587, which issued on June 30, 2015 as U.S. Patent No. 9,072,011.  The '2011 patent claims priority to Chinese Patent Application No. 200710076513 filed on August 22, 2007 and PCT Application No. PCT/CN2008/072090 filed on August 21, 2008.  The '2011 patent lists Yong Qiu, Min Huang, Ying Huang, and Hongzhuo Zhang as the named inventors.

159.    On June 29, 2015 Huawei filed U.S. patent application 14/753,834, which issued on May 16, 2017 as U.S. Patent No. 9,655,011.  The '5011 patent claims priority to Chinese Patent Application No. 200710076513 filed on August 22, 2007 and PCT Application No. PCT/CN2008/072090 filed on August 21, 2008.  The '5011 patent lists Yong Qiu, Min Huang, Ying Huang, and Hongzhuo Zhang as the named inventors.

160.    Huawei has alleged that the asserted '2011 and '5011 patents are essential to practicing certain aspects of the LTE standard relating to handover of a UE from a source to target eNB.

161.    During prosecution of the '011 patent family, Huawei admitted that the prior art, including as discussed in 3GPP TS 36.300, included allocation of a parameter (C-RNTI) by the Target eNB, and that the allegedly novel aspect of the inventions included that the source eNB allocated the C-RNTI.

162.    During prosecution, Huawei further identified the 36.300 standard, version 8.1.0 (2007-06) as prior art.

163.    The RAN WG2 (Radio Access Network Work Group 2) is the primary group responsible for the evolution of the 3GPP TS 36.300 standard.  On information and belief, Huawei representatives attended meetings of the RAN WG2.

164.    The RAN WG2 Meeting #58bis was held in Orlando, Florida between June 25-20, 2007 (see Minutes of 58bis TSG-RAN WG2 meeting (R2-073623).

165.    A Huawei member was the Vice-Chairman of meeting #58bis and made the following call for IPR:

> The attention of the delegates of this Working Group was drawn to the fact that 3GPP Individual Members have the obligation under the IPR Policies of their respective Organizational Partners to inform their respective Organizational Partners of Essential IPRs they become aware of.

> The delegates were asked to take note that they were hereby invited:
> - to investigate whether their organization or any other organization owns IPRs which were, or were likely to become Essential in respect of the work of 3GPP.
> - to notify their respective Organizational Partners of all potential IPRs, e.g., for ETSI, by means of the IPR Statement and the Licensing declaration forms (http://webapp.etsi.org/Ipr/).

166.    On information and belief, four Huawei representatives attended RAN WG2 Meeting #58bis where discussions included handover procedures.

167.    The RAN WG2 Meeting #59 was held in Athens, Greece between Aug. 20-24, 2007. During that meeting, the chairman also made a similar call for IPRs reminding delegates of their disclosure obligations. At least 4 Huawei representatives attended RAN WG2 Meeting #59 (see R2-074444).

168.    Also during that meeting, Benoist Sebire of Nokia Siemens Networks presented a draft Change Request (R2-073054), dated July 25, 2007, which, among other things, made proposed changes to 36.300 version 8.1.0.  See R2-074444 at 4.2.  One such change, includes proposed changes to the Handover procedure section 10.1.2.1, that includes a source eNB sending C-RNTI.  See R2-073054.

169.    This changed language, including the use of a source eNB sending C-RNTI, originated in a proposal (R2-072382) made at the 3GPP TSG-RAN WG2 Meeting #58, held in Orlando, Florida between June 25-29, 2007 by Nokia Siemens Networks and others (not Huawei).  At least 5 Huawei representatives attended RAN WG2 Meeting #58bis (see R2-073623).

170.    On August 22, 2007, Huawei filed Chinese application 2007 1 0076513 to which the '2011 and '5011 claim priority.

171.    On or around Aug. 31, 2007, Nokia Siemens Networks submitted Change Request 36.300 CR 0004 (R2-073863), which, among other things, made proposed changes to 36.300 version 8.1.0.  One such change, shown by Benoist Sebire, includes proposed changes to the Handover procedure, that includes a source eNB sending C-RNTI.   This Change Request was approved and incorporated into 3GPP TS 36.300 version 8.2.0.

172.    The RAN WG2 Meeting #60 was held in Jeju, Korea between Nov. 5-9, 2007. During this meeting, further discussions occurred on handover signaling, including C-RNTI allocations.  For example, see 50th TSG-RAN WG2 meeting minutes at 16-22.

173.    On information and belief, at least four delegates from Huawei attended RAN WG2 Meeting # 60, where the call for IPR was made.

174.    On information and belief, Huawei delegates continued to attend RAN WG2 Meetings where discussions about Handover procedures continued.

175.    Huawei presently alleges that L3Harris infringes the '011 patents by practicing version 8.5.0 of the 3GPP TS 36.331 and TS 36.423 standards which were published in March 2009.  *See e.g.*, Dkt. 1, ¶¶ 54-72.

176.    The TSG RAN WG2 is one group that participates in the evolution of the 3GPP TS 36.331 standard.

177.    Leading up to the March 2009 standards, 3GPP participants held numerous meetings and discussions about Handover procedures and specific signaling mechanism or parameters.  *See., e.g.,* RAN Plenary Meeting #42 meeting report at 21.

178.    Despite Huawei delegates participating in various meetings and discussions surrounding Handover procedures, Huawei did not disclose the existence of its '011 patent families or applications.

179.    On information and belief, to this day, Huawei has never officially declared this patent family essential to the 3GPP or ETSI standards bodies.

## '371 PATENT AND '624 PATENT

180.    On October 7, 2011 Huawei filed U.S. patent application 13/269,301, which issued on September 18, 2012 as U.S. Patent No. 8,270,371.  The '371 patent claims priority to

Chinese Patent Application No. 200710194669 filed on November 29, 2007, Chinese Patent

Application No. 200710147031 filed on August 23, 2007, Chinese Patent Application No.

200710140567 filed on August 13, 2007, and PCT Application No. PCT/CN2008/071970 filed

on August 13, 2008.  The '371 patent lists Hongzhuo Zhang, Yong Qiu, Ying Huang, and Qiang

Wang as the named inventors.

181.    On January 15, 2014 Huawei filed U.S. patent application 14/156,184, which

issued on December 15, 2015 as U.S. Patent No. 9,215,624.  The '624 patent claims priority to

Chinese Patent Application No. 200710194669 filed on November 29, 2007, Chinese Patent

Application No. 200710147031 filed on August 23, 2007, Chinese Patent Application No.

200710140567 filed on August 13, 2007, and PCT Application No. PCT/CN2008/071970 filed

on August 13, 2008.  The '624 patent lists Hongzhuo Zhang, Yong Qiu, Ying Huang, and Qiang

Wang as the named inventors.

182.    Huawei has alleged that the asserted '371 and '624 patents ('371 patent family)

are essential to practicing certain aspects of the LTE standard; alleging that the patents cover

"sending to the MME a reply including the NAS message and a cause value indicating the NAS

message has not been sent to the UE because of the handover of the UE." *See* Complaint, ¶¶ 82,

92, 29-30.

183.    During prosecution of the '371 patent family, Huawei identified numerous

proposals as relevant prior art from the 3GPP TSG-RAN WG3 Meetings, including Meeting #56

(May 7-11, 2007 in Kobe, Japan); Meeting #57 (Aug. 20-24, 2007 in Athens, Greece), as well as

proposals made during the TSG-RAN WG2 Meeting #58 (May 7-11, 2007 in Kobe Japan).

184.    On August 13, 2007, Huawei filed Chinese Application 2007 1 0140567 to which

the '371 patent family claims priority.

41

185.    On August 23, 2007, Huawei filed Chinese Application 2007 1 0147031 to which the '371 patent family claims priority.

186.    On November 29, 2007, Huawei filed Chinese Application 2007 1 0194669 to which the '371 patent family claims priority.

187.    During the time that Huawei was filing its multiple Chinese applications, it was also actively participating in the standards setting discussions and meetings and making proposals that Huawei believed were covered by its patent applications.

188.    For example, during the TSG RAN WG3 Meeting #57, Huawei submitted Tdoc R3-071463, titled "NAS message handling during X2 handover" in which Huawei analyzed alternative solutions proposed by others for a problem identified by others (R3-071284, attaching R2-072309).  Huawei proposed adopting the alternative of "indicating the non-delivery of the NAS message to the MME by means of a reject message (or an appropriate cause value in the procedure response message) in S1-AP"

189.    Huawei presented the R3-071463 proposal at Meeting #57 between Aug. 20-24, 2007.

190.    On information and belief, at TSG RAN WG3 Meeting #57, Huawei had at least four representatives present.

191.    During TSG RAN WG3 Meeting #57, the delegates were reminded of their IPR obligations:

> The attention of the delegates to the meeting of this Technical Specification Group was drawn to the fact that 3GPP Individual Members have the obligation under the IPR Policies of their respective Organizational Partners to inform their respective Organizational Partners of Essential IPRs they become aware of.
>
> The delegates were asked to take note that they were thereby invited:
> - to investigate whether their organization or any other organization owns IPRs which were, or were likely to become Essential in respect of the work of 3GPP.

- to notify their respective Organizational Partners of all potential IPRs,e.g., for ETSI, by means of the IPR Statement and the Licensing declaration forms (http://webapp.etsi.org/Ipr/).

192.    At the beginning of TSG-RAN WG3 Meeting #58 in Jeju Island, Korea held

between Nov 5-9, 2007, the chairman also reminded delegates of their IPR obligations:

The attention of the delegates to the meeting of this Technical Specification Group was drawn to the fact that 3GPP Individual Members have the obligation under the IPR Policies of their respective Organizational Partners to inform their respective Organizational Partners of Essential IPRs they become aware of.

The delegates were asked to take note that they were thereby invited:
- to investigate whether their organization or any other organization owns IPRs which were, or were likely to become Essential in respect of the work of 3GPP.
- to notify their respective Organizational Partners of all potential IPRs,e.g., for ETSI, by means of the IPR Statement and the Licensing declaration forms (http://webapp.etsi.org/Ipr/).
See R3-080002 revised report.

193.    On or around Oct. 23, 2007, Huawei prepared a Change Request titled "NAS

handling during X2 handover" which was to be discussed at the 3GPP TSG-RAN WG3 Meeting

#58.  Therein, Huawei proposed the following text: "If the NAS message is failed to be delivery

to UE (i.e. due to X2 handover reason), the eNB shall send the DOWNLINK NAS

TRANSPORT FAILURE message to MME with an appropriate cause value. The non-delivery

NAS message shall be contained in the DOWNLINK NAS TRANSPORT FAILURE message."

*See* R3-072082.

194.    On information and belief, the first named inventor of the '371 patent family,

Hongzhou Zhang, was involved in making the changes to the R3-072082 change request.  For

example, certain redline edits in R3-072082 show the reviewer's name 张宏卓 which are

Chinese characters translated by Google as Zhăng hóng zhuō.

195.    When R3-072082 was presented by Huawei during TSG-RAN WG3 Meeting #58, "It was proposed to base the text proposal on the decisions taken during the meeting and to align with [a proposal by Alcatel-Lucent]" *See* Meeting #58 minutes.

196.    During TSG-RAN WG3 Meeting #58, on or around November 9, 2007, Huawei submitted a Change Request to TS 36.300 version 8.2.0 in which it made certain modifications to R3-072082 as shown in Draft R3-072334.

197.    During TSG-RAN WG3 Meeting #58, on or around November 9, 2007, Huawei submitted another Change Request to TS 36.300 version 8.2.0 in which it further revised its change request and proposed a new feature for NAS handling during X2 handover.  *See* R3-072415.  During TSG-RAN WG3 Meeting #58, this CR was approved and later incorporated into 36.300 version 8.3.0, Section 19.2.2.6, which was published in December 2007.  *See* R3-072430 / R2-075506.

198.    Huawei now bases its infringement allegations on, inter alia, L3Harris's alleged practicing of section 19.2.2.6 of the 36.300 standard.  See Complaint ¶¶ 82, 92.

199.    Despite Huawei's—and the named inventor's—knowledge of its pending patent applications that Huawei now contends are essential to the standard, and despite its proposals and change requests, Huawei did not declare its '371 patent family as essential to any LTE standard for more than a year, until April of 2009.  *See* 200904-001 Disclosure 59.

## HUAWEI'S NEGOTIATIONS WITH L3HARRIS AND BREACH OF FRAND OBLIGATIONS

200.    L3Harris is informed and believes that Huawei is a member of, and an active participant in, standards setting organizations such as 3GPP, ETSI, and IEEE.  Huawei Complaint at ¶ 6.  Huawei admits that it is obligated to license the Huawei LTE Asserted Patents

on FRAND terms.  Case No. 2:18-cv-00439-JRG, Dkt. 68 at 1 (". . . Huawei readily acknowledges that its patents are subject to FRAND obligations . . .").

201.    A party that has made a FRAND commitment has committed that it will be prepared to license its patents.  That requires being prepared to propose specific licensing terms to a potential licensee.

202.    On information and belief, Huawei was aware of the impropriety of bringing an action for infringement after a party had expressed willingness to negotiate for a license on FRAND terms, but before offering such a license with specific terms including a royalty rate.

203.    In ITC litigation with Complainant InterDigital in 2012 (337-TA-800), Huawei recognized that FRAND-committed patents could be declared "void and unenforceable" where the patent holder initiated litigation against a party without proposing FRAND terms, arguing in its Response to the Third Amended Complaint: "The Asserted Patents are void and unenforceable by reason of the equitable doctrine of unclean hands based (among other things) on . . . their failure to comply with the rules and obligations of ETSI, 3GPP, and other SSOs including TIA by undertaking to grant but failing to propose RAND or FRAND terms for licensing the Asserted Patents they claim are essential."   Likewise, in the same litigation, Huawei recognized and argued in Respondents' July 15, 2013 Petition for Review that "a FRAND obligation requires more than good faith efforts, and actually requires an SEP holder to grant FRAND licenses."

204.    In a decision in litigation between Huawei and ZTE in the European Court of Justice, the Court required that "after the alleged infringer has expressed its willingness to conclude a licensing agreement on FRAND terms, it is for the proprietor of the SEP to present to that alleged infringer a specific, written offer for a license on FRAND terms, in accordance with

the undertaking given to the standardisation body, specifying, in particular, the amount of the royalty and the way in which that royalty is to be calculated." *Huawei Tech. v. ZTE Corp.*, C-170/13 (E.C.J. July 16, 2015) at ¶ 63.

205.   In recent litigation with PanOptis in the Eastern District of Texas, Huawei argued that a patent owner could be barred from asserting its ETSI and 3GPP standard FRAND-committed patents for "failing to offer and grant FRAND terms and conditions for licensing the Asserted Patents."   *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, E.D. Tex. Case No. 2:17-CV-00123-JRG-RSP, Dkt. 70 at 31-32.   Huawei further argued that: "The Asserted Patents are void and unenforceable by reason of the equitable doctrine of unclean hands based on (among other things) PanOptis' (or its predecessors-in-interest's) participation in ETSI and 3GPP, its commitments to license the Asserted Patents on FRAND terms and conditions, and its failure to offer FRAND terms and conditions for licensing the Asserted Patents." *Id.*, Dkt. 70 at 32. Huawei argued for (*id.* at Dkt. 179 at 17) and obtained a ruling that trial was needed to resolve factual questions, such as whether "offers made during negotiations … are consistent with the FRAND obligation." *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-CV-00123-JRG-RSP, 2018 WL 3375192, at *6 (E.D. Tex. July 11, 2018).   Huawei argued that pre-litigation offers there were inconsistent with FRAND obligations despite the patent owner having negotiated with Huawei over the royalty rate for three years before filing suit.  *Optis*, E.D. Tex. Case No. 2:17-CV-00123-JRG-RSP, Dkt. 153 at 1.  On information and belief, Huawei was aware of the impropriety of bringing its counterclaims for infringement prior to having even proposed a royalty rate to Harris.

206.   L3 Harris was and remains a willing licensee of the Huawei LTE Asserted Patents to the extent they are valid, enforceable, and infringed standard-essential patents.

207.    On December 5, 2018 and December 21, 2018, Huawei sent L3Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE and Power over Ethernet and including no information about offered license terms.  On December 21, 2018, Huawei identified certain Huawei patents to Harris's L3licensing representative, including some of the Huawei LTE Asserted Patents.  On March 31, 2019, Huawei sent a letter to L3Harris stating that a worldwide FRAND license would be available but included no information about offered license terms and no further identification of patents (that would be asserted or otherwise).

208.    L3Harris responded to Huawei's March 31, 2019 letter on April 3, 2019 stating a willingness to include discussion of Huawei's Asserted Patents in ongoing discussions.  E.D. Tex. Case No. 2:18-cv-00439-JRG, Dkt. 72 at ¶ 36.  L3Harris further arranged a phone call with Huawei representatives and further responded on April 12, 2019 that L3Harris would provide more details concerning Huawei's March 31, 2019 letter.  *Id.*  On April 22, 2019, L3Harris emailed Huawei to ask if they could set up a call that week.  Huawei did not respond.  *Id.*  Instead, Huawei asserted its Texas counterclaims for infringement on April 26, 2019 despite L3Harris's good faith responses and without having communicated specific offered license terms.  *Id.*  On May 1, 2019, after Huawei's counterclaims were filed, L3Harris again emailed Huawei seeking to set up the requested call.  *Id.*  Responding to Huawei's surprise counterclaims, L3Harris stated again that it was a willing licensee.  *Id.* at ¶ 188.

209.    Huawei's Eastern District of Texas infringement counterclaims were severed into a separate action for trial purposes and were re-filed as a Complaint under a separate docket number on June 21, 2019.  E.D. Tex. Case No. 2:19-cv-00222-JRG, Dkt. 4.  Three weeks later, on July 12, 2019, Huawei filed the present action, without any prior notice to L3Harris, asserting

four additional allegedly standard-essential LTE patents.  Huawei filed the present action despite L3Harris's good faith responses and assurances that it was a willing licensee, and without having communicated specific offered FRAND license terms.

210.    Contrary to the obligations expressed in its representations to L3Harris, Huawei did not make an offer to license Huawei's Asserted Patents on FRAND terms and conditions to L3Harris or otherwise negotiate a FRAND license in good faith before filing its counterclaims for patent infringement in the Eastern District of Texas or before filing this suit.  Huawei did not communicate terms, including economic terms, to L3Harris.  Huawei brought its counterclaims before even making any FRAND offer to L3Harris to license its LTE portfolio or the Huawei LTE Asserted Patents, and Huawei initiated this suit before even making any FRAND offer to L3Harris to license its LTE portfolio or the Huawei LTE Asserted Patents.

### THE FEDERAL TRADE COMMISSION'S ENFORCEMENT ACTIONS FOR SSO MISCONDUCT

211.    The Federal Trade Commission ("FTC") has recognized that the type of SSO misconduct Huawei has committed violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") which prohibits "unfair or deceptive acts or practices in or affecting commerce."

212.    First, the FTC has recognized that an SSO member's failure to disclose the existence of intellectual property rights relevant to an industry standard violates Section 5 of the FTC Act.  For example, in a complaint against Dell Computer Corporation, the FTC alleged that Dell's deception of an SSO regarding the existence of patents relating to the standard and subsequent assertion of those patents against implementers of the standard constituted unfair methods of competition that "restrained competition" in violation of Section 5.

213. Second, the FTC has recognized that reneging on FRAND commitments can violate Section 5 of the FTC Act.  In 2008, the FTC filed a complaint against Negotiated Data Solutions LLC in which it alleged that Negotiated Data "and its predecessor in interest, Vertical Networks, Inc. ('Vertical'), engaged in unfair acts or practices and unfair methods of competition through which it sought to break a licensing commitment that its predecessor, National Semiconductor ('National'), made to the Institute of Electrical and Electronics Engineers ('IEEE'), a standard setting organization, in 1994."  Specifically, the FTC alleged that although National had committed to license patents essential to an IEEE standard for $1,000, Vertical sought to rescind that commitment and sought licensing royalties at a "substantial increased over National's commitment to license the NWay technology for a one-time fee of one thousand dollars."

214. The FTC concluded that this breach of a licensing commitment caused or threatened to cause substantial harm to competition and consumers, including "increased royalties (or other payments) associated with the manufacture, sale, use or importation of products that implement an IEEE standard enabling autonegotiation by or with 802.3 compliant products," "increases in price and/or reductions in the use or output of products that implement an IEEE standard enabling autonegotiation by or with 802.3 compliant products," "decreased incentives on the part of semiconductor chip and LAN equipment manufacturers to produce products that implement IEEE standards enabling autonegotiation by or with 802.3 compliant products," "decreased incentives on the part of semiconductor chip and LAN equipment manufacturers and others to participate in IEEE or other standard setting activities," and "both within and outside the semiconductor chip and LAN equipment industries decreased reliance, or willingness to rely, on standards established by industry standard setting organizations."

## L3HARRIS'S PATENTED TECHNOLOGY

215.   L3Harris is an international communications and information technology company serving government and commercial markets in more than 150 countries.  Harris is a proven leader in tactical communications, avionics, air traffic management, space and intelligence, and weather systems.  L3Harris currently employs more than 20,000 scientists and engineers and has advanced facilities that promote innovation and collaboration.  L3Harris owns more than 3,000 patents that span various fields of technology.

216.   United States Patent No. 7,440,572 ("the '572 Patent"), entitled "Secure Wireless LAN Device and Associated Methods," was duly and lawfully issued October 21, 2008. L3Harris is the owner of all right, title, and interest in the '572 Patent.  A true and correct copy of the '572 Patent is attached hereto as Exhibit 1.

217.   The '572 Patent describes problems and shortcomings in the field of wireless networks and disclosed and claimed technical advances in the field of secure wireless local area networks.  *See, e.g.*, '572 patent at 1:64-67.  The background of the patent noted that encryption in wireless networks was accomplished, according to the IEEE 802.11 standard of the time, using the WEP algorithm.  *Id.* at 1:46-48.  That prior technique "only protects the data packet information and does not protect the physical layer header," creating a problem of "a reduced level of security"—such as when bad actors observe the unprotected header address information along with the "other stations on the network" that are expected to listen.  *Id.* at 1:51-54.  The patent also noted that existing alternatives, which could provide "confidentiality and end-to-end authentication," were "bulky and expensive" for the context of wireless networks.  *Id.* at 1:55-60. The claimed advances of the '572 patent solved this problem specific to wireless network security, and did so "without a significant increase in cost and/or complexity."  *Id.* at 1:64-67.

218.    Specifically, and for example, the '572 patent taught and claimed techniques for extending the scope of encryption by including a cryptography circuit in the wireless device, such that:

> The cryptography circuit may encrypt both address and data information for transmission, and decrypt both address and data information upon reception. Accordingly, a higher level of security may be provided by the encryption of the address and control portions of the transmitted packet contained within the MAC generated header.

*Id.* at 2:1-16; *see also* 4:20-24 ("higher level of security is thus provided."). As the patent noted: "This information is not encrypted in conventional LAN cryptographic devices." *Id.* The improvement of extending encryption to both address and data is captured in the claims. *See, e.g.*, *id.* at 7:52-64 (claim 1), 11:1-12 (claim 47).

219.    In addition, and for example, the '572 patent taught and claimed techniques for combining "cryptographically generated bits" with both address and data information. This represented a novel improvement over the prior art encryption methods like WEP, which did not add a plurality of encrypting bits to both the address and data information. *See, e.g.*, *id.* at 5:42-50. This improvement is captured in the claims. *See, e.g.*, *id.* at 7:52-64 (claim 1: "encrypting both address and data information for transmission by at least adding a plurality of encrypting bits to both the address and the data information").

220.    The specification provides further teaching of how the claimed advance can be implemented. *See, e.g.*, *id.* at Figs 7 & 8, 5:26-30; *see also* 2:32-35, 8:22-26 (teaching and claiming the addition of encrypting bits to the transmitted information). The claimed cryptography circuit with its improved encryption was also implemented by Harris in products described in the specification. *See id.* at Fig. 9, 5:53-65 (describing the Harris "Sierra"

cryptographic module), cover page (citing to Harris Product Sheet, "Sierra Cryptographic Module" Feb. 2000).

221.    United States Patent No. 7.082,117 ("the '117 Patent"), entitled "Mobile Ad-Hoc Network with Intrusion Detection Features and Related Methods," was duly and lawfully issued July 25, 2006.  L3Harris is the owner of all right, title, and interest in the '117 Patent.  A true and correct copy of the '117 Patent is attached hereto as Exhibit 2.

222.    The '117 Patent describes problems and shortcomings in the field of wireless networks and claims novel and inventive technological improvements and solutions to such problems and shortcomings.  For example, wireless local area networks (LAN) or metropolitan area networks (MAN) have significant drawbacks, including that they are readily available to would-be hackers who may attempt to intrude upon the network and compromise network security using an unauthorized wireless station.  Intrusion detection software might attempt to detect intruders by monitoring packet addresses and comparing them to known addresses of authorized network stations.  However, if a rogue station obtained access to an authorized address and/or ID, these approaches may not detect the intrusion of the rogue station into the networks.  The '117 Patent describes novel ways of monitoring transmissions and packets to provide intrusion detection features and related methods in wireless networks.  Exemplary ways of detecting intrusions include monitoring transmissions to detect frame check sequence (FCS) errors from a medium access control (MAC) address exceeding a threshold; monitoring transmissions to detect failed attempts to authenticate MAC addresses; monitoring requests-to-send and clear-to-send packets to detect illegal network allocation vector values; and monitoring transmissions to detect transmissions during contention or contention-free mode.

223.    United States Patent No. 6,986,161 ("the '161 Patent"), entitled "Mobile Ad-Hoc Network with Intrusion Detection Features and Related Methods," was duly and lawfully issued Jan. 10, 2006.  L3Harris is the owner of all right, title, and interest in the '161 Patent.  A true and correct copy of the '161 Patent is attached hereto as Exhibit 3.

224.    The '161 Patent describes problems and shortcomings in the field of wireless networks and claims novel and inventive technological improvements and solutions to such problems and shortcomings.  For example, wireless local area networks (LAN) or metropolitan area networks (MAN) have significant drawbacks, including that they are readily available to would-be hackers who may attempt to intrude upon the network and compromise network security using an unauthorized wireless station.  Intrusion detection software might attempt to detect intruders by monitoring packet addresses and comparing them to known addresses of authorized network stations.  However, if a rogue station obtained access to an authorized address and/or ID, these approaches may not detect the intrusion of the rogue station into the networks.  The '161 Patent describes novel ways of monitoring transmissions and packets to provide intrusion detection features and related methods in wireless networks.  Exemplary ways of detecting intrusions include detecting transmissions during an unauthorized period and integrity checking for values that do not correspond with their respective data packets; detecting usage of non-consecutive MAC sequence numbers; detecting a threshold number of collisions of packets having a predetermined packet type; and detecting a threshold number of collisions of a same MAC address.

225.    The '117 and '161 wireless network security patents were filed at a time when aspects of  security for wireless ad hoc networks were "largely undefined."  *See, e.g.*, '117 and '161 patents at 2:14-28.  The patents disclose and claim innovative and unconventional ways of

detecting rogue devices that gain access to an authorized address and/or ID.  *See, e.g.*, id.; see also '117 patent at 10:59-62 and '161 patent at 11:12-15.  The patented inventions addressed this problem of how to detect intrusions in the network by entities that attempt to mask their intrusion behind an otherwise legitimate network address.  *Id.*

226.    The patents describe a "policing station" that monitors transmissions among the wireless network nodes.  *See, e.g.*, '117 patent at 2:34-35, Figures 1-10.  They explain, and claim, various alternate intrusion detection methods that were unconventional at the time and improve upon the operation of the network by solving the stated problem.  *See, e.g.*, *id.* at Figures 11-21.  For example, Figures 9 and 19 show policing for and detecting "collisions of predetermined packet type."  The specification teaches "if a certain type of packet is supposed to have a time delay between transmissions, (e.g., a few seconds, etc.), if two such packet types are transmitted too close together (i.e., with less than the requisite delay time between them), this would be considered a collision."  '161 patent at 8:41-48.  This improved technique—which unlike prior techniques can detect intrusions regardless of whether the intruder is spoofing a known address—is captured in the claims.  *See, e.g.*, *id.* at 13:40-50 (claim 22: "detect collisions of packets having a predetermined packet type").  There are many other novel techniques described and claimed in the patents.

227.    As further examples, what is meant by "collisions of a same MAC address" is discussed in the '171 patent at Fig. 20, 10:14-22.  The '171 patent explains how to "detect contention-free mode operation outside of a CFP" at Fig. 4 & 14, 7:6-33, 9:25-39, 11:55-54.  It also explains the usefulness, and how to detect, an "illegal NAV value" at Fig. 3 & 13, 6:58-7:5, 13:22-35, and how to "detect failed attempts to authenticate MAC addresses" at Fig. 2 & 12, 6:32-47, 9:3-13, 12:24-36.  The disclosed and claimed inventions solve specific problems arising

in wireless computer networks with innovative solutions specific to wireless computer networks. For example, detecting a threshold number of "collisions of the same MAC address" improves the system by detecting when an unauthorized rogue device attempts to use a known address at the same time as a legitimate user. *See, e.g.*, '161 patent at Figs. 10 & 20, 10:33-42, 11:12-15, 14:8-19 (claim 29).

## HUAWEI'S USE OF L3HARRIS'S PATENTED TECHNOLOGY

228.    On information and belief, Huawei, including through its subsidiaries Huawei Device Co., Ltd., Huawei Technologies USA, Inc., and/or Huawei Device USA, Inc., makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States various enterprise networking equipment and consumer networking products that communicate using advanced Wi-Fi security protocols, such as IEEE 802.11i / WPA2 encryption and authentication. On information and belief, Huawei includes these technologies across an array of products including at least Huawei's access points, remote units, access controllers, switches, routers, and consumer products including smartphones, laptops, and tablets (the "Huawei Wi-Fi Products").

229.    On information and belief, Huawei, including through its subsidiaries Huawei Device Co., Ltd., Huawei Technologies USA, Inc., and/or Huawei Device USA, Inc., makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States enterprise networking equipment and consumer networking products compatible with 802.11a/b/g/n/ac standards (the "Huawei Wi-Fi Products"), including access points (*e.g.*, AP7060DN access points), access controllers (*e.g.*, AC6000 series access controllers), switches (*e.g.*, S6720-HI Series), routers (*e.g.*, AR120 series, AR160-M series, AR161W-P-M9, and AR169RW-P-M9), access networks (*e.g.*, DN8245 and HG8245H), smartphones (*e.g.*, Mate 20),

laptops (*e.g.*, Matebook 13), and tablets (*e.g.*, Mediapad M5) and other models that include similar functionality.

230.    The Accused Huawei Access Points (APs) include, but are not limited to: AD9000 series, AP1000 series, AP2000 series, AP3000 series, AP4000 series, AP5000 series, AP6000 series, AP7000 series, AP8000 series, AP9000 series Access Points, and other models that include similar functionality.

231.    The Accused Huawei Remote Units include, but are not limited to: R230D, R240D, R250D, R250D-E, R251D, R251D-E, R450D Remote Units and other models that include similar functionality.

232.    The Accused Huawei Access Controllers (ACs) include, but are not limited to: AC6800V, AC6605, AC6005, ENP Series, ACU2 Wireless Access Controller Unit, and other models that include similar functionality.

233.    The Accused Huawei switches include, but are not limited to: S12700 Series Switches, S5720-LI, S5720-SI, and S5720-HI Switches, S5700-SI Series Standard Gigabit Switches, S5700-EI Series Enhanced Gigabit Switches, S3700 Series Enterprise Switches, S6720-HI Series Agile Fixed Switches, S5730-HI Series Next generation Agile Switch and other models that include similar functionality.

234.    The Accused Huawei routers include, but are not limited to, NE9000 Series, NE 5000E Cluster, Net Engine40E Series, NE20E Series, NE05E Series, NE08E Series, ME60 Series, AR Series (including without limitation the AR120, AR150, AR160 and AR160-M, AR200, AR500, AR502, AR510, AR1200, AR2200, AR3200, and AR3600 series), and other models that include similar functionality.

235.    The Accused Huawei phones include, but are not limited to, P30, P30 lite, P30 Pro, P20, P20 lite, P20 Pro, Mate 20, Mate 20 X, Mate 20 Pro, Mate 20 lite, Porsche Design Huawei Mate 20 RS, Mate 10, Mate 10 Pro, Porsche Design Huawei Mate 10, Porsche Design Huawei Mate RS, Mate 9, Mate SE, Ascend XT2, Elate, Honor 7X, Honor 8, Honor 8A, Honor 8X, Honor 10, Honor 10 lite, Y7, Y9, nova 3, nova 4, P Smart, and other models that include similar functionality.

236.    The Accused Huawei laptops include, but are not limited to, Matebook E, Matebook D, Matebook D 14, Matebook X, Matebook X Pro, Matebook 13, and other models that include similar functionality.

237.    The Accused Huawei tablets include, but are not limited to, MediaPad M5 (also including 8.2", 10.8", lite, lite 8", and Pro varieties), MediaPad T5, MediaPad M3, MediaPad M3 lite, MediaPad T3 (also including 7, 8, and 10 varieties), MediaPad M2, MediaPad T1, and other models that include similar functionality.

238.    On information and belief, Huawei, including through its subsidiaries Huawei Device Co., Ltd., Huawei Technologies USA, Inc., and/or Huawei Device USA, Inc., makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States various enterprise networking equipment and consumer networking products that incorporate Huawei's Wireless Intrusion Detection System (WIDS), Wireless Intrusion Prevention System (WIPS), Wi-Fi Threat Detection engine, and/or equivalent features with similar functionality.  These technologies ensure network border security for Huawei networking products operating in small-, medium-, and large-scale wireless networks (including ad hoc networks) by helping detect attacks from rogue devices.  On information and belief, Huawei includes these technologies across an array of Huawei Wi-Fi Products including at least Huawei's access points, remote

units, access controllers, switches, routers, and consumer products including smartphones, laptops, and tablets.  For example, and without limitation, the Huawei AP7060DN Access Point Datasheet indicates that the product supports: "Wireless intrusion detection system (WIDS) and wireless intrusion prevention system (WIPS), including rogue device detection and countermeasure, attack detection and dynamic blacklist, and STA/AP blacklist and whitelist." *See also* Huawei Enterprise AP Series 802.11ac Brochure at 5 (indicating support for "WIDS," as well as Mesh networking, in AP5030DN, AP5130DN, AP7030DE, AP8030DN, AP8130DN, and AP9130DN access points); *see also* Huawei AP5030DN and AP5130DN Access Points Datasheet at 2, 6.

239.    Wireless Mesh Networks (WMN) consist of multiple wirelessly connected access points (nodes) that can automatically establish a wireless multi-hop network that is connected to a wired network through a portal node.  Nodes in a WMN can automatically establish ad-hoc topology and maintain mesh connectivity.  On information and belief, many of the Huawei Wi-Fi Products listed above have mesh networking capability.  For example, and without limitation, the Huawei AP8050DN & AP8150DN Access Points Datasheet indicates that those products support "Mesh networking in Fit AP mode" and "Dual-MPP Mesh networking."  ). S*ee also* Huawei AP5030DN and AP5130DN Access Points Datasheet at 5.

240.    The Huawei Wi-Fi Products also participate in and monitor wireless mobile ad hoc networks.  For example, and without limitation, many of the Huawei Wi-Fi Products listed above support Hotspot 2.0 / IEEE 802.11u technology and/or other ad hoc wireless networking methods.  *See, e.g.*, Huawei AP7060DN Access Point Datasheet at 5; Huawei AP5030DN and AP5130DN Access Points Datasheet at 5.  On information and belief, Huawei's consumer

laptops, tablets, and smartphones can connect with and participate in Hotspot 2.0 and/or other wireless mobile ad hoc networks.

## COUNT I
## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '969 PATENT)

241.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

242.    Huawei's Complaint alleged that L3Harris infringes the '969 Patent, even though L3Harris has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '969 Patent.

243.    For example, and without limitation, Huawei's Complaint does not identify how the '969 Accused products include a "thin client" according to asserted claim 1.  Huawei's Complaint does not identify how the '969 Accused products include a "stylus" according to asserted claim 1.  Huawei's Complaint alleges facts to be true and claim limitations to be present on "information and belief" without providing any factual support—such as, for example, claim limitations requiring that "an edge of the map cannot be panned beyond a center of a view."

244.    An actual, continuing and justiciable controversy exists between L3Harris and Huawei as to L3Harris's non-infringement of the '969 Patent as evidenced by Huawei's Complaint and L3Harris's Answer, as set forth above.  Absent a declaration of non-infringement, Huawei will continue to wrongfully assert the '969 Patent against L3Harris and will continue to cause L3Harris injury and damage.

245.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, L3Harris requests a judicial determination and declaration that L3Harris does not and has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of

the '969 Patent either literally or under the doctrine of equivalents, willfully, or in any other manner.

## COUNT II
## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '2011 PATENT)

246.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

247.    Huawei's Complaint alleged that L3Harris infringes the '2011 Patent, even though L3Harris has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '2011 Patent.

248.    For example, and without limitation, Huawei's Complaint does not identify any specific product as a '2011 Accused Product.   Huawei's Complaint does not demonstrate that any '2011 Accused Product practices the particular standards and versions thereof cited in the Complaint, and fails to adequately map the identified sections and parameters to specific claim limitations as they will be construed.  Huawei's Complaint also fails to identify whether the identified standard elements and processes are mandatory or optional.  L3Harris asserts that methods exist by which a device can be configured to act in compliance with the cited standard sections without infringing claim 8.

249.    An actual, continuing and justiciable controversy exists between L3Harris and Huawei as to L3Harris's non-infringement of the '2011 Patent as evidenced by Huawei's Complaint and L3Harris's Answer, as set forth above.  Absent a declaration of non-infringement, Huawei will continue to wrongfully assert the '2011 Patent against L3Harris and will continue to cause L3Harris injury and damage.

250.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, L3Harris requests a judicial determination and declaration that L3Harris does not and has not infringed,

contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '2011 Patent either literally or under the doctrine of equivalents, willfully, or in any other manner.

## COUNT III
## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '5011 PATENT)

251.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

252.    Huawei's Complaint alleged that L3Harris infringes the '5011 Patent, even though L3Harris has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '5011 Patent.

253.    For example, and without limitation, Huawei's Complaint does not identify any specific product as a '5011 Accused Product.   Huawei's Complaint does not demonstrate that any '5011 Accused Product practices the particular standards and versions thereof cited in the Complaint, and fails to adequately map the identified sections and parameters to specific claim limitations as they will be construed.  Huawei's Complaint also fails to identify whether the identified standard elements and processes are mandatory or optional.  L3Harris asserts that methods exist by which a device can be configured to act in compliance with the cited standard sections without infringing claim 8.

254.    An actual, continuing and justiciable controversy exists between L3Harris and Huawei as to L3Harris's non-infringement of the '5011 Patent as evidenced by Huawei's Complaint and L3Harris's Answer, as set forth above.  Absent a declaration of non-infringement, Huawei will continue to wrongfully assert the '5011 Patent against L3Harris and will continue to cause L3Harris injury and damage.

255.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., L3Harris requests a judicial determination and declaration that L3Harris does not and has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '5011 Patent either literally or under the doctrine of equivalents, willfully, or in any other manner.

## COUNT IV
## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '371 PATENT)

256.     L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

257.     Huawei's Complaint alleged that L3Harris infringes the '371 Patent, even though L3Harris has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '371 Patent.

258.     For example, and without limitation, Huawei's Complaint does not identify any specific product as a '371 Accused Product.   Huawei's Complaint does not demonstrate that any '371 Accused Product practices the particular standards and versions thereof cited in the Complaint, and fails to adequately map the identified standard sections to specific claim limitations as they will be construed.  Huawei's Complaint alleges facts to be true and claim limitations to be present on "information and belief" without providing any factual support.  Dkt. 1 at ¶ 82.  Huawei's Complaint also fails to identify whether the identified standard elements and processes are mandatory or optional.  L3Harris asserts that methods exist by which a device can be configured to act in compliance with the cited standard sections without infringing claim 1.

259.     An actual, continuing and justiciable controversy exists between L3Harris and Huawei as to L3Harris's non-infringement of the '371 Patent as evidenced by Huawei's Complaint and L3Harris's Answer, as set forth above.  Absent a declaration of non-infringement,

Huawei will continue to wrongfully assert the '371 Patent against L3Harris and will continue to cause L3Harris injury and damage.

260.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, L3Harris requests a judicial determination and declaration that L3Harris does not and has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '371 Patent either literally or under the doctrine of equivalents, willfully, or in any other manner.

## COUNT V
## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '624 PATENT)

261.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

262.    Huawei's Complaint alleged that L3Harris infringes the '624 Patent, even though L3Harris has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '624 Patent.

263.    For example, and without limitation, Huawei's Complaint does not identify any specific product as a '624 Accused Product.   Huawei's Complaint does not demonstrate that any '624 Accused Product practices the particular standards and versions thereof cited in the Complaint, and fails to adequately map the identified standard sections to specific claim limitations as they will be construed.   Huawei's Complaint alleges facts to be true and claim limitations to be present on "information and belief" without providing any factual support.   Dkt. 1 at ¶ 92.   Huawei's Complaint also fails to identify whether the identified standard elements and processes are mandatory or optional.   L3Harris asserts that methods exist by which a device can be configured to act in compliance with the cited standard sections without infringing claim 1.

264.     An actual, continuing and justiciable controversy exists between L3Harris and Huawei as to L3Harris's non-infringement of the '624 Patent as evidenced by Huawei's Complaint and L3Harris's Answer, as set forth above.  Absent a declaration of non-infringement, Huawei will continue to wrongfully assert the '624 Patent against L3Harris and will continue to cause L3Harris injury and damage.

265.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, L3Harris requests a judicial determination and declaration that L3Harris does not and has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '624 Patent either literally or under the doctrine of equivalents, willfully, or in any other manner.

## COUNT VI
## (DECLARATORY JUDGMENT OF INVALIDITY OF '989 PATENT)

266.     L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

267.     An actual, continuing and justiciable controversy exists between L3Harris and Huawei as to the validity of the claims of the '989 Patent as evidenced by Huawei's counterclaims and L3Harris's Answer, as set forth above.  Absent a declaration of invalidity, Huawei will continue to wrongfully assert the '989 Patent against L3Harris and will continue to cause L3Harris injury and damage.

268.     For example, and without limitation, the '969 patent is invalid because it is not novel and is obvious.  The alleged inventive concepts asserted in Huawei's Complaint to be novel and/or a technical solution—such as "distinguishing between a tap and a drag" or "gesture interpretation rules"—are instead ordinary, obvious aspects of human communication and manipulation of tools.  They were also concepts available on graphical touchscreen interfaces of

devices, such as the Apple Newton (see Newton Apple MessagePad Handbook, available at
http://www.retrocomputing.net/info/siti/ManualiApple/article.html-artnum=50092.htm), long
before the alleged invention of the '969 patent.  In addition, and in part for these same reasons,
the claims of the '969 patent are invalid as ineligible under 35 U.S.C. § 101.

269.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, L3Harris
requests a judicial determination and declaration that the claims of the '989 Patent are invalid for
failure to comply with one or more of the statutory requirements for patentability set forth in
Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119
and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT VII
## (DECLARATORY JUDGMENT OF INVALIDITY OF '2011 PATENT)

270.    L3Harris repeats and incorporates by reference the allegations contained in the
preceding paragraphs as if fully set forth herein.

271.    An actual, continuing and justiciable controversy exists between L3Harris and
Huawei as to the validity of the claims of the '2011 Patent as evidenced by Huawei's
counterclaims and L3Answer, as set forth above.  Absent a declaration of invalidity, Huawei will
continue to wrongfully assert the '2011 Patent against L3Harris and will continue to cause
L3Harris injury and damage.

272.    For example, and without limitation, the '2011 patent is invalid because it is not
novel and is obvious.  The alleged inventive concepts asserted in Huawei's Complaint to be
novel and/or a technical solution—such as having the source eNB send handover information
(Dkt. 1 at ¶ 23)—were proposed and included in the draft standard by others, at meetings Huawei
representatives attended, prior to the filing of Huawei's earliest claimed priority application.  See

factual discussion above.  In addition, including because they reference only abstract steps, the claims of the '2011 patent are invalid as ineligible under 35 U.S.C. § 101.

273.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., L3Harris requests a judicial determination and declaration that the claims of the '2011 Patent are invalid for failure to comply with one or more of the statutory requirements for patentability set forth in Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119 and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT VIII
## (DECLARATORY JUDGMENT OF INVALIDITY OF '5011 PATENT)

274.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

275.    An actual, continuing and justiciable controversy exists between L3Harris and Huawei as to the validity of the claims of the '5011 Patent as evidenced by Huawei's counterclaims and L3Harris's Answer, as set forth above.  Absent a declaration of invalidity, Huawei will continue to wrongfully assert the '5011 Patent against L3Harris and will continue to cause L3Harris injury and damage.

276.    For example, and without limitation, the '5011 patent is invalid because it is not novel and is obvious.  The alleged inventive concepts asserted in Huawei's Complaint to be novel and/or a technical solution—such as having the source eNB send handover information (Dkt. 1 at ¶ 23)—were proposed and included in the draft standard by others, at meetings Huawei representatives attended, prior to the filing of Huawei's earliest claimed priority application.  See factual discussion above.  In addition, including because they reference only abstract steps, the claims of the '5011 patent are invalid as ineligible under 35 U.S.C. § 101.

277.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, L3Harris requests a judicial determination and declaration that the claims of the '5011 Patent are invalid for failure to comply with one or more of the statutory requirements for patentability set forth in Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119 and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT IX
## (DECLARATORY JUDGMENT OF INVALIDITY OF '371 PATENT)

278.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

279.    An actual, continuing and justiciable controversy exists between L3Harris and Huawei as to the validity of the claims of the '371 Patent as evidenced by Huawei's counterclaims and L3Harris's Answer, as set forth above.  Absent a declaration of invalidity, Huawei will continue to wrongfully assert the '371 Patent against L3Harris and will continue to cause L3Harris injury and damage.

280.    For example, and without limitation, the '371 patent is invalid because it is not novel and is obvious.  The alleged inventive concepts asserted in Huawei's Complaint to be novel and/or a technical solution—such as sending a NAS message back to the MME with a non-delivery cause value (Dkt. 1 at ¶ 29)—were first proposed by others, at meetings Huawei representatives attended, prior to the filing of Huawei's earliest claimed priority application.  See factual discussion above.  In addition, including because they reference only abstract steps, the claims of the '371 patent are invalid as ineligible under 35 U.S.C. § 101.

281.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, L3Harris requests a judicial determination and declaration that the claims of the ' 371 Patent are invalid for failure to comply with one or more of the statutory requirements for patentability set forth in

Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119 and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT X
## (DECLARATORY JUDGMENT OF INVALIDITY OF '624 PATENT)

282.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

283.    An actual, continuing and justiciable controversy exists between L3Harris and Huawei as to the validity of the claims of the '624 Patent as evidenced by Huawei's counterclaims and L3Harris's Answer, as set forth above.  Absent a declaration of invalidity, Huawei will continue to wrongfully assert the '624 Patent against L3Harris and will continue to cause L3Harris injury and damage.

284.    For example, and without limitation, the '624 patent is invalid because it is not novel and is obvious.  The alleged inventive concepts asserted in Huawei's Complaint to be novel and/or a technical solution—such as sending a NAS message back to the MME with a non-delivery cause value (Dkt. 1 at ¶ 29)—were first proposed by others, at meetings Huawei representatives attended, prior to the filing of Huawei's earliest claimed priority application.  See factual discussion above.  In addition, including because they reference only abstract steps, the claims of the '624 patent are invalid as ineligible under 35 U.S.C. § 101.

285.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., L3Harris requests a judicial determination and declaration that the claims of the '624 Patent are invalid for failure to comply with one or more of the statutory requirements for patentability set forth in Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119 and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT XI
## (BREACH OF CONTRACT)

286.     L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

287.     L3Harris is informed and believes that Huawei has declared at least the '2011, '5011, '371, and '624 ("Huawei Asserted LTE Patents") patent families as allegedly essential to the 3GPP and/or ETSI standards and has agreed to license these patents and other Huawei patents on FRAND terms.

288.     L3Harris is informed and believes that Huawei has submitted a general IPR licensing declaration whereby it has agreed to license any IPRs that it believes are essential to any ETSI Standards and Technical Specifications in accordance with Clause 6.1 of the ETSI IPR Policy.

289.     L3Harris is informed and believes that Harris has entered into express or implied contractual commitments, in accordance with the applicable rules and intellectual property rights policies of the applicable SSOs, to grant licenses to each of the Huawei Asserted Patents on fair, reasonable and nondiscriminatory ("FRAND") terms and conditions.  These FRAND obligations are found in Intellectual Property Policies adopted by ETSI and 3GPP, including but not limited to clause 6.1 of the ETSI IPR Policy, Article 5.

290.     Initially, as an independent breach of its contractual obligations to ETSI, 3GPP, and to L3Harris, Huawei failed to timely disclose its allegedly essential patents in accordance with the requirements of the ETSI IPR Policy.

291.     As described above, by eventually committing to license its declared-essential patents on FRAND terms to all parties practicing the ETSI/3GPP standards, Huawei entered into contractual commitments with ETSI and/or 3GPP obligating it to license 3GPP and/or ETSI's

members and suppliers of products that support the standard (as third-party beneficiaries) on FRAND terms.  Huawei's FRAND commitments impose ongoing, continuing contractual obligations on Huawei.

292.    By initiating litigation against L3Harris before making any FRAND compliant licensing offer, Huawei has breached its FRAND commitment to be prepared to license the Huawei LTE Asserted Patents.

293.    In addition, by failing to provide Harris with FRAND license terms for each of the Asserted Patents—even after bringing its claims for infringement—Huawei has breached its FRAND commitments specific to each of the Huawei LTE Asserted Patents.

294.    As a result of these multiple contractual breaches, L3Harris has been injured, including in its business or property.   L3Harris has been forced to defend groundless infringement claims and has incurred substantial expense in doing so.

## COUNT XII
## (DECLARATORY JUDGMENT THAT HUAWEI HAS NOT MADE A FRAND OFFER)

295.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

296.    There is a dispute between the parties concerning whether Huawei has complied with its FRAND obligations to offer L3Harris a license on fair, reasonable and nondiscriminatory terms.  The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

297.    Huawei has failed to offer license terms conforming to applicable legal and equitable requirements or provide a date certain by which it will make such an offer.

298.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., L3Harris requests a judicial determination and declaration that Huawei has not offered license terms to L3Harris conforming to applicable legal and equitable requirements.

## COUNT XIII
## (BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING)

299.     L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

300.     There is an implied duty of good faith and fair dealing in every contract.  This duty applies to FRAND commitments no less than to any other contract.

301.     Huawei has failed to comport with the implied duty of good faith and fair dealing inherent in every contract, including by failing to make a FRAND offer conforming to applicable legal and equitable requirements and by filing suit against L3Harris before making any FRAND offer.

302.     As a result of Huawei's breach of the implied covenant of good faith and fair dealing, L3Harris has been injured in its business and is threatened by loss of profits, customers, goodwill and product image.

## COUNT XIV
## (PROMISSORY ESTOPPEL)

303.     L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

304.     L3Harris is informed and believes that Huawei has entered into express or implied contractual commitments, in accordance with the applicable rules and IPR policies of the applicable SSOs, to grant licenses to the Huawei LTE Asserted Patents on FRAND terms and conditions.

305.    Huawei's declarations and representations of essentiality constitute an express or implied contractual commitment with ETSI, 3GPP, and its members, affiliates and adopters.

306.    Each third party that would potentially implement the technologies covered by those standards was and is an intended beneficiary to those contracts.

307.    The intended purpose of Huawei's (and/or its predecessor in interest's) promises was to induce reliance.  Huawei knew or should have reasonably expected that this promise would induce companies producing products incorporating the standards to develop products compliant with the relevant standards.

308.    Huawei asserts that L3Harris, L3Harris's vendors and partners, and third-parties have developed, marketed and/or used products and services that allegedly incorporate the standards.  Any such demonstrated incorporation was done in reliance on Huawei's promises.

309.    Huawei is estopped from reneging on these promises to 3GPP, ETSI, and/or their Organizational Partners and third-party beneficiaries under the doctrine of promissory estoppel.

310.    L3Harris has been and continues to be harmed as a result of its reasonable reliance on Huawei's promises and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

311.    L3Harris will suffer irreparable injury by reason of the acts and conduct of Huawei alleged above unless and until the court enjoin such acts, practices and conduct.

## COUNT XV
## (WAIVER)

312.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

313.    L3Harris is informed and believes that Huawei has entered into express or implied contractual commitments, in accordance with the applicable rules and IPR policies of the

applicable SSOs, to grant licenses to the Huawei LTE Asserted Patents on FRAND terms and conditions.

314.   Huawei's declarations and representations of essentiality constitute an express or implied contractual commitment with ETSI, 3GPP, and its members, affiliates and adopters.

315.   Each third party that would potentially implement the technologies covered by those standards was and is an intended beneficiary to those contracts.

316.   Through this express statement, Huawei voluntarily and intentionally waived its rights to obtain compensation for any allegedly essential patents for 3GPP and ETSI Standards other than at reasonable rates and on non-discriminatory terms.

317.   L3Harris will suffer irreparable injury by reason of the acts and conduct of Huawei alleged above until and unless the court enjoins such acts, practices, and conduct.

## COUNT XVI
## (DECLARATORY JUDGMENT THAT PATENTS ARE UNENFORCEABLE)

318.   L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

319.   There is a dispute between the parties concerning whether Huawei has complied with its FRAND obligations to offer L3Harris a license on fair, reasonable and nondiscriminatory terms.  The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

320.   Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., L3Harris requests a judicial determination and declaration that Huawei's LTE Asserted Patents are unenforceable due to its conduct with respect to SSO standardization efforts described above and/or its conduct with respect to L3Harris described above.

## COUNT XVII
## (VIOLATION OF FLORIDA UNFAIR COMPETITION LAW)

321.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.  L3Harris also references its Florida unfair competition law counterclaim in E.D. Tex. Case No. 2:19-cv-00222-JRG, Dkt. 5 at ¶¶ 286-294; *see also* E.D. Tex. Case No. 2:18-cv-00439-JRG (Lead Case), Dkt. 78, 83 (opposing Motion to Dismiss state law claims).

322.    Florida's Consumer protection act, including FLA. STAT. § 501.204 states that "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  And further explains: "It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017."

323.    The FTC has recognized that reneging on FRAND commitments can violate Section 5 of the FTC Act.  *In re Motorola Mobility LLC,* Docket No. C-4410; *In re Negotiated Data Solutions LLC,* Docket No. C-4234.

324.    Huawei has reneged on the FRAND commitments to which its Huawei LTE Asserted Patents are subject.

325.    Huawei's unfair and fraudulent business acts and practices are a direct and proximate cause of injury to the public and L3Harris.

326.    Huawei's unlawful, anticompetitive, and unfair conduct constitutes unfair competition under Florida law and has interfered or threatens to interfere with competition and L3Harris's ability to conduct its business.

327.    Huawei has committed unlawful and unfair acts that constitute violations of Section 5 of the FTC Act, including: (a) failing to timely disclose the existence of patent or patent applications related to the Huawei LTE Asserted Patents in accordance with the requirements of the 3GPP and/or ETSI IPR Policy, and (b) failing to abide by its FRAND commitments, including refusing to license the Huawei LTE Asserted Patents on FRAND terms and conditions.

328.    As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, there is a significant threat of injury to downstream price, quality, innovation, and consumer choice for cellular services and products, thereby causing injury to consumers in Florida and elsewhere.  These threatened injuries include the inevitable passing on to consumers of improper royalties demanded by Huawei and decreases in innovation, quality, and consumer choice for products and services that support the 4G standard, as well as decreased incentives to participate in standard setting generally and to support products that rely on standards.

329.    As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, Huawei has interfered with L3Harris's ability to do business in Florida and elsewhere by, among other things: (a) causing L3Harris to face a threat of loss of profits and loss of customers; and (b) being forced to expend money and other resources defending against Huawei's actions notwithstanding that Huawei has committed to license the Huawei LTE Asserted Patents on FRAND terms.  As a result, L3Harris is entitled to damages, and is additionally entitled to attorneys' fees, including pursuant to FLA. STAT. § 501.2105.

## COUNT XVIII
## (INFRINGEMENT OF U.S. PATENT NO. 7,440,572)

330.    L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

331.    Huawei, including through its subsidiaries Huawei Device Co., Ltd., Huawei Technologies USA, Inc., and/or Huawei Device USA, Inc., makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that comply with or operate compatibly with the "WPA2" IEEE 802.11i (published as IEEE Std 802.11-2007) standards that directly infringe the '572 Patent, including but not limited to the Huawei Wi-Fi Products identified above (the '572 Accused Products).  For example, and without limitation, Huawei's EMUI 9.0 Security Technology White Paper at 17, available at https://consumer.huawei.com/en/privacy/whitepaper/, indicates that its consumer products and devices running Huawei's customized EMUI mobile operating system support WPA2 PSK encryption and authentication "to ensure the security of the connections."

332.    In addition, Huawei's smartphones, including without limitation its Mate 20 product running EMUI and Android software, communicate using WPA2 PSK (CCMP mode) encryption and authentication:



333.    In addition, Huawei's laptops, including without limitation its Matebook 13 product, communicate using WPA2 PSK (CCMP mode) encryption and authentication, including when communicating with Huawei's smartphones and other WLAN devices:



334.    Huawei's '572 Accused Products infringe one or more claims of the '572 Patent, including without limitation claim 1 of the '572 Patent.

335.    The '572 Accused Products comprise a housing in which the electronic components of the device are contained.  For example, and without limitation:



336.    The '572 Accused Products comprise a wireless transceiver carried by said housing.  For example, because the '572 Accused Products comply with IEEE 802.11i, their housings contain a wireless transceiver.  *See, e.g.*, IEEE Std 802.11-2007 at p. 14.  ("3.136 station (STA): Any device that contains an IEEE 802.11-conformant medium access control (MAC) and physical layer (PHY) interface to the wireless medium (WM)."); *see also id.* at 5 ("3.3 access point (AP): Any entity that has station (STA) functionality and provides access to the distribution services, via the wireless medium (WM) for associated STAs.").

337.    The '572 Accused Products comprise a MAC carried by said housing for implementing a predetermined wireless LAN MAC protocol.  For example, because the '572 Accused Products comply with IEEE 802.11i standard, they use the LAN MAC protocol specified in detail in the standard.  *See, e.g.*, IEEE Std 802.11-2007 at p. 251 ("9. MAC sublayer functional description").

338.    The '572 Accused Products comprise a cryptography circuit carried by said housing and connected to said MAC and said wireless transceiver for encrypting both address and data information for transmission, and for decrypting both the address and the data information upon reception.   The accused products contain processors and/or application specific circuitry for performing the encryption and decryption.  For example, and without

limitation, Huawei's Mate 20 smartphone includes a Huawei Kirin 980 chipset that performs processing for 802.11ac wireless communication, including WPA2 PSK (CCMP mode) encryption and authentication. *See, e.g.*, https://consumer.huawei.com/en/campaign/kirin980/. In addition, Huawei's EMUI 9.0 Security Technology White Paper at 5, available at https://consumer.huawei.com/en/privacy/whitepaper/, indicates that its consumer products and devices include a hardware chip-based "high-performance hardware encryption/decryption acceleration engine which supports" encryption and decryption algorithms used in WPA2 PSK (CCMP mode).

339.    The '572 Accused Products encrypt both address and data information for transmission by at least adding a plurality of encrypting bits to both the address and data information.  For example, because the '572 Accused Products comply with IEEE 802.11i standard, they follow a specific security protocol as set forth in chapter 8 of the standard, which specifies inputs to the CCMP encryption transformation including a nonce (which contains address information), an encryption key, and data.  *See, e.g.*, IEEE Std 802.11-2007 at §§ 8.3.3.3 et seq. & 8.3.3.4 et seq.

340.    By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '572 Accused Products, Huawei has injured L3Harris and is liable to L3Harris for directly infringing one or more claims of the '572 Patent, including without limitation claim 1 pursuant to 35 U.S.C. § 271(a).

341.    Huawei also infringes the '572 Patent under 35 U.S.C. § 271(b) & (c).

342.     Huawei knowingly encourages and intends to induce infringement of the '572 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '572 Accused Products.

343.     Huawei also contributes to the infringement of the '572 Patent.  Huawei makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '572 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '572 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

344.     On March 12, 2018, Harris informed Huawei of its infringement of the '572 Patent.  Thus, as of March 12, 2018, Huawei was aware of the '572 Patent, had knowledge of the infringing nature of its activities, and nevertheless continues its infringing activities.

345.     Huawei's infringement of the '572 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

346.     As a result of Huawei's infringement of the '572 Patent, Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

## COUNT XIX
## (INFRINGEMENT OF U.S. PATENT NO. 7,082,117)

347.     L3Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

348.     Huawei, including through its subsidiaries Huawei Device Co., Ltd., Huawei Technologies USA, Inc., and/or Huawei Device USA, Inc., makes, uses, sells, and/or offers to

sell in the United States, and/or imports into the United States enterprise networking equipment and consumer networking products compatible with 802.11a/b/g/n/ac standards that participate in and monitor mobile ad hoc networks in ways that directly infringe the '117 Patent, including but not limited to the Huawei Wi-Fi Products identified above (the '117 Accused Products).  For example, Huawei's Wi-Fi Products support WIDS, WIPS, Wi-Fi Threat Detection, and/or other similar intrusion detection and prevention technology.  *See, e.g.*, Huawei AP7060DN Access Point Datasheet at 3 ("Huawei APs support WIDS/WIPS, and can monitor, identify, defend, counter, and perform refined management on the rogue devices, to provide security guarantees for air interface environment and wireless data transmission"), 6 ("Wireless intrusion detection system (WIDS) and wireless intrusion prevention system (WIPS), including rogue device detection and countermeasure, attack detection and dynamic blacklist, and STA/AP blacklist and whitelist").

349.    Huawei's '117 Accused Products infringe one or more claims of the '117 Patent, including without limitation claim 10 of the '117 Patent.

350.    Huawei mobile ad hoc networks are made up of two or more '117 Accused Products and comprise a plurality of stations for transmitting data therebetween using a MAC layer, each of said stations having a respective MAC address associated therewith.  For example, Huawei '117 Accused Products, transmit data therebetween.  The '117 Accused Products are advertised by Huawei to comply with one or more of the IEEE 802.11 standards and therefore transmit data using MAC layers described in detail in those standards.  *See, e.g.*, IEEE Std 802.11-2007 at p. 14.  ("3.136 station (STA): Any device that contains an IEEE 802.11-conformant medium access control (MAC) and physical layer (PHY) interface to the wireless

medium (WM).").  The '117 Accused Products further have a MAC address associated therewith
*See, e.g.*, Huawei AP7060DN Access Point Datasheet at 6 ("MAC address authentication").

351.    Huawei mobile ad hoc networks include a policing station for detecting intrusions
into the wireless network by monitoring transmissions among said plurality of stations to detect
failed attempts to authenticate MAC addresses.  For example, Huawei Wi-Fi Products that
incorporate the WIDS, WIPS, Wi-Fi Threat Detection, and/or similar intrusion alert technology,
including at least APs and ACs, are capable of detecting flood attacks, spoofing attacks, weak
initialization vector (IV) attacks, and can also defend the WLAN against brute force cracking.
*See generally* Huawei's WLAN WIDS & WIPS Technology White Paper.  Brute force cracking
attacks also exist when a user authentication mode is used, such as MAC address.  *Id*. at 15.  The
WIDS and similar intrusion detection systems thus detect failed attempts to authenticate MAC
addresses.  On information and belief, Huawei Wi-Fi Products including laptops, tablets, and
smartphones detect failed attempts to authenticate MAC addresses when operating as mobile
hotspots for other devices.

352.    The Huawei mobile ad hoc networks generate an intrusion alert based upon
detecting a number of failed attempts to authenticate a MAC address.  For example, when an
attack is detected, the AP may report an intrusion alert to the AC.  *See, e.g.*, Huawei's WLAN
WIDS & WIPS Technology White Paper at 15-16.  Further, when an AC identifies an AP as a
rogue AP, a rogue AP alarm is triggered and sent to the network management system (NMS).  *Id*.

353.    By making, using, offering for sale, and/or selling products in the United States,
and/or importing them into the United States, including but not limited to the '117 Accused
Products, Huawei has injured L3Harris and is liable to L3Harris for directly infringing one or

more claims of the '117 Patent, including without limitation claim 10, pursuant to 35 U.S.C. § 271(a).

354.    Huawei also infringes the '117 Patent under 35 U.S.C. § 271(b) & (c).

355.    Huawei knowingly encourages and intends to induce infringement of the '117 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '117 Accused Products, with knowledge and specific intention that such products will be used by its customers.  One example is Huawei's supporting documentation instructing customers how to implement the technology claimed in the '117 patent.  *See e.g.,* Huawei's WLAN WIDS & WIPS Technology White Paper.

356.    Huawei also contributes to the infringement of the '117 Patent.  Huawei makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '117 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '117 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

357.    On March 12, 2018, Harris informed Huawei of its infringement of the '117 Patent.  Thus, as of March 12, 2018, Huawei was aware of the '117 Patent, had knowledge of the infringing nature of its activities, and nevertheless continues its infringing activities.

358.    Huawei's infringement of the '117 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

359.    As a result of Huawei's infringement of the '117 Patent, L3Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

## COUNT XX
## (INFRINGEMENT OF U.S. PATENT NO. 7,986,161)

360.    Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

361.    Huawei, including through its subsidiaries Huawei Device Co., Ltd., Huawei Technologies USA, Inc., and/or Huawei Device USA, Inc., makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States enterprise networking equipment and consumer networking products compatible with 802.11a/b/g/n/ac standards that participate in and monitor mobile ad hoc networks in ways that directly infringe the '161 Patent, including but not limited to the Huawei Wi-Fi Products identified above (the '161 Accused Products).  For example, Huawei's Wi-Fi Products support WIDS, WIPS, Wi-Fi Threat Detection, and/or other similar intrusion detection and prevention technology.  *See, e.g.*, Huawei AP7060DN Access Point Datasheet at 3 ("Huawei APs support WIDS/WIPS, and can monitor, identify, defend, counter, and perform refined management on the rogue devices, to provide security guarantees for air interface environment and wireless data transmission"), 6 ("Wireless intrusion detection system (WIDS) and wireless intrusion prevention system (WIPS), including rogue device detection and countermeasure, attack detection and dynamic blacklist, and STA/AP blacklist and whitelist").

362.    Huawei's '161 Accused Products infringe one or more claims of the '161 Patent, including without limitation claim 29 of the '161 Patent.

363.    Huawei mobile ad hoc networks are made up of two or more '161 Accused Products and comprise a plurality of stations for transmitting data therebetween using a MAC layer, each of said stations having a respective MAC address associated therewith.  For example, Huawei '161 Accused Products, transmit data therebetween.  The '161 Accused Products are advertised by Huawei to comply with one or more of the IEEE 802.11 standards and therefore transmit data using MAC layers described in detail in those standards.  *See, e.g.*, IEEE Std 802.11-2007 at p. 14.  ("3.136 station (STA): Any device that contains an IEEE 802.11-conformant medium access control (MAC) and physical layer (PHY) interface to the wireless medium (WM).").  The '161 Accused Products further have a MAC address associated therewith *See, e.g.*, Huawei AP7060DN Access Point Datasheet at 6 ("MAC address authentication").

364.    Huawei mobile ad hoc networks include a policing station for detecting intrusions into the wireless network by monitoring transmissions among said plurality of stations to detect collisions of a same MAC address.  For example, Huawei Wi-Fi Products that incorporate the WIDS, WIPS, Wi-Fi Threat Detection, and/or similar intrusion alert technology, including at least APs and ACs, are capable of detecting flood attacks, spoofing attacks, weak initialization vector (IV) attacks, and can also defend the WLAN against brute force cracking.  *See generally* Huawei's WLAN WIDS & WIPS Technology White Paper.  A flood attack occurs when an AP receives a large number of management packets or null packets of the same type from a source MAC address within a short period.  *Id*. at 12.  WIDS can detect 802.11 packet flood, and attack information reported by an AP that includes the rogue device MAC address.  *Id*.  The WIDS and similar intrusion detection systems thus detect failed attempts to authenticate MAC addresses.  On information and belief, Huawei Wi-Fi Products including laptops, tablets, and smartphones detect collisions of a same MAC address when operating as mobile hotspots for other devices.

Huawei Wireless LAN/MAN contain a policing station for detecting intrusions into the wireless network by monitoring transmissions among said plurality of stations to detect collisions of a same MAC address.

365. The Huawei mobile ad hoc networks generate an intrusion alert based upon detecting a threshold number of collisions of a same MAC address. For example, in the '161 Accused Products using WIDS and/or similar technology, when the traffic received from a device exceeds the allowed threshold, the AP considers that the device is initiating a flood attack and reports an alarm message to the AC. *See, e.g.*, Huawei's WLAN WIDS & WIPS Technology White Paper at 17. Further, when an AC identifies an AP as a rogue AP, a rogue AP alarm is triggered and sent to the network management system (NMS). *Id.*

366. By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '161 Accused Products, Huawei has injured L3Harris and is liable to L3Harris for directly infringing one or more claims of the '161 Patent, including without limitation claim 29, pursuant to 35 U.S.C. § 271(a).

367. Huawei also infringes the '161 Patent under 35 U.S.C. § 271(b) & (c).

368. Huawei knowingly encourages and intends to induce infringement of the '161 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '161 Accused Products, with knowledge and specific intention that such products will be used by its customers. One example is Huawei's supporting documentation instructing customers how to implement the technology claimed in the '161 patent. *See e.g.,* Huawei's WLAN WIDS & WIPS Technology White Paper.

369. Huawei also contributes to the infringement of the '161 Patent. Huawei makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '161 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '161 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

370. On March 12, 2018, Harris informed Huawei of its infringement of the '117 Patent, which is related to the '161 patent. Thus, at least as of March 12, 2018, Huawei was aware of the '161 Patent, had knowledge of the infringing nature of its activities, and nevertheless continues its infringing activities.

371. Huawei's infringement of the '161 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

372. As a result of Huawei's infringement of the '161 Patent, L3Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

## RESERVATION OF RIGHTS

L3Harris expressly reserves the right to assert counterclaims or any additional defenses which may now exist or in the future may be available based on discovery and further factual investigation in this case, including doctrine of acquiescence, patent misuse, inequitable conduct, waiver, unclean hands and/or other applicable equitable doctrines.

## PRAYER FOR RELIEF

L3Harris respectfully requests this Court grant relief on Huawei's Complaint and

L3Harris's counterclaims as follows:

A.  Judgment that Huawei's claims in their entirety be dismissed with prejudice;

B.  Judgment that Huawei takes nothing by its claims, including that Huawei is not

entitled to an award of compensatory damages, attorneys' fees, costs,

prejudgment or post-judgment interest under 35 U.S.C. §§ 284 or 285, or any

applicable law;

C.  Denial of any and all of Huawei's requests for relief;

D.  Judgment that L3Harris has not infringed, and is not infringing, any valid and

enforceable claim of the Huawei Asserted Patents.

E.  Judgment that the asserted claims of the Huawei Asserted Patents are invalid;

F.  Judgment that Huawei and/or any of its successors and attorneys, and all persons

in active concert or participation with any of them, are enjoined from directly or

indirectly asserting infringement or instituting any further action for infringement

of the Huawei Asserted Patents against L3Harris, or any of L3Harris's customers,

end-users, agents, suppliers, contractors, consultants, successors, and assigns;

G.  Judgment that Huawei has breached its contractual obligations to ETSI and 3GPP

to offer the Huawei Asserted Patents on FRAND terms;

H.  Judgment that the Huawei Asserted Patents are unenforceable;

I.  Judgment requiring Huawei to pay L3Harris's costs and expenses, along with pre-

judgment and post-judgment interest;

J.  Judgment requiring Huawei to pay L3Harris's attorneys' fees pursuant to FLA.

STAT. §501.2105, or any other applicable statute;

K.  Judgment that U.S. Patent Nos. 7,440,572, 7,082,117, and 6,986,161 have been and continue to be infringed by Huawei;

L.  An accounting of all damages sustained by L3Harris as the result of Huawei's acts of infringement;

M.  A finding that Huawei's infringement is willful and enhancing damages pursuant to 35 U.S.C. § 284;

N.  A mandatory future royalty payable on each and every future sale by Huawei of a product that is found to infringe U.S. Patent No. 7,440,572, 7,082,117, or 6,986,161 and on all future products which are not colorably different from products found to infringe;

O.  An award of attorneys' fees pursuant to 35 U.S.C. § 285 or otherwise permitted by law;

P.  All costs of suit; and

Q.  Grant to L3Harris such other and further relief as the Court deems just and proper.

<div style="margin-left: 50%;">

*/s/ David M. Fry*

David M. Fry (No. 5486)

SHAW KELLER LLP

I.M. Pei Building

1105 North Market Street, 12th Floor

Wilmington, DE 19801

(302) 298-0700

dfry@shawkeller.com

*Attorneys for Defendant*

</div>

OF COUNSEL:

Denise De Mory

Corey Johanningmeier

Brenda Entzminger

BUNSOW DE MORY LLP

701 El Camino Real

Redwood City, CA 94063

(650) 651-7248

Dated: August 19, 2019