# EXHIBIT 11

US009838851B2

(12) **United States Patent**
Huang et al.

(10) Patent No.: **US 9,838,851 B2**
(45) Date of Patent: **\*Dec. 5, 2017**

(54) **SUBFRAME PROCESSING METHOD AND DEVICE**

(71) Applicant: **HUAWEI TECHNOLOGIES CO.,LTD.**, Shenzhen, Guangdong (CN)

(72) Inventors: **Qufang Huang**, Shanghai (CN); **Wenji Liu**, Shanghai (CN); **Qinghai Zeng**, Shanghai (CN)

(73) Assignee: **HUAWEI TECHNOLOGIES CO., LTD.**, Shenzhen (CN)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 202 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/321,550**

(22) Filed: **Jul. 1, 2014**

(65) **Prior Publication Data**

US 2014/0313968 A1      Oct. 23, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/433,876, filed on Mar. 29, 2012, which is a continuation of application No. PCT/CN2010/077371, filed on Sep. 27, 2010.

(30) **Foreign Application Priority Data**

Sep. 29, 2009    (CN) .......................... 2009 1 0110717

(51) **Int. Cl.**
**H04W 72/12** (2009.01)
**H04W 4/06** (2009.01)
**H04W 72/00** (2009.01)

(52) **U.S. Cl.**
CPC ........... **H04W 4/06** (2013.01); **H04W 72/005** (2013.01); **H04W 72/1289** (2013.01)

(58) **Field of Classification Search**
CPC .. H04W 72/004; H04W 4/06; H04W 72/1289
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2005/0129042 A1    6/2005  Muhonen et al.
2006/0088023 A1    4/2006  Muller
(Continued)

FOREIGN PATENT DOCUMENTS

CN        101247544 A      8/2008
CN        101931881 A      12/2010
(Continued)

OTHER PUBLICATIONS

ETSI TS 136 300 V8.9.0; LTE; Evolved Universal Terrestrial Radio Access(E-UTRA) and Evolved Universal Terrestrial Radio Access Network(E-UTRAN); Overall description; Stage 2; (3GPP TS 36.300 version 8.9.0 Release 8); Jul. 2009; total 164 pages.
(Continued)

*Primary Examiner* — Luat Phung
(74) *Attorney, Agent, or Firm* — Huawei Technologies Co., Ltd.

(57) **ABSTRACT**

A subframe processing method and device are disclosed. The subframe processing method includes: if data packets that are not received by an evolved NodeB (eNB) include at least two consecutive Multimedia Broadcast Multicast Service (MBMS) data packets to be scheduled in a Dynamic Schedule Period (DSP) by the eNB, setting a subframe of the eNB that is used to transmit Dynamic Schedule Information (DSI) corresponding to the DSP to null. When the eNB finds that consecutive MBMS data packets are lost and/or that a type 0 Protocol Data Unit (PDU) group is lost, a subframe used to transmit the DSI may be set to null, thereby preventing the eNB from transmitting incorrect DSI which

(Continued)



## US 9,838,851 B2

Page 2

may interfere with other eNBs and cause incorrect data receiving of a user equipment (UE).

**8 Claims, 3 Drawing Sheets**

### (56) References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2010/0027455 A1* | 2/2010 | Wang .................. | H04W 72/005 370/312 |
| 2010/0195558 A1 | 8/2010 | Koskinen | |
| 2011/0044225 A1* | 2/2011 | Rinne ................. | H04W 72/005 370/312 |
| 2011/0188436 A1* | 8/2011 | Damnjanovic ..... | H04W 72/005 370/312 |
| 2012/0182923 A1 | 7/2012 | Huang et al. | |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2008137786 A1 | 11/2008 |
| WO | 2008155332 A2 | 12/2008 |

### OTHER PUBLICATIONS

3GPP TSG-RAN3 Meeting #66; R3-093331; CR on Mechanism for Consecutive Packet Loss in 36.300; CMCC, ZTE, Alcatel-Lucent Shanghai Bell, Alcatel-Lucent, CATT, Huawei, New Postcom, Samsung; Jeju, Korea, 9th-13th 2009; total 4 pages.

3GPP TS 36.300 V8.3.0; 3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Evolved Universal Terrestrial Radio Access(E-UTRA) and Evolved Universal Terrestrial Radio Access Network (E-UTRAN); Overall description; Stage 2; (Release 8); Dec. 2007; total 120 pages.

3GPP TSG-RAN WG2 Meeting #68; R2-096534; Muting DSI; Huawei;Work item code: MBMS_LTE; Nov. 9-13, 2009, Jeju, Korea; total 3 pages.

3GPP TSG-RAN WG2 Meeting #68bis; R2-100211; Agenda item: 6.3.1; Nokia Corporation, Nokia Siemens Networks; Uncaptured agreements on muting the DSI; Valencia, Spain, Jan. 18-22, 2010; total 3 pages.

3GPP TS 23.246 V9.1.0; 3rd Generation Partnership Project; Technical Specification Group Services and Architecture; Multimedia Broadcast/Multicast Service (MBMS); Architecture and functional description (Release 9); Jun. 2009; total 61 pages.

3GPP TS 25.346 V8.3.0; 3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Introduction of the Multimedia Broadcast Multicast Service (MBMS) in the Radio Access Network (RAN); Stage 2 (Release 8); Mar. 2009; total 71 pages.

3GPP TSG-RAN WG3 Meeting #65 R3-091749, "SYNC protocol for LTE", Huawei, Aug. 24-28, 2009, total 9 pages.

3GPP TSG-RAN WG3 Meeting #65 R3-091917, "Uniform packet dropping in LTE MBSFN transmission", Nokia Siemens Networks, Nokia Corporation, Aug. 24-28, 2009, total 3 pages.

* cited by examiner



FIG. 1

FIG. 2



FIG. 3

FIG. 4

**U.S. Patent**          Dec. 5, 2017          Sheet 3 of 3          **US 9,838,851 B2**



FIG. 5



FIG. 6

US 9,838,851 B2

**1**

## SUBFRAME PROCESSING METHOD AND DEVICE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 13/433,876, filed on Mar. 29, 2012, which is a continuation of International Application No. PCT/CN2010/077371, filed on Sep. 27, 2010. The International Application claims priority to Chinese Patent Application No. 200910110717.0, filed on Sep. 29, 2009. All of the aforementioned patent applications are hereby incorporated by reference in their entireties.

### FIELD OF THE INVENTION

The present invention relates to the field of mobile communications technologies, and in particular, to a subframe processing method and device.

### BACKGROUND OF THE INVENTION

In a long term evolution (LTE) system, Multimedia Broadcast Multicast Service (MBMS) data may be transmitted in MBMS Single Frequency Network (MBSFN) mode. That is, multiple evolved NodeBs (eNBs) transmit radio signals carrying the same MBMS data with the same frequency at the same time from multiple cells. An area covered by the multiple eNBs that transmit the MBMS data in MBSFN mode is called an MBSFN area. User equipments (UEs) in the MBSFN area may consider that only one transmitter is transmitting radio signals and receive the MBMS data.

Data transmitted by the eNBs in the MBSFN area is the same, and the physical resources used are the same. That is, information of each eNB is synchronous. For example, a synchronization (SYNC) entity is set on the broadcast multicast-service center (BM-SC) side on the core network (CN) and an SYNC entity is set on the eNB side. The SYNC entity on the BS-SC side sets a time stamp for various MBMS data packets and provides the time stamp for all eNBs in the MBSFN area. Specifically, the BM-SC may include multiple MBMS data packets in a synchronization sequence. The SYNC entity on the BM-SC side sets the same time stamp for MBMS data packets in a synchronization sequence and transmits a type 0 control packet (namely, a type 0 Protocol Data Unit (PDU), hereinafter referred to as a type 0 PDU) after the BM-SC transmits the synchronization sequence. The type 0 PDU is used to notify the eNBs of transmission completion of the current synchronization sequence. To improve the reliability, the SYNC entity on the BM-SC side transmits a type 0 PDU group but not merely a type 0 PDU. The type 0 PDU group includes all type 0 PDUs that include the same information and are transmitted repeatedly. For example, after a synchronization sequence is transmitted, a type 0 PDU is transmitted consecutive three times. The three type 0 PDUs form one type 0 PDU group.

When receiving the MBMS data, eNB determines the time when the BM-SC starts to transmit the synchronization sequence according to the time stamp obtained by the SYNC entity on the eNB side, and determines reception completion of the synchronization sequence according to the type 0 PDU. The eNB transmits the received MBMS data packets according to the time stamp of the received MBMS data packets.

**2**

If the eNBs in the MBSFN area have buffered all MBMS data packets to be transmitted in a Dynamic Schedule Period (DSP) before the DSP, the eNBs can generate the same Dynamic Schedule Information (DSI) to implement the same dynamic scheduling for the same MBMS data packets. For example, the eNBs have buffered all the MBMS data packets to be transmitted in the DSP before the DSP. The eNBs determine the time for transmitting the MBMS data packets, and then generate DSI corresponding to the DSP to indicate scheduling of the DSP, for example, the start positions of data packets of different services in the DSP. In a first MBSFN subframe on a multicast channel (MCH), the eNBs transmit the DSI of the corresponding transmission channel in the DSP and transmit the data packets according to the scheduling result. A UE at the receiving end receives the DSI, knows eNB scheduling according to the DSI, and thus selects the time when the eNBs transmit data that is interesting to the UE to receive data.

In evolved MBMS, air interface resources of the MBSFN service are reserved in advance in a manner of semi-persistent scheduling. A reserved subframe that is used to transmit MBSN data is called an MBSFN subframe. To meet different quality of service (QoS) requirements of different MBSFN services, the evolved MBMS maps the MBSFN services to different MCHs, and the different MCHs adopt different Modulation Coding Schemes (MCSs) to achieve different QoS. Different MCHs do not share a reserved MBSFN subframe. To reduce scheduling overheads, the eNBs perform air-interface transmission scheduling for MBMS data in each DSP. The eNBs only schedule MB SFN data of which time stamp is earlier than the start time of the corresponding DSP. Generally, the eNBs schedule the corresponding MBSFN data in one DSP that is later than a time stamp.

In the prior art, transmission between a BS-SC and an eNB is based on the Internet Protocol (IP), which may cause loss of MBMS data packets or a type 0 PDU. If an eNB in an MBSFN area cannot normally receive at least two consecutive MBMS data packets in a synchronization sequence or all type 0 PDUs that indicate transmission completion of a synchronization sequence, the eNB generates incorrect DSI, which may interfere with other eNBs and cause incorrect data receiving of the UE.

### SUMMARY OF THE INVENTION

Embodiments of the present invention provide a subframe processing method and device.

A subframe processing method is provided, where the method includes:

if data packets that are not received by an eNB include at least two consecutive MBMS data packets to be scheduled by the eNB in a DSP, setting, by the eNB, a subframe that is used to transmit DSI corresponding to the DSP to null.

Another subframe processing method is provided, where the method includes:

if an eNB does not receive a type 0 control packet group, setting, by the eNB, a subframe that is used to transmit DSI corresponding to a DSP to null, in which the DSP is used to transmit MBMS data packets corresponding to the type 0 control packet group.

A subframe processing device is provided, where the device includes:

a first receiving unit, configured to determine whether data packets that are not received meet a first condition: the data packets that are not received include at least

US 9,838,851 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

two consecutive MBMS data packets to be scheduled by a first sending unit in a DSP; and

the first sending unit, configured to set a subframe that is used to transmit DSI corresponding to the DSP to null when the determination result of the first receiving unit is yes.

Another subframe processing device is provided, where the device includes:

a second receiving unit, configured to determine that a type 0 control packet group is not received; and

a second sending unit, configured to set a subframe that is used to transmit DSI corresponding to a DSP to null when the determination result of the second receiving unit is yes, in which the DSP is used to transmit MBMS data packets corresponding to the type 0 control packet group.

In embodiments of the present invention, when an access network (AN) device (such as an eNB) finds that consecutive MBMS data packets are lost and/or a type 0 PDU group is lost, a subframe that is used to transmit DSI may be null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of a UE.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic flow chart of a subframe processing method according to an embodiment of the present invention;

FIG. **2** is a schematic diagram of a synchronization sequence transmitted by a BM-SC according to an embodiment of the present invention;

FIG. **3** is a schematic flow chart of another subframe processing method according to an embodiment of the present invention;

FIG. **4** is a schematic diagram of another synchronization sequence transmitted by a BM-SC according to an embodiment of the present invention;

FIG. **5** is a schematic diagram of a subframe processing device according to an embodiment of the present invention; and

FIG. **6** is a schematic diagram of another subframe processing device according to an embodiment of the present invention.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

The technical solution of the present invention will be clearly and completely described in the following with reference to the accompanying drawings. It is obvious that the embodiments to be described below are only a part rather than all the embodiments of the present invention. All other embodiments obtained by persons or ordinary skill in the art based on the embodiments of the present invention without any creative effort shall fall within the protection scope of the present invention.

An embodiment of the present invention provides a subframe processing method. According to the method, if data packets that are not received by an eNB include at least two consecutive MBMS data packets to be scheduled by the eNB in a DSP, the eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of a UE.

Another embodiment of the present invention provides a subframe processing method, as shown in FIG. **1**. An eNB

is located in an AN; a BM-SC is located in a CN; an SYNC entity on the BM-SC side may be an independent entity that is located on the CN and is able to communicate with the BM-SC, a part of the independent entity, or a unit inside a BM-SC device. The method includes the following steps.

Step **110**: The BM-SC transmits MBMS data packets to the eNB.

For example, the BM-SC transmits a synchronization sequence, which includes multiple MBMS data packets, to the eNB. Generally, MBMS data packets in one synchronization sequence belong to one MBMS service. Besides, MBMS data packets in one synchronization sequence may belong to multiple MBMS services. The SYNC entity on the BM-SC side sets the same time stamp for each MBMS data packet in the synchronization sequence, and then transmits a type 0 PDU after the BM-SC transmits all MBMS data packets in the synchronization sequence.

Further, header information of the MBMS data packets may include a "total number of octet", which indicates the total amount of data transmitted by a data source in a certain period of time. Similar to the prior art, the value of the field of "total number of octet" monotonically increases in a certain time for data of a service. The header information of the MBMS data packets may further include a "total number of packet", which indicates the total amount of packets transmitted by a data source in a certain period of time. The data source refers to the BM-SC in this embodiment.

As shown in FIG. **2**, assume that four consecutive MBMS data packets transmitted by the BM-SC to the eNB are A, B, C, and D. Lengths of A, B, C, and D are 100 bytes, 50 bytes, 150 bytes, and 100 bytes respectively. The values of the "total number of octet" information in the headers of the corresponding data packets are 100 bytes, 150 bytes, 300 bytes, and 400 bytes respectively. For example, the value of the "total number of octet" in the header of D indicates the total number of octets of D and the previous MBMS data packets, namely, 400 (100+50+150+100=400) bytes. Header information of A, B, C, and D further include total number of packet information (not shown in FIG. **2**), of which values are 1, 2, 3, and 4 respectively. For example, the value of the total number of packet in the header of D indicates the total number of packets, which include D and the previous MBMS data packets, that are transmitted by the BM-SC, namely, 4.

Step **120**: The eNB receives the MBMS data packets that are transmitted by the BM-SC, and determines whether the following case occurs: at least two consecutive MBMS data packets to be scheduled in a DSP are lost. If at least two consecutive MBMS data packets to be scheduled in a DSP are lost, the process proceeds to step **130**; and if not at least two consecutive MBMS data packets to be scheduled in a DSP are lost, the process proceeds to step **140**.

The preceding case determined by the eNB whether occurs may also be described as follows. At least two consecutive MBMS data packets to be scheduled in a DSP do not reach the eNB, that is, at least two consecutive MBMS data packets to be scheduled in a DSP are not received by the eNB.

For example, according to SYNC header information of the received MBMS data packets, the eNB determines whether consecutive data packets are lost and whether the consecutively lost data packets are supposed to be scheduled in the same DSP. The eNB may implement the operation according to the prior art.

As shown in FIG. **2**, assume that two consecutive DSPs in which the eNB schedules MBMS data packets are DSP**1** and DSP**2** respectively. The start time of DSP**1** is T**1**, and the

US 9,838,851 B2

5

start time of DSP**2** that is later than DSP**1** is T2. MBMS data packets shown in FIG. **2** are included in a synchronization sequence, that is, the MBMS data packets have the same time stamp. Assume that the time indicated in the time stamp is T0. In step **120**, if the eNB determines that T0 is between T1 and T2, that is, T0 is later than T1 and earlier than T2, the eNB determines that it should schedule the MBMS data packets A, B, C, and D in DSP**2**.

Further, assume that the eNB receives only A and D, the eNB can buffer A and D. According to the total number of octets **100** in the header of A, total number of octets **400** in the header of D, and data packet length **100** of D, the eNB may determine that MBMS data of 200 (400−100−100=200) bytes is the lost data that should have been received by the eNB but does not reach the eNB. According to the total number of packets **1** in the header of A and the total number of packets **4** in the header of D, the eNB may determine that two MBMS data packets with the total number of packets **2** and **3** in the headers exist between A and D. Through the preceding process, the eNB may determine that two consecutive MBMS data packets (B and C) are lost. It should be noted that the eNB can only determine loss of data packets and the number of the lost data packets, and cannot determine the length of each lost data packet. Therefore, if the eNB predicts the length of each MBMS data packet and generates DSI according to the prior art, the DSI may be incorrect and may be different from DSI generated by other eNBs in other MBSFN areas. Consequently, the incorrect DSI interferes with other eNBs, and a UE may incorrectly receive data or even cannot receive data.

In the preceding process, according to the SYNC header information of the received MBMS data packets, the eNB determines that consecutive data packets are lost and the MBMS data packets that are not received are supposed to be scheduled in a DSP. The process proceeds to step **130**.

Step **130**: The eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null.

For example, the eNB keeps mute in a subframe, the subframe being supposed to be used to transmit the DSI corresponding to the DSP. For another example, the eNB first determines whether to generate complete DSI corresponding to the DSP, and if it is determined not to generate the complete DSI corresponding to the DSP, the eNB keeps mute in a subframe, the subframe being supposed to be used to transmit the DSI corresponding to the DSP.

This step in which the eNB sets a subframe that is used to transmit the DSI corresponding to the DSP to null may also be described as follows. The eNB does not transmit any information when the eNB should transmit a subframe that carries the DSI. The DSI that should be generated is used to instruct the eNB how to dynamically schedule the MBMS data that is supposed to be transmitted in the DSP.

It should be noted that a subframe that is supposed to be used to transmit the DSI corresponding to a DSP in the embodiment of the present invention refers to a subframe X in a DSP (for example, a first subframe in a DSP). If the eNB generates DSI, the eNB is to transmit the DSI in the subframe X. In the embodiment of the present invention, the eNB does not generate DSI when the eNB determines that the data packets that are not received meet a given condition (for example, step **120**). Therefore, the eNB keeps mute in the subframe X.

In this step, the eNB may transmit the MBMS data packets in the DSP. In details, if other MBMS data packets that have been received by the eNB and are to be scheduled in the DSP exist, the eNB may transmit the other MBMS data packets in other subframes in the DSP. Optionally, if a

6

subframe that is supposed to be used to transmit the DSI corresponding to the DSP is the first subframe of the DSP, the other subframes may be after the subframe that is supposed to be used to transmit the DSI corresponding to the DSP. If a subframe that is supposed to be used to transmit the DSI corresponding to the DSP is not the first subframe of the DSP, the other subframes may be before or after the subframe that is supposed to be used to transmit the DSI corresponding to the DSP. Optionally, other MBMS data packets may include: MBMS data packets of which time of transmission by the BM-SC is earlier than the time of transmission of the determined lost consecutive MBMS data packets by the BM-SC, and which belong to the same service as the determined lost consecutive MBMS data packets; and/or MBMS data packets of other services that are supposed to be scheduled before the eNB schedules a service of the determined lost consecutive MBMS data packets. In the latter case, the other MBMS data packets belong to a service different from that of the lost consecutive MBMS data packets. The time of transmission of the other MBMS data packets by the BM-SC may not be earlier than the time of transmission of the determined lost consecutive MBMS data packets by the BM-SC.

As shown in FIG. **2**, the eNB has received A in step **120**. According to header information of the received MBMS data packets, the eNB can know that the time when the BM-SC transmits A is earlier than the time when the BM-SC transmits the lost consecutive data packets (B and C). In addition, the eNB has received D. The time when the BM-SC transmits D is later than the time when the BM-SC transmits the lost consecutive data packets. Therefore, in the DSP, the eNB can use a subframe after a null subframe that is supposed to be used to transmit the DSI to transmit A. The eNB can only determine the number and the total length of the lost data packets, but cannot determine the length of each lost data packet (B and C). Therefore, the eNB cannot determine the transmission position of each lost data packet and cannot determine the transmission position of D that is transmitted later than the lost data packets. As a result, eNB cannot transmit D even when the eNB has received D.

Assume that the eNB transmits A in a manner of dynamic scheduling according to the prior art. Accordingly, a UE can read all information in the DSP when the UE does not receive the DSI corresponding to the DSP. The UE can read MBMS data packet A. Compared with the method in which the eNB transmits no data packet or transmits incorrect DSI, the method according to this embodiment enables the UE to receive more data, and enables the eNB to transmit data more efficiently.

Optionally, assume that the DSP includes a subframe being supposed to be used to transmit the DSI, other subframes that are used to transmit other MBMS data packets, and remaining subframes, the eNB may keep mute in the remaining subframes after transmitting the other MBMS data packets in the DSP. It should be noted that the subframes that form the DSP are subframes of an MCH reserved by the eNB for transmitting the MBMS data packets, and "the eNB keeps mute in the remaining subframes of the DSP" means that the eNB does not transmit any information on an MCH that is used to transmit MBMS data packets in the remaining subframes.

It is understandable by persons of ordinary skill in the art that the eNB may transmit non-MBMS data packets in the remaining subframes. These non-MBMS data packets occupy non-MCHs. For example, the eNB may transmit unicast data packets at low power in the remaining subframes. These unicast data packets are carried on a dedicated

US 9,838,851 B2

7

traffic channel (DTCH). The occupied transmission channel is a downlink shared channel (DL-SCH).

Step **140**: The eNB generates and transmits the DSI corresponding to the DSP.

In this step, the eNB can generate and transmit the DSI according to the prior art. After transmitting a subframe that carries the DSI, the eNB transmits the received MBMS data packets.

In this embodiment, the eNB may first determine whether data packets that are not received meet a given condition. For example, the eNB determines whether the data packets that are not received include at least two consecutive MBMS data packets to be scheduled by the eNB in a DSP. If the given condition is met, the eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of the UE.

Another embodiment of the present invention provides a subframe processing method. In this method, if an eNB does not receive a type 0 control packet group, that is, data packets that are not received by the eNB include a type 0 control packet group, the eNB sets a subframe that is used to transmit DSI corresponding to a DSP to null. The DSP is used to transmit MBMS data packets corresponding to the type 0 control packet group. This method can prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of a UE.

Another embodiment of the present invention provides a subframe processing method, as shown in FIG. **3**. An eNB is located on an AN; a BM-SC is located on a CN; an SYNC entity on the BM-SC side may be an independent entity that is located on the CN and can communicate with the BM-SC, a part of the independent entity, or a unit inside a BM-SC device. The method includes the following steps.

Step **310**: The BM-SC transmits a synchronization sequence formed of MBMS data packets and the corresponding type 0 PDU group to the eNB.

As shown in FIG. **4**, the BM-SC transmits four synchronization sequences E, F, G, and H to the eNB. Each synchronization sequence includes several MBMS data packets. The number of the MBMS data packets included in each synchronization sequence may be the same or different. This embodiment does not restrict that the MBMS data packets in a synchronization sequence belong to one or more MBMS services. This embodiment does not restrict whether the MBMS data packets in a synchronization sequence are empty. For example, MBMS data packets in G are empty, or G does not contain any MBMS data.

In this step, the SYNC entity on the BM-SC side sets a time stamp for each MBMS data packet in each synchronization sequence. After transmitting all MBMS data packets in a synchronization sequence, the BM-SC transmits a type 0 PDU group corresponding to the synchronization sequence. Each type 0 PDU group that corresponds to a synchronization sequence may include multiple type 0 PDUs. The type 0 PDUs may have the same information and may have the same time stamp as the MBMS data packets in the corresponding synchronization sequence. Type 0 PDUs that are repeatedly transmitted by the BM-SC may form a type 0 PDU group.

As shown in FIG. **4**, a type 0 PDU group corresponding to each synchronization sequence includes three type 0 PDUs, which are marked as 1, 2, and 3 according to the sequence in each type 0 PDU group. Optionally, a type 0 PDU in a type 0 PDU group corresponding to synchronization sequence E may carry a time stamp. The time stamp is

8

the same as the time stamp of the MBMS data in synchronization sequence E. Assume that the time stamp is Te. MBMS data packets in synchronization sequence G are null, that is, G does not include MBMS data. A type 0 PDU in a type 0 PDU group corresponding to synchronization sequence G may carry a time stamp, and the time stamp may be a value in the time range of synchronization sequence H. Assume that the time stamp is Tg. In addition, assume that the time indicated by a time stamp of MBMS data packets in synchronization sequence F and the time indicated by a time stamp of MBMS data packets in synchronization sequence H are Tf and Th respectively. Header information of each MBMS data packet is not illustrated in FIG. **4**.

Further, the header information of the MBMS data packets may further include the total number of octets and the total number of packets. The header information is similar to the header information in other embodiments of the present invention, and is not described here.

Step **320**: The eNB receives the synchronization sequence transmitted by the BM-SC and determines whether the following case occurs: one type 0 PDU group is lost. If one type 0 PDU group is lost, the process proceeds to step **330**; and if no one type 0 PDU group is lost, the process proceeds to step **340**.

The preceding case may also be described as follows. A type 0 PDU group corresponding to a synchronization sequence that is received or not received by the eNB does not reach the eNB, that is, all type 0 PDUs in the type 0 group are not received by the eNB. A synchronization sequence may include multiple MBMS data packets. Time stamps of MBMS data packets in a synchronization sequence are the same, that is, multiple MBMS data packets in a synchronization sequence correspond to a type 0 PDU group, which means, each MBMS data packet has a unique type 0 PDU group. The preceding case the eNB determines whether occurs may also be described as follows. A type 0 PDU group corresponding to MBMS data packets that are received or not received by the eNB does not reach the eNB, that is, all type 0 PDUs in the type 0 group are not received by the eNB.

It should be noted that the subframe processing method provided by this embodiment is applicable to various scenarios where an eNB may determine loss of a type 0 PDU group. In details, if a type 0 PDU group is lost, an eNB may determine the type 0 PDU group that should reach the eNB but is not received by the eNB according to information related to the received MBMS data packets such as a time stamp, the total number of octets, or the total number of packets, regardless of whether all or part of synchronization sequences corresponding to the type 0 PDU group are received by the eNB, or synchronization sequences corresponding to the type 0 PDU group are empty. Therefore, the subframe processing method provided by this embodiment is applicable to various scenarios.

In this embodiment, assume that two consecutive DSPs in which the eNB schedules MBMS data packets are DSP**3** and DSP**4** respectively. The start time of DSP**3** is T**3**, and the start time of DSP**4** that is later than DSP**3** is T**4**.

As shown in FIG. **4**, in step **320**, if the eNB determines that Te, Tf, Tg, and Th are between T**3** and T**4**, that is, Te, Tf, Tg, and Th are later than T**3** and earlier than T**4**, the eNB determines that the eNB should schedule the MBMS data packets in E, F, and H in DSP**4**.

Further, the eNB may determine a range of time stamp in which each synchronization sequence is supposed to be received according to the pre-configuration. Therefore, if the eNB does not receive any type 0 PDU and the time stamp is

US 9,838,851 B2

9

in a range of time stamp determined according to the pre-configuration, it is determined that a type 0 PDU group is lost. If information of at least one PDU group in the preceding four type 0 PDU groups is lost, the process proceeds to step 330.

As shown in FIG. 4, the eNB does not receive a first type 0 PDU, a second type 0 PDU, and a third type 0 PDU corresponding to F; therefore, the eNB cannot determine the time of transmission completion of data packets in synchronization sequence F even when the eNB receives synchronization sequence F. If the eNB predicts the time of transmission completion of data packets in the synchronization sequence according to the prior art, the time is inaccurate. Therefore, DSI generated by the eNB according to the prediction result is inaccurate, and is different from DSI generated by other eNBs in other MBSFN areas. Consequently, the incorrect DSI interferes with other eNBs, and a UE may incorrectly receive data or even cannot receive data. In this embodiment, after the eNB determines that all information in a type 0 PDU group corresponding to F is lost, the process proceeds to step 330.

If at least one type 0 PDU in each type 0 PDU group in the preceding four type 0 PDU groups is received by the eNB, the eNB may determine the time of transmission completion of each synchronization sequence. The process proceeds to step 340.

Step 330: The eNB sets a subframe that is used to transmit DSI corresponding to a DSP to null. The DSP is used to transmit MBMS data packets corresponding to a type 0 PDU group or MBMS data packets in a synchronization sequence that are not received by the eNB.

For example, the eNB keeps mute in a subframe, the subframe being supposed to be used to transmit DSI corresponding to the DSP. Further, for example, the eNB first determines whether to generate complete DSI corresponding to the DSP. If it is determined not to generate the complete DSI corresponding to the DSP, the eNB keeps mute in a subframe, the subframe being supposed to be used to transmit the DSI corresponding to the DSP.

This step in which the eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null may also be described as follows. The eNB does not transmit any information when the eNB should transmit a subframe that carries the DSI. The DSI that should be generated is used to instruct the eNB how to dynamically schedule MBMS data that is supposed to be transmitted in the DSP.

In this step, the eNB may transmit MBMS data packets in the DSP. In details, if other MBMS data packets that have been received by the eNB and are to be scheduled in the DSP exist, the eNB may transmit the other MBMS data packets in other subframes in the DSP. Optionally, the other MBMS data packets may include MBMS data packets of which time of transmission by the CN device BM-SC is earlier than the end time of a synchronization sequence corresponding to a lost type 0 PDU group; and/or MBMS data packets that are supposed to be scheduled by the eNB before the eNB schedules a service of MBMS data packets corresponding to a lost type 0 PDU group, and which belong to a service different from that of the MBMS data packets corresponding to the lost type 0 PDU group.

As shown in FIG. 4, the eNB has received synchronization sequence E in step 320, and MBMS data packets in E are to be scheduled in the DSP. In addition, according to header information of the received MBMS data packets, the eNB can know that the time of transmission of E by the BM-SC is earlier than the time of transmission of the synchronization sequence (F) corresponding to the lost type

10

0 PDU group. Therefore, in the DSP, in subframes after the null subframe that is supposed to be used to transmit DSI, the eNB may transmit the received MBMS data packets in synchronization sequence E. If the eNB does not receive the type 0 PDU group corresponding to synchronization sequence F, but receives some MBMS data packets in synchronization sequence F, the eNB may transmit the received MBMS data packets in synchronization sequence F after transmitting MBMS data packets in E. The eNB cannot determine whether transmission of F is completed, so the eNB cannot determine the transmission positions of MBMS data packets in G and H in the DSP even when the eNB receives synchronization sequences G and H transmitted by the BM-SC. Therefore, the eNB does not transmit the received MBMS data packets in G and H. Further, assume that the eNB transmits E in a manner of dynamic scheduling according to the prior art. Accordingly, a UE can read all information in the DSP when the UE does not receive the DSI corresponding to the DSP. The UE can read MBMS data packets in E. Compared with the method in which the eNB transmits no data packet or transmits incorrect DSI, the method provided by this embodiment enables the UE to receive more data, and enables the eNB to transmit data more efficiently.

Further, assume that the DSP includes a subframe that is supposed to be used to transmit DSI, other subframes that are used to transmit the other MBMS data packets, and remaining subframes, the eNB may keep mute in the remaining subframes after transmitting the other MBMS data packets in the DSP. It should be noted that the subframes that form the DSP are subframes of an MCH reserved by the eNB for transmitting MBMS data packets, and "the eNB may keep mute in the remaining subframes" means that the eNB does not transmit any information on an MCH that is used to transmit MBMS data packets corresponding to the lost type 0 control point group in the remaining subframes.

It is understandable by persons of ordinary skill in the art that the eNB may transmit non-MBMS data packets in the remaining subframes. The non-MBMS data packets occupy non-MCHs. For example, the eNB may transmit unicast data packets at low power in the remaining subframes. The unicast data packets are carried on a DTCH. The occupied transmission channel is a DL-SCH.

Step 340: The eNB generates and transmits the DSI corresponding to the DSP.

In this step, the eNB can generate and transmit the DSI according to the prior art. After transmitting a subframe that carries the DSI, the eNB transmits the received MBMS data packets.

In this embodiment, the eNB may first determine whether data packets that are not received meet a given condition. For example, the eNB determines whether data packets that are not received by the eNB include a type 0 PDU group corresponding to one or more MBMS data packets. If the given condition is met, the eNB sets a subframe that is used to transmit the DSI corresponding to the DSP to null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of the UE.

The two subframe processing methods provided by the aforementioned embodiments of the present invention may be combined to form another embodiment of the present invention. In the embodiment of the present invention, an eNB may first determine whether data packets that are not received meet a given condition. That is, the eNB determines whether data packets that are not received include two consecutive MBMS data packets to be scheduled by the eNB

US 9,838,851 B2

11

in a DSP and a type 0 PDU group corresponding to one or more MBMS data packets. The one or more MBMS data packets may be MBMS data packets that have been or have not been received by the eNB. If the given condition is met, the eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of a UE. In the embodiment of the present invention, the method for the eNB to determining whether data packets that are not received meet the given condition is the same as the method described in the aforementioned embodiments of the present invention, and is not described here.

In the subframe processing methods provided by the aforementioned embodiments of the present invention, the eNB is an AN device, and the BM-SC is a CN device, but the eNB device and the BM-SC device are not limited to an AN device and a CN device in embodiments of the present invention. For example, the eNB in the aforementioned embodiments of the present invention may be replaced by other devices such as a home NodeB (hNB), a microcell NodeB, or other devices on the AN in an LTE+ system; and the BM-SC may be replaced by other devices on the CN.

As shown in FIG. 5, an embodiment of the present invention further provides a subframe processing device, namely, a first device 50, which is configured to implement the subframe processing methods provided by the aforementioned embodiments of the present invention. The first device 50 includes a first receiving unit 510 and a first sending unit 520. The first receiving unit 510 is configured to determine whether data packets that are not received meet a first condition: the data packets that are not received include at least two consecutive MBMS data packets to be scheduled by the first sending unit 520 in a DSP. The first sending unit 520 is configured to set a subframe that is used to transmit DSI corresponding to the DSP to null when the determination result of the first receiving unit 510 is yes.

"The first sending unit 520 is configured to set a subframe that is used to transmit DSI corresponding to the DSP to null" may refer to any one of the following cases: the first sending unit 520 keeps mute in a subframe that is supposed to be used to transmit DSI corresponding to the DSP; or the first sending unit 520 determines whether to generate complete DSI corresponding to the DSP, and if it is determined not to generate the complete DSI corresponding to the DSP, the first sending unit 520 keeps mute in a subframe that is supposed to be used to transmit DSI corresponding to the DSP.

In this embodiment, the first receiving unit 510 may be configured to receive MBMS data packets and determine whether data packets that are not received meet the first condition according to the received MBMS data packets. For example, header information of the MBSM data packets received by the first receiving unit 510 includes the total number of octets and the total number of packets. The first receiving unit 510 determines whether data packets that are not received meet the first condition according to the total number of octets and the total number of packets.

Optionally, in this embodiment, if other MBMS data packets that have been received by the first receiving unit 510 and are to be scheduled by the first sending unit 520 in the DSP exist, optionally, the other MBMS data packets include any one or more of the following MBMS data packets: MBMS data packets of which time of transmission by the BM-SC is earlier than the time of transmission of the determined lost consecutive MBMS data packets by the BM-SC, and which belong to a same service as the deter-

12

mined lost consecutive MBMS data packets; and MBMS data packets of other services that are to be scheduled before the eNB schedules a service of the determined lost consecutive MBMS data packets. In the latter case, the other MBMS data packets belong to a service different from that of the lost consecutive MBMS data packets. The time of transmission of the other MBMS data packets by the BM-SC may not be earlier than the time of transmission of the determined lost consecutive MBMS data packets by the BM-SC.

Optionally, if a subframe that is supposed to be used to transmit DSI corresponding to the DSP is a first subframe of the DSP, the other subframes may be after the subframe that is supposed to be used to transmit DSI corresponding to the DSP. If the subframe that is supposed to be used to transmit DSI corresponding to the DSP is not a first subframe of the DSP, the other subframes can be before or after the subframe that is supposed to be used to transmit DSI corresponding to the DSP.

Optionally, the first sending unit 520 in this embodiment is further configured to keep mute in remaining subframes after transmitting the other MBMS data packets. The remaining subframes include subframes that are after the other subframes in the DSP and reserved for a transmission channel that maps a service of the consecutive MBMS data packets by the first sending unit 520.

The device according to this embodiment may be a NodeB (such as eNB) or other AN entities, such as an hNB) or microcell NodeB, or a unit that is inside a NodeB or other AN entities. The device may first determine whether data packets that are not received meet a given condition. For example, the device determines whether data packets that are not received include at least two consecutive MBMS data packets to be scheduled by the eNB in a DSP. If the given condition is met, the device sets a subframe that is used to transmit the DSI corresponding to the DSP to null to prevent the device from transmitting incorrect DSI which may interfere with other devices and cause incorrect data receiving of a UE.

As shown in FIG. 6, an embodiment of the present invention further provides another subframe processing device, namely, a second device 60, which is configured to implement the subframe processing methods provided by the aforementioned embodiments of the present invention. The second device 60 includes a second receiving unit 610 and a second sending unit 620. The second receiving unit 610 is configured to determine whether a type 0 control packet group is not received, that is, the second receiving unit 610 determines whether data packets that are not received meet a second condition that is the data packets that are not received include a type 0 control packet group. The second sending unit 620 is configured to set a subframe that is used to transmit DSI corresponding to a DSP to null, where the DSP is used to transmit MBMS data packets corresponding to the type 0 control packet group when the determination result of the second receiving unit 610 is yes.

"The second sending unit 620 is configured to set a subframe that is used to transmit DSI corresponding to the DSP to null" may refer to any one of the following cases: the second sending unit 620 keeps mute in a subframe, the subframe being supposed to be used to transmit DSI corresponding to the DSP; or the second sending unit 620 determines whether to generate complete DSI corresponding to the DSP, and if it is determined not to generate the complete DSI corresponding to the DSP, the second sending unit 620 keeps mute in a subframe, the subframe being supposed to be used to transmit DSI corresponding to the DSP.

US 9,838,851 B2

13

Optionally, in this embodiment, if other MBMS data packets that have been received by the second receiving unit **610** and are to be scheduled by the second sending unit **620** in the DSP exist, the second sending unit **620** is further configured to transmit the other MBMS data packets in other subframes in the DSP. Optionally, the other MBMS data packets may include MBMS data packets of which time of transmission by the CN device BM-SC is earlier than the end time of a synchronization sequence corresponding to a lost type 0 PDU group; and/or MBMS data packets that are supposed to be scheduled before scheduling a service of MBMS data packets corresponding to the lost type 0 PDU group, and which belong to a service different from that of the MBMS data packets corresponding to the lost type 0 PDU group.

Optionally, if a subframe that is supposed to transmit DSI corresponding to the DSP is a first subframe of the DSP, the other subframes may be after the subframe is supposed to be used to transmit DSI corresponding to the DSP. If the subframe is supposed to be used to transmit DSI corresponding to the DSP is not a first subframe of the DSP, the other subframes may be before or after the subframe is supposed to be used to transmit DSI corresponding to the DSP.

Optionally, the second sending unit **620** is further configured to keep mute in remaining subframes after transmitting the other MBMS data packets. The remaining subframes include subframes that are after the other subframes in the DSP and reserved for a transmission channel that maps a service of MBMS data packets corresponding to the type 0 control packet group by the eNB.

In the embodiment of the present invention, the type 0 control packet group includes all type 0 control packets that include the same information and are transmitted repeatedly.

The device according to this embodiment may be a NodeB (such as eNB) or other AN entities, such as an hNB or microcell NodeB, or a unit that is inside a NodeB or other AN entities. The device may first determine whether data packets that are not received meet a given condition. For example, the device determines whether data packets that are not received include a type 0 PDU group corresponding to one or more MBMS data packets. If the given condition is met, the device sets a subframe that is used to transmit DSI corresponding to the DSP to null to prevent the device from transmitting incorrect DSI which may interfere with other devices and cause incorrect data receiving of a UE.

Persons of ordinary skill in the art may understand that all or part of the steps of the methods according to the embodiments of the present invention may be implemented by a program instructing relevant hardware. The program may be stored in a computer readable storage medium. The storage medium may be a Read-only Memory (ROM)/Random-access Memory (RAM), a magnetic disk or an optical disk.

The above descriptions are merely preferred embodiments of the present invention. It should be noted that persons of ordinary skill in the art can make various improvements and variations without departing from the principle of the invention. All such modifications and variations fall within the scope of the present invention.

What is claimed is:

**1**. A subframe processing method, the method comprising:

determining, by an evolved NodeB (eNB), that at least two consecutive Multimedia Broadcast Multicast Service (MBMS) data packets to be scheduled in a Dynamic Schedule Period (DSP) have not been received; and

14

setting a first subframe to null, by the eNB, if the eNB cannot determine the transmission position of the at least two consecutive MBMS data packets in the DSP, wherein the first subframe is to be used to transmit Dynamic Schedule Information (DSI) corresponding to the DSP, wherein the DSP includes at least the first subframe and subframes to be used to transmit the at least two consecutive MBMS data packets that have not been received.

**2**. The method according to claim **1**, wherein the setting the first subframe to null comprises keeping mute in the first subframe.

**3**. The method according to claim **1**, the method further comprising:

receiving other MBMS data packets that are to be scheduled in the DSP by the eNB; and

transmitting, by the eNB, the other MBMS data packets in other subframes in the DSP,

wherein the other MBMS data packets comprise at least one of:

first MBMS data packets, wherein a time of a transmission of the first MBMS data packets by a core network (CN) device is earlier than a time of a transmission of consecutive MBMS data packets by the CN device, and the first MBMS data packets belong to the same service as the consecutive MBMS data packets; and

second MBMS data packets, wherein the second MBMS data packets are to be scheduled by the eNB before the eNB schedules a service of the consecutive MBMS data packets, and the second MBMS data packets belong to a service different from that of the consecutive MBMS data packets.

**4**. The method according to claim **3**, wherein, after the eNB transmits the other MBMS data packets, the method further comprises:

keeping, by the eNB, mute in remaining subframes, wherein the remaining subframes comprise subframes being after the other subframes in the DSP and reserved for a transmission channel that maps the service of the consecutive MBMS data packets by the eNB.

**5**. A device, comprising:

one or more processors; and

a non-transitory computer-readable storage medium in communication with the one or more processors, with the computer-readable storage medium including computer-executable instructions executed by the one or more processors to:

determine at least two consecutive Multimedia Broadcast Multicast Service (MBMS) data packets to be scheduled in a Dynamic Schedule Period (DSP) have not been received; and

set a first subframe to null if the transmission position of the at least two consecutive MBMS data packets in the DSP cannot be determined, wherein the first subframe is to be used to transmit Dynamic Schedule Information (DSI) corresponding to the DSP, wherein the DSP includes at least the first subframe and subframes to be used to transmit the at least two consecutive MBMS data packets that have not been received.

**6**. The device according to claim **5**, wherein the setting the first subframe to null comprises keeping mute in the first subframe.

**7**. The device according to claim **5**, wherein the one or more processors further execute the computer-executable instructions to:

US 9,838,851 B2

15 16

receive other MBMS data packets that are to be scheduled in the DSP; and

transmit the other MBMS data packets in other subframes in the DSP,

wherein the other MBMS data packets comprise at least one of:

first MBMS data packets wherein a time of a transmission of the first MBMS data packets by a core network (CN) device is earlier than a time of a transmission of consecutive MBMS data packets by the CN device and the first MBMS data packets belong to the same service as the consecutive MBMS data packets; and

second MBMS data packets, wherein the second MBMS data packets are to be scheduled before the device schedules a service of the consecutive MBMS data packets and the second MBMS data packets belong to a service different from that of the consecutive MBMS data packets.

8. The device according to claim 7, wherein, after the transmitting the other MBMS data packets in other subframes in the DSP, the one or more processors further execute the computer-executable instructions to:

keep mute in remaining subframes, wherein the remaining subframes comprise subframes after the other subframes in the DSP and reserved for a transmission channel that maps the service of the consecutive MBMS data packets.

* * * * *

# EXHIBIT 12



US010117226B2

(12) **United States Patent**
Huang et al.

(10) Patent No.: **US 10,117,226 B2**
(45) Date of Patent: **Oct. 30, 2018**

(54) **METHOD, APPARATUS, AND SYSTEM FOR TRANSMISSION CONTROL OF MULTIMEDIA BROADCAST MULTICAST SERVICE DATA**

(71) Applicant: **Huawei Technologies Co., Ltd.,** Shenzhen (CN)

(72) Inventors: **Qufang Huang**, Shanghai (CN); **Mingzeng Dai**, Shanghai (CN)

(73) Assignee: **Huawei Technologies Co., Ltd.,** Shenzhen (CN)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 144 days.

(21) Appl. No.: **15/200,352**

(22) Filed: **Jul. 1, 2016**

(65) **Prior Publication Data**

US 2016/0316453 A1     Oct. 27, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/175,303, filed on Feb. 7, 2014, now Pat. No. 9,398,605, which is a
(Continued)

(30) **Foreign Application Priority Data**

Aug. 8, 2011     (CN) .......................... 2011 1 0226133

(51) **Int. Cl.**
*H04H 20/71*          (2008.01)
*H04W 72/00*          (2009.01)
(Continued)

(52) **U.S. Cl.**
CPC ........... *H04W 72/005* (2013.01); *H04W 4/06* (2013.01); *H04W 72/121* (2013.01);
(Continued)

(58) **Field of Classification Search**
USPC ....... 370/229, 230, 235, 236, 252, 312, 328, 370/390, 395.4, 432
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

9,191,222 B2 *  11/2015  Sun ..................... H04W 72/005
9,398,605 B2 *   7/2016  Huang ................... H04W 4/06
(Continued)

FOREIGN PATENT DOCUMENTS

CN     101686431 A      3/2010
CN     101909244 A     12/2010
(Continued)

OTHER PUBLICATIONS

"SYNCProtocol for LTE; Discussion and Decision," 3GPP TSG-RAN WG3 Meeting #65, R3-091749, Aug. 24-28, 2009, 9 pages.
(Continued)

*Primary Examiner* — Kwang B Yao
*Assistant Examiner* — Nguyen Ngo
(74) *Attorney, Agent, or Firm* — Slater Matsil, LLP

(57) **ABSTRACT**

Embodiments of the present invention disclose a method, an apparatus, and a system for transmission control of multimedia broadcast multicast data. The method includes: according to a reference time, determining a scheduling period of suspending or resuming sending MBMS service data; and suspending or resuming sending the MBMS service data in the determined scheduling period. According to the embodiments of the present invention, transmission control of the MBMS service data by a base station can be realized, which facilitates each base station in the same MBSFA range synchronously suspending or resuming sending the MBMS service data of the same service, thereby facilitating reducing interferences in the service.

**15 Claims, 14 Drawing Sheets**



## US 10,117,226 B2

### Related U.S. Application Data

continuation of application No. PCT/CN2012/079808, filed on Aug. 8, 2012.

(51) **Int. Cl.**
 *H04W 4/06*          (2009.01)
 *H04W 72/12*        (2009.01)
 *H04W 84/04*        (2009.01)
(52) **U.S. Cl.**
 CPC ...  *H04W 72/1226* (2013.01); *H04W 72/1263* (2013.01); *H04W 84/042* (2013.01)

(56)                **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2005/0190712 A1* | 9/2005 | Lee | H04L 12/1881 370/312 |
| 2006/0059407 A1 | 3/2006 | Wang et al. | |
| 2006/0067361 A1* | 3/2006 | Lee | H04W 72/005 370/466 |
| 2008/0318566 A1* | 12/2008 | Chun | H04W 48/12 455/422.1 |
| 2010/0315988 A1 | 12/2010 | Chen | |
| 2010/0323714 A1* | 12/2010 | Schmidt | H04W 48/18 455/456.1 |
| 2011/0086608 A1* | 4/2011 | Yamagishi | G08B 27/006 455/404.1 |
| 2011/0199973 A1* | 8/2011 | Li | H04W 72/005 370/328 |
| 2011/0274025 A1* | 11/2011 | Hsu | H04W 72/005 370/312 |
| 2012/0202493 A1* | 8/2012 | Wang | H04W 60/00 455/435.1 |
| 2012/0213142 A1* | 8/2012 | Van Lieshout | H04W 72/121 370/312 |
| 2014/0153475 A1 | 6/2014 | Huang et al. | |
| 2014/0362756 A1 | 12/2014 | Maeda et al. | |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102035794 A | 4/2011 |
| EP | 2346204 A1 | 7/2011 |
| JP | 2011511589 A | 4/2011 |
| WO | 2005078962 A1 | 8/2005 |
| WO | 2009078152 A1 | 6/2009 |
| WO | 2013020503 A1 | 2/2013 |

#### OTHER PUBLICATIONS

"3rd Generation Partnership Project; Technical Specification Group Radio Accesss Network; Evolved Universal Terrestrial Radio Access E-UTRA) and Evolved Universal Terrestrial Radio Access Network (E-UTRAN); Overall description; Stage 2 (Release 10)," 3GPP TS 36.300 V10.4.0, Technical Specification, Jun. 2011, 194 pages.

Extended European Search Report, Application No. 12821815.3, Applicant Huawei Technologies Co., Ltd., dated Jun. 27, 2014, 6 pages.

Chinese Search Report of PCT, Application No. PCT/CN2012/079808, Nov. 22, 2012, 11 pages.

"3rd Generation Partnership Project; Technical Specification Group Radio Accesss Network; Evolved Universal Terrestrial Radio Access Network (E-UTRAN); M2 Application Protocol (M2AP); (Release 10)," 3GPP TS 36.443 V10.2.0, Technical Specification, Jun. 2011, 84 pages.

* cited by examiner

**U.S. Patent**          Oct. 30, 2018          Sheet 1 of 14          US 10,117,226 B2



11

According to a reference time, determine a scheduling period of
suspending or resuming sending MBMS service data

12

Suspend or resume sending the MBMS service data in the determined
scheduling period

FIG. 1

21

Generate indication information including a reference time

22

Send the indication information to each base station in the same
MBSFA range, so as to instruct the base station to determine,
according to the reference time, a scheduling period of
suspending or resuming sending MBMS service data

FIG. 2



FIG. 3a



FIG. 3b



FIG. 3c



FIG. 3d



FIG. 3e



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

FIG. 12

US 10,117,226 B2

1

**METHOD, APPARATUS, AND SYSTEM FOR TRANSMISSION CONTROL OF MULTIMEDIA BROADCAST MULTICAST SERVICE DATA**

CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 14/175,303 filed on Feb. 7, 2014, which is a continuation of International Application No. PCT/CN2012/079808, filed on Aug. 8, 2012, which claims priority to Chinese Patent Application No. 201110226133.7, filed on Aug. 8, 2011, both of which are hereby incorporated by reference in their entireties.

TECHNICAL FIELD

Embodiments of the present invention relate to communication technologies, and in particular, to a method, an apparatus, and a system for transmission control of multimedia broadcast multicast service data.

BACKGROUND

An MBMS mainly indicates that a network side may send multimedia service data with the same content at the same time to multiple terminals (also referred to as user equipment, abbreviated as UE), so that an air interface resource can be effectively saved, and a utilization ratio of the resource can be improved. A process of a control plane needs to be performed before MBMS service data in a long term evolution (LTE) communication system starts to be sent, so as to establish a bearer and allocate the air interface resource. In the process of the control plane, a data source triggers a control signaling along a gateway, a mobility management entity (MME), a multi-cell/multicast coordination entity (MCE), and a base station (E-UTRAN NodeB, abbreviated as eNB). Specifically, the data source sequentially informs the gateway about information such as characteristics of the service, requested resource, and expected areas to be sent to; the gateway assigns corresponding IP multicast addresses and transmits to the MME and the MCE; the MCE allocates an air interface transmission resource and informs each eNB; and the eNB joins a corresponding IP multicast group according to the IP multicast addresses assigned by the gateway, and according to the air interface resource information allocated by the MCE, updates a reserved sub-frame which is used for the MBMS transmission. After the process of the control plane ends, the MBMS service data which is of a user plane and is sent out by the data source flows through the gateway, and arrives at each eNB in the IP multicast group in a manner of IP multicast, and then is transmitted to the terminals by the eNB through the air interface.

In the LTE, the sending of the MBMS service data follows a transmission mode of multimedia broadcast multicast service single frequency network (MBSFN), that is to say, multiple eNBs in a certain area need to send the completely same MBMS service data in the same sub-frame, in this way, after the MBMS service data sent by the eNBs arrived at the terminals, the terminals cannot distinguish which eNB sends the signal, and the signals sent by the multiple eNBs may be superimposed and enhanced at the UE, thereby reducing a packet error ratio. The MCE suspends some services according to actual control needs of communication, that is, interrupts sending the MBMS service data of these services,

2

so as to achieve the purpose of saving the air interface resource and reducing the power consumption of the eNB. The service suspension is temporary; and when the conditions are not satisfied, the sending of the MBMS service data of the suspended services needs to be resumed. The service suspension and the service resumption are performed in a range of a multimedia broadcast multicast service single frequency network area (MBSFN Area, abbreviated as MBSFA), and generally, one service may be transmitted in multiple MBSFA ranges. Therefore, the data source generally continues sending the MBMS service data of this service for the usage of an MBSFA whose service is not suspended.

The control signaling of the MBMS service data, that is, a multicast control channel (MCCH) message, is sent cyclically, and the MCE can only modify the MCCH message at some predefined time points, where a time interval between two time points when the MCCH message may be modified is referred to as an MCCH modification period, and each eNB in the same MBSFA range uses the same MCCH modification period number. When the MCE determines that a certain service needs to be suspended or resumed in a certain MBSFA range, the MCE firstly informs all the eNBs in the MBSFA range, and updates the MCCH message from a certain MCCH modification period, thereby ensuring that all the eNBs in the same MBSFA range synchronously update the MCCH message. However, the prior art does not provide a corresponding solution for how the eNB in the same MBSFA range realizes suspension or resumption control of the MBMS service data.

SUMMARY

The embodiments of the present invention provide a method, an apparatus, and a system for transmission control of multimedia broadcast multicast service data, so as to realize transmission control of the multimedia broadcast multicast service data.

In one aspect, an embodiment of the present invention provides a transmission control method for multimedia broadcast multicast service data, including: according to a reference time, determining a scheduling period of suspending or resuming sending multimedia broadcast multicast service data; and suspending or resuming sending the multimedia broadcast multicast service data in the determined scheduling period.

In another aspect, an embodiment of the present invention further provides another transmission control method for multimedia broadcast multicast service data, including: generating indication information including a reference time; and sending the indication information to each base station in the same multimedia broadcast multicast service single frequency network area range, so as to instruct the base station to determine, according to the reference time, a scheduling period of suspending or resuming sending the multimedia broadcast multicast service data.

In another aspect, an embodiment of the present invention provides a base station, including: a scheduling period determining module, configured to: according to a reference time, determine a scheduling period of suspending or resuming sending multimedia broadcast multicast service data; and a transmission control module, configured to suspend or resume sending the MBMS service data in the determined scheduling period.

In another aspect, an embodiment of the present invention further provides a network device, including: a generating

US 10,117,226 B2

3

module configured to generate indication information including a reference time; and a sending module configured to send the indication information to each base station in the same multimedia broadcast multicast service single frequency network area range, so as to instruct the base station to determine, according to the reference time, a scheduling period of suspending or resuming sending the multimedia broadcast multicast service data.

In another aspect, an embodiment of the present invention further provides a communication system, including the foregoing base station and the foregoing network device.

In the method, the apparatus, and the system for transmission control of multimedia broadcast multicast service data provided in the embodiments of the present invention, according to the pre-acquired reference time, the base station determines the scheduling period of starting suspending or resuming sending the MBMS service data, and suspends or resumes sending the MBMS service data in the determined scheduling period, so as to realize the transmission control of the MBMS service data by the base station. Through the embodiments of the present invention, it facilitates each base station in the same MBSFA range synchronously suspending or resuming sending the MBMS service data of the same service, thereby facilitating reducing interferences in the service.

BRIEF DESCRIPTION OF THE DRAWINGS

To illustrate the technical solutions in the embodiments of the present invention or in the prior art more clearly, the accompanying drawings required for describing the embodiments or the prior art are briefly introduced in the following. Apparently, the accompanying drawings in the following description are merely some embodiments of the present invention, and persons of ordinary skill in the art can further derive other drawings according to these drawings without making creative efforts.

FIG. 1 is a flow chart of a transmission control method for MBMS service data according to a first embodiment of the present invention;

FIG. 2 is a flow chart of a transmission control method for MBMS service data according to a second embodiment of the present invention;

FIG. 3a is a schematic diagram of mapping MBMS service data to MCH scheduling periods according to an embodiment of the present invention;

FIG. 3b is a schematic diagram of mapping MBMS service data to MBSFN sub-frames in MCH scheduling periods according to an embodiment of the present invention;

FIG. 3c is a schematic diagram of an MCCH modification period when an MCCH message is updated according to an embodiment of the present invention;

FIG. 3d is a scenario example of suspending sending MBMS service data according to an embodiment of the present invention;

FIG. 3e is a scenario example of bringing in interferences in resuming sending MBMS service data according to an embodiment of the present invention;

FIG. 4 is a signaling interaction diagram of a transmission control method for MBMS service data according to a third embodiment of the present invention;

FIG. 5 is a first optional implementation manner example of determining a time of transmission control of MBMS service data according to a third embodiment of the present invention;

4

FIG. 6 is a second optional implementation manner example of determining a time of transmission control of MBMS service data according to a third embodiment of the present invention;

FIG. 7 is a third optional implementation manner example of determining a time of transmission control of MBMS service data according to a third embodiment of the present invention;

FIG. 8 is a signaling interaction diagram of a transmission control method for MBMS service data according to a fourth embodiment of the present invention;

FIG. 9 is an optional implementation manner example of determining a time of transmission control of MBMS service data according to a fourth embodiment of the present invention;

FIG. 10 is a signaling interaction diagram of a transmission control method for MBMS service data according to a fifth embodiment of the present invention;

FIG. 11 is a schematic structural diagram of a base station according to a sixth embodiment of the present invention; and

FIG. 12 is a schematic structural diagram of a network device according to a seventh embodiment of the present invention.

DETAILED DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

To make the objectives, technical solutions, and advantages of embodiments of the present invention clearer, the technical solutions in the embodiments of the present invention are clearly and completely described in the following with reference to the accompanying drawings in the embodiments of the present invention. Apparently, the embodiments in the following description are merely a part of rather than all the embodiments of the present invention. All other embodiments acquired by persons skilled in the art based on the embodiments of the present invention without making creative efforts shall fall within the protection scope of the present invention.

The sequence numbers of the following embodiments of the present invention are only for description, and do not represent the embodiments are good or bad.

FIG. 1 is a flow chart of a transmission control method for MBMS service data according to a first embodiment of the present invention. The implementation subject of this embodiment may be a base station such as an eNB. As shown in FIG. 1, the transmission control method for MBMS service data according to this embodiment includes:

Step 11: According to a reference time, determine a scheduling period of suspending or resuming sending the MBMS service data.

The base station acquires the reference time before determining the scheduling period of suspending or resuming sending the MBMS service data. The reference time may be directly indicated by a network side device such as an MCE. Or, the reference time may be indirectly indicated by a network side device such as an MCE, for example, the MCE instructs the base station to update an MCCH modification period of an MCCH message, and the base station determines the reference time based on the MCCH modification period. After the base station acquires the reference time, the base station determines a certain scheduling period starting from the reference time and backwards along the time axis, and this scheduling period is taken as the scheduling period of suspending or resuming sending the MBMS service data.

US 10,117,226 B2

5

For example, the base station may start from the reference time and search backwards for an Mth scheduling period of a multicast channel (MCH) that bears the MBMS service data, where M is an integer greater than or equal to 1; and determine the found scheduling period as the scheduling period of suspending or resuming the MBMS service data. M may be a certain predetermined value, for example, a communication protocol predetermines M=1; or, M may be a certain preconfigured value, for example, a network management system configures the same M value for each base station in the same multimedia broadcast multicast service single frequency network area (MBSFA) in advance, for example, configures M to 1.

Step 12: Suspend or resume sending the MBMS service data in the determined scheduling period.

In the transmission control method for the MBMS service data according to the embodiment, the base station determines, according to the pre-acquired reference time, the scheduling period of suspending or resuming sending the MBMS service data, and suspends or resumes sending the MBMS service data in the determined scheduling period, so as to realize transmission control of the MBMS service data by the base station. Since each base station in the same MBSFA may adopt the same method provided in the embodiment of the present invention to determine the same scheduling period of suspending or resuming sending the MBMS service data of a certain service, synchronously suspending or resuming sending the MBMS service data of the same service by these base stations can be realized, thereby facilitating reducing interferences in the service.

FIG. 2 is a flow chart of a transmission control method for MBMS service data according to a second embodiment of the present invention. The implementation subject of this embodiment may be a network side device relative to a base station, such as an MCE. As shown in FIG. 2, the transmission control method for MBMS service data according to this embodiment includes:

Step 21: Generate indication information including a reference time.

The reference time is used for the base station to determine a scheduling period of suspending or resuming the MBMS service data, which may include, but is not limited to: a start time designated by the network side device; or, an MCCH modification period deviation value N, and N is an integer greater than or equal to 1.

Step 22: Send the indication information to each base station in the same MBSFA range, so as to instruct the base station to determine, according to the reference time, the scheduling period of suspending or resuming sending the MBMS service data.

Each base station in the same MBSFA range receives the indication information sent by the network side device such as the MCE, acquires the reference time included in the indication information, and according to the reference time, determines the scheduling period of suspending or resuming sending the MBMS service data.

For example, the reference time may be the start time designated by the network side device, for example, the start time designated by the MCE or an OAM (Operations, Administration and Maintenance), and then, each base station in the same MBSFA range may determine, according to the start time indicated by the network side device, an Mth scheduling period of the MCH that bears the MBMS service data after the start time indicated by the network side device, as the scheduling period of suspending or resuming sending the MBMS service data, and M is an integer greater than or equal to 1.

6

For example, the reference time may be an MCCH modification period deviation value N, and N is an integer greater than or equal to 1, and then, each base station in the same MBSFA range may determine, the Mth scheduling period of the multicast channel that bears the multimedia broadcast multicast service data after a start time of an Nth multicast control channel modification period after the multicast control channel modification period of updating the multicast control channel message, as the scheduling period of suspending or resuming sending the multimedia broadcast multicast service data, where M is an integer greater than or equal to 1.

In the transmission control method for MBMS service data according to this embodiment, the network device indicates the reference time for determining the scheduling period of suspending or resuming sending the MBMS service data of a certain service for each base station in the same MBSFA, and therefore, each base station in the same MBSFA may determine, according to the reference time, the same scheduling period of suspending or resuming sending the MBMS service data of this service, and synchronously suspending or resuming sending the MBMS service data of the same service by these base stations is realized, thereby facilitating reducing interferences in the service.

In the following, a transmission principle of the MBMS service data is described in detail with reference to FIG. 3a to FIG. 3e, possible reasons of generating interferences in the service in a LTE system are analyzed, and the technical essence of reducing the interferences in the service by using the technical solutions provided in the embodiments of the present invention is described.

FIG. 3a is a schematic diagram of mapping MBMS service data to MCH scheduling periods according to an embodiment of the present invention. In order to achieve the purpose of sending by an MBSFN, MCHs of the service bearers may be predetermined, and each scheduling period of each MCH includes one or more sub-frames that can be used for transmitting the MBMS service data, and this type of sub-frame is referred to as an MBSFN sub-frame. In FIG. 3a, three sub-frames are in each wireless frame and are used for MBSFN transmission, and are numbers 3, 6 and 8 sub-frames, that is, the numbers 3, 6 and 8 sub-frames are MBSFN frames. It is assumed that the MCH shown in the FIG. 3a bears the MBMS service data of services A, B and C. The scheduling periods of the MCH are numbered starting from a certain predetermined time according to the time order. The eNB maps each MBMS service data packet to a corresponding scheduling period of the MCH according to a time stamp carried by each MBMS service data packet. For example, in FIG. 3a, number 360 and number 361 MBMS service data packets of the service A and number 0 and number 1 MBMS service data packets of the service B are mapped to an Mth scheduling period of the MCH; number 2 and number 3 MBMS service data packets of the service B and number 0 and number 1 MBMS service data packets of the service C are mapped to an (M+1)th scheduling period of the MCH, where M represents the number of the scheduling period of the MCH, and is an integer greater than or equal to 1.

FIG. 3b is a schematic diagram of mapping MBMS service data to MBSFN sub-frames in MCH scheduling periods according to an embodiment of the present invention. In one scheduling period of the MCH, the MBMS service data of each service is sequentially arranged into each MBSFN sub-frame, firstly arranged according to the service, and this service sequence may be determined by the MCE and indicated to the eNB; the MBMS service data of

US 10,117,226 B2

7

the same service is arranged sequentially. If the service sequence is A, B and C, the specific transmission in the foregoing example is shown in FIG. 3b. Specifically, the number 360 MBMS service data packet of the service A is mapped to the number 3 sub-frame; if the number 3 sub-frame still has a remaining resource, the number 361 MBMS service data packet is continuously mapped to the number 3 sub-frame; and the remaining content after the number 361 MBMS service data packet being mapped to the number 3 sub-frame is mapped to the number 6 sub-frame, and so on. If the MBSFN sub-frame resource included in the current scheduling period of the MCH are exhausted, but the transmission of the MBMS service data packet of a certain number is still not completed, the eNB discards the service data that is not transmitted in the current scheduling period which is of the MCH and is the MBMS service data packet.

In the MBMS system, the MCE may suspend certain services according to actual needs of communication, so as to achieve the purpose of saving an air interface resource and reducing the power consumption of the eNB. For example, the MCE instructs each eNB to make statistics of the quantity of receivers of the MBMS service data of a certain service; if the quantity of the receivers is very few, the MCE may suspend the service. For example, when transmitting the MBMS service data of a service with a higher priority starts, if the MCE finds that the current air interface resource is insufficient, in this case, the MCE may suspend some services with low priorities.

The service suspension is usually temporary, and the suspended services need to be resumed after a period of time. For example, after suspending a certain service for a period of time, the MCE may instruct the eNB to make statistics of the quantity of receivers of the MBMS service data of this service again, and if the quantity of the receivers rises, the MCE may determine to allow the eNB to resume sending the MBMS service data of this service through the air interface. For example, when transmitting the MBMS service data of one or more other services, except the suspended services, ends, and a part of the air interface resource is empty, the MCE may instruct the eNB to resume sending the MBMS service data of the service.

Since a terminal determines, according to a control signaling of the MBMS service, that is, an MCCH message, to receive the MBMS service data, the service information indicated by the MCCH message should correspond to the MBMS service data that is actually sent. When the MCE determines to suspend or resume sending the MBMS service data of a certain service, based on the current updating mechanism of the MCCH message, it is ensured that each eNB synchronously updates the MCCH messages. Specifically, the MCCH message is sent cyclically, the MCE can only update the MCCH message at some predefined time points, and a time interval between two time points when the MCCH message is possibly updated is referred to as an MCCH modification period. Each MCCH modification period may include multiple MCCH repeat periods, as shown in FIG. 3c, each MCCH modification period may include four MCCH repeat periods. The eNB sends an MCCH message in each of the four MCCH repeat periods, and the contents of the MCCH messages sent in the four MCCH repeat periods are the same; the eNB can merely modify the content of the MCCH message, that is, update the MCCH message, at a start time of a next MCCH modification period. Each MCCH modification period in the LTE is numbered, and each eNB in the MBSFN numbers the MCCH modification period all at the same start point, so that at the same moment, each eNB in the same MBSFA range

8

uses the same MCCH modification period number. When the MCE determines that a certain service needs to be suspended or resumed in a certain MBSFA, the MCE firstly instructs all the eNBs in the MBSFA to update the MCCH message from a certain MCCH modification period. All the eNBs in the same MBSFA range update the MCCH message in the same MCCH modification period, so as to ensure that the service information indicated in the MCCH message is consistent with the MBMS data that is actually transmitted by the air interface.

Although each eNB in the same MBSFA synchronously updates the MCCH message in the same MCCH modification period, the prior art does not have a unified method used for determining the time of transmission control for the corresponding MBMS service data, so that the eNB usually randomly determines the time of transmission control for the corresponding MBMS service data, and as a result, interferences in the service may be caused. The details are described with examples as follows:

FIG. 3d is a scenario example of suspending sending MBMS service data according to an application scenario according to an embodiment of the present invention. It is assumed that the MCE determines to suspend a service A in the MBSFA 2 range, and then the MCE indicates all the eNBs, such as eNB 21 and eNB 22, in the MBSFA 2 range. Specifically, as shown in FIG. 3d, the MCE instructs all the eNBs, such as eNB 21 and eNB 22, in the MBSFA 2 range to start updating the MCCH message at the start time of the number 81 MCCH modification period: delete corresponding control information of the service A from the original MCCH message. The eNB 21 and eNB 22 synchronously update the MCCH message, but may start suspending sending data packets of the service A in different scheduling periods.

FIG. 3e is a scenario example of bringing in interferences by resuming sending MBMS service data according to an application scenario of an embodiment of the present invention. If the MCE determines to resume the service A in MBSFA 2 range, the MCE instructs all the eNBs, such as the eNB 21 and eNB 22, in the MBSFA 2 range to start updating the MCCH message at the start time of the MCCH modification period with the same number. The eNB 21 and eNB 22 synchronously update the MCCH message, but may start resuming sending the MBMS service data of the service in different scheduling periods. For example, if the eNB 21 randomly determines to resume sending the data packet of the service A in an Mth scheduling period of the MCH, the MBMS service data sent by the eNB 21 in the Mth scheduling period of the MCH is that: the number 360 and number 361 data packets of the service A, and the number 0 and number 1 data packets of the service B; if the eNB 22 randomly determines to resume sending the MBMS data of the service in an (M+1)th scheduling period of the MCH, the MBMS data sent by the eNB 22 in the (M+1)th scheduling period of the MCH is that: the number 0 and number 1 data packets of the service B. It can be seen that, in the Mth scheduling period of the MCH, the data packets sent by the eNB 21 and the eNB 22 through the air interface are different. Since the MBSFN transmission mode must ensure that all the eNB in the same MBSFA range transmit the same content, and the eNB 21 and the eNB 22 send different MBMS service data on the air interface, interferences in the services are caused. Similarly, when the MBMS service is suspended, when different eNBs in the same MBSFA range start suspending sending the MBMS service data of the service in different scheduling periods, each eNB is caused

US 10,117,226 B2

9 10

to send different contents on the air interface in the same scheduling period, and interferences in the service may also be caused.

In the transmission control method for the MBMS data provided in this embodiment, according to the pre-acquired reference time, the eNB determines the time of the transmission control for the MBMS service data. Each eNB in the same MBSFA range uses the same method, and the determined time of the transmission control for the MBMS service data is the same, so that each eNB in the same MBSFA range can synchronously suspend or resume sending the same MBMS service data, thereby reducing interferences in the service.

FIG. 4 is a signaling interaction diagram of a transmission control method for MBMS service data according to a third embodiment of the present invention. A reference time in this embodiment is: a certain time of an MCCH modification period when an MCCH message is updated. As shown in FIG. 4, the method according to this embodiment includes:

Step 41: An MCE determines to suspend or resume the service A, and generates MBMS scheduling information.

If the MCE determines to suspend a service A, the MCE deletes a control signaling of the service A from the MCCH message, so as to update the MCCH message; if the MCE determines to resume the suspended service A, a control signaling of the service A is added into the MCCH message, so as to update the MCCH message.

The MCCH scheduling information includes: a parameter "an MCCH updated modification period", used to indicate the MCCH modification period when the MCCH message is updated; and the MCCH message includes a control signaling corresponding to the MBMS service data, such as information of suspending or resuming the MBMS service.

Step 42: The MCE sends the MBMS scheduling information to an eNB, where the MBMS scheduling information includes the parameter "MCCH updated modification period".

Step 43: The eNB receives the MBMS scheduling information, and updates the MCCH message in the MCCH modification period corresponding to the parameter "MCCH updated modification period" that is included in the MBMS scheduling information.

The eNB receives an MCCH message in the MCCH modification period corresponding to the parameter "MCCH updated modification period", and compares the newly received MCCH message with an MCCH message stored by the eNB (referred to as: original MCCH message). If the newly received MCCH message is in lack of the control signaling of the service A relative to the original MCCH message, the eNB learns that the MCE suspends the service A; and if the newly received MCCH message is added with the control signaling of the service A relative to the original MCCH message, the eNB learns that the MCE resumes the service A.

Step 44: The eNB determines, from a certain time of the MCCH modification period when the MCCH message is updated, a first scheduling period of the MCH that bears the MBMS service data, as a scheduling period of suspending or resuming the MBMS service data.

In the LTE system, a corresponding relationship between the service and the MCH is determined in advance, a certain service such as the MBMS data of the service A can merely be transmitted on the MCH corresponding to the service A. In the following, with reference to FIG. 5 to FIG. 8, from different times of the MCCH modification period when the MCCH message is updated optional, implementation manners of the eNB for determining the scheduling period of

starting suspending or resuming the corresponding MBMS service data are described in detail. For the ease of description, merely three MCHs, that is, an MCH 1, an MCH 2, and an MCH 3, are used as examples in FIG. 5 to FIG. 7 for description; and the examples should not be construed as a limitation to the essence of the technical solutions of the present invention.

Implementation manner 1: From a start time of the MCCH modification period when the MCCH message is updated, search backwards for a first scheduling period of the MCH that bears the MBMS service data; and determine the found scheduling period as the scheduling period of suspending or resuming the MBMS service data; and the details are shown in FIG. 5.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 1, the eNB, from a start time of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 1, that is, corresponding to a time 1 shown in FIG. 5; and determines the found first scheduling period of the MCH 1 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 2, the eNB, from a start time of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 2, that is, corresponding to a time 2 shown in FIG. 5; and determines the found first scheduling period of the MCH 2 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 3, the eNB, from a start time of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 3, that is, corresponding to a time 3 shown in FIG. 5; and determines the found first scheduling period of the MCH 3 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

Implementation manner 2: From a start time of transmitting the MCCH message for the first time in the MCCH modification period when the MCCH message is updated, search backwards for the first scheduling period of the MCH that bears the MBMS service data; and determine the found scheduling period as the scheduling period of suspending or resuming the MBMS service data.

Each MCCH modification period may include four MCCH repeat periods, and the contents of the MCCH messages transmitted in different MCCH repeat periods are the same. The MCCH message may be sent in the first or not the first MBSFN sub-frame of each MCCH repeat period. Each MCCH repeat period may include four common periods, and each common period includes a resource block of the MCH 1, the MCH 2, and the MCH 3.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 1, the eNB, from a time of transmitting the MCCH message in a first repeat period of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 1, that is, corresponding to a time 1 shown in FIG. 6; and determines the found first scheduling period of the MCH 1 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

US 10,117,226 B2

11

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 2, the eNB, from a time of transmitting the MCCH message in a first repeat period of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 2, that is, corresponding to a time 2 shown in FIG. 6; and determines the found first scheduling period of the MCH 2 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 3, the eNB, from a time of transmitting the MCCH message in a first repeat period of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 3, that is, corresponding to a time 3 in FIG. 6; and determines the found first scheduling period of the MCH 3 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

Implementation manner 3: From a start time of a second MCCH repeat period in the MCCH modification period when the MCCH message is updated, search backwards for a first scheduling period of the MCH that bears the MBMS service data; and determine the found scheduling period as the scheduling period of suspending or resuming the MBMS service data.

Each MCCH modification period may include four MCCH repeat periods, and the contents of the MCCH messages transmitted in different MCCH repeat periods are the same.

If the MCH that supports and bears the MBMS service data of the service A is predetermined to be the MCH 1, the eNB, from a start time of the second repeat period in the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 1, that is, corresponding to a time 1 shown in FIG. 7; and determines the found first scheduling period of the MCH 1 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 2, the eNB, from a start time of the second repeat period in the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 2, that is, corresponding to a time 2 shown in FIG. 7; and determines the found first scheduling period of the MCH 2 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 3, the eNB, from a start time of the second repeat period in the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 3, that is, corresponding to a time 3 shown in FIG. 7; and determines the found first scheduling period of the MCH 3 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

Step 45: The eNB suspends or resumes sending the MBMS service data of the service A in the scheduling period that is determined in step 44.

No matter whether the eNB suspends or resumes sending the MBMS service data of the service A to the UE in the scheduling period that is determined in step 44, a data source continues to deliver the MBMS service data of the service A through a gateway (GW). When the eNB suspends sending the MBMS service data of a certain service such as the service A, the eNB may exit an IP multicast group, and join

12

the corresponding IP multicast group again when the MCE instructs resuming the service A. In this way, the eNB does not receive the data packets of the MBMS service in the suspended period of this MBMS service. Or, the eNB may not exit the IP multicast group, in this way, the eNB does not need to join the IP multicast group again when the MCE instructs resuming the service A. If this method is adopted, the eNB continues receiving the MBMS data of the service A in the suspended period of the service A, and eNB merely needs to discard the received MBMS data of the service A.

In this embodiment, each eNB in the same MBSFA determines, according to the certain same time of the MCCH modification period when the MCCH message is updated, the same scheduling period of starting the transmission control of the MBMS service data, and suspends or resumes sending the MBMS service data of the same service in the determined scheduling period, and therefore, it is realized that the eNB synchronously suspends or resumes sending the MBMS service data of the same service, thereby reducing interferences in the service.

FIG. 8 is a signaling interaction diagram of a transmission control method for MBMS service data according to a fourth embodiment of the present invention. A reference time in this embodiment is: a start time of an Nth MCCH modification period after an MCCH modification period when an MCCH message is updated, where N represents an MCCH modification period deviation value and is an integer greater than or equal to 1. As shown in FIG. 8, the method according to this embodiment includes:

Step 81: An MCE determines to suspend or resume the service A, and generates MBMS scheduling information.

Step 82: The MCE sends the MBMS scheduling information to an eNB, where the MBMS scheduling information includes a parameter "MCCH updated modification period".

Step 83: The eNB receives the MBMS scheduling information, and updates the MCCH message in the MCCH modification period corresponding to the parameter "MCCH updated modification period" that is included in the MBMS scheduling information.

Step 84: The eNB, from a start time of an Nth MCCH modification after the MCCH modification period when the MCCH message is updated, determines, a first scheduling period of the MCH that bears the MBMS service data, as a scheduling period of suspending or resuming the MBMS service data, where N represents the MCCH modification period deviation value and is an integer greater than or equal to 1.

The eNB pre-acquires the MCCH modification period deviation value N when determining the scheduling period of starting suspending or resuming the MBMS service data. The scheduling period deviation value N configured by each eNB in the same MBSFA range is the same.

Optionally, the MCCH modification period deviation value N may be preconfigured on the eNB. Or, the MCCH modification period deviation value N may be indicated to the eNB by a network side device such as the MCE, and the specific manner of the network side device such as the MCE indicating the MCCH modification period deviation value N to the eNB is not limited, for example, the MCCH modification period deviation value N may be carried in the MBMS scheduling information described in the foregoing step 82 and is indicated to the eNB; or, the MCCH modification period deviation value N may be carried in other M2 interface messages between the MCE and the eNB, except the MBMS scheduling information, such as an initial configuration message and an MBMS service start/end/update message.

US 10,117,226 B2

13

N=1 is taken as an example for description:

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **1**, the eNB, from a start time of a first MCCH modification period after the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **1**, that is, corresponding to a time **1** shown in FIG. **9**; and determines the found first scheduling period of the MCH **1** as the scheduling period of suspending or resuming the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **2**, the eNB, from a start time of the first MCCH modification period after the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **2**, that is, corresponding to a time **2** shown in FIG. **9**; and determines the found first scheduling period of the MCH **2** as the scheduling period of suspending or resuming the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **3**, the eNB, from a start time of the first MCCH modification period after the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **3**, that is, corresponding to a time **3** shown in FIG. **9**; and determines the found first scheduling period of the MCH **3** as the scheduling period of suspending or resuming the MBMS service data of the service A.

The implementation manner when the MCCH modification period deviation value N is an integer greater than or equal to 2 is similar to the foregoing technical solutions when N=1, which is not repeatedly described here again.

Step **85**: The eNB suspends or resumes sending the MBMS service data of the service A in the scheduling period that is determined in step **84**.

In this embodiment, each eNB in the same MBSFA uses the same reference time to determine the same scheduling period of starting the transmission control of the MBMS service data, and suspends or resumes sending the MBMS service data of the same service in the determined scheduling period, so that it can be realized that the eNB synchronously suspends or resumes sending the MBMS service data of the same service, thereby reducing interferences in the service.

FIG. **10** is a signaling interaction diagram of a transmission control method for MBMS service data according to a fifth embodiment of the present invention. A reference time in this embodiment is: a start time indicated by a network side device. As shown in FIG. **10**, the method according to this embodiment includes:

Step **101**: An MCE determines to suspend or resume a service A, and generates MBMS scheduling information.

Step **102**: The MCE sends the MBMS scheduling information to an eNB, where the MBMS scheduling information includes a parameter "MCCH updated modification period".

Step **103**: The eNB receives the MBMS scheduling information, and updates an MCCH message in an MCCH modification period corresponding to the parameter "MCCH updated modification period" that is included in the MBMS scheduling information.

Step **104**: The eNB determines, from the start time indicated by the network side device, a first scheduling period of the MCH that bears the MBMS service data, as a scheduling period of suspending or resuming the MBMS service data.

Optionally, before determining the scheduling period of starting suspending or resuming the MBMS service data, the

14

eNB may receive indication information including the reference time, where the reference time may include the start time indicated by the network side device, such as the start time indicated by the MCE. According to the start time indicated by the network side device, such as the start time indicated by the MCE, the eNB determines the scheduling period of suspending or resuming the MBMS service data. The start time which is indicated by the network side device, such as the MCE, and is acquired by each eNB in the same MBSFA range is the same.

The start time indicated by the network side device, such as the MCE, may be carried in the MBMS scheduling information described in the foregoing step **102** and is indicated to the eNB; or, the start time indicated by the network side device, such as the MCE, may be carried in other M2 interface messages between the MCE and the eNB, except the MBMS scheduling information, such as an initial configuration message and an MBMS service start/end/update message.

Step **105**: The eNB suspends or resumes sending the MBMS service data of the service A in the scheduling period that is determined in step **104**.

In this embodiment, each eNB in the same MBSFA, according to the start time indicated by the network side device, determines the same scheduling period of starting the transmission control of the MBMS service data, and suspends or resumes sending the MBMS service data of the same service in the determined scheduling period, so that it can be realized that the eNB synchronously suspends or resumes sending the MBMS service data of the same service, thereby reducing interferences in the service.

FIG. **11** is a schematic structural diagram of a base station according to a sixth embodiment of the present invention. The base station shown in FIG. **11** includes: a scheduling period determining module in and a transmission control module **112**.

The scheduling period determining module **111** may be configured to: according to a reference time, determine a scheduling period of suspending or resuming sending MBMS service data.

The transmission control module **112** may be configured to suspend or resume sending the MBMS service data in the determined scheduling period.

Based on the foregoing technical solutions, optionally, the scheduling period determining module **111** may be further configured to: according to the reference time, determine, an Mth multimedia broadcast multicast service data after the reference time, as the scheduling period of suspending or resuming sending the multimedia broadcast multicast service data; and M is an integer greater than or equal to 1.

Optionally, the reference time may include: a start time of the MCCH modification period when the MCCH message is updated. In this case, the scheduling period determining module **111** may be further configured to determine, from the start time of the MCCH modification period when the MCCH message is updated, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data. The MCCH message includes a control signaling corresponding to the MBMS service data.

Optionally, the reference time may include: a start time of transmitting the MCCH message for the first time in the MCCH modification period when the MCCH message is updated. In this case, the scheduling period determining module **111** may be further configured to determine, from the start time of transmitting the MCCH message for the first

US 10,117,226 B2

15

time in the MCCH modification period when the MCCH message is updated, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data.

Optionally, the reference time may include: a start time of a second MCCH repeat period in the MCCH modification period when the MCCH message is updated. In this case, the scheduling period determining module 111 may be further configured to determine, from the start time of the second MCCH repeat period in the MCCH modification period when the MCCH message is updated, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data.

Optionally, the reference time may include: a start time of an Nth MCCH modification period after the MCCH modification period when the MCCH message is updated, where N represents an MCCH modification period deviation value and is an integer greater than or equal to 1. In this case, the scheduling period determining module 111 may be further configured to determine, from the start time of the Nth MCCH modification period after the MCCH modification period when the MCCH message is updated, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data. Further, the base station may also include: an acquisition module 113. The acquisition module 113 may be configured to preconfigure the MCCH modification period deviation value; or, to acquire the MCCH modification period deviation value according to received indication information including the MCCH modification period deviation value.

Optionally, the reference time may include: a start time indicated by the network side device, such as a start time indicated by the MCE. In this case, the base station may further include: an acquisition module 113. The acquisition module is configured to receive indication information including the reference time; and the reference time includes the start time indicated by the network side device. The scheduling period determining module 111 may be further configured to determine, from the start time indicated by the network side device, such as the MCE, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data; and M is an integer greater than or equal to 1.

According to the pre-acquired reference time, the base station provided in this embodiment may determine the scheduling period of suspending or resuming sending the MBMS service data, and suspends or resumes sending the MBMS service data in the determined scheduling period, so as to realize transmission control of the MBMS service data by the base station. Since each base station in the same MBSFA may use the same method provided in the embodiment of the present invention to determine the same scheduling period of starting suspending or resuming sending the MBMS service data of a certain service, so that it can be realized that these base stations synchronously suspend or resume sending the MBMS service data of the same service, thereby facilitating reducing interferences in the service. As for the working principle of the base station provided in this embodiment, reference can be made to the corresponding records of the corresponding embodiments in FIG. 1 and FIG. 4 to FIG. 10, which is not repeatedly described here again.

FIG. 12 is a schematic structural diagram of a network device according to a seventh embodiment of the present

16

invention. The network shown in FIG. 12 includes: a generating module 121 and a sending module 122.

The generating module 121 may be configured to generate indication information including a reference time. The reference time is used for the base station to determine the scheduling period of suspending or resuming the MBMS service data, which may include, but is not limited to, a start time designated by a network side device, for the base station to determine, according to the start time indicated by the network side device, the scheduling period of suspending or resuming sending multimedia broadcast multicast service data; or, an MCCH modification period deviation value N, for the base station to determine, according to a start time of an Nth multicast control channel modification period after an multicast control channel modification period when a multicast control channel message is updated, the scheduling period of suspending or resuming sending the multimedia broadcast multicast service data, where N is an integer greater than or equal to 1. The sending module 122 may be configured to send the indication information to each base station in the same multimedia broadcast multicast service single frequency network area range, so as to instruct the base station to determine, according to the reference time, the scheduling period of suspending or resuming sending the multimedia broadcast multicast service data.

The network device provided in this embodiment indicates the reference time for determining the scheduling period of suspending or resuming sending the MBMS service data of a certain service to each base station in the same MBSFA, so that each base station in the same MBSFA can determine, according to the reference time, the same scheduling period of suspending or resuming sending the MBMS service data of the service; which realizes that these base stations synchronously suspend or resume sending the MBMS service data of the same service, thereby facilitating reducing interferences in the service. The network device provided in this embodiment may be, but is not limited to the MCE, and as for its working principle, reference can be made to the corresponding records of the corresponding embodiments in FIG. 2 and FIG. 4 to FIG. 10, which is not repeatedly described here.

Further, an embodiment of the present invention further provides a communication system, and the communication system at least includes the base station as shown in FIG. 11 and the network device as shown in FIG. 12, where the base station and the network device are in communication connection. As for the working principle of the base station, reference can be made to the corresponding records of the corresponding embodiments in FIG. 1 and FIG. 4 to FIG. 10; and as for the working principle of the network device, reference can be made to the corresponding records of the corresponding embodiments in FIG. 2 and FIG. 4 to FIG. 10, which is not repeatedly described here again.

It should be understood by persons of ordinary skill in the art that the accompanying drawings are merely schematic diagrams of an embodiment, and modules or processes in the accompanying drawings are not necessarily required for implementing the present invention.

Those of ordinary skill in the art should understand that the modules in the apparatuses in the embodiments may be distributed in the apparatuses of the embodiments according to the description of the embodiments, and may also be allocated in one or multiple apparatuses which are different from those described in the embodiments after corresponding changes are performed. The modules in the foregoing embodiments may be combined into one module, and may also be further split into multiple submodules.

US 10,117,226 B2

17

Finally it should be noted that the foregoing embodiments are merely intended for describing the technical solutions of the present invention other than limiting the present invention. Although the present invention is described in detail with reference to the foregoing embodiments, persons of ordinary skill in the art should understand that they can still make modifications to the technical solutions recorded in the foregoing embodiments or make equivalent replacements to some technical features in the technical solutions, and these modifications or replacements do not make the essence of the corresponding technical solutions depart from the spirit and scope of the technical solutions of the embodiments of the present invention.

What is claimed is:

**1.** A method for transmitting multimedia broadcast multicast service data, the method comprising:

receiving, by a base station, from a multi-cell/multicast coordination entity (MCE), indication information indicating a multicast control channel modification period when a multicast control channel is updated; and

sending, by the base station, multimedia broadcast multicast service data in a scheduling period determined according to the indication information,

wherein the scheduling period is a same scheduling period in which another base station resumes sending the multimedia broadcast multicast service data in a same multimedia broadcast multicast service single frequency network (MBSFN) area.

**2.** The method according to claim **1**, wherein the scheduling period is an Mth scheduling period of a multicast channel that bears the multimedia broadcast multicast service data from a start time of the multicast control channel modification period when the multicast control channel is updated, wherein M is an integer greater than or equal to 1.

**3.** The method according to claim **2**, wherein M is preconfigured by a network management system.

**4.** The method according to claim **1**, wherein the scheduling period is a scheduling period within the multicast control channel modification period when the multicast control channel is updated.

**5.** The method according to claim **1**, further comprising:

receiving, by the base station from the MCE, an instruction instructing the base station to determine a quantity of user equipment devices receiving the multimedia broadcast multicast service data, wherein the quantity of user equipment devices is used for the MCE to determine the base station to send the multimedia broadcast multicast service data; and

notifying, by the base station to the MCE, the quantity of the user equipment devices.

**6.** A base station, comprising: a receiver, a processor and a memory;

wherein the receiver is configured to receive from a multi-cell/multicast coordination entity (MCE) indication information indicating a multicast control channel modification period when a multicast control channel is updated;

wherein the memory comprises programming instructions to be executed in the processor, the programming instructions configured to:

send multimedia broadcast multicast service data in a scheduling period determined according to the indication information;

wherein the scheduling period is a same scheduling period in which another base station resumes sending the multimedia broadcast multicast service data in a same

18

multimedia broadcast multicast service single frequency network (MBSFN) area.

**7.** The base station according to claim **6**, wherein the scheduling period is an Mth scheduling period of a multicast channel that bears the multimedia broadcast multicast service data from a start time of the multicast control channel modification period when the multicast control channel is updated, wherein M is an integer greater than or equal to 1.

**8.** The base station according to claim **7**, wherein M is preconfigured by a network management system.

**9.** The base station according to claim **6**, wherein the scheduling period is a scheduling period within the multicast control channel modification period when the multicast control channel is updated.

**10.** The base station according to claim **6**,

wherein the receiver is further configured to receive from the MCE, an instruction instructing the base station to determine a quantity of user equipment devices receiving the multimedia broadcast multicast service data, wherein the quantity of user equipment devices is used for the MCE to determine the base station to resume sending the multimedia broadcast multicast service data; and

wherein the programming instructions is further configured to notify to the MCE, the quantity of the user equipment devices.

**11.** A multi-cell/multicast coordination entity (MCE) comprising:

a processor;

a memory storing program instructions to be executed in the processor, the instructions configured to cause the processor to generate indication information indicating a multicast control channel modification period when a multicast control channel is updated; and

a transmitter configured to send the indication information to a base station in a multimedia broadcast multicast service single frequency (MBSFN) area, wherein the indication information is used for the base station to determine a scheduling period of sending multimedia broadcast multicast service data;

wherein the scheduling period is a same scheduling period in which another base station resumes sending the multimedia broadcast multicast service data in the same MBSFN area.

**12.** The MCE according to claim **11**, wherein the scheduling period is an Mth scheduling period of a multicast channel that bears the multimedia broadcast multicast service data from a start time of the multicast control channel modification period when the multicast control channel is updated, wherein M is an integer greater than or equal to 1.

**13.** The MCE according to claim **12**, wherein M is preconfigured by a network management system.

**14.** The MCE according to claim **11**, wherein the scheduling period is a scheduling period within the multicast control channel modification period when the multicast control channel is updated.

**15.** The MCE according to claim **11**,

wherein the transmitter is further configured to send an instruction instructing the base station to determine a quantity of user equipment devices receiving the multimedia broadcast multicast service data; and

wherein the instructions are further configured to cause the processor to determine the base station to send the multimedia broadcast multicast service data according to the quantity of user equipment devices received from the base station.

* * * * *

# EXHIBIT 13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| HARRIS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 2:18-cv-439 |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| HUAWEI DEVICE USA, INC., HUAWEI | ) | |
| DEVICE CO., LTD., HUAWEI | ) | |
| TECHNOLOGIES USA INC., HUAWEI | ) | |
| TECHNOLOGIES CO. LTD., AND | ) | |
| HUAWEI DEVICE (SHENZHEN) CO., | ) | |
| LTD. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## HARRIS CORPORATION'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Harris Corporation, for its Complaint against Defendants, Huawei Device USA, Inc., Huawei Device Co., Ltd., Huawei Technologies USA Ltd., Huawei Technologies Co. Ltd., and Huawei Device (Shenzhen) Co., Ltd. (collectively "Huawei") alleges:

## THE PARTIES

1.      Plaintiff Harris Corporation ("Harris") is a Delaware corporation duly organized and existing under the laws of the state of Delaware with its principal place of business at 1025 West NASA Boulevard, Melbourne, Florida.

2.      Defendant Huawei Device USA, Inc. ("Huawei USA") is a corporation organized under the laws of Texas with its principal place of business in this judicial district at 5700 Tennyson Parkway, Suite 300, Plano, Texas 75024.

3.      Defendant Huawei Device Co., Ltd. ("Huawei China") is a Chinese company with its principal place of business in Bantian, Longgang District Shenzhen, 518129 China.  Huawei China does business in Texas and in the Eastern District of Texas.

4.      Defendant Huawei Technologies Co. Ltd. ("Huawei Technologies") is a Chinese corporation with its principal place of business at Huawei Industrial Base, Bantian Longgang District Shenzhen, China.

5.      Defendant Huawei Technologies USA Inc. ("HTUS") is a corporation organized under the laws of Texas with its principal place of business in this judicial district at 5700 Tennyson Parkway, Suite 500, Plano, Texas, 75024.

6.      Defendant Huawei Device (Shenzhen) Co., Ltd. ("HSZ") is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business at Building 2, Section B, Huawei Industrial Base (Shenzhen Campus), Bantian, Longgan District, Shenzhen, Guangdong, 518129, China.

## JURISDICTION

7.      This is an action arising under the patent laws of the United States, 35 U.S.C. §

271, *et seq.*  Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§

1331 and 1338(a).

8.      This Court has personal jurisdiction over Huawei due to its continuous presence

in, and systematic contact with, this judicial district and Huawei USA's and HTUS's

incorporation in Texas and domicile in this judicial district.

## VENUE

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b), (c), (d)

and 1400(b) because Huawei USA and HTUS are Texas corporations located in this judicial

district.  Huawei has committed, and continues to commit, acts of infringement, including

providing electronic products that are used, offered for sale, sold, and have been purchased in the

State of Texas, including in the Eastern District of Texas.

## FACTUAL ALLEGATIONS

### Harris Patents

10.      Harris is an international communications and information technology company

serving government and commercial markets in more than 150 countries.  Harris is a proven

leader in tactical communications, avionics, air traffic management, space and intelligence, and

weather systems.

11.      For more than 120 years, Harris has been a leader in technology and innovation.

Harris currently employs more than 7,700 scientists and engineers and has advanced facilities

that promote innovation and collaboration.  In addition to substantial government funded

research, Harris spent more than $300 million in research and development in fiscal year 2018

alone.  Harris owns more than 3,000 patents that span various fields of technology.

12.     United States Patent No. 6,535,227 ("the '227 Patent"), entitled "System and Method for Assessing the Security Posture of a Network and Having a Graphical User Interface," was duly and lawfully issued March 18, 2003.  Harris is the owner of all right, title, and interest in the '227 Patent.  A true and correct copy of the '227 Patent is attached hereto as Exhibit 1.

13.     The '227 Patent describes problems and shortcomings in the field of vulnerability analysis in computer network infrastructure and claims novel and inventive technological improvements and solutions to such problems and shortcomings.  By providing a data processing system and method for assessing the security vulnerability of the network, a security posture is determined efficiently.  In one aspect of the invention, a graphical user interface is used for determining the vulnerability posture of a network. A system design window displays network icons of a network map that are representative of different network elements contained within a network. The respective network icons are linked together in an arrangement corresponding to how network elements are interconnected within the network.  Network vulnerabilities are depicted in different colors on the network map.  A graphical user interface can also comprise a manager window for displaying properties of network elements. A data sensitivity box can have user selected items for selecting the sensitivity of network elements. The graphical user interface can also comprise a select node configuration edit box having a user selectable vulnerability profile.

14.     United States Patent No. 6,958,986 ("the '986 Patent"), entitled "Wireless Communication System with Enhanced Time Slot Allocation and Interference Avoidance/Mitigation Features And Related Methods," was duly and lawfully issued October 25, 2005.  Harris is the owner of all right, title, and interest in the '986 Patent.  A true and correct copy of the '986 Patent is attached hereto as Exhibit 2.

3

15.     The '986 Patent describes problems and shortcomings in the field of wireless networks and claims novel and inventive technological improvements and solutions to such problems and shortcomings.  For example, Time Division Multiple Access (TDMA) is an access scheme used to establish communication links between mobile communication systems. Because an omnidirectional antenna is typically used in TDMA systems when operating at a fixed frequency, the mobile communication systems must take turns transmitting within their respective time slots to prevent channel interference.  It is an object of the invention of the '986 Patent to schedule time slots and mitigate the effects of interference in a manner that is responsive to variations in communication link demands within a mobile wireless network.  For example, a controller may schedule semi-permanent time slots to establish communication links with neighboring mobile nodes for transmitting data therebetween.  The controller may also determine respective link utilization metrics for each data priority level for each communication link, and schedule demand-assigned time slots for establishing additional communication links with the neighboring mobile nodes for transmitting data therebetween based upon the link utilization metrics and data priority levels.

16.     United States Patent No. 6,980,537 ("the '537 Patent"), entitled "Method and Apparatus for Communication Network Cluster Formation and Transmission of Node Link Status Messages with Reduced Protocol Overhead Traffic," was duly and lawfully issued December 27, 2005.  Harris is the owner of all right, title, and interest in the '537 Patent.  A true and correct copy of the '537 Patent is attached hereto as Exhibit 3.

17.     The '537 Patent describes problems and shortcomings pertaining to wireless communication systems utilizing network topology information and claims novel and inventive technological improvements and solutions to such problems and shortcomings.  The invention utilizes network topology information to identify network nodes crucial for relaying traffic. The

identified nodes are designated as head nodes, while remaining nodes are designated as member nodes. Since head nodes basically serve as relay nodes, the invention removes the need for gateway type nodes. In other words, the invention leverages network nodes with relay or routing capability, designating such as head nodes, to achieve connectivity among the nodes. Since the invention employs a deterministic approach, the cluster formation remains substantially the same independently of the initial start-up sequence of network nodes. Further, the designation of head nodes is optimal since the designated nodes are crucial for relaying network traffic. Moreover, since the quantity of head nodes that may facilitate communications depends upon the interval between node status packet transmissions, the invention, *inter alia*, adaptively adjusts that interval to subsequently facilitate cluster formation independent of network size and varying start times of network nodes.

18.    United States Patent No. 7,017,426 ("the '426 Patent"), entitled "Multi-Channel Mobile Ad Hoc Network," was duly and lawfully issued April 11, 2006.  Harris is the owner of all right, title, and interest in the '426 Patent.  A true and correct copy of the '426 Patent is attached hereto as Exhibit 4.

19.    The '426 Patent describes problems and shortcomings in the field of wireless networks and claims novel and inventive technological improvements and solutions to such problems and shortcomings.  For example, the patent specification describes mobile ad hoc networks, in which the network does not in general depend on a particular node and dynamically adjusts as some nodes join or others leave the network.  Conventional mobile ad hoc networks did not utilize multiple channels for transmitting packet data.  One object of the invention is to provide a multichannel ad hoc network to make use of a plurality of channels.

20.    United States Patent No. 7,224,678 ("the '678 Patent"), entitled "Wireless Local or Metropolitan Area Network with Intrusion Detection Features and Related Methods," was

duly and lawfully issued May 29, 2007.  Harris is the owner of all right, title, and interest in the '678 Patent.  A true and correct copy of the '678 Patent is attached hereto as Exhibit 5.

21.    The '678 Patent describes problems and shortcomings in the field of wireless networks and claims novel and inventive technological improvements and solutions to such problems and shortcomings.  For example, wireless local area networks (LAN) or metropolitan area networks (MAN) have significant drawbacks, including that they are readily available to would-be hackers who may attempt to intrude upon the network and compromise network security using an unauthorized wireless station.  Intrusion detection software might attempt to detect intruders by monitoring packet addresses and comparing them to known addresses of authorized network stations.  However, if a rogue station obtained access to an authorized address and/or ID, these approaches may not detect the intrusion of the rogue station into the networks.  The '678 Patent describes novel ways of monitoring transmissions and packets to provide intrusion detection features and related methods in wireless networks.  Exemplary ways of detecting intrusions include monitoring transmissions to detect frame check sequence (FCS) errors from a medium access control (MAC) address exceeding a threshold; monitoring transmissions to detect failed attempts to authenticate MAC addresses; monitoring requests-to-send and clear-to-send packets to detect illegal network allocation vector values; monitoring transmissions to detect transmissions during contention or contention-free mode; and detecting frame check sequence errors for MAC addresses exceeding a threshold.

22.    United States Patent No. 7,327,690 ("the '690 Patent"), entitled "Wireless Local or Metropolitan Area Network with Intrusion Detection Features and Related Methods," was duly and lawfully issued Feb. 5, 2008.  Harris is the owner of all right, title, and interest in the '690 Patent.  A true and correct copy of the '690 Patent is attached hereto as Exhibit 6.

23.     The '690 Patent describes problems and shortcomings in the field of wireless
networks and claims novel and inventive technological improvements and solutions to such
problems and shortcomings.  For example, wireless local area networks (LAN) or metropolitan
area networks (MAN) have significant drawbacks, including that they are readily available to
would-be hackers who may attempt to intrude upon the network and compromise network
security using an unauthorized wireless station.  Intrusion detection software might attempt to
detect intruders by monitoring packet addresses and comparing them to known addresses of
authorized network stations.  However, if a rogue station obtained access to an authorized
address and/or ID, these approaches may not detect the intrusion of the rogue station into the
networks.  The '690 Patent describes novel ways of monitoring transmissions and packets to
provide intrusion detection features and related methods in wireless networks.  Exemplary ways
of detecting intrusions include detecting transmissions during an unauthorized period and
integrity checking for values that do not correspond with their respective data packets; detecting
usage of non-consecutive MAC sequence numbers; detecting a threshold number of collisions of
packets having a predetermined packet type; and detecting a threshold number of collisions of a
same MAC address.

24.     United States Patent No. 7,440,572 ("the '572 Patent"), entitled "Secure Wireless
LAN Device and Associated Methods," was duly and lawfully issued October 21, 2008.  Harris
is the owner of all right, title, and interest in the '572 Patent.  A true and correct copy of the '572
Patent is attached hereto as Exhibit 7.

25.     The '572 Patent describes problems and shortcomings in the field of wireless
networks and claims novel and inventive technological improvements and solutions to such
problems and shortcomings.  For example, the '572 Patent describes connecting computers
wirelessly by means of a local area network (LAN).  Security for communications can be

provided by a wireless standard, such as IEEE 802.11. To provide higher levels of security, more powerful cryptographic equipment is available, but such equipment is relatively bulky and expensive. It is an object of the invention of the '572 Patent to provide a secure wireless device, such as a LAN device, that provides greater security without significant increase in cost or complexity. For example, such devices may include a cryptography circuit that encrypts both address and data information for transmission, and decrypts both address and data information upon reception.

### Huawei's Use of the Patented Technology

### Huawei Intrusion Detection Products

26. On information and belief, Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States various enterprise networking equipment and solutions.

27. On information and belief, in the fall of 2011, Huawei formally launched its United States enterprise business focusing on unified communications and collaboration (UC&C), cloud computing, and enterprise information security. Huawei delivers its portfolio of products to American enterprises through channel partners including, but not limited to, WAV, TigerDirect and NewEgg. For example, on information and belief, Huawei, alone or in collaboration with its partners, recently worked or is working with a company in San Francisco, California (Cloud4Wi) to install a CloudCampus solution. https://cloud4wi.com/cloud4wi-and-huawei/.

28. Network security is a critical part of any wireless network, and it is desirable to detect attempts at network intrusion. On information and belief, Huawei's Wireless Intrusion Detection System (WIDS) and Wireless Intrusion Prevention System (WIPS) ensure network border security for Huawei networking products in small-, medium-, and large-scale enterprise

networks to help detect attacks from rogue devices. On information and belief, Huawei includes these technologies across an array of products including at least Huawei's access points, access controllers, routers, remote units and switches.

29.     On information and belief, the Huawei Access Points (APs) support WIDS, WIPS and/or other similar intrusion detection and prevention technology. The Accused Huawei APs include, but are not limited to: AD9000 series, AP1000 series, AP2000 series, AP3000 series, AP4000 series, AP5000 series, AP6000 series, AP7000 series, AP8000 series, AP9000 series Access Points, the AT815SN Outdoor Access Terminal and other models that include similar functionality.

30.     On information and belief Huawei remote units also support WIDS, WIPS and/or other similar intrusion detection and prevention technology.  The Accused Huawei remote units include, but are not limited to: R230D, R240D, R250D, R250D-E, R251D, R251D-E, R450D Remote Units and other models that include similar functionality.

31.     On information and belief, Huawei switches support WIDS, WIPS and/or other similar intrusion detection and prevention technology.  The Accused Huawei switches include, but are not limited to: S12700 Series Switches, S5720-LI and S5720-SI Switches, S5700-SI Series Standard Gigabit Switches, S5700-EI Series Enhanced Gigabit Switches, S3700 Series Enterprise Switches, S6720-HI Series Agile Fixed Switches, S5730-HI Series Next generation Agile Switch and other models that include similar functionality.

32.     On information and belief, Huawei Access Controllers (ACs) support WIDS, WIPS and/or other similar intrusion detection and prevention technology.  The Accused Huawei ACs include, but are not limited to: AC6800V, AC6605, AC6005, ENP Series, ACU2 Wireless Access Controller Unit, and other models that include similar functionality.

33.     On information and belief Huawei routers also support WIDS, WIPS and/or other similar intrusion detection and prevention technology. The routers include, but are not limited to, NE9000 Series, NE 5000E Cluster, Net Engine40E Series, NE20E Series, NE05E Series, NE08E Series, ME60 Series, AR Series, and other models that include similar functionality.

34.     Huawei makes, uses, offers to sell, sells or imports into the U.S various other hardware and software that support WLAN security and intrusion detection and prevention technology, including but not limited to, Next-Generation Intrusion Prevention (NIP) devices, formerly also known as Network Intelligent Police devices, such as the NIP6000 series; Anti-DDoS devices such as the AntiDDoS1000 Series and AntiDDoS8000 Series and other hardware and software that include similar functionality.  Huawei further operates and/or supports at least four Cloud Mitigation Alliance scrubbing centers in the United States (San Jose, Miami, Los Angeles and Ashburn) that work with the Anti-DDoS systems to detect and clean network traffic.

35.     On information and belief, Huawei's eSight Platform, the eSight WLAN Manager and other eSight products ("Huawei eSight Products") incorporate the WIDS, WIPS and/or other similar intrusion detection and prevention technology.

**Huawei Wi-Fi Products**

36.     On information and belief, Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States numerous WLAN products compatible with 802.11a/b/g/n/ac standards, including access points (e.g., AP1000, AP2000, AP4000, AP5000, AP6000, AP7000, AP8000, AP9000, AD9000 series of indoor and outdoor access points), access controllers (e.g., AC6000 series access controllers), routers (e.g., AR160-M series, AR161W-P-M9, and AR169RW-P-M9), access networks (e.g., DN8245W-10) and Home Wi-Fi (e.g., Q2

and A1) and other models that include similar functionality.  On information and belief, at least

some of these products are included in the CloudCampus Solution, discussed above.

37.     Wireless Mesh Networks (WMN) consist of multiple wirelessly connected access

points (nodes) that can automatically establish a wireless multi-hop network that is connected to

a wired network through a portal node.  Nodes in a WMN can automatically establish ad-hoc

topology and maintain mesh connectivity.  On information and belief, many of Huawei's WLAN

products devices listed above have mesh networking capability (e.g., the Home Wi-Fi Q2 and

most of the Huawei's APs and ACs listed above).

**Huawei Zigbee Products**

38.     The Internet of Things, often referred to as IoT, is a rapidly expanding market. At

a simple level, IoT is the concept of connecting any device with an on/off switch to the Internet

(and/or to each other). This includes cellphones, coffee makers, washing machines, other home

appliances, headphones, light fixtures, lamps, wearable fitness devices and virtually any other

electrical or battery-operated device.

39.     The Zigbee Alliance is the standard bearer of the open IoT.  Zigbee devices are

based on the IEEE 802.15.4 MAC and PHY specification.

40.     The IEEE 802.15.4 standard defines the physical layer (PHY) and medium access

control (MAC) sublayer specifications for low-data-rate wireless connectivity with fixed,

portable, and moving devices with no battery or very limited battery consumption requirements

typically operating in the personal operating space (POS) of 10 m.  Zigbee is an enhancement of

the IEEE 802.15.4 standard that covers the third and higher layers (including the network and

application layers) of the standard model of network operation.  Thus, any device that is Zigbee

compliant is also compliant with the IEEE 802.15.4 standard.

41.     On information and belief, the media access layer and physical layer of the IEEE 802.15.4 specifications are used at the underlying layers of Huawei's IoT solutions.

42.     On information and belief, Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States, numerous Zigbee certified products.  On information and belief, Huawei is a member of the Zigbee Alliance and produces products certified by Zigbee, including but not limited to the EchoLife HS2145V, LS2035V, and LS2025 smart home gateway devices, the QUIVICON Home Base and other similar products certified by Zigbee.  In its product literature, Huawei identifies a number of other products as Zigbee compliant, including the AR160-M series enterprise routers (specifically the AR169RW-P-M9 router) and the X-Gen Wi-Fi AP7060DN access point.

### FIRST COUNT
### (Infringement of U.S. Patent No. 6,535,227)

43.     Harris incorporates by reference the allegations set forth in Paragraphs 1-42 of this Complaint as though fully set forth herein.

44.     Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '227 Patent, including the above identified Huawei eSight Products ('227 Accused Products).  Huawei's '227 Accused Products infringe one or more claims of the '227 Patent, including without limitation, claim 24.

45.     As an example, the '227 Accused Products contain a graphical user interface on a computer screen and used for determining the security posture of a network. The Huawei eSight Platform has a graphical user interface that displays a unified topology of devices over the entire network as well as device and link statuses in real time, simplifying topology monitoring. *See* Huawei eSight Platform, https://e.huawei.com/us/products/software/mgmt-sys/esight/esight-platform.  Huawei eSight Platform displays the networking structure, device alarms, and network status over the entire network in one topology.

12

46.     Huawei eSight has a system design window for displaying network icons of a network map that are representative of different network elements contained within a network, wherein respective network icons are linked together in an arrangement corresponding to how network elements are interconnected within the network. For example, Huawei eSight Platform has a graphical user interface that displays a unified topology of devices over the entire network as well as device and link statuses in real time, simplifying topology monitoring. *See* Huawei eSight Platform, https://e.huawei.com/us/products/software/mgmt-sys/esight/esight-platform.

47.     Huawei eSight has a select node configuration edit box having a user selectable vulnerability profile for selecting a vulnerability profile of a network node. The Wireless Intrusion Detection System (WIDS) in eSight manages information about rogue devices, interference resources, and attacks, and supports type-based recognition and alarm notification based on user-defined rules.  *See* Huawei eSight WLAN Technical Paper (https://e.huawei.com/ca/material/onLineView?MaterialID=90f6b3166abd445e8760fa679fac2ec6), 2017-03-20, at 10.  Network administrators can classify, and filter rogue APs and management alarms based on defined rules. (*Id*. at 9.)  Users can enable eSight to generate alarms when rogue APs are detected in accordance with defined rules. (*Id*.)



(*Id*. at 27.)



(*Id*. at 15.)

48.    In Huawei eSight, a selected portion of the network map changes color to indicate the vulnerability that has been established for that portion of the network after a security posture of the network has been established.  For example, eSight identifies alarm severity levels, such as

14

critical, major, minor, and warning using different colors or words. *See* Huawei eSight Platform, https://e.huawei.com/us/products/software/mgmt-sys/esight/esight-platform.

49.     By making, using, offering for sale, and/or selling products in the United States, and/or importing products into the United States, including but not limited to the '227 Accused Products, Huawei has injured Harris and is liable to Harris for directly infringing one or more claims of the '227 Patent, including without limitation claim 24 pursuant to 35 U.S.C. § 271(a).

50.     Huawei also infringes the '227 Patent under 35 U.S.C. § 271(b) & (c).

51.     Huawei knowingly encourages and intends to induce infringement of the '227 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '227 Accused Products, with knowledge and specific intention that such products will be used by its customers.  For example, Huawei instructs its customers on how to use and implement the technology claimed in the '227 patent. *See e.g., See* Huawei eSight Platform webpage, https://e.huawei.com/us/products/software/mgmt-sys/esight/esight-platform.

52.     Huawei also contributes to the infringement of the '227 Patent.  Huawei makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '227 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '227 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

53.     On March 12, 2018, Harris informed Huawei of its infringement of the '227 Patent. Thus, as of March 12, 2018, Huawei was aware of the '227 Patent, had knowledge of the infringing nature of its activities, and nevertheless continues its infringing activities.  Following

the March 12, 2018 letter, Harris attempted to contact Huawei on multiple occasions (April 25, 2018 email, May 4, 2018 email and May 25, 2018 letter), but received no response from Huawei.

54.     Huawei's infringement of the '227 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

55.     As a result of Huawei's infringement of the '227 Patent, Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

## SECOND COUNT
## (Infringement of U.S. Patent No. 6,958,986)

56.     Harris incorporates by reference the allegations set forth in Paragraphs 1-55 of this Complaint as though fully set forth herein.

57.     Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that comply with the Zigbee and IEEE 802.15.4 standards that directly infringe the '986 Patent, including but not limited to the Huawei Zigbee Products identified above (the '986 Accused Products). Huawei's '986 Accused Products infringe one or more claims of the '986 Patent, including without limitation claim 25 of the '986 Patent.

58.     As an example, the '986 Accused Products are mobile nodes with data queues that can be assembled into a wireless communication network.  For example, because the '986 Accused Products comply with IEEE 802.15.4, they contain a "coordinator" as defined and discussed in that standard, i.e., "[a] device in an [sic] low rate wireless personal area network (LR WPAN) that provides synchronization services to other devices in the LR WPAN."  *See* IEEE Std. 802.15.4-2011, at § 3.1.  The coordinator contains a data queue.  *Id*. at § 5.1.6.4.3.

59.    The '986 Accused Products schedule semi-permanent time slots to establish communication links between respective pairs of mobile nodes for transmitting data stored in the data queues therebetween.  For example, because the '986 Accused Products comply with IEEE 802.15.4, they contain a MAC sublayer which feature "beacon management, channel access, GTS management, frame validation, acknowledged frame delivery, association, and disassociation."  *Id*. at § 4.4.2.  Further, in the MAC protocol, personal area networks (PANs) "that wish to use the superframe structure (referred to as beacon-enabled PANs) shall set macBeaconOrder to a value between 0 and 14, both inclusive, and *macSuperframeOrder* to a value between 0 and the value of *macBeaconOrder*, both inclusive."  *Id*. at § 5.1.1.1

60.    The '986 Accused Products determine link utilization metrics for each communication link based upon a quantity of data previously sent over the communication link during the semi-permanent time slots and the data queues.  For example, because the '986 Accused Products comply with IEEE 802.15.4, they contain a Link Quality Indicator (LQI).  *Id*. at § 8.2.6.  Further, a "device on a beacon-enabled PAN can determine whether any frames are pending for it by examining the contents of the received beacon frame, as described in 5.1.4.1."  *Id*. at § 5.1.6.3.

61.    The '986 Accused Products schedule demand assigned time slots for establishing additional communication links between the pairs of mobile nodes for transmitting the data based upon the link utilization metrics.  For example, because the '986 Accused Products comply with IEEE 802.15.4, they contain a superframe structure which, "[f]or low-latency applications or applications requiring specific data bandwidth, the PAN coordinator dedicates portions of the active superframe to that application."  *Id*. at § 4.5.1.  "GTSs shall be allocated on a first-come-first-served basis …provided there is sufficient bandwidth available."  *Id*. at § 5.1.7.2

17

62.     By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '986 Accused Products, Huawei has injured Harris and is liable to Harris for directly infringing one or more claims of the '986 Patent, including without limitation claim 25, pursuant to 35 U.S.C. § 271(a).

63.     Huawei also infringes the '986 Patent under 35 U.S.C. § 271(b) & (c).

64.     Huawei knowingly encourages and intends to induce infringement of the '986 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '986 Accused Products, with knowledge and specific intention that such products will be made by Huawei or by its customers into a network that infringes the '986 Patent.  One example is the CloudCampus Solution being implemented for Cloud4Wi, as discussed above.

65.     Huawei also contributes to the infringement of the '986 Patent.  Huawei makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '986 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '986 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

66.     On March 12, 2018, Harris informed Huawei of its infringement of the '986 Patent. Thus, as of March 12, 2018, Huawei was aware of the '986 Patent, had knowledge of the infringing nature of its activities, and nevertheless continues its infringing activities.  Following the March 12, 2018 letter, Harris attempted to contact Huawei on multiple occasions (April 25, 2018 email, May 4, 2018 email and May 25, 2018 letter), but received no response from Huawei.

67.     Huawei's infringement of the '986 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

68.     As a result of Huawei's infringement of the '986 Patent, Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

## THIRD COUNT
### (Infringement of U.S. Patent No. 6,980,537)

69.     Harris incorporates by reference the allegations set forth in Paragraphs 1-68 of this Complaint as though fully set forth herein.

70.     Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that comply with the Zigbee and IEEE 802.15.4 standards that directly infringe the '537 Patent, including but not limited to the Huawei Zigbee Products identified above (the '537 Accused Products). Huawei's '537 Accused Products infringe one or more claims of the '537 Patent, including without limitation claim 30 of the '537 Patent.

71.     Huawei communications networks are made up of two or more '537 Accused Products and comprise a plurality of communication units that transmit and receive messages within said network.

72.     The '537 Accused Products comprise a status transmission module to facilitate periodic transmission of a unit status message. For example, because the '537 Accused Products comply with IEEE 802.15.4 standard, they contain a MAC sublayer that features "beacon management, channel access, GTS management, frame validation, acknowledged frame delivery, association, and disassociation." *See* IEEE Std. 802.15.4-2011 at § 4.4.2. When a '537 Accused Product, which is an IEEE 802.15.4 WPAN full-functioning device (FFD), joins the WPAN at

19

the PAN coordinator, it adds the PAN coordinator as its parent in its neighbor list and begins

transmitting periodic beacons; other candidate devices are able to then join the network at that

device. *See* IEEE Std. 802.15.4-2011 at § 4.3.2.

73.     The '537 Accused Products comprise an interval module to adjust the time

between each said periodic transmission in response to detecting modifications in connectivity

with neighboring units.  When a '537 Accused Product, which is an IEEE 802.15.4 WPAN full-

functioning device (FFD), "misses between one and (*aMaxLostBeacons*–1) consecutive beacon

frames from its coordinator, the device shall continue to transmit its own beacons based on both

*macBeaconOrder*… and its local clock. If the device… does not lose synchronization, the device

shall resume transmitting its own beacons based on the *StartTime* parameter and the incoming

beacon." *See* IEEE Std. 802.15.4-2011 at § 5.1.2.4.

74.     The '537 Accused Products comprise a configuration module to determine a

status of that communication unit as a routing unit for routing network traffic or as a member

unit of a corresponding routing unit in accordance with information contained within received

unit status messages.  The responsibilities of the ZDO (ZigBee Device Object) include defining

the role of the device within the network (e.g., ZigBee coordinator or end device), initiating

and/or responding to binding requests and establishing a secure relationship between network

devices. The ZDO is also responsible for discovering devices on the network and determining

which application services they provide. *See* ZigBee Specification, ZigBee Document

053474r06, Version 1.0, 2005 at 17-18.

75.     In the Huawei communications network, a status of a '537 Accused Products as a

said routing unit is fixed for routing subsequent network messages and re-evaluated in response

to changes in network connectivity. For example, the network manager shall implement the

ZigBee Coordinator, ZigBee Router or ZigBee End Device logical device types according to

configuration settings established either via a programmed application or during installation. If the device type is a ZigBee Router or ZigBee End Device, this function shall provide the ability to select an existing PAN to join and implement orphaning procedures which permit the device to re-associate with the same ZigBee Coordinator or ZigBee Router if network communication is lost. (*Id*. at 136).

76.     By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '537 Accused Products, Huawei has injured Harris and is liable to Harris for directly infringing one or more claims of the '537 Patent, including without limitation claim 30, pursuant to 35 U.S.C. § 271(a).

77.     Huawei also infringes the '537 Patent under 35 U.S.C. § 271(b) & (c).

78.     Huawei knowingly encourages and intends to induce infringement of the '537 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '537 Accused Products, with knowledge and specific intention that such products will be made by Huawei or by its customers into a network that infringes the '537 Patent.  One example is the CloudCampus Solution being implemented for Cloud4Wi, as discussed above.

79.     Huawei also contributes to the infringement of the '537 Patent.  Huawei makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '537 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '537 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

80.     On March 12, 2018, Harris informed Huawei of its infringement of the '537 Patent. Thus, as of March 12, 2018, Huawei was aware of the '537 Patent, had knowledge of the

infringing nature of its activities, and nevertheless continues its infringing activities. Following the March 12, 2018 letter, Harris attempted to contact Huawei on multiple occasions (April 25, 2018 email, May 4, 2018 email and May 25, 2018 letter), but received no response from Huawei.

81.    Huawei's infringement of the '537 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

82.    As a result of Huawei's infringement of the '537 Patent, Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

## FOURTH COUNT
### (Infringement of U.S. Patent No. 7,017,426)

83.    Harris incorporates by reference the allegations set forth in Paragraphs 1-82 of this Complaint as though fully set forth herein.

84.    Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that use Wi-Fi and/or Zigbee radio links, including but not limited to the Huawei Zigbee Wi-Fi Products identified above (the '426 Wi-Fi Accused Products) and the Huawei Zigbee Products identified above (the '426 Zigbee Accused Products) (collectively, the '426 Accused Products) that Huawei and others combine into networks that perform the infringing process described below. The '426 Accused Products infringe one or more of the claims of the '426 Patent, including without limitation claim 8.

85.    As an example, networks consisting of the '426 Accused Products perform a method for operating a mobile ad hoc network comprising a plurality of wireless mobile nodes and a plurality of wireless communication links connecting the plurality of nodes together over a plurality of electrically separate wireless channels. For example, Huawei has shown in public documentation how it uses the '426 Wi-Fi Accused Products to set up mobile ad hoc network

having a plurality of mobile nodes (e.g., mesh points or access points) connected by wireless communication links (e.g., 802.11 radio links).  Huawei documentation shows Wi-Fi mesh networks connecting the nodes over more than one electrically separate wireless channel.  *See, e.g.,* Huawei Configuration Guide WLAN-AC (http://support.huawei.com/enterprise/en/doc/EDOC1000141952), § 13.3, at 744 (S5720HI V200R010C00**;** Nov. 30, 2017).  For the '426 Zigbee Accused Products, the 802.15.4 standard specifies a plurality of mobile nodes (e.g., Zigbee Coordinators, Zigbee Routers) connected by wireless communication links (e.g., 802.15.4 radio links) over more than one electrically separate wireless channels.  *See, e.g.,* Zigbee Specification, Zigbee document 053474r06, v. 1.0, at 135 (2005).

86.      Networks consisting of the '426 Accused Products perform the step of, at the source node, sending a route request over each of the plurality of electrically separate channels to discover routing to a destination node.  For example, Huawei public documentation shows that the '426 Wi-Fi Accused Products support automatic route discovery.  *See, e.g.,* Huawei Configuration Guide WLAN-AC at § 13.2.  This discovery is done over more than one electrically separate channel.  *Id*. at § 13.3.  IEEE 802.15.4 documentation shows that '426 Zigbee Accused Products, which comply with the 802.15.4 standard, perform an orphan scan across a specified list of channels when they lose synchronization with the coordinator.  *See, e.g.,* IEEE Std. 802.15.4-2011, at 27 (5 Sept. 2011).

87.      Networks consisting of the '426 Accused Products perform the step of, at the source node, selecting a route to the destination node on at least one of the plurality of electrically separate channels.  For example, for the '426 Wi-Fi Accused Products, the Huawei public documentation shows that the destination node responds to the route requests, which in turn causes the source node to select a route to the destination node on at least one of the

channels.  *See, e.g.,* Huawei Configuration Guide WLAN-AC at § 13.2.  For the '426 Zigbee

Accused Products, the standard documentation shows that the Zigbee coordinator returns a

coordinator realignment command to the source node, which causes it to select a route to the

destination node on at least one of the channels.  *See, e.g.,* IEEE Std. 802.15.4-2011, at 27.

88.     By making, using, offering for sale, and/or selling products in the United States,

and/or importing them into the United States, including but not limited to the '426 Accused

Products, Huawei has injured Harris and is liable to Harris for directly infringing one or more

claims of the '426 Patent, including without limitation claim 8, pursuant to 35 U.S.C. § 271(a).

89.     Huawei also infringes the '426 Patent under 35 U.S.C. § 271(b) & (c).

90.     Huawei knowingly encourages and intends to induce infringement of the '426

Patent by making, using, offering for sale, and/or selling products in the United States, and/or

importing them into the United States, including but not limited to the '426 Accused Products,

with knowledge and specific intention that such products will be made by Huawei or by its

customers into a network that infringes the '426 Patent, as shown by Huawei documentation for

customers, such as Huawei Configuration Guide WLAN-AC referenced above.

91.     Huawei also contributes to the infringement of the '426 Patent.  Huawei makes,

uses, sells, and/or offers to sell products in the United States, and/or imports them into the United

States, including but not limited to the '426 Accused Products, knowing that those products

constitute a material part of the claimed invention, that they are especially made or adapted for

use in infringing the '426 Patent, and that they are not staple articles or commodities of

commerce capable of substantial non-infringing use.

92.     On March 12, 2018, Harris informed Huawei of its infringement of the '426

Patent. Thus, as of March 12, 2018, Huawei was aware of the '426 Patent, had knowledge of the

infringing nature of its activities, and nevertheless continues its infringing activities.  Following

the March 12, 2018 letter, Harris attempted to contact Huawei on multiple occasions (April 25, 2018 email, May 4, 2018 email and May 25, 2018 letter), but received no response from Huawei.

93.     Huawei's infringement of the '426 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

94.     As a result of Huawei's infringement of the '426 Patent, Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

**FIFTH COUNT**
**(Infringement of U.S. Patent No. 7,224,678)**

95.     Harris incorporates by reference the allegations set forth in Paragraphs 1-94 of this Complaint as though fully set forth herein.

96.     Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '678 Patent, including but not limited to the above identified Huawei Intrusion Detection Products that support WIDS, WIPS and/or other similar intrusion detection and prevention technology ('678 Accused Products). Huawei's '678 Accused Products infringe one or more claims of the '678 Patent, including without limitation, claim 12 of the '678 Patent.

97.     Huawei Wireless LANs/MANs are made up of two or more '678 Accused Products and comprise a plurality of stations for transmitting data therebetween using a MAC layer, each of said stations having a respective MAC address associated therewith. For example, Huawei '678 Accused Products, transmit data therebetween. On information and belief, the '678 Accused Products comply with one or more of the IEEE 802.11 standards and transmit data using MAC layers and further have a MAC address associated therewith.

98.     Huawei Wireless LAN/MAN contain a policing station for detecting intrusions into the wireless network by monitoring transmissions among said plurality of stations to detect failed attempts to authenticate MAC addresses.  For example, Huawei eSight and WLAN devices that incorporate the WIDS, WIPS and/or intrusion alert technology, including at least APs and ACs, are capable of detecting flood attacks, spoofing attacks, weak initialization vector (IV) attacks, and can also defend the WLAN against brute force cracking.  *See generally* Huawei's WLAN WIDS & WIPS Technology White Paper (https://e.huawei.com/us/material/onLineView?materialid=b81ebd45523d4d6591d00aa98b99692c), 2017-07-05.  Brute force cracking attacks also exist when a user authentication mode is used, such as MAC address. (*Id.* at 15.) The WIDS and intrusion detection systems thus detect failed attempts to authenticate MAC addresses.

99.     The Huawei Wireless LANs/MANs generate an intrusion alert based upon detecting a number of failed attempts to authenticate a MAC address.  For example, when an attack is detected, the AP may report an intrusion alert to the AC.  (*Id.* at 15-16.) Further, when an AC identifies an AP as a rogue AP, a rogue AP alarm is triggered and sent to the network management system (NMS). (*Id.*)

100.     By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '678 Accused Products, Huawei has injured Harris and is liable to Harris for directly infringing one or more claims of the '678 Patent, including without limitation claim 12, pursuant to 35 U.S.C. § 271(a).

101.     Huawei also infringes the '678 Patent under 35 U.S.C. § 271(b) & (c).

102.     Huawei knowingly encourages and intends to induce infringement of the '678 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '678 Accused Products,

with knowledge and specific intention that such products will be used by its customers. One example is Huawei's supporting documentation instructing customers how to implement the technology claimed in the '678 patent. *See e.g.,* Huawei's WLAN WIDS & WIPS Technology White Paper (https://e.huawei.com/us/material/onLineView?materialid=b81ebd45523d4d6591d00aa98b99692c), 2017-07-05.

103.     Huawei also contributes to the infringement of the '678 Patent. Huawei makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '678 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '678 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

104.     On March 12, 2018, Harris informed Huawei of its infringement of the '678 Patent. Thus, as of March 12, 2018, Huawei was aware of the '678 Patent, had knowledge of the infringing nature of its activities, and nevertheless continues its infringing activities. Following the March 12, 2018 letter, Harris attempted to contact Huawei on multiple occasions (April 25, 2018 email, May 4, 2018 email and May 25, 2018 letter), but received no response from Huawei.

105.     Huawei's infringement of the '678 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

106.     As a result of Huawei's infringement of the '678 Patent, Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

## SIXTH COUNT
### (Infringement of U.S. Patent No. 7,327,690)

107.    Harris incorporates by reference the allegations set forth in Paragraphs 1-106 of this Complaint as though fully set forth herein.

108.    Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '690 Patent, including but not limited to the above identified Huawei Intrusion Detection Products that support WIDS, WIPS and/or other similar intrusion detection and prevention technology ('690 Accused Products). Huawei's '690 Accused Products infringe one or more claims of the '690 Patent, including without limitation, claim 40 of the '690 Patent.

109.    Huawei wireless LAN/MAN are made up of two or more '690 Accused Products and comprises a plurality of stations for transmitting data via a MAC layer, each station having a MAC address associated therewith to be transmitted with data sent therefrom.  For example, Huawei '690 Accused Products transmit data therebetween.  On information and belief, all Huawei Access Points and the '690 Accused Products comply with one or more of the IEEE 802.11 standards and transmit data using MAC layers and further have a MAC address associated therewith to be transmitted with data sent therefrom.

110.    Huawei Wireless LAN/MAN contain a policing station for detecting intrusions into the wireless network by monitoring transmissions among said plurality of stations to detect collisions of a same MAC address.  For example, Huawei eSight and WLAN devices that incorporate the WIDS and/or intrusion alert technology, including at least APs, ACs, are capable of detecting flood attacks, spoofing attacks, weak initialization vector (IV) attacks, and can also defend the WLAN against brute force cracking. *See generally* Huawei's WLAN WIDS & WIPS Technology White Paper (https://e.huawei.com/us/material/onLineView?materialid=b81ebd45523d4d6591d00aa98b9969

2c), 2017-07-05. A flood attack occurs when an AP receives a large number of management packets or null packets of the same type from a source MAC address within a short period. (*Id*. at 12.) WIDS can detect 802.11 packet flood, and attack information reported by an AP that includes the rogue device MAC address. (*Id*.)

111. The Huawei Wireless LAN/MAN networks generate an intrusion alert based upon detecting a threshold number of collisions of a same MAC address. For example, in the '690 Accused Products using WIDS, when the traffic received from a device exceeds the allowed threshold, the AP considers that the device is initiating a flood attack and reports an alarm message to the AC. (*Id*. at 17.) Further, when an AC identifies an AP as a rogue AP, a rogue AP alarm is triggered and sent to the network management system (NMS). (*Id*.)

112. By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '690 Accused Products, Huawei has injured Harris and is liable to Harris for directly infringing one or more claims of the '690 Patent, including without limitation claim 40, pursuant to 35 U.S.C. § 271(a).

113. Huawei also infringes the '690 Patent under 35 U.S.C. § 271(b) & (c).

114. Huawei knowingly encourages and intends to induce infringement of the '690 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '690 Accused Products, with knowledge and specific intention that such products will be used by its customers. One example is Huawei's supporting documentation instructing customers how to implement the technology claimed in the '690 patent. *See e.g.,* Huawei's WLAN WIDS & WIPS Technology White Paper (https://e.huawei.com/us/material/onLineView?materialid=b81ebd45523d4d6591d00aa98b9969 2c), 2017-07-05.

115.     Huawei also contributes to the infringement of the '690 Patent.  Huawei makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '690 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '690 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

116.     On March 12, 2018, Harris informed Huawei of its infringement of the '690 Patent. Thus, as of March 12, 2018, Huawei was aware of the '690 Patent, had knowledge of the infringing nature of its activities, and nevertheless continues its infringing activities.  Following the March 12, 2018 letter, Harris attempted to contact Huawei on multiple occasions (April 25, 2018 email, May 4, 2018 email and May 25, 2018 letter), but received no response from Huawei.

117.     Huawei's infringement of the '690 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

118.     As a result of Huawei's infringement of the '690 Patent, Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

## SEVENTH COUNT
### (Infringement of U.S. Patent No. 7,440,572)

119.     Harris incorporates by reference the allegations set forth in Paragraphs 1-118 of this Complaint as though fully set forth herein.

120.     Huawei makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that comply with the Zigbee and IEEE 802.15.4 standards that directly infringe the '572 Patent, including but not limited to the Huawei Zigbee Products identified above (the '572 Accused Products).  Huawei's '572 Accused Products

infringe one or more claims of the '572 Patent, including without limitation claim 1 of the '572 Patent.

121.    As an example, Huawei makes, uses, sells, and/or offers for sale in the United States, and imports into the United States secure wireless LAN devices.  For example, because the '572 Accused Products comply with IEEE 802.15.4, they comprise a "device" as defined and discussed in that standard, i.e., "[a] system conforming to this standard consists of several components.  The most basic is the device.  Two or more devices communicating on the same physical channel constitute a WPAN." *See* IEEE Std 802.15.4-2011, at § 4.2.  These devices are secure. *Id*. at Ch. 7 (Security).

122.    The '572 Accused Products comprise a housing in which the electronic components of the device are contained.

123.    The '572 Accused Products comprise a wireless transceiver carried by said housing.  For example, because the '572 Accused Products comply with IEEE 802.15.4, their housings contain a wireless transceiver. *Id*. at § 4.2.  ("An LR-WPAN [low-rate wireless personal area network] is a simple, low-cost communication network that allows wireless connectivity in applications with limited power and relaxed throughput requirements.")

124.    The '572 Accused Products comprise a MAC carried by said housing for implementing a predetermined wireless LAN MAC protocol.  For example, because the '572 Accused Products comply with IEEE 902.15.4 standard, they use the LAN MAC protocol specified in detail in chapter 5 of the standard.

125.    The '572 Accused Products comprise a cryptography circuit carried by said housing and connected to said MAC and said wireless transceiver for encrypting both address and data information for transmission by at least adding a plurality of encrypting bits to both the address and data information, and for decrypting both the address and the data information upon

reception. For example, because the '572 Accused Products comply with IEEE 902.15.4 standard, they follow a specific security protocol as set forth in chapter 7 of the standard, which specifies inputs to the CCM* encryption transformation including a nonce (which contains address information), an encryption key, and data. *See, e.g., id.* at §§ 7.3.2 & 7.3.4.

126. By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '572 Accused Products, Huawei has injured Harris and is liable to Harris for directly infringing one or more claims of the '572 Patent, including without limitation claim 1 pursuant to 35 U.S.C. § 271(a).

127. Huawei also infringes the '572 Patent under 35 U.S.C. § 271(b) & (c).

128. Huawei knowingly encourages and intends to induce infringement of the '572 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '572 Accused Products. One example is the CloudCampus Solution being implemented for Cloud4Wi, as discussed above.

129. Huawei also contributes to the infringement of the '572 Patent. Huawei makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '572 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '572 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

130. On March 12, 2018, Harris informed Huawei of its infringement of the '572 Patent. Thus, as of March 12, 2018, Huawei was aware of the '572 Patent, had knowledge of the infringing nature of its activities, and nevertheless continues its infringing activities. Following

32

the March 12, 2018 letter, Harris attempted to contact Huawei on multiple occasions (April 25, 2018 email, May 4, 2018 email and May 25, 2018 letter), but received no response from Huawei.

131.    Huawei's infringement of the '572 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

132.    As a result of Huawei's infringement of the '572 Patent, Harris has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Huawei's infringement, but in no event less than a reasonable royalty with interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and seeks relief against Huawei as follows:

(a)    For judgment that U.S. Patent Nos. 6,535,227; 6,980,537; 6,958,986; 7,027,426; 7,224,678; 7,327,690; and 7,440,572 have been and continue to be infringed by Huawei;

(b)    For an accounting of all damages sustained by Plaintiff as the result of Huawei's acts of infringement;

(c)    For finding that Huawei's infringement is willful and enhancing damages pursuant to 35 U.S.C. § 284;

(d)    For a mandatory future royalty payable on each and every future sale by Huawei of a product that is found to infringe one or more of the Patents-in-Suit and on all future products which are not colorably different from products found to infringe;

(e)    For an award of attorneys' fees pursuant to 35 U.S.C. § 285 or otherwise permitted by law;

(f)    For all costs of suit; and

(g)    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Rule CV-38,

Plaintiff demands a trial by jury of this action.


Dated:  February 15, 2019                              Respectfully Submitted,


                                          By:  /s/ *Denise De Mory*

                                                Henry C. Bunsow
                                                Denise De Mory
                                                **BUNSOW DE MORY LLP**
                                                701 El Camino Real
                                                Redwood City, CA 94063
                                                Telephone: (650) 351-7248
                                                Facsimile: (415) 426-4744
                                                hbunsow@bdiplaw.com
                                                ddemory@bdiplaw.com

                                                ATTORNEYS FOR PLAINTIFF
                                                HARRIS CORPORATION

# EXHIBIT 14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| HARRIS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 2:18-cv-00439-JRG |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| HUAWEI DEVICE USA, INC., HUAWEI | ) | |
| DEVICE CO., LTD., HUAWEI | ) | |
| TECHNOLOGIES USA INC., HUAWEI | ) | |
| TECHNOLOGIES CO. LTD., AND | ) | |
| HUAWEI DEVICE (SHENZHEN) CO., | ) | |
| LTD. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF HARRIS CORPORATION'S MOTION TO SEVER DEFENDANTS' INFRINGEMENT COUNTERCLAIMS

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ................................................................................................ 1

II.    HUAWEI'S INFRINGEMENT COUNTERCLAIMS PRESENT A
       COMPLETELY SEPARATE SET OF FACTS ................................................... 2

       A.     The two cases do not share common factual background or facts to be
              determined.............................................................................................. 2

       B.     Huawei has not identified any practical benefit to litigating the two cases
              together other than distraction and limitation of Harris's claims. .......... 4

III.   THIS COURT HAS PREVIOUSLY SEVERED IN LIKE CIRCUMSTANCES ............ 7

IV.    CONCLUSION................................................................................................... 9

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Anderson v. Red River Waterway Comm'n*,
231 F.3d 211 (5th Cir. 2000) ............................................................................................. 8

*Arteris S.A.S. v. Sonics, Inc.*,
No. C 12–0434 SBA, 2013 WL 3052903 (N.D. Cal. June 17, 2013)................................. 8

*Broadcom Corp. v. Sony Corp.*,
No. SACV 16-1052-JVS (JCGx), 2016 WL 9108039 (N.D. Cal.
Dec. 20, 2016)................................................................................................................... 8

*Huawei Technologies Co. Ltd. v. T-Mobile US, Inc.*,
No. 2:16-cv-00052-JRG-RSP, 2016 WL 7191855 (E.D. Tex. July
11, 2016) .................................................................................................................... 1, 7

*In re TS Tech USA Corp.*,
551 F.3d 1315 (Fed. Cir. 2008)........................................................................................ 8

*Intel Corp. v. Commonwealth Scientific and Indus. Research Corp.*,
Nos. 6:06–cv–551 *et al.*, 2008 WL 5378037 (E.D. Tex. Dec. 23,
2008) .................................................................................................................................. 9

*ROY-G-BIV Corporation v. FANUC Ltd.*,
No. 2:07-CV-418 (DF), 2009 WL 10677443 (E.D. Tex. April 14,
2009) .................................................................................................................................. 7

*Spectra-Physics Lasers, Inc. v. Uniphase Corp.*,
144 F.R.D. 99 (N.D. Cal. 1992)....................................................................................... 9

*Wyndham Assoc. v. Bintliff*,
398 F.2d 614 (2d Cir. 1968)............................................................................................. 8

## RULES

Fed. R. Civ. P. 21 .................................................................................................................. 1, 8

Fed. R. Civ. P. 42(b) .................................................................................................................. 9

## I.    INTRODUCTION

Huawei's Counterclaims for infringement, brought six months after this case was filed and over a year after Harris first notified Huawei of its infringement, attempt to inject a completely separate case into these proceedings—a case with little to no common operative facts.  Huawei's surprise assertion of five Power over Ethernet and LTE patents here will over-burden and confuse the factfinder, disrupt the schedule and proceedings, and will be prejudicial to Harris's own assertion of its Wi-Fi and Zigbee networking and security patents.  Huawei's infringement counterclaims concern different networking technologies and standards, accuse different categories of products in different markets, implicate no common witnesses or evidence, and will require completely separate analyses for claim construction, infringement, validity, and damages—including because Huawei's asserted patents are subject to FRAND obligations whereas Harris's asserted patents are not.

Accordingly, Harris respectfully moves this Court to sever Huawei's Fifteenth through Nineteenth Counterclaims for patent infringement into a separate action, pursuant to the Court's discretion under Federal Rule of Civil Procedure 21.[1]

Courts in this district have generally not allowed plaintiffs' patents and defendants' distinct technology counterclaim patents to proceed to trial together.  For example, as discussed below Huawei successfully moved this Court in a recent case to sever LTE patent counterclaims due to the lack of factual commonality between the claims.  *Huawei Technologies Co. Ltd. v. T-Mobile US, Inc.*, No. 2:16-cv-00052-JRG-RSP, 2016 WL 7191855, Dkt. 54 at 2-3 (E.D. Tex. July 11, 2016) (severing "the counterclaims against Huawei Tech to reduce the complexity of the

---

[1] Harris also opposes Huawei's Motion to Amend the DCO in this case (Dkt. 60), for the reasons given herein and in Harris's Opposition to that Motion to be filed today at the Court's request.  *See* Order, Dkt. 62.

cases.").  The same result is appropriate here.  Where there is no commonality of issues, there is

no efficiency gain from forcing those issues to be discovered, briefed, heard, or tried together.

Instead there is only risk of prejudice to litigants and of factfinder confusion.

## II.  HUAWEI'S INFRINGEMENT COUNTERCLAIMS PRESENT A COMPLETELY SEPARATE SET OF FACTS

### A.  The two cases do not share common factual background or facts to be determined.

Harris's seven Asserted Patents claim distinct innovations in routing, clustering, and

scheduling, as well as security (including cryptography and intrusion detection) for wireless

networks.  *See, e.g.*, Harris's Response in Opposition to Defendants' Motion to Dismiss, Dkt. 40

at 12-15, 17-19, 22-23, 26-27, 29-30, 31-33 (describing the claimed advances of Harris's

asserted patents).  Harris accuses various Huawei commercial products, including many of its

wireless routers, access points, gateways, switches, and consumer Wi-Fi or Zigbee products.

Am. Complaint, Dkt. 13 at ¶¶ 26-42.  Harris's infringement contentions provide extensive

documentation, based on public materials,[2] of Huawei's use of the claimed inventions—

including by Huawei's advertised compliance with certain IEEE 802.11 Wi-Fi standard

amendments, as well as IEEE 802.15.4 Low-Rate Wireless Personal Area Network standards and

Zigbee Alliance specifications, provisions of which are implicated in infringement here.  Harris

does not believe its Asserted Patents are subject to FRAND restrictions, and Huawei has

provided no facts suggesting otherwise.  *See generally* Answer and Counterclaims, Dkt. 56.

---

[2] To date, Huawei has not produced non-public technical documentation for the Accused Products, including for those numerous products identified by model number in Harris's original Complaint on October 24, 2018.  Declaration of Denise De Mory in Support of Harris's Motion to Sever ("De Mory Decl."), ¶ 3.

Harris initially informed Huawei of its infringement of the Asserted Patents via letter on March 12, 2018.  *See, e.g.*, Dkt. 13 at ¶¶ 53, 130.  After Huawei failed to even acknowledge any of the four letters Harris sent between March and October (*id.* at ¶ 130), Harris filed its initial Complaint on October 24, 2018, further informing Huawei of the basis for its claims.  Dkt. 1. Harris then agreed to a lengthy extension on service (90 days) and time to answer (45 days), and also amended its Complaint merely to adjust the Defendant party entities, both at Huawei's request.  Huawei then filed, and the parties briefed, its Motion to Dismiss, and the parties proceeded through initial disclosures, service of Harris's Infringement Contentions with nearly 700 pages of claim charts, and negotiation of the various proposed case management orders. During this time, Huawei provided no notice to Harris or the Court that it would be filing infringement counterclaims related to its LTE patents.[3]

Huawei's infringement counterclaims assert five distinct patents related to aspects of Power over Ethernet ("PoE") technology or of Long-Term Evolution ("LTE") mobile phone communications.  Dkt. 56 at Counterclaims, ¶¶ 12-35.  Huawei asserts that its asserted PoE patent is practiced by and/or essential to aspects of IEEE 802.3af, at, or bt standards, and that its LTE patents are practiced by and/or essential to aspects of versions of 3GPP standards for LTE. *See, e.g.*, *id.* at ¶¶ 116, 128.  Huawei does not allege any commonality or overlap between these

---

[3] After Harris filed its Complaint, Huawei finally responded to Harris's requests to engage in discussions.  Huawei did eventually mention its LTE patents during negotiations between the parties, specifically suggesting that they be treated on a separate negotiation track because discussions about a license to the Huawei patents are "not related to the pending lawsuit."  De Mory Decl., ¶ 1, Exhibit A.  Huawei makes several counter-factual allegations concerning Harris's responses, both in its Counterclaims (Dkt. 56 at ¶ 36) and in its Motion to Amend the DCO (Dkt. 60).  In fact, Harris did respond to Huawei's March 31, 2019 letter, contrary to statements in ¶ 36 of the Counterclaims, including via email days later expressing willingness to "includ[e] the LTE patents as part of the discussions."  De Mory Decl., ¶ 2, Exhibit B. Whatever strategic reasons Huawei had for filing its infringement Counterclaims when it chose to, its unsupported assertions that Harris failed to respond or lacked good faith are wrong and should be disregarded.

standards or the issues raised by their application, beyond the fact that some of them fall under the umbrella of the IEEE.  Dkt. 60 at 4.  On information and belief, Huawei's participation in these standards and its assertion of allegedly essential patents will subject it to FRAND obligations under the relevant patent policies of those standards organizations.  *See, e.g.*, Dkt. 56 at ¶¶ 6, 123, 134, 144, 156.

Huawei's infringement counterclaims accuse commercial sales of various military-grade battlefield and tactical communications equipment, including the "Falcon III RF-7850A-TM001 Roll-on/Roll-off Airborne System" and several of Harris's Tactical and Vehicle Based Radios. *Id*. at ¶¶ 37, 42.  In its single paragraph on allegedly common issues, Huawei does not allege any commonality or overlap between these products or the markets they are sold to, and the corresponding products or markets of Harris's infringement accusations.  Dkt. 60 at 4.  Huawei merely alleges that the patents are all related to "networking arrangements and communications." *Id*.

In short, there are no identified factual issues in common between claim construction, infringement, validity, or damages for Harris's Asserted Patents and Huawei's counterclaim patents.  There are no identified common witnesses, evidence, or claim terms to be construed. Accordingly, there are no issues that could be reduced or avoided by treating the groups of patents together.

**B.**     **Huawei has not identified any practical benefit to litigating the two cases together other than distraction and limitation of Harris's claims.**

In its Motion to Amend the DCO, Huawei does not support its conclusory assertion that proceeding under a common schedule will "reduce costs" or promote efficiency.  Dkt. 60 at 3-4. Indeed, because there is no overlap of issues, there is no reason to expect that Huawei's counterclaims will not simply double the parties' collective need for access to judicial and

-4-

factfinder resources to resolve all of the issues and claims. Huawei's only alleged justification for treating the indisputably distinct allegations together in one hearing or trial, rather than two hearings or trials, is Huawei's stated hope that the additional issues derived from its counterclaims will force Harris to drop aspects of its claims in order to fit them within the briefing pages, hearing time, or trial days allotted to one case instead of two. *Id.* at 4-5. Put another way, Huawei expects that access to judicial resources will not double if the two cases proceed together, and so merely by asserting counterclaims it will have reduced Harris's ability to fairly litigate and try its own claims.

Harris fully expects that both its claims, and Huawei's counterclaims, will be narrowed through the course of discovery, claim construction, and dispositive motions—in the ordinary course according to the established procedures of this Court, with which both sides' counsel are well familiar. Huawei's attempt to apply *further* narrowing pressure through the untimely assertion and proposed joint treatment of disparate counterclaims should be rejected as prejudicial.

In addition, Huawei's proposed combined schedule prejudices Harris even with respect to the Counterclaims alone, by denying Harris time to investigate and prepare defenses. Huawei has known of Harris's specific patent infringement counts and dozens of Accused Products since October 24, 2018 when the original Complaint was filed. Harris has known of Huawei's specific patent infringement assertions and accused products for less than three weeks. Yet under Huawei's proposed common schedule, Harris would have to serve Invalidity Contentions less than six weeks after Huawei does. *See* Dkt. 60-1 at 4. Defendants in this district under this Court's procedures are not asked to proceed so quickly. Because Harris had no prior notice of the Counterclaims, and because they assert completely factually distinct claims and raise

separate issues, Harris is in the same position as if the Counterclaims were a newly filed Complaint.

Huawei's voluntary early service of contentions or disclosures, as well as its stated willingness to enter claim construction days after seeing Harris's contentions (*see* Dkt. 60 at 3), fail to cure the burden it seeks to impose on Harris by compressing the ordinary early course of what is (in practical effect) a completely separate litigation. In addition, the compressed proposed schedule fails to allow time to address, and exacerbates the harm from, any deficiencies in Huawei's contentions, disclosures, or document productions.[4] Huawei also does not mention or address the shortened period for fact discovery before claim construction that arises under its proposal with respect to the Counterclaim patents, a shortened period that would now need to accommodate discovery related to twelve patents instead of seven. The additional claims, as well as the different accused products, will likely also require that the parties negotiate new discovery limits and Protective Order provisions, whether the Counterclaims are severed or not. The need to do so immediately, whilst also preparing contentions and disclosures under Huawei's compressed proposed schedule, only increases the harm to Harris.

Huawei has not identified any practical benefit to its proposed treatment of its Counterclaims together with and on the same schedule as Harris's claims. But the harm to Harris would be substantial, because of the compressed early schedule for responding, Huawei's hoped-for reduction in access to judicial and factfinder resources, and likely jury confusion of complex distinct issues at trial.

---

[4] Huawei served Infringement Contentions on May 13, 2019. Harris is evaluating those materials—which appear to only cite to three Harris documents in one of the five claim charts among unexplained quotations from industry standards—and will seek to confer with Huawei regarding any deficiencies that are identified. De Mory Decl., ¶ 4.

## III.    THIS COURT HAS PREVIOUSLY SEVERED IN LIKE CIRCUMSTANCES

In a recent prior case before this very Court, Huawei asserted several of its LTE patents, Nokia intervened and asserted counterclaims alleging infringement of other LTE patents, and Huawei sought severance.  Huawei argued: "There is no technical efficacy to be gained by tying these patents together because the issues for infringement, validity, and damages will have little in common."  *Huawei Technologies Co. Ltd. v. T-Mobile US, Inc.*, No. 2:16-cv-00052-JRG-RSP, Dkt. 35 at 4-5 (E.D. Tex. June 6, 2016).  This Court agreed, finding that: "Trying these technologically disparate patents in one case creates no efficiency gains.  A fact-finder's understanding of one patent will not inform her understanding of the other patent." *Id.*, Order, 2016 WL 7191855, Dkt. 54 at 2-3 (E.D. Tex. July 11, 2016).  This Court noted that while the patents on both sides in that case related to LTE and presented issues of FRAND encumbrances, they covered distinct aspects of LTE with no factual overlap, and damages in FRAND cases "raise highly patent-specific issues." *Id.*  Here, as discussed above, the patents are not even in the same networking technology categories or standards, and only Huawei has relevant FRAND commitments.  This case presents even stronger reasons to sever the infringement counterclaims.

Other courts in this district have granted severance when a defendant seeks to inject technologically dissimilar patents into ongoing litigation.  *See ROY-G-BIV Corporation v. FANUC Ltd.*, No. 2:07-CV-418 (DF), 2009 WL 10677443 at *1 (E.D. Tex. April 14, 2009) ("Given the different technology embodied in Defendants' patents, this Court believes that a severance would simplify an already complex matter.").  In its motion proposing a combined schedule and opposing severance, Huawei fails to cite any Eastern District of Texas authority supporting litigation or trial of separate counterclaim patents together with plaintiffs' claims.

Dkt. 60.[5]  Huawei also fails to even mention its own prior case before this Court—where LTE

counterclaim patents were severed from other asserted LTE patents at its request.  *Id.*

The Court has broad discretion in deciding whether to sever.  *Anderson v. Red River*

*Waterway Comm'n*, 231 F.3d 211, 214 (5th Cir. 2000).[6]  Rule 21 of the Federal Rules of Civil

Procedure provides that: "On a motion or on its own, the court may at any time, on just terms, . .

. sever any claim against a party."  Fed. R. Civ. P. 21.  Rule 21 "authorizes the severance of any

claim, even without a finding of improper joinder, when there are sufficient other reasons for

ordering a severance."  *Wyndham Assoc. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968).

Here, there are no common issues supporting any alleged need to align the case schedule

or deal with Harris's and Huawei's patents at the same time.  Any logistical benefit from having

the proceedings in the same Court, with the same counsel, could just as easily be realized with

Huawei's counterclaims trailing in a separate action.  Finally, and most importantly, there is no

benefit from trying Harris's and Huawei's patents before the same jury, with all of the

complications and risk of jury confusion that doing so would raise.  *See, e.g.*, *Huawei*, 2016 WL

7191855 at *1 ("A fact-finder's understanding of one patent will not inform her understanding of

the other patent.").

---

[5] Huawei mentions one Northern District of California case that denied a motion to sever infringement counterclaims.  Dkt. 60 at 4.  But even in that case the court found that several factors favored severing.  *Broadcom Corp. v. Sony Corp.*, No. SACV 16-1052-JVS (JCGx), 2016 WL 9108039, at *3-5 (N.D. Cal. Dec. 20, 2016) (noting "large factual differences," and the need for "different evidence and witnesses").  The *Broadcom* court also noted that there, unlike here, prejudice was reduced because defendant "disclosed its intent to pursue infringement counterclaims in the parties' Rule 26(f) discussions and in pre-suit negotiations." *Id.* at *5.  Other courts in California have separated claims on distinct sets of patents.  *See Arteris S.A.S. v. Sonics, Inc.*, No. C 12–0434 SBA, 2013 WL 3052903 at * 7-8 (N.D. Cal. June 17, 2013) (severing remaining declaratory judgment claims into one action and consolidating infringement counterclaims into a separate action in which the counterclaim patents had been asserted).  Huawei provides no basis for overturning what has been common practice in this district in favor of a factually distinguishable result in another circuit and district.

[6] Because motions to sever do not involve substantive issues of patent law, precedent from the Fifth Circuit controls.  *See In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008).

Huawei has not shown otherwise. *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99 (N.D. Cal. 1992), cited by Huawei, concerned bifurcation of liability and damages and did not involve separate counterclaim patent assertions. In comparison, courts in this district frequently bifurcate or sever when there are no common issues predominating. *See, e.g.*, *Intel Corp. v. Commonwealth Scientific and Indus. Research Corp.*, Nos. 6:06–cv–551 *et al.*, 2008 WL 5378037 at *1-2 (E.D. Tex. Dec. 23, 2008) (ordering separate trials on damages, and noting that "'any separate issue' may be severed for trial 'in furtherance of convenience or to avoid prejudice, or to expedite and economize.'") (*quoting* Fed. R. Civ. Proc. 42(b)). Despite being informed of Harris's intention to move to sever and/or proceed on a different schedule for Huawei's infringement Counterclaims (*see* Dkt. 60 at 1), Huawei failed to point to any relevant authority in this district, ignored countervailing authority including from this Court, and presented no common issues or facts that would justify the result it seeks here. Huawei's infringement Counterclaims should be severed into a separate action and proceed there according to an appropriate schedule based on the Court's model. *See also* Harris's Opposition to Huawei's Motion to Amend the DCO, which will be filed on May 15, 2019 in accordance with the Court's May 9, 2019 Order (Dkt. 62).

## IV. CONCLUSION

Plaintiff Harris respectfully requests that the Court sever Huawei's counterclaims for patent infringement (Counterclaim Nos. 15-19) into a separate action.

Dated:  May 15, 2019           Respectfully Submitted,

By:  /s/ *Corey Johanningmeier*

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
**CAPSHAW DERIEUX, LLP**
114 E. Commerce Ave.
Gladewater, TX 75467
Telephone: 903-845-5770
Email: ccapshaw@capshawlaw.com
Email: ederieux@capshawlaw.com

Henry C. Bunsow
Denise De Mory
Christina Finn
Robin Curtis
Corey Johanningmeier
Nicolas Mancuso
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063
Telephone: (650) 351-7248
Facsimile: (415) 426-4744
hbunsow@bdiplaw.com
ddemory@bdiplaw.com
cfinn@bdiplaw.com
rcurtis@bdiplaw.com
cjohanningmeier@bdiplaw.com
nmancuso@bdiplaw.com

Attorneys for Plaintiff
HARRIS CORPORATION

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that counsel for Plaintiff have complied with the meet and confer requirement of Local Rule CV-7(h).  This motion is opposed.  The conference required by Local Rule CV-7(h) was conducted on May 7, 2019, by telephone, among the following participants: Corey Johanningmeier for Harris; and Andrew Radsch for Huawei.  The parties' discussions on this issue have conclusively ended in an impasse, leaving an open issue for the Court to resolve.


Dated:  May 15, 2019

By: /s/ *Corey Johanningmeier*
　　　Corey Johanningmeier


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) with a copy of this document via the Court's CM/ECF system.


Dated:  May 15, 2019

By: /s/ *Corey Johanningmeier*
　　　Corey Johanningmeier

# EXHIBIT 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| HARRIS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 2:18-cv-00439-JRG |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| HUAWEI DEVICE USA, INC., HUAWEI | ) | |
| DEVICE CO., LTD., HUAWEI | ) | |
| TECHNOLOGIES USA INC., HUAWEI | ) | |
| TECHNOLOGIES CO. LTD., AND | ) | |
| HUAWEI DEVICE (SHENZHEN) CO., | ) | |
| LTD. | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY IN SUPPORT OF PLAINTIFF HARRIS CORPORATION'S MOTION TO SEVER DEFENDANTS' INFRINGEMENT COUNTERCLAIMS

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................................. 1

II.   HUAWEI'S INFRINGEMENT COUNTERCLAIMS SHOULD BE SEVERED
      AND SHOULD PROCEED ON A SEPARATE, TRAILING SCHEDULE ...................... 2

III.  CONCLUSION ................................................................................................................. 5

## I.    INTRODUCTION

Harris brought this case more than seven months ago, asserting seven Wi-Fi and Zigbee routing and security patents, which are not alleged to be wholly standard essential or subject to FRAND obligations.[1]  Harris identified infringement by various Huawei commercial routers, switches, gateways, and consumer products.  Six months later, Huawei brought a completely separate case via counterclaims, without prior notice to Harris or the Court.  Huawei asserted five LTE cellular and Power over Ethernet patents—which are asserted as standard essential[2] and are admittedly FRAND obligated[3]—against battlefield and tactical radio communications equipment used in vehicles, aircraft, and by soldiers and law enforcement officers.  The factual dissimilarity between the two cases is starkly obvious from the parties' own descriptions of the patents, products, and issues.  *See, e.g.*, Mot., Dkt. 65 at 2-4 (*citing* Motion to Dismiss Opposition, Amended Complaint, and Counterclaims).  Huawei fails to rebut this clear dissimilarity with any specific examples of factual overlap.

Without identified common issues to be decided once rather than twice, there is no efficiency gain to litigating and trying the two separate cases together.  Huawei fails to explain how one combined *Markman* hearing or trial will supposedly narrow the disputes or "promote settlement" as compared to two *Markman* hearings or trials.  Any narrowing that Huawei seeks here would be solely due to the logistical and scheduling pressure it seeks to impose by forcing Harris to share time in presentation of its case with Huawei's separate patents and issues.  Just

---

[1] While Huawei's opposition purports to disagree (*see* Opp., Dkt. 68 at 2), it has not pled defenses or made counterclaims alleging any FRAND obligation by Harris.  *See* Dkt. 56.

[2] Huawei's infringement contention claim charts exclusively relate the asserted claim limitations to portions of the LTE and PoE standards and rely on no Harris technical information other than to allege compliance with standards—indicating that Huawei intends to prove infringement by the standards.  *See* Opp. at 9 (describing contentions).

[3] *See* Opp. at 1.

resolution is promoted when all important disputed terms or issues are argued and decided—but this does not require dissimilar issues to be lumped together or decided simultaneously. Furthermore, foregoing presentation and resolution of important disputed terms or issues due to complexity—or lack of time with the Court or jury—is not an efficiency.

Finally, there is significant risk of jury confusion in Huawei's proposal to cover up to twelve patents on distinct technologies, four distinct sets of industry standards, asymmetrical FRAND issues, and multiple damages models in one trial. In short, Huawei's infringement counterclaims should be severed, and proceed on a separate schedule toward a separate trial.[4] Harris respectfully suggests that this course is the most efficient way to resolve both cases, without creating unnecessarily complex hearings, briefing, or trials. *Huawei Technologies Co. Ltd. v. T-Mobile US, Inc.*, No. 2:16-cv-00052-JRG-RSP, 2016 WL 7191855 at \*1, Dkt. 54 at 2 ("The Court, however, in all of the cases above, severs the counterclaims against Huawei Tech to reduce the complexity of the cases.").

## II. HUAWEI'S INFRINGEMENT COUNTERCLAIMS SHOULD BE SEVERED AND SHOULD PROCEED ON A SEPARATE, TRAILING SCHEDULE

Harris's Motion demonstrated, consistent with prior cases of this Court, that the lack of factual overlap and the complexity of the issues presented by the two distinct cases here call for the exercise of the Court's discretion to sever Huawei's infringement counterclaims.

In opposition, Huawei fails to identify any specific overlap between the two cases, instead relying on the general suggestions that the patents relate to networking, or to one of four sets of different industry standards, in some way. But this Court has recognized that "[t]rying

---

[4] Huawei's opposition to the Motion to Sever repeats and revisits certain arguments from its Motion to Amend the DCO (Dkt. 60). If the Court were to decline to exercise its discretion to sever the two cases, Harris respectfully requests that Huawei's infringement counterclaims still proceed on a separate schedule, for all of the reasons given herein and in Harris's opposition to the Motion to Amend the DCO (Dkt. 66).

these technologically disparate patents in one case creates no efficiency gains," and that damages in FRAND cases "raise highly patent-specific issues," even in a case where all the patents were directed to LTE standards and implicated FRAND. Mot. at 7 (citing *Huawei*, 2016 WL 7191855 at *1-2, Dkt. 54 at 2-3 ("A fact-finder's understanding of one patent will not inform her understanding of the other patent.")).

Huawei's attempt to distinguish the result it argued for (successfully) in its prior case falls flat. Opp. at 2-3. By Huawei's own admission, there this Court severed four LTE patent cases, none of which had more than seven patents asserted, into eight cases, none of which had more than four. *Id.* Here there are twelve patents asserted in one case, and four distinct sets of industry standards at issue instead of just one. If this were simply a matter of counting patents-per-case, the result in *Huawei v. T-Mobile* would further support severing here.

But this is not just a matter of counting patents, and instead is one of complete lack of factual overlap to justify simultaneous treatment of claims. As Huawei argued in its *T-Mobile* cases: "Although NSN contends both sets of patents broadly involve 'LTE cellular technology,' the differences . . . are incredibly broad." *Huawei*, No. 2:16-cv-00052-JRG-RSP, Dkt. 35 at 4-5 (E.D. Tex. June 6, 2016) ("There is no technical efficacy to be gained by tying these patents together because the issues for infringement, validity, and damages will have little in common."). In contrast, here Huawei suggests that the sets of claims remain together because they both "relate to networking arrangement and communications." Opp. at 1. This alleged commonality is even more vague than what was argued in the *Huawei v. T-Mobile* cases, even as the differences between the patents are more pronounced here. Huawei's position here simply cannot be reconciled with its position there. But even setting aside what Huawei has argued, this Court correctly determined in the *Huawei v. T-Mobile* cases, as it should here, that keeping

"technologically disparate patents in one case creates no efficiency gains." *Huawei*, 2016 WL 7191855 at *1-2, Dkt. 54 at 2-3.[5]

Technological difference was also an important aspect of the court's decision in *ROY-G-BIV Corporation v. FANUC Ltd.*, No. 2:07-CV-418 (DF), 2009 WL 10677443 at *1 (E.D. Tex. April 14, 2009), where the court severed because "Defendants' two counterclaim patents deal with relatively distinct technology," and not merely because of delay as Huawei suggests. Opp. at 4; Mot. at 7.

Huawei fails to present any case from this district denying a motion to sever infringement counterclaims. Instead Huawei suggests that the Court "allow[ed] a case to proceed without severing" or "declined to sever" in three cases in which **no motion to sever infringement counterclaims was ever brought**. Opp. at 7-9. In fact, in the *Metaswitch* cases referred to by Huawei (*id.* at 7-8) this Court **did** stay and then sever non-patent claims and counterclaims (including for breach of FRAND obligations) from two cases to consolidate them with a third. *See, e.g.*, *Genband US LLC v. Metaswitch Networks Ltd.*, 2:14-cv-00744-JRG, Dkt. 385 (June 3, 2016). Huawei does not explain or opine why counsel in each of the three cases it cites did not also seek to sever infringement counterclaims, or provide analysis sufficient to determine

---

[5] Differences between the patents were a significant factor weighing toward severing even in the primary N.D. Cal. case relied on by Huawei. *See Broadcom Corp. v. Sony Corp.*, No. SACV 16-1052-JVS (JCGx), 2016 WL 9108039, at *3-5 (N.D. Cal. Dec. 20, 2016) ("There are vast, important factual differences between Broadcom's claims and Sony's counterclaims: 'different patents, covering different technologies, invented by different inventors, allegedly infringed at different times, by different parties, by different, noncompeting products, in different ways.'"). That case was decided based in part on factors that do not apply and in fact would pull the other way here, such as advance notice by Sony of its "intent to pursue infringement counterclaims in the parties' Rule 26(f) discussions and in pre-suit negotiations." *Id.* at *5. Harris had no advance warning or reason to expect that Huawei would file counterclaims here, particularly given that Harris was participating in good faith in negotiations with Huawei immediately prior to the filing. *See* Mot. at fn. 3.

whether doing so would have been warranted.

Here in this case, for all of the reasons given in its Motion to Sever and herein, Harris has

very real concerns about prejudice, undue complexity in hearings and briefs, and jury confusion

at trial, should Harris's claims and Huawei's infringement counterclaims be jammed together

into the same case and case schedule.  These fundamentally separate and factually distinct cases

should be treated as separate and factually distinct in the interest of the just and efficient

resolution of both.  Huawei has failed to show any legitimate reason to suggest otherwise, or any

authority from this district for denying Harris's motion.

## III.    CONCLUSION

Plaintiff Harris respectfully requests that the Court sever Huawei's counterclaims for

patent infringement (Counterclaim Nos. 15-19) into a separate action to be litigated and tried

according to a separate, trailing schedule.


Dated:  May 30, 2019                              Respectfully Submitted,


                                        By:  /s/ Corey Johanningmeier

                                              S. Calvin Capshaw
                                              State Bar No. 03783900
                                              Elizabeth L. DeRieux
                                              State Bar No. 05770585
                                              CAPSHAW DERIEUX, LLP
                                              114 E. Commerce Ave.
                                              Gladewater, TX 75467
                                              Telephone: 903-845-5770
                                              Email: ccapshaw@capshawlaw.com
                                              Email: ederieux@capshawlaw.com

                                              Henry C. Bunsow
                                              Denise De Mory
                                              Christina Finn
                                              Robin Curtis
                                              Corey Johanningmeier
                                              Nicolas Mancuso
                                              BUNSOW DE MORY LLP
                                              701 El Camino Real
                                              Redwood City, CA 94063

Telephone: (650) 351-7248
Facsimile: (415) 426-4744
hbunsow@bdiplaw.com
ddemory@bdiplaw.com
cfinn@bdiplaw.com
rcurtis@bdiplaw.com
cjohanningmeier@bdiplaw.com
nmancuso@bdiplaw.com

Attorneys for Plaintiff
HARRIS CORPORATION

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in

compliance with Local Rule CV-5(a) with a copy of this document via the Court's CM/ECF

system.


Dated:  May 30, 2019

By: _/s/ Corey Johanningmeier_
Corey Johanningmeier

# EXHIBIT 16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| HARRIS CORPORATION, | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:18-CV-00439-JRG |
| | § | |
| HUAWEI DEVICE USA, INC.,  HUAWEI | § | |
| DEVICE CO., LTD.,  HUAWEI | § | |
| TECHNOLOGIES CO. LTD.,  HUAWEI | § | |
| TECHNOLOGIES USA INC.,  HUAWEI | § | |
| DEVICE (SHENZHEN) CO., LTD., | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

## ORDER

Before the Court is Defendants Huawei Device (Shenzhen) Co., Ltd., Huawei Device Co., Ltd.; Huawei Device USA, Inc.; Huawei Technologies Co. Ltd.; and Huawei Technologies USA Inc.'s (collectively, "Huawei") Opposed Motion to Amend/Correct Docket Control Order (the "Huawei Motion").  (Dkt. No. 60.)  Also before the Court is Plaintiff Harris Corporation's ("Harris") Motion to Sever Defendants' Infringement Counterclaims (the "Harris Motion").  (Dkt. No. 65.)  Having considered the respective motions and for the reasons discussed herein, the Court **GRANTS** the Harris Motion and **DENIES AS MOOT** the Huawei Motion.

## I.    BACKGROUND

On October 24, 2018, Harris sued Huawei for infringement (the "Harris Infringement Claims") of U.S. Patent Nos. 6,535,227 (the "'227 Patent"); 6,958,986 (the "'986 Patent"); 6,980,537 (the "'537 Patent"); 7,017,426 (the "'426 Patent"); 7,224,678 (the "'678 Patent"); 7,327,690 (the "'690 Patent"); and 7,440,572 (the "'572 Patent") (collectively, the "Harris Patents").  (Dkt. No. 1 ¶¶ 14–27, 45–134 (Complaint); *see also* Dkt. No. 13 ¶¶ 12–25, 43–132

(Amended Complaint filed on Feb. 15, 2019).)  The Harris Patents relate to network management (e.g., routing, clustering, and scheduling) and security (e.g., cryptography and intrusion detection) aspects of wireless networks.  (*See* Dkt. No. 65 at 2; Dkt. No. 13 ¶¶ 12–25; Dkt. No. 31 at 1–3 (Huawei's Motion to Dismiss).)  Huawei subsequently filed a Rule 12(b)(6) Motion to Dismiss Amended Complaint for Failure to State a Claim Under 35 U.S.C. § 101.  (Dkt. No. 31; *see also* Dkt. No. 47 (identifying challenged claims of the Harris Patents).)

Despite its pending motion to dismiss, Huawei filed an Answer on April 26, 2019, asserting five counterclaims of patent infringement (the "Huawei Infringement Claims").  (Dkt. No. 56 ¶¶ 113–70 (Counterclaims Fifteen, Sixteen, Seventeen, Eighteen, and Nineteen).)  Specifically, Huawei accuses Harris of infringing U.S. Patent Nos. RE44,325 (the "'325 Patent"); 8,416,892 (the "'892 Patent"); 8,798,575 (the "'575 Patent"); 9,838,851 (the "'851 Patent"); and 10,117,226 (the "'226 Patent") (collectively, the "Huawei Patents").  (*Id.* at ¶ 1.)  The Huawei Patents relate to aspects of Power over Ethernet technology and Long-Term Evolution (LTE) telecommunication technology.  (*See id.*; *see also* Dkt. No. 68 at 1; Dkt. No. 65 at 3.)

During the pendency of the Harris and Huawei Motions, Huawei disclosed its infringement contentions pursuant to Local Patent Rules 3-1 & 3-2 on May 13, 2019.  (Dkt. No. 64.)  Likewise, Harris has filed an Answer to the Huawei Infringement Claims.  (Dkt. No. 72 ¶¶ 113–70.)

## II.   DISCUSSION

Huawei moves for this Court to "add deadlines [to the Docket Control Order] for the parties' disclosures and document productions pursuant to Local Patent Rules 3-1 through 3-4." (Dkt. No. 60 at 1 (Huawei Motion).)  Harris requests the Court "sever Huawei's Fifteenth through Nineteenth Counterclaims for patent infringement into a separate action" and reject Huawei's

proposed amendments to the Docket Control Order.  (Dkt. No. 65 at 1 (Harris Motion); Dkt. No. 66 at 8 (Response to Huawei Motion).)

Federal Rule of Civil Procedure 21 states that "[a]ny claim against a party may be severed and proceeded with separately."  A district court is afforded "broad discretion to sever issues to be tried before it."  *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1994) (citing Rule 21).  However, the court may refuse to sever claims if it "believes that it only will result in delay, inconvenience, or added expense."  *In re Rolls Royce Corp.*, 775 F.3d 671, 680 n.40 (5th Cir. 2014).

Harris argues that "there are no identified factual issues in common between claim construction, infringement, validity, or damages for [the Harris P]atents and [the] Huawei[ P]atents" because the Huawei Infringement Claims "concern different networking technologies and standards, accuse different categories of products in different markets, implicate no common witnesses or evidence, and will require completely separate analyses for claim construction, infringement, validity, and damages—including because [the Huawei P]atents are subject to FRAND obligations whereas [the Harris P]atents are not."  (*See* Dkt. No. 65 at 1, 4.)  Harris also argues that "Huawei's voluntary early service of contentions or disclosures, as well as its stated willingness to enter claim construction days after seeing Harris's contentions . . . fail to cure the burden it seeks to impose on Harris by compressing the ordinary early course of what is (in practical effect) a completely separate litigation."  (*Id.* at 6 (internal citation omitted).)  "Huawei's attempt to apply *further* narrowing pressure through the untimely assertion and proposed joint treatment of disparate counterclaims should be rejected as prejudicial."  (*Id.* at 5 (emphasis in original).)

3

Huawei responds that "litigating Harris'[] and Huawei's infringement claims at the same time will reduce the burden on the Court and the parties because there will not be a need to double all of the activities across two litigations and on different—often competing—schedules."  (Dkt. No. 68 at 5.)  Harris is not prejudiced by litigating the Huawei Infringement Claims because "Huawei filed its counterclaims early enough to not disrupt the dates in the current schedule," thereby "ensuring that the parties would be able to proceed with claim construction disclosures under a single, unified schedule."  (Dkt. No. 71 at 4.)  Huawei also argues that "any risk of confusing the jury [is] premature because 'there are other procedural mechanisms to address this issue' and the parties are more likely to take steps toward resolving the dispute."  (*See* Dkt. No. 68 at 6 (quoting *Broadcom Corp. v. Sony Corp.*, No. SACV 16-1052-JVS (JCGx), 2016 WL 9108039, at *4 (C.D. Cal. Dec. 20, 2016)).)  Additionally, Huawei contends that "jointly litigating both parties' claims will promote earlier settlement."  (Dkt. No. 68 at 7.)

Considering the totality of circumstances, the Court is persuaded that the Huawei Infringement Claims should be severed from the above-captioned case.  *See* Fed. R. Civ. P. 21. The Harris Patents and the Huawei Patents do not share similar technologies, and severance would simplify an already complex matter.  A fact-finder's understanding of any one of the Harris Patents will not inform her understanding of the Huawei Patents, and vice-versa.  *See Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-cv-52-JRG-RSP, 2016 WL 7191855, at *1 (E.D. Tex. July 11, 2016), *report and recommendation adopted*, 2017 WL 7052466 (E.D. Tex. Sept. 10, 2017).  This is particularly true given that the Harris Patents themselves involve interrelated, yet distinct, technologies (e.g., cryptography; intrusion detection; and network routing, scheduling, and clustering).  Moreover, the technological differences between the Harris and Huawei Patents do not present common or overlapping questions of law or fact, thus necessitating different witnesses,

experts, and documentary proof to resolve the parties' respective disputes.[1,2]  Further adding the complexity of the Huawei Patents to the factual considerations that the fact-finder would already be tasked with as to the Harris Patents risks jury-confusion.  Indeed, "[t]rying these technologically disparate patents in one case creates no efficiency gains."  *Huawei Techs.*, 2016 WL 7191855, at *1.

Additionally, unlike the *Broadcom* case upon which Huawei relies, the Court finds no indication that the Harris Infringement Claims and the Huawei Infringement Claims arose from a single, pre-suit transaction.  *Cf. Broadcom*, 2016 WL 9108039, at *3 (finding that the fact that "it appear[ed] as though there was a single transaction that involved some of the patents at issue . . . . weigh[ed] against severing the case").  The only commonality between the Harris Infringement Claims and the Huawei Infringement Claims is the presence of the parties before this Court in this case.  Accordingly, the Court is persuaded that Harris' and Huawei's respective patent rights may

---

[1] While the Court finds that the five factors set forth in *Broadcom* are persuasive in exercising the Court's discretion under Rule 21, the Court declines to expressly adopt the *Broadcom* factors as the sole avenue through which to exercise its discretion in this instance.  *See Broadcom*, 2016 WL 9108039, at *2 (examining whether (1) the claims arise out of the same transaction or occurrence; (2) the claims present some common questions of law or fact; (3) settlement of the claims or judicial economy would be facilitated; (4) prejudice would be avoided if severance were granted; and (5) different witnesses and documentary proof are required for the separate claim.")

[2] *See Broadcom*, 2016 WL 9108039, at *3–4 ("There are vast, important factual differences between [the parties' respective infringement claims and counterclaims]: different patents, covering different technologies, invented by different inventors, allegedly infringed at different times, by different parties, by different, noncompeting products, in different ways . . . . [that] weighs in favor of severing the case."); *id.* at *5 (explaining that the counterclaimant's "need to present different evidence and witnesses to establish its infringement claims . . . . weighs in favor of the Court severing the case"); *Huawei Techs.*, 2016 WL 7191855, at *2 (explaining that "in many ways, FRAND cases actually de-emphasize the importance of shared facts such as facts about the parties" because "[d]amages assessments in FRAND cases raise highly patent-specific issues"); *ROY-G-BIV Corp. v. FANUC Ltd.*, No. 2:07-cv-418-DF, 2009 WL 10677443, at *1 (E.D. Tex. Apr. 14, 2009) ("Because Defendants' two counterclaim patents deal with relatively distinct technology and because this case would be unduly delayed if those patents remain in this case, the Court finds that Defendants' infringement counterclaims . . . warrant a severance pursuant to Rule 21.").

be prejudiced by trying the Harris Infringement Claims and the Huawei Infringement Claims together.  Severance of the Huawei Infringement Claims is appropriate.

However, given the early posture of this case,[3] the Court is not persuaded that resolution of the Huawei Infringement Claims should be delayed.  *See U.S. v. O'Neil*, 709 F.2d 361, 368 (5th Cir. 1983) (explaining that severance creates "two separate actions or suits where previously there was but one").  Huawei has not been dilatory in bringing the Huawei Infringement Claims.  Despite Huawei's pending Rule 12(b)(6) motion,[4] Huawei filed its Answer and raised the Huawei Infringement Claims 70 days after Harris' Amended Complaint and 125 days before Harris' deadline to file amended pleadings.  (*See* Dkt. No. 45.)  Additionally, the Court finds that Huawei's proposed amendments to the Docket Control Order provides Harris with the same amount of time to serve its P.R. 3-3 and 3-4 invalidity contentions as to the Huawei Patents after receipt of Huawei's P.R. 3-1 and 3-2 infringement contentions as Huawei had with respect to the Harris Patents.  (*See* Dkt. No. 61-1 at 4 (Huawei's proposed amendment to the Docket Control Order).)  Indeed, Huawei has endeavored not to disturb the Court's deadlines.

Accordingly, the Court is persuaded that the pretrial deadlines set forth in Huawei's proposed Docket Control Order, with some modification, should govern the severed action comprising the Huawei Infringement Claims.

---

[3] The deadline for the parties to file amended pleadings is August 29, 2019, and the deadline for the parties to complete fact discovery is January 13, 2020.  (Dkt. No. 45.) *Cf. also ROY-G-BIV*, 2009 WL 10677443, at *1 (explaining that "Defendants' delay in bringing their counterclaims created a situation in which discovery and claim-construction on both parties' patents could not proceed simultaneously without drastic modification of this Court's Docket Control Order" was "reason alone . . . to sever Defendants' patents").

[4] "Unless the court sets a different time, serving a motion under [Rule 12] alters the[ time to serve responsive pleadings] as follows: (A) if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action . . . ."  Fed. R. Civ. P. 12.  The Court has not yet ruled on Huawei's Rule 12(b)(6) Motion to Dismiss Amended Complaint for Failure to State a Claim Under 35 U.S.C. § 101 (Dkt. No. 31).

## III. CONCLUSION

For the forgoing reasons, Harris' Motion to Sever Defendants' Infringement Counterclaims (Dkt. No. 65) is **GRANTED**. It is therefore **ORDERED** that Huawei's Fifteenth, Sixteenth, Seventeenth, Eighteenth, and Nineteenth Counterclaims (Dkt. No. 56 ¶¶ 113–70) are hereby **SEVERED** into a separate cause of action (the "Huawei Action"), with Huawei's remaining counterclaims continuing (and remaining unsevered) in the above-captioned case. It is further **ORDERED** that:

1) Huawei is permitted to file an amended complaint asserting its Fifteenth, Sixteenth, Seventeenth, Eighteenth, and Nineteenth Counterclaims (Dkt. No. 56 ¶¶ 113–70) in the Huawei Action, in which Huawei shall be designated and re-aligned as the Plaintiff and Harris shall be designated and re-aligned as the Defendant;

2) After the Huawei Action has been created, the Court will consolidate the Huawei Action (the "Member Case") with this case—No. 2:18-cv-00439 (the "Lead Case")—for all pre-trial issues;

3) The Court hereby **ADOPTS AS MODIFIED** Huawei's proposed amendment to the Docket Control Order (Dkt. No. 60-1) as the Docket Control Order for the Huawei Action. The Court **SETS** jury selection for the Huawei Action on **June 8, 2020**. The proposed Docket Control Order (Dkt. No. 60-1), as modified, shall govern the Huawei Action regardless of when it is formally consolidated with the Lead Case. After the Huawei Action has been created, the Court will enter a Docket Control Order in that case that conforms to the Court's instructions herein; and

4) Harris and Huawei shall meet and confer to determine whether any amendments to the Court's Protective Order (Dkt. No. 53), Discovery Order (Dkt. No. 44) in the

Lead Case should be made for entry in the Huawei Action. Unless and until modified as to the Huawei Action, these orders shall be equally binding in the Huawei Action and in this case.

Accordingly, Huawei's Opposed Motion to Amend/Correct Docket Control Order (Dkt. No. 60) is **DENIED AS MOOT**.

    **So ORDERED and SIGNED this 12th day of June, 2019.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

# EXHIBIT 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| HUAWEI DEVICE USA, INC., HUAWEI DEVICE CO., LTD., HUAWEI TECHNOLOGIES CO. LTD., HUAWEI TECHNOLOGIES USA INC., HUAWEI DEVICE (SHENZHEN) CO., LTD., <br><br> *Plaintiff*, <br><br> v. <br><br> HARRIS CORPORATION, <br><br> *Defendants*. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br><br> CIVIL ACTION NO. 2:19-CV-00222-JRG |

## <u>ORDER</u>

In view of the Court's previous order (Case No. 2:18-cv-439, Dkt. No. 73) severing Plaintiffs Huawei Device (Shenzhen) Co.; Ltd., Huawei Device Co.; Ltd., Huawei Device USA, Inc.; Huawei Technologies Co. Ltd.; and Huawei Technologies USA Inc.'s (collectively, "Huawei") claims of patent infringement against Defendant Harris Corporation ("Harris") into the instant action, the Court issues this Order *sua sponte*.

It is hereby **ORDERED** that Case No. 2:19-cv-00222 ("Member Case") is hereby **CONSOLIDATED** into the **LEAD CASE**, No. 2:18-cv-00439 ("Lead Case") (together, "Consolidated Action"). All parties are instructed to file any future filings (except relating to venue) in the Lead Case. The Court's protective order (Lead Case, Dkt. No. 53), discovery order (Lead Case, Dkt. No. 44), and order appointing a mediator (Lead Case, Dkt. No. 39) in the Lead Case will govern the entire Consolidated Action and all parties thereto, as well as their counsel. The Court shall enter a separate docket control order to govern the Member Case. Any proposed

amendments to the docket control order, protective order, discovery order, or appointment of a mediator shall be filed within two weeks of this Order.

The local rules' page limitations for *Markman* briefs and other motions will apply to the Consolidated Action. To further promote judicial economy and to conserve the parties' resources, the Court encourages the parties to file a notice with the Court in the event that there are other related cases currently pending on the Court's docket that may also be appropriate for consolidation with this case.

**So ORDERED and SIGNED this 12th day of June, 2019.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

# EXHIBIT 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| HARRIS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 2:18-cv-00439-JRG |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| HUAWEI DEVICE USA, INC., HUAWEI | ) | |
| DEVICE CO., LTD., HUAWEI | ) | |
| TECHNOLOGIES USA INC., HUAWEI | ) | |
| TECHNOLOGIES CO. LTD., AND | ) | |
| HUAWEI DEVICE (SHENZHEN) CO., | ) | |
| LTD. | ) | |
| | ) | |
| Defendants. | ) | |

**<u>HARRIS CORPORATION'S DISCLOSURE OF ASSERTED CLAIMS AND
INFRINGEMENT CONTENTIONS UNDER P.R. 3-1 AND DOCUMENT PRODUCTION
ACCOMPANYING DISCLOSURE UNDER P.R. 3-2</u>**

Pursuant to Patent Rules 3-1 and 3-2 of the United States District Court for the Eastern

District of Texas, Harris Corporation ("Harris") provides the following Disclosure of Asserted

Claims and Infringement Contentions and Document Production Accompanying Disclosure

relating to U.S. Patent Nos. 6,535,227; 6,958,986; 6,980,537; 7,027,426; 7,224,678; 7,327,690;

and 7,440,572 (the "Asserted Patents").  Harris' investigation of the infringing acts of

Defendants Huawei Device USA, Inc., Huawei Device Co., Ltd., Huawei Technologies USA

Inc., Huawei Technologies Co. Ltd., and Huawei Device (Shenzhen) Co., Ltd., collectively

("Huawei" or "Huawei Corporation") is ongoing, and discovery has not started yet.  Harris

Corporation therefore expressly reserves the right to supplement or amend its contentions and

disclosures herein based on additional information obtained through formal discovery or other

| Patent No. | Claims | Accused Products |
|---|---|---|
| | | Networking Management systems, including Agile Controller and Cybersecurity Intelligence System. |
| 6,958,986 | 1, 5-6, 9, 17, 21-22, 25 | The Huawei Wi-Fi Products, as listed below with respect to the '426 patent.<br><br>The Huawei Zigbee Products, as listed below with respect to the '537 patent. |
| 6,980,537 | 1-5, 10-11, 16-19, 24-25, 30-31, 33-34, 36-40, 45-49, 54-68 | Huawei products that support connectivity according to the Zigbee and/or IEEE 802.15.4 standards, (collectively the "Huawei Zigbee Products") including:<br>• HS2145V,<br>• LS2035V,<br>• LS2025, and<br>• Configuration Tools for the QIVICON Home Base product<br>• Huawei Echolife ONT products that support Zigbee connectivity, including but not limited to those listed above as Zigbee Certified Products<br>• Huawei AR160-M series routers that support Zigbee connectivity, including:<br>  • AR169RW-P-M9<br>• Huawei AR502 series IoT gateways, including:<br>  • AR502EG-L,<br>  • AR502EGW-L,<br>  • AR502EGRz-L,<br>  • AR502CG-L, and<br>  • AR502EG-L-PD<br>• X-Gen Wi-Fi AP7060DN access point<br>• IoT Connection Management |

| Patent No. | Claims | Accused Products |
|---|---|---|
| | | Platform and associated IoT gateway devices that support Zigbee connectivity |
| 7,027,426 | 1-27 | Huawei products that support connectivity according to the IEEE 802.11 Wi-Fi standards, including 802.11a/b/g/n, 802.11ac, and 802.11s, as well as Huawei's Mesh networking products (collectively the "Huawei Wi-Fi Products"), including, but not limited to: <br> • Huawei Access Points (e.g., AP1000, AP2000, AP4000, AP5000, AP6000, AP7000, AP8000, AP9000, AD9000 series of indoor and outdoor access points), including: <br> • AP2010DN <br> • AP2030DN, <br> • AP2050DN, <br> • AP2050DN-E, <br> • AP4030DN, <br> • AP4130DN, <br> • AP4030TN, <br> • AP4050DN, <br> • AP4050DN-E, <br> • AP4050DN-HD, <br> • AP4051DN, <br> • AP4151DN, <br> • AP4051TN, <br> • AP5030DN, <br> • AP5130DN, <br> • AP6050DN, <br> • AP6150DN, <br> • AP6052DN, <br> • AP7030DE, <br> • AP7050DE, <br> • AP7052DE, <br> • AP7052DN, <br> • AP7152DN, <br> • AP7060DN, |

| Patent No. | Claims | Accused Products |
|---|---|---|
| | | <ul><li>AC6605,</li><li>AC6005,</li><li>AC6003,</li><li>ACU2 Wireless Access Controller Unit,</li><li>X1E Series Native Wireless Access Controller Card,</li><li>and other models that include WIDS or similar functionality.</li><li>Huawei Routers, which may act as Access Controllers, including, on information and belief: AR Series (including AR120, AR150, AR160, AR200, AR500, AR510, AR1200, AR2200, AR3200, AR3600 Series Enterprise Routers.</li><li>eSight Platform, eSight WLAN Manager and other eSight products that support WIDS</li></ul> |
| 7,440,572 | 1, 47 | The Huawei Zigbee Products, as listed below with respect to the '537 patent. |

## III.  CLAIM CHARTS FOR INFRINGEMENT OF THE ASSERTED PATENTS (P.R. 3-1 (c))

Attached as Exhibits A-F are claim charts showing infringement of the Asserted Patents identifying where each limitation of each Asserted Claim is found in each Accused Instrumentality, including identification of the structures, acts, or materials in the Accused Instrumentalities that perform the function limitations governed by 35 U.S.C. § 112(6).

| Exhibit | Chart For Patent No. |
|---|---|
| A. | 6,535,227 |
| B. | 6,958,986 |
| C. | 6,980,537 |

Dated:  April 3, 2019                          Respectfully Submitted,

                                         By: _/s/ *Denise De Mory*_____
                                                Henry C. Bunsow
                                                Denise De Mory
                                                Christina M. Finn
                                                  Robin K. Curtis
                                                Corey Johanningmeier
                                                Nicolas Mancuso
                                                **BUNSOW DE MORY LLP**
                                                701 El Camino Real
                                                Redwood City, CA 94063
                                                Telephone: (650) 351-7248
                                                Facsimile: (415) 426-4744
                                                Email: hbunsow@bdiplaw.com
                                                Email: ddemory@bdiplaw.com
                                                Email: cfinn@bdiplaw.com
                                                Email: rcurtis@bdiplaw.com
                                                Email: cjohanningmeier@bdiplaw.com
                                                Email: nmancuso@bdilaw.com

                                                S. Calvin Capshaw
                                                State Bar No. 03783900
                                                Elizabeth L. DeRieux
                                                State Bar No. 05770585
                                                Capshaw DeRieux, LLP
                                                114 E. Commerce Ave.
                                                Gladewater, TX 75467
                                                Telephone: 903-845-5770
                                                Email: ccapshaw@capshawlaw.com
                                                Email: ederieux@capshawlaw.com

                                                **ATTORNEYS FOR PLAINTIFF**
                                                **HARRIS CORPORATION**

# EXHIBIT 19

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| HUAWEI DEVICE USA, INC. | ) | |
| HUAWEI DEVICE CO., LTD., | ) | Civil Action No. 2:19-cv-00222-JRG |
| HUAWEI TECHNOLOGIES USA INC., | ) | |
| HUAWEI TECHNOLOGIES CO. LTD., AND | ) | |
| HUAWEI DEVICE (SHENZHEN) CO., LTD., | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HARRIS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Huawei Device USA, Inc. ("Huawei USA"), Huawei Device Co. Ltd. ("Huawei Device"), Huawei Technologies USA Inc. ("HTUS"), Huawei Technologies Co. Ltd. ("Huawei Technologies"), and Huawei Device (Shenzhen) Co. Ltd. ("Huawei Shenzhen") (collectively, "Plaintiffs" or "Huawei") hereby files this complaint for Patent Infringement against Defendant Harris Corporation ("Harris" or "Defendant") and alleges as follows:

## NATURE OF ACTION

1.     This is an action brought by Huawei against Harris for infringement of U.S. Patent Nos. RE44,325 ("the '325 Patent), 8,416,892 ("the '892 Patent), 8,798,575 ("the '575 Patent), 9,838,851 ("the '851 Patent) and 10,117,226 ("the '226 Patent) (collectively, "the Huawei Asserted Patents").

## PARTIES

2.     Huawei USA is a Texas corporation with a place of business in Plano, Texas; Huawei Device is a Chinese company with a place of business in Dongguan, People's Republic

of China; HTUS is a Texas corporation with a place of business in Plano, Texas; Huawei

Technologies is a Chinese company with a place of business in Shenzhen, People's Republic of

China; Huawei Shenzhen is a Chinese company with a place of business in Shenzhen, People's

Republic of China.

3.      Founded in 1987 in Shenzhen, China, Huawei has become a global leader of

information and communication technology ("ICT") solutions.  Continuously innovating to meet

customer need, Huawei is committed to enhancing customer experience and creating maximum

value for telecommunications carriers, enterprises, and consumers.  Huawei's telecom network

equipment, IT products and solutions, and smart devices are deployed and used in more than 170

countries and regions and serve over one-third of the world's population.  Huawei currently

employs 180,000 employees globally.

4.      Huawei is a leader in research, innovation, and implementation of future

networks, focusing on current customer needs, as well as long-term technology research and

standardization.  Huawei has invested substantially in research and development to become and

maintain its global leadership in 4G, 5G and other wireless communications technology.  Huawei

has assembled a global team of approximately 80,000 employees working on research and

development, located in 36 joint innovation centers and 14 R&D centers around the world.

5.      Huawei's innovations are central to important cutting-edge technologies,

including ultrabroadband solutions, such as LTE wireless networks.  As a result of Huawei's

substantial dedication to R&D in the telecommunications industry over the past three decades,

Huawei has witnessed and contributed to the evolution of telecommunication networks from the

Wire Link Age, into the Wireless Age, and developing from 2G to 3G to 4G, with current

progress toward 5G. Over the course of this evolution, Huawei has been responsible for several of the industry's notable achievements and milestones.

6.     Huawei actively participates and drives core telecommunications standards in leading technical organizations, such as 3GPP, IEEE, IETF, ITU-T, GSMA, ETSI, CCSA, IMTC, SIP Forum, MSF, NGMN, OMA, 3GPP2, etc. Huawei is a member of 400 Standard Setting Organizations ("SSOs"), industry alliances, and open source communities. Thousands of contributions submitted by Huawei were approved by these organizations. In addition, Huawei has obtained dozens of leadership positions in these core network technology related SSOs, such as chairs, rapporteurs, and editors.

7.     Huawei has led the development of technologies that improve the individuation and reliability of wireless networks, while reducing the operating costs and improving the efficiency of wireless networks. These technologies enable, for example, efficient initial access to a wireless network, improving multicast communications over a wireless network, and improving the efficiency and variety of charging solutions. These features can be and generally are implemented on various networking products or software components, such as a User Equipment ("UE"), a Multi-cell/Multicast Coordination Entity ("MCE"), a Broadcast Multicast-Service Center ("BM-SC"), a Serving Gateway ("SGW"), a Packet Data Network Gateway ("PGW"), a Mobility Management Entity ("MME"), an Evolved Node B ("eNodeB"), a Radio Network Controller ("RNC"), Flow Based Charging ("FBC") and/or Policy and Charging Control ("PCC") system/ architecture related components, such as Charging Rules Function (CRF), Traffic Plane Function (TPF), Policy and Charging Rules Function ("PCRF"), Policy and Charging Enforcement Function ("PCEF"), and a Serving GPRS Support Node ("SGSN"), a Gateway GPRS Support Node ("GGSN").

8.      In paragraph 1 its Amended Complaint in Case No. 2:18-cv-00439-JRG, Harris

avers that Harris Corporation is a Delaware corporation duly organized and existing under the

laws of the state of Delaware with its principal place of business at 1025 West NASA Boulevard,

Melbourne, Florida.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C.

§§ 1331, 1338(a), 2201, and 2202 as Huawei counterclaims against Harris in Case No. 2:18-cv-

00439-JRG pursuant to the patent laws of the United States, Title 35, United States Code, and

the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  An actual, substantial and

continuing justiciable controversy exists between Harris and Huawei based on Harris having

filed an Amended Complaint in Case No. 2:18-cv-00439-JRG against Huawei alleging

infringement of the '227 Patent, the '986 Patent, the'537 Patent, the'426 Patent, the '678 Patent,

the '690 Patent, and the '572 Patent.

10.     Harris has submitted to personal jurisdiction of this Court through the filing of its

Amended Complaint against Huawei in Case No. 2:18-cv-00439-JRG.

11.     Venue is proper in this Court because Harris filed the Complaint in Case No.

2:18-cv-00439-JRG.

## HUAWEI PATENTS

12.     United States Reissue Patent No. RE44,325 ("the '325 Patent"), titled "Method of

Providing a Remote Power Feed to a Terminal in a Local Area Network, and Corresponding

Remote Power Feed Unit, Concentrator, Repeater, and Terminal," was duly and lawfully issued

June 25, 2013. Huawei Technologies is the owner of all right, title, and interest in the '325

Patent.  A true and correct copy of the '325 Patent is attached hereto as Exhibit 1.

-4-

13.     The claims of the '325 Patent are not directed to basic tools of scientific and technological work, fundamental economic practices, or the use of an abstract idea or mathematical formula.

14.     Rather, the '325 Patent describes problems and shortcomings in the field of power distribution and networking, and claims novel and inventive technological improvements and solutions to such problems and shortcomings.  For example, the '325 Patent describes the difficulty of providing power to a remote terminal over a communication line.  Transmitting supply power over the same set of wires used to transmit data can be advantageous, allowing devices to operate even if a local power source isn't available.  This transmission, however, can damage a terminal unless it is specially designed to be powered over the communication line.  To address this problem, the '325 Patent generally describes novel methods for safely testing a terminal, determining if it is designed to be powered remotely, and supplying power only if it is safe to do so.  In an exemplary embodiment, the '325 Patent describes a system that is configured to transmit low energy test signals to the terminal device.  The system will then determine the impedance of the terminal.  The system will transmit power if the detected impedance is indicative of a terminal that is designed to operate on remote power.

15.     United States Patent No. 8,416,892 ("the '892 Patent"), titled "Method and apparatus of transmitting a random access preamble," was duly and lawfully issued April 9, 2013.  Huawei Technologies is the owner of all right, title, and interest in the '892 Patent.  A true and correct copy of the '892 Patent is attached hereto as Exhibit 2.

16.     The claims of the '892 Patent are not directed to basic tools of scientific and technological work, fundamental economic practices, or the use of an abstract idea or mathematical formula.

-5-

17.     Rather, the '892 Patent describes a random access procedure that a mobile device and base station use to synchronize with and connect to each other in a mobile telecommunication system.  As part of this procedure, a mobile device transmits a random access preamble ("RAP") that a base station detects and uses to estimate the time of arrival of an uplink signal.  The set of RAPs must be carefully designed to have good autocorrelation and cross-correlation properties in order to have good detection properties.  The '892 Patent discloses an improved synchronization process that involves transmitting RAPs with desirable properties.  For example, the RAPs of the '892 Patent are generated using a cyclic shift, selected from a pre-defined set of cyclic shift increments.

18.     The '892 Patent addresses a problem rooted in mobile communications technology: "selecting an appropriate limited set of ZCZ lengths, in order to ensure a small and limited signaling overload." '892 Patent at 3:20–23.  Prior systems were deficient because they either selected only one of fixed set of preambles without modification, or cyclically shifted one preamble but without any restriction on the number of possible cyclic shifts.  *See, e.g., Id.* at 3:9-14.  The claimed solution of the '892 Patent resulted in decreased interference and low signal overload.

19.     United States Patent No. 8,798,575 ("the '575 Patent"), titled "Method for improving service data flow based charging and system thereof," was duly and lawfully issued August 5, 2014.  Huawei Technologies is the owner of all right, title, and interest in the '575 Patent.  A true and correct copy of the '575 Patent is attached hereto as Exhibit 3.

20.     The claims of the '575 Patent are not directed to basic tools of scientific and technological work, fundamental economic practices, or the use of an abstract idea or mathematical formula.

21.     Rather, the '575 Patent describes methods and systems for improving service data flow based charging.  The '575 Patent provides a solution whereby a charging rules function ("CRF") dynamically provides address information of a charging system to a traffic plane function (TPF) so that the TPF can address the charging system corresponding to the address information.

22.     The claims of the '575 Patent are directed to a manner in which a CRF and TPF communicate to facilitate access of charging system by the TPF.  The claimed solutions of the '575 Patent override the routine and conventional manner in which prior systems accessed charging systems.  For example, instead of pre-configuring address information of a charging system, the CRF of '575 Patent's system dynamically sends address information to the TPF.

23.     The claimed solution of the '575 Patent addresses a problem rooted in wireless networking technology: how to efficiently direct a TPF to a charging system.  The '575 Patent's claimed solution, like the problem it addresses, is also rooted in wireless networking technology, and is directed to how the CRF provides the TPF with the charging rules and address information about the charging system to facilitate flexible charging of services provided in a cellular telecommunications system. This interaction between the CRF and TPF maximizes the efficiency of the network.

24.     United States Patent No. 9,838,851 ("the '851 Patent"), titled "Subframe Processing Method and Device," was duly and lawfully issued December 5, 2017.  Huawei Technologies is the owner of all right, title, and interest in the '851 patent.  A true and correct copy of the '851 Patent is attached hereto as Exhibit 4.

25.     The claims of the '851 Patent are not directed to basic tools of scientific and technological work, fundamental economic practices, or the use of an abstract idea or mathematical formula.

26.     Rather, the '851 Patent addresses problems and shortcomings in the field of mobile communications, and subframe processing in particular, and claims novel and inventive technological solutions to such problems and shortcomings.  For example, the '851 Patent describes the limitations in the prior art Multimedia Broadcast Multicast Service (MBMS) system where the loss of at least two consecutive MBMS data packets in a synchronization sequence or all type 0 PDUs that indicated transmission completion of a synchronization sequence would cause the evolved NodeB (eNB) to generate incorrect Dynamic Schedule Information (DSI) in a transmission between the eNB and user equipment (UE), which could interfere with other eNBs and cause incorrect data reception by the UE connected to the network.

27.     The technology recited in the claims of the '851 Patent specifies how to prevent the distribution of incorrect DSI and increase the quality of synchronization during the transmission of MBMS data packets in a MBMS Single Frequency Network (MBSFN)—a result that overrides the routine and conventional practice of transmitting incorrect DSI when data packets are lost during an MBMS transmission.  For example, instead of the eNB in the MBSFN area transmitting incorrect DSI when two or more consecutive packets in a synchronization sequence are lost in transmission from a broadcast multicast-service center (BM-SC) to the eNB, as an eNB operating in the normal, expected manner would do, the claimed subframe processing method sets a subframe with DSI to null when an eNB cannot determine the transmission position of the at least two lost consecutive MBMS data packets in the Dynamic Schedule Period (DSP).

-8-

28.    The claims of the '851 Patent address problems arising out of the field of MBMS

transmission.  For example, the '851 Patent explains how, in the art at the time, eNBs may

transmit incorrect DSI when the eNB does not receive at least two consecutive packets and the

eNB cannot determine the positions of these packets.

> In the prior art, transmission between a B[M]-SC and an eNB is based on the
> Internet Protocol (IP), which may cause loss of MBMS data packets or a type 0
> PDU. If an eNB in an MBSFN area cannot normally receive at least two
> consecutive MBMS data packets in a synchronization sequence or all type 0
> PDUs that indicate transmission completion of a synchronization sequence, the
> eNB generates incorrect DSI, which may interfere with other eNBs and cause
> incorrect data receiving of the UE.

'851 Patent at 2:35-43.

> [I]f the eNB predicts the length of each MBMS data packet and generates DSI
> according to the prior art, the DSI may be incorrect and may be different from
> DSI generated by other eNBs in other MBSFN areas. Consequently, the incorrect
> DSI interferes with other eNBs, and a UE may incorrectly receive data or even
> cannot receive data.

'851 Patent at 5:24-30.

29.    The '851 Patent solved this technological problem through a technical solution.

The '851 Patent explains, for example, that the technological approach of setting a subframe to

null provided a solution to the technological problem mentioned above.

> In embodiments of the present invention, when an access network (AN) device
> (such as an eNB) finds that consecutive MBMS data packets are lost and/or a type
> 0 PDU group is lost, a subframe that is used to transmit DSI may be null to
> prevent the eNB from transmitting incorrect DSI which may interfere with other
> eNBs and cause incorrect data receiving of a UE.

'851 Patent at 3:17-23.

> Compared with the method in which the eNB transmits no data packet or
> transmits incorrect DSI, the method according to this embodiment enables the UE
> to receive more data, and enables the eNB to transmit data more efficiently.

'851 Patent at 6:45-49.

30.     United States Patent No. 10,117,226 ("the '226 Patent"), titled "Method, Apparatus, and System for Transmission Control of Multimedia Broadcast Multicast Service Data," was duly and lawfully issued on October 30, 2018.  Huawei Technologies is the owner of all right, title, and interest in the '226 Patent.  A true and correct copy of the '226 Patent is attached hereto as Exhibit 5.

31.     The claims of the '226 Patent are not directed to basic tools of scientific and technological work, fundamental economic practices, or the use of an abstract idea or mathematical formula.

32.     Rather, the '226 Patent addresses problems and shortcomings in the field of mobile communications, and multimedia broadcast multicast service data in particular, and claims novel and inventive technological solutions to such problems and shortcomings.  For example, the '226 Patent describes limitations in the prior art transmission control methods and systems in an MBMS system, in which "multiple eNBs in a certain area need to send the completely same MBMS service data in the same sub-frame" ('226 Patent at 1:59-60), where eNBs would send MBMS service data at different times, based on Multicast Control Channel contents, when the multi-cell/multicast coordination entity (MCE) updates the MCCH contents.

33.     The claims of the '226 Patent specify technology for implementing transmission control for simultaneously transmitting MBMS data when the broadcast of data is suspended or reinstated—a result that overrides the routine and conventional practice of suspending or reinstating data transmission in an MBMS system.  For example, instead of allowing eNBs in the same MBSFA range to suspend or resume MBMS service data transmission at different times, the '226 Patent provides uniform transmission control of the MBMS data through modification

of the MCCH in a specific way that requires synchronous suspension or resumption of MBMS service data transmission.

34.     The claims of the '226 Patent address technical problems arising out of the field of MBMS transmission.  For example, the '226 Patent explains how, in the art at the time, various eNBs would transmit MBMS at different times, resulting in interference in services, a problem unique to wireless networks.

> Although each eNB in the same MBSFA synchronously updates the MCCH message in the same MCCH modification period, the prior art does not have a unified method used for determining the time of transmission control for the corresponding MBMS service data, so that the eNB usually randomly determines the time of transmission control for the corresponding MBMS service data, and as a result, interferences in the service may be caused.

'226 Patent at 8:11-19.

35.     The '226 patent solves this technological problem through the technological solution of coordinating the transmission of MBMS service data by multiple eNBs so that they overlap completely.

36.     Harris has shown unwillingness to license the Huawei Asserted Patents on fair, reasonable and non-discriminatory terms.  On December 5, 2018, Huawei sent Harris a presentation setting forth Huawei's extensive patent portfolio, including its LTE patents and PoE patents.  On December 21, 2018, Huawei resent that presentation, and also sent Harris a list of selected essential patents.  On March 31, 2019, Huawei sent a letter to Harris reminding Harris of the existence of Huawei's LTE and PoE standard essential patent portfolios, and encouraging Harris to enter into good faith licensing discussions about Huawei's patents.  Harris did not respond to Huawei's March 31, 2019 letter.

## HARRIS'S INFRINGING PRODUCTS AND ACTIVITIES

37.    On information and belief, Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States numerous networking products compatible with IEEE 802.3af, 802.3at, 802.3bt, or similar industry standards for providing power to network devices via Ethernet cables (Power over Ethernet ("POE") standards).   These products include the Harris RF-7800W-IU200 Network Interface Unit, the Harris RF-7800W-PS104 Rugged Power Supply, the Harris Falcon III RF-7850A-TM001 Roll-on/Roll-off Airborne System and other similar devices that comply with one or more POE standards in the same way.

38.    On information and belief, the Harris RF-7800W-IU200 Network Interface Unit is capable of providing power to devices in compliance with the IEEE 802.3at standard.  For example, the Harris RF-7800W-IU200 Network Interface Unit data sheet specifies that it includes "802.3 at POE for deployment flexibility and integration with networked devices." *See* RF-7800W-IU200 Data Sheet, https://www.harris.com/sites/default/files/downloads/solutions/rf-7800w-iu200-network-interface-unit-datasheet.pdf.  The data sheet also specifies that the unit includes a "Data/Ethernet" interface with four "Rugged RJ-45 ports with PoE," and allows "up to four Harris RF-7800W HCLOS radios to be deployed in the harshest scenarios." *Id*.

39. On information and belief, the Harris RF-7800W-PS104 Rugged Power Supply and Harris Falcon III RF-7850A-TM001 Roll-on/Roll-off Airborne System are capable of providing power to devices in accordance with a POE standard.  For example, the Harris RF-7800W-IU200 Network Interface Unit data sheet specifies that the unit is "designed for use with the RF-7800W family of radios" and includes two Ethernet ports "with POE++." *See* RF-7800W-PS104 Rugged Power Supply Data Sheet, https://www.harris.com/sites/default/files/rf-7800w-ps104-rugged-power-supply-specifications.pdf.  *See also*

https://www.harris.com/sites/default/files/downloads/solutions/rf-7850a-tm001-roll-on-roll-off-airborne-system-datasheet.pdf.

40.     The term "PoE++" is an industry marketing term.  Prior to the release of the 802.3bt standard, several companies often used the term to refer to PoE systems that exceeded the 30 Watt limit imposed under the 802.3at standard.  Upon information and belief, the POE++ system described in connection with the Harris RF-7800W-PS104 Rugged Power Supply includes a similar method as set forth in the IEEE standards (e.g., the IEEE 802.3at standard) for detecting devices capable of being powered remotely.

41.     On information and belief, Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States numerous products compliant with 4G LTE mobile communication networks ("LTE Products").  These products include mobile communication devices capable of connecting to an LTE communications network, including user equipment (UE), and equipment supporting the infrastructure of an LTE communications network, including base stations (e.g., eNodeBs, eNBs), evolved packet core (EPC) components such as MMEs, SGWs, PGWs and PCRFs.

42.     On information and belief, Harris's mobile communication LTE products include XL Radios, Tactical 4G LTE Radios, and Vehicle Based Radios.  Harris advertises that its XL Radios, including the XL-185P Single Band Portable Radio, and XL-200P Multiband Portable Radio, support LTE functionality.  *See, e.g.*, https://www.harris.com/sites/default/files/downloads/product_line/xl-family-portable-radios-brochure.pdf.  Harris advertises that Vehicle Based Radios, including the TM9300-DMR and TM9400 P25, provide connectivity through LTE.  *See, e.g.*, https://www.harris.com/sites/default/files/unified-vehicle-network-computing-platform.pdf.

Harris advertises that its Tactical 4G LTE radios support LTE.  *See, e.g.*, https://www.harris.com/solution-grouping/tactical-4g-lte-radios.  Harris has stated that mobile devices such as the RF-3590 LTE Tablet support LTE.  *See, e.g.*, https://www.harris.com/press-releases/2012/02/harris-corporation-introduces-ruggedized-tablet-for-defense-and-public-safety.  Upon information and belief, Harris makes, makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States cellular site simulator devices compliant with 4G LTE communications networks.  For example, the manual for the Gemini describes support for LTE.  *See, e.g.*, https://www.documentcloud.org/documents/3105793-Gemini-3-3-Quick-Start-Guide.html#document/p1

## FIRST CAUSE OF ACTION
### (Infringement of U.S. Reissue Patent No. RE44,325)

43.     Huawei incorporates by reference the allegations set forth in the foregoing paragraphs of its Complaint.

44.     Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '325 Patent, including but not limited to the Harris RF-7800W-IU200 Network Interface Unit, the Harris RF-7800W-PS104 Rugged Power Supply, the Harris Falcon III RF-7850A-TM001 Roll-on/Roll-off Airborne System, and other similar devices that comply with Power-Over-Ethernet (POE) standards (the "'325 Accused Products").  The '325 Accused Products infringe one or more claims of the '325 Patent, including without limitation, claim 30 of the '325 Patent.

45.     As an example, the '325 Accused Products provide a remote power feed to a terminal in a local area network.  For example, the RF-7800W-IU200, the RF-7800W-PS104 and the RF-7850A-TM001 are capable of providing power throughout a network to feed power to remote terminals in a manner compliant with one or more POE standards.  The RF-7800W-

IU200 "delivers secure voice communications with other networked NIUs through a standard headset," can connect "up to four Harris RF-7800W HCLOS radios," and Harris advertises that the "Power over Ethernet and a fiber optic connection keeps users connected while separated from their communications equipment at distances up to 2 km." RF-7800W-IU200 Data Sheet, https://www.harris.com/sites/default/files/downloads/solutions/rf-7800w-iu200-network-interface-unit-datasheet.pdf. The data sheet also states that the RF-7800W-IU200 includes "802.3 at PoE for deployment flexibility and integration with networked devices." Similarly, the RF-7800W-PS104 "is a rugged power supply designed for use with the RF-7800W family of radios" that includes "two Power over Ethernet ports." RF-7800W-PS104 Rugged Power Supply Data Sheet, https://www.harris.com/sites/default/files/rf-7800w-ps104-rugged-power-supply-specifications.pdf.  Harris advertises that the RF-7850A-TM001 "standard kit includes . . . Ethernet switch with PoE."  https://www.harris.com/sites/default/files/downloads/solutions/rf-7850a-tm001-roll-on-roll-off-airborne-system-datasheet.pdf

46.     The '325 Accused Products produce at least first and second test signals on at least two conductors of a line for connecting the local area network to a remote terminal, the test signals having an energy such that the terminal cannot be damaged under any circumstances. For example, upon information and belief, in compliance with POE standards, such as the IEEE 802.3at standard, the '325 Accused Products detect compliant, powered devices (PD) prior to supplying power. *See* IEEE 802.3at at pp. 37-39.  The '325 Accused Products "probes the link section in order to detect a valid PD detection signature" prior to supplying power. *See Id.* at p. 37.  To evaluate the presence of the PD, the '325 Accused Products make at least two measurements by applying test signals with voltages bounded between 2.8 V and 10.0 V and with current no greater than 0.005 amps.  The '325 Accused Products measure the resulting

currents. *See Id.* at pp. 38-39. Upon information and belief, the energy of a signal with 10 volts and 0.005 amps prevents terminal damage. The '325 Accused Products send the test signals over at least two conductors that carry signals and power to a PD according to one of the following arrangements. *See Id.* at pp. 24-38.





**Figure 33–4—10BASE-T/100BASE-TX Endpoint PSE location overview**

47.     The '325 Accused Products detect the presence of a remote terminal adapted to receive a remote power feed by detecting the presence of predetermined impedance in the remote terminal in compliance with a predetermined impedance threshold, on the basis of a current

| Table 33–5—Valid PD detection signature electrical characteristics | | | | | | |
|------|-----------|--------|------|-----|-----|------------------------|
| Item | Parameter | Symbol | Unit | Min | Max | Additional information |
| 1 | Accept signature resistance | $R_{good}$ | kΩ | 19.0 | 26.5 | — |
| 2 | Accept signature capacitance | $C_{good}$ | μF | | 0.150 | — |
| 3 | Signature offset voltage tolerance | $V_{os}$ | V | 0 | 2.00 | — |
| 4 | Signature offset current tolerance | $I_{os}$ | μA | 0 | 12.0 | — |

created by at least one of the test signals in the line.  For example, on information and belief, the '325 Accused Products calculate a resistance and capacitance from voltage and current measurements created from the test signals, and determines that a terminal can receive power over the network line where the resistance and capacitance are in a range defined in table 33-5. *See Id*. at p. 39 and Table 33-5 reproduced below:

48.     The '325 Accused Products send a power supply current in the line when the presence of a terminal adapted to receive a remote power feed is detected.  For example, the '325 Accused Products apply operating power to the terminal when the '325 Accused Products successfully detect a PD requesting power.  *See Id.* at pp. 37.

49.     By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '325 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more claims of the '325 Patent, including without limitation claim 30, pursuant to 35 U.S.C. § 271(a).

50.     Harris also infringes the '325 Patent under 35 U.S.C. § 271(b) & (c).

51.     Harris knowingly encourages and intends to induce infringement of the '325
Patent by making, using, offering for sale, and/or selling products in the United States, and/or
importing them into the United States, including but not limited to the '325 Accused Products,
with knowledge and specific intention that such products will be used by Harris or its customers
in a network that infringes the '325 patent, as shown by Harris's documentation suggesting that
the products be used to connect and power RF-7800W radios such as the RF-7800W-IU200 and
the RF-7800W-PS104 data sheet referenced above.

52.     Harris also contributes to the infringement of the '325 Patent. Harris makes, uses,
sells, and/or offers to sell products in the United States, and/or imports them into the United
States, including but not limited to the '325 Accused Products, knowing that those products
constitute a material part of the claimed invention, that they are especially made or adapted for
use in infringing the '325 Patent, and that they are not staple articles or commodities of
commerce capable of substantial non-infringing use.

53.     Harris knew of Huawei's patent portfolio before the filing of this action and was
alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents
essential to the PoE standard.  Upon information and belief, Harris knew of the '325 patent or
was willfully blind to the '325 patent.  Also, Harris has had knowledge of the '325 Patent at least
by virtue of the filing of this Complaint.

54.     Harris's infringement of the '325 Patent has been and continues to be deliberate
and willful, and this is therefore an exceptional case warranting an award of enhanced damages
and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

55.     As a result of Harris's infringement of the '325 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

## SECOND CAUSE OF ACTION
### (Infringement of U.S. Patent No. 8,416,892)

56.     Huawei realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of its Complaint.

57.     Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '892 Patent, including but not limited to Harris's Tactical 4G LTE Radios, and Harris's LTE-capable User Equipment (UE) mobile devices, such as the XL-185M, the XL-185P, the RF3590 LTE Tablet, and the XL-200P, and any other Harris products practicing the LTE standard (the "'892 Accused Products").  Harris's '892 Accused Products infringe one or more claims of the '892 Patent, including without limitation, claims 10 and 20 of the '892 Patent.

58.     For example, 3GPP TS 36.213 (including v1.2.0, and all subsequent releases and versions) of the LTE standard practiced by the '892 Accused Products requires that a mobile device select and transmit a random access preamble from a defined set.  *See, e.g*., 3GPP TS 36.213 v8.5.0, Section 6 ("Random access procedure").  3GPP 36.211 (including v8.1.0, and all subsequent releases and versions) of the LTE standard uses the same set of random access preambles as claims 10 and 20 of the '892 patent.  See, e.g., 3GPP TS 36.211 v8.5.0, Section 5.7.2 & Table 5.7.2-2.  Table 5.7.2-2 of 3GPP TS 36.211 v8.5.0 requires creating the preambles in the same manner and using the exact same set of cyclic shift increments as claimed in the '892 patent: 0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, and 419.  Moreover, the

random access preambles is provided with Zero Correlation Zones of length $N_{CS}$ -1. *See, e.g.*, 3GPP TS 36.211 v8.5.0 at 39.

59.    On information and belief, the '892 Accused Products that include an LTE base station, such as Harris's Tactical 4G LTE Radios, include a non-transitory computer readable storage medium that causes a processor to estimate a time of arrival of an uplink signal that includes a random access preamble. *See, e.g.*, 3GPP TS 36.300 v8.7.0 at 29, 50. The '892 Accused Products that include an LTE base station, such as Harris's Tactical 4G LTE Radios, include a processor that transmits a time advanced based on the uplink signal time of arrival. *See, e.g.*,3GPP TS 36.300 v8.7.0 at 29.

60.    By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '892 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more claims of the '892 Patent, including without limitation claims 10 and 20, pursuant to 35 U.S.C. § 271(a).

61.    Harris also infringes the '892 Patent under 35 U.S.C. § 271(b) & (c).

62.    Harris knowingly encourages and intends to induce infringement of the '892 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '892 Accused Products, with knowledge and specific intention that such products will be used by Harris or its customers in a network that infringes the '892 Patent. For example, Harris expressly advertises that its products can be used for LTE communications, and are "ideal" for various infringing uses. *See, e.g.*, https://www.harris.com/solution-grouping/tactical-4g-lte-radios. On information and belief, Harris also trains its customers in the use of the '892 Accused Products.

63.     Harris also contributes to the infringement of the '892 Patent. Harris makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '892 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '892 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

64. Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents essential to the LTE standard.  Moreover, on May 24, 2016, Huawei asserted the '892 patent in *Huawei Technologies Co., Ltd. v. Samsung Elecs. Co. Ltd.*, Case No. 3:16-cv-02787, in the Northern District of California.  Upon information and belief, Harris knew of the '892 Patent or was willfully blind to the '892 Patent.  Also, Harris has had knowledge of the '892 Patent at least by virtue of the filing of this Complaint.

65.     Harris's infringement of the '892 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

66.     As a result of Harris's infringement of the '892 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

### THIRD CAUSE OF ACTION
### (Infringement of U.S. Patent No. 8,798,575)

67.     Huawei realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of its Complaint.

68.     Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '575 Patent, including but not limited to Harris's Evolved Packet Cores (EPCs) that practice and comply with the LTE standard (the "'575 Accused Products").  For example, upon information and belief, Harris uses Cisco Packet Data Network (PDN) Gateway (P-GW) as part of its EPC.  Harris's '575 Accused Products infringe one or more claims of the '575 Patent, including without limitation, claim 1 of the '575 Patent.

69.     For example, on information and belief, Harris's '575 Accused Products include a Policy and Charging Rules Function (PCRF) that determining a charging method and charging rules in response to a credit-control request.  *See, e.g.*, 3GPP TS 29.212 v8.2.0 at 11, 12, 13, 15, 17, 56-57.  The PCRF provides a PCEF with the charging rules and address information of a charging system, such as an offline charging system and/or online charging system.  *See, e.g.*, 3GPP TS 29.212 v8.2.0 at 17, 34, 57; 3GPP TS 29.203 v8.4.0 at 44.

70.     By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '575 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more claims of the '575 Patent, including without limitation claim 1, pursuant to 35 U.S.C. § 271(a).

71.     Harris also infringes the '575 Patent under 35 U.S.C. § 271(b) & (c).

72.     Harris knowingly encourages and intends to induce infringement of the '575 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '575 Accused Products, with knowledge and specific intention that such products will be used by Harris or its customers in a network that infringes the '575 Patent.  For example, Harris expressly advertises that its

products can be used for LTE communications, and are "ideal" for various infringing uses. *See, e.g.*, https://www.harris.com/solution-grouping/tactical-4g-lte-radios. On information and belief, Harris also trains its customers in the use of the '575 Accused Products.

73.     Harris also contributes to the infringement of the '575 Patent. Harris makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '575 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '575 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

74. Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2012 email that Huawei's portfolio included a set of patents essential to the LTE standard.  Moreover, on January 15, 2015, Huawei asserted the '575 patent in *Huawei Technologies Co., Ltd. v. T-Mobile US, Inc.*, Case No. 2:16-CV-00055, in the Eastern District of Texas. Upon information and belief, Harris knew of the '575 Patent or was willfully blind to the '575 Patent.  Also, Harris has had knowledge of the '575 Patent at least by virtue of the filing of this Complaint.

75.     Harris's infringement of the '575 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

76.     As a result of Harris's infringement of the '575 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

## FOURTH CAUSE OF ACTION
### (Infringement of U.S. Patent No. 9,838,851)

77. Huawei realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of its Complaint.

78. Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '851 Patent, including but not limited to Harris's Tactical 4G LTE Radios and any other Harris base station/eNB products practicing the LTE standard (the "'851 Accused Products"). Harris's '851 Accused Products infringe one or more claims of the '851 Patent, including without limitation, claim 1 of the '851 Patent.

79. As an example, the '851 Accused Products include an eNB capable of determining that at least two consecutive Multimedia Broadcast Multicast Service (MBMS) data packets to be scheduled in a Dynamic Schedule Period (DSP) have not been received. For example, the '851 Accused Products employ an "MBMS synchronization protocol," which may "carry additional information that enable eNBs to identify the timing for radio frame transmission and detecting packet loss." *See, e.g.*, 3GPP TS 25.446 V9.2.1 at 6; 3GPP TS 36.300 V9.10.0 at 87. The '851 Accused Products further determine "if two or more consecutive SYNC service data units ("SDU") within a SYNC bearer are not received by the eNB." *See, e.g.*, 3GPP TS 36.300 V9.10.0 at 90. The '851 Accused Products further use a Multicast Channel ("MCH") Scheduling Period ("MSP") where all SYNC packets in one synchronization sequence of an MBMS service have the same timestamp value, and the "MSP length is one or multiple times of the synchronisation sequence length for the MBMS services in the MCH." *See, e.g.*, 3GPP TS 36.300 V9.10.0 at 91.

80. The eNB of the '851 Accused Products further sets a first subframe to null if the eNB cannot determine the transmission position of the at least two consecutive MBMS data

packets in the DSP. For example, the '851 Accused Products do not transmit in the subframe corresponding to the MSI of the MSP for which two or more consecutive SYNC SDUs within a SYNC bearer are not received by the eNB when the '851 Accused Products cannot determine the transmission positions of at least two consecutive SYNC SDUs. *See, e.g.*, 3GPP TS 36.300 V9.10.0 at 90.

81.     In the '851 Accused Products, the first subframe is used to transmit Dynamic Schedule Information (DSI) corresponding to the DSP, and the DSP includes at least the first subframe and subframes to be used to transmit the at least two consecutive MBMS data packets that have not been received. For example, the '851 Accused Products send a first subframe that includes MSI "to indicate which subframes are used by each MTCH during the MSP," which is "generated by the eNB and provided once at the beginning of the MSP." *See, e.g.*, 3GPP TS 36.300 V9.10.0 at 89-90.

82.     By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '851 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more claims of the '851 Patent, including without limitation claim 1, pursuant to 35 U.S.C. § 271(a).

83.     Harris also infringes the '851 Patent under 35 U.S.C. § 271(b) & (c).

84.     Harris knowingly encourages and intends to induce infringement of the '851 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '851 Accused Products, with knowledge and specific intention that such products will be used by Harris or its customers in a network that infringes the '851 patent. For example, Harris expressly advertises that its products can be used for LTE communications, and are "ideal" for various uses. *See, e.g.*,

https://www.harris.com/solution-grouping/tactical-4g-lte-radios.  On information and belief, Harris also trains its customers in the use of the '851 Accused Products.

85.    Harris also contributes to the infringement of the '851 Patent. Harris makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '851 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '851 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

86.    Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents essential to the LTE standard and Huawei's December 21, 2018 email identifying the '851 patent explicitly.  Upon information and belief, Harris knew of the '851 patent or was willfully blind to the '851 patent.  Also, Harris has had knowledge of the '851 Patent at least by virtue of the filing of this Complaint.

87.    Harris's infringement of the '851 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

88.    As a result of Harris's infringement of the '851 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

**FIFTH CAUSE OF ACTION**
**(Infringement of U.S. Patent No. 10,117,226)**

89.    Huawei realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of its Complaint.

90.     Harris makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the '226 Patent, including but not limited to Harris's Tactical 4G LTE Radios and any other Harris base station/eNB products practicing the LTE standard (the "'226 Accused Products").  Harris's '226 Accused Products infringe one or more claims of the '226 Patent, including without limitation, claim 1 of the '226 Patent.

91.     As an example, the '226 Accused Products transmit multimedia broadcast multicast service data.  In addition, the '226 Accused Products receive, from a multi-cell/multicast coordination entity (MCE), indication information including a multicast control channel modification period when a multicast control channel is updated.  For example, MBMS scheduling information is received in a message from the MCE to obtain MCCH related information.  *See, e.g.*, 3GPP TS 36.443 v.10.3.0 at 31.  The message includes indication information, including an "MCCH Update Time," which may be an absolute value from which the MCCH update should be applied.  *Id.* at 31, 46.

92.     The '226 Accused Products further send multimedia broadcast multicast service data in a scheduling period determined according to the indication information.  For example, the eNB resumes transmission of MBMS data from the beginning of the Modification Period indicated by the MCCH Update Time.  *See, e.g.*, 3GPP TS 36.300 v.10.5.0 at 106.

93.     In the '226 Accused Products, the scheduling period is a same scheduling period in which another base station resumes sending the multimedia broadcast multicast service data in a same multimedia broadcast multicast service single frequency network (MBSFN) area.  For example, within an MBSFN synchronization area, "all eNodeBs can be synchronized and perform MBSFN transmissions" that are "co-ordinated to achieve an MBSFN Transmission." 3GPP TS 36.300 v.10.5.0 at 84.

94.     By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '226 Accused Products, Harris has injured Huawei and is liable to Huawei for directly infringing one or more claims of the '226 Patent, including without limitation claim 1, pursuant to 35 U.S.C. § 271(a).

95.     Harris also infringes the '226 Patent under 35 U.S.C. § 271(b) & (c).

96.     Harris knowingly encourages and intends to induce infringement of the '226 Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the '226 Accused Products, with knowledge and specific intention that such products will be used by Harris or its customers in a network that infringes the '226 patent.  For example, Harris expressly advertises that its products can be used for LTE communications, and are "ideal" for various infringing uses.  *See, e.g.*, https://www.harris.com/solution-grouping/tactical-4g-lte-radios.

97.     Harris also contributes to the infringement of the '226 Patent. Harris makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the '226 Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the '226 Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

98.     Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents essential to the LTE standard.  Upon information and belief, Harris knew of the '226 patent or was willfully blind to the '226 patent.  Also, Harris has had knowledge of the '226 Patent at least by virtue of the filing of this Complaint.

99.    Harris's infringement of the '226 Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

100.    As a result of Harris's infringement of the '226 Patent, Huawei has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Harris's infringement, but in no event less than a reasonable royalty with interest and costs.

## DEMAND FOR JURY TRIAL

Huawei hereby demands a trial by jury of all issues so triable in this action.

## PRAYER FOR RELIEF

Huawei respectfully requests this Court grant relief as follows:

A.    Judgment that Harris has infringed one or more claims of each of the Huawei Asserted Patents in this litigation pursuant to 35 U.S.C. §§ 271(a), 271(b), 271(c) and/or 271(g) and that Harris is liable for damages caused by such infringement;

B.    A judicial determination of the conditions for future infringement such as an ongoing royalty;

C.    Judgment requiring Harris to make an accounting of damages resulting from Harris's infringement of the Huawei Asserted Patents;

D.    Judgment awarding Huawei its damages resulting from Harris's infringement of the Huawei Asserted Patents, and increasing such damages pursuant to 35 U.S.C. § 284 because of the willful and deliberate nature of Harris's conduct;

E.    Judgment requiring Harris to pay Huawei's costs and expenses, along with pre-judgment and post-judgment interest, for Harris's infringement of each of the Huawei Asserted Patents;

F.     An order that this case is "exceptional" pursuant to 35 U.S.C. § 285, entitling

Huawei to an award of its reasonable and necessary attorneys' fees, expenses, and costs, and pre-

judgment interest thereon;

G.     Grant to Huawei such other and further relief as the Court deems just and proper.

Dated: June 21, 2019                      */s/ Melissa R. Smith*
                                          Melissa R. Smith
                                          **GILLAM & SMITH, LLP**
                                          TX State Bar No. 24001351
                                          303 S. Washington Avenue
                                          Marshall, Texas 75670
                                          Telephone: (903) 934-8450
                                          Facsimile: (903) 934-9257
                                          melissa@gillamsmithlaw.com

                                          James R. Batchelder
                                          (CA Bar No. 136347)
                                          (Eastern District of Texas Member)
                                          James L. Davis, Jr.
                                          (CA Bar No. 304830)
                                          (Eastern District of Texas Member)
                                          Andrew T. Radsch
                                          (CA Bar No. 303665)
                                          (Eastern District of Texas Member)
                                          Christopher M. Bonny
                                          (CA Bar No. 280554)
                                          (Eastern District of Texas Member)
                                          **ROPES & GRAY LLP**
                                          1900 University Avenue, 6th Floor
                                          East Palo Alto, CA 94303-2284
                                          Telephone: (650) 617-4000
                                          Facsimile: (650) 617-4090
                                          james.batchelder@ropesgray.com
                                          james.l.davis@ropesgray.com
                                          andrew.radsch@ropesgray.com
                                          christopher.bonny@ropesgray.com

                                          Kevin J. Post
                                          (NY Bar No. 4382214)
                                          (Eastern District of Texas Member)
                                          Alexander E. Middleton

(NY Bar No. 4797114)
(Eastern District of Texas Member)
Jolene L. Wang
(NY Bar No. 5462619)
(Eastern District of Texas Member)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile; (212) 596-9090
jolene.wang@ropesgray.com

Attorneys for Plaintiffs
HUAWEI DEVICE USA, INC.,
HUAWEI DEVICE CO., LTD.,
HUAWEI TECHNOLOGIES USA INC.,
HUAWEI TECHNOLOGIES CO. LTD., and
HUAWEI DEVICE (SHENZHEN) CO., LTD.


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system per Local Rule CV-5(a)(3) on June 21, 2019.


*/s/  Melissa R. Smith*
Melissa R. Smith

# EXHIBIT 1

Case 1:19-cv-01606-MN-JRC Document 16-2 Filed 09/09/19 Page 152 of 312 PageID #: 759

US00RE44325E

(19) **United States**

(12) **Reissued Patent**
Vergnaud et al.

(10) Patent Number: **US RE44,325 E**
(45) Date of Reissued Patent: **Jun. 25, 2013**

(54) **METHOD OF PROVIDING A REMOTE POWER FEED TO A TERMINAL IN A LOCAL AREA NETWORK, AND CORRESPONDING REMOTE POWER FEED UNIT, CONCENTRATOR, REPEATER, AND TERMINAL**

(75) Inventors: **Gerard Vergnaud**, Fraconville (FR); **Luc Attimont**, Saint Germain en Laye (FR); **Jannick Bodin**, Garches (FR); **Raymond Gass**, Bolsenheim (FR); **Jean-Claude Laville**, Nanterre (FR)

(73) Assignee: **Alcatel Lucent**, Paris (FR)

(21) Appl. No.: **11/391,669**

(22) Filed: **Mar. 29, 2006**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **6,715,087**
    Issued: **Mar. 30, 2004**
    Appl. No.: **09/703,654**
    Filed: **Nov. 2, 2000**

(30) **Foreign Application Priority Data**

| Nov. 4, 1999 | (FR) | .................................... | 99 13834 |
| Apr. 14, 2000 | (FR) | .................................... | 00 04834 |
| Jul. 3, 2000 | (FR) | .................................... | 00 08592 |

(51) **Int. Cl.**
    *G06F 1/26* (2006.01)

(52) **U.S. Cl.**
    USPC ........................................... **713/300**; 713/340

(58) **Field of Classification Search**
    USPC ............................ 713/300, 330, 340
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,389,694 A * 6/1983 Cornwell, Jr. .................. 361/48

| 5,121,482 | A | * | 6/1992 | Patton | ............................ | 710/16 |
| 5,402,073 | A | * | 3/1995 | Ross | ............................ | 324/539 |
| 5,506,900 | A | * | 4/1996 | Fritz | ............................ | 379/402 |
| 5,530,748 | A | * | 6/1996 | Ohmori | ............................ | 379/413 |
| 5,991,885 | A | * | 11/1999 | Chang et al. | ................. | 713/300 |
| 6,175,556 | B1 | * | 1/2001 | Allen et al. | ................. | 370/293 |
| 6,218,930 | B1 | * | 4/2001 | Katzenberg et al. | ......... | 370/200 |
| 6,643,566 | B1 | * | 11/2003 | Lehr et al. | ................. | 700/286 |
| 6,681,013 | B1 | * | 1/2004 | Miyamoto | ................. | 379/413 |

FOREIGN PATENT DOCUMENTS

| EP | 0 981 227 A2 | * | 2/2000 |
| WO | WO 96/23377 | * | 8/1996 |

OTHER PUBLICATIONS

Bearfield, J.M., "Control the power interface of USB's Voltage Bus", Electronic Design, US, Penton Publishing, Cleveland, OH, vol. 45, No. 15, Jul. 27, 1997, pp. 80, 82, 84, 86. XP00078289 ISSN: 0013-48728.*
Richard Glaser et al, IEEE 802.3 DTE Power via MDI Detection and Signature Protocol, Lucent Technologies Apr. 18, 2000.
Robert Leonowich et al, IEEE 802.3af DTE Power via MDI Detection and Signature Tutorial, Alcatel Lucent, Jul. 10, 2000.

* cited by examiner

*Primary Examiner* — Dennis M Butler
(74) *Attorney, Agent, or Firm* — Sughrue Mion, PLLC

(57) **ABSTRACT**

A method for sending a remote power feed to a terminal in a local area network. A repeater of the local area network produces a [detection] *test* signal in a line to which a remote terminal is connected, and the signal has an energy level that will not damage the terminal. The presence of a remote terminal adapted to receive a remote power feed via the repeater is detected by detecting the presence of a predetermined impedance in the terminal, and power is supplied to the terminal via the repeater in response to detection of the presence of the terminal.

**63 Claims, 13 Drawing Sheets**



Case 1:19-cv-01606-MN  Document 16-2  Filed 09/03/19  Page 153 of 312 PageID #: 760
Case 2:19-cv-00222-JRG  Document 4-1  Filed 06/21/19  Page 3 of 27 PageID #: 50



FIG_1

Case 1:19-cv-01606-MN Document 16-2 Filed 09/03/19 Page 154 of 312 PageID #: 5761
Case 2:19-cv-00022-JRG Document 4-1 Filed 06/21/19 Page 4 of 27 PageID #: 161



FIG_2

Case 1:19-cv-01608-MN Document 16-2 Filed 09/03/19 Page 155 of 312 PageID #: 5762
Case 1:19-cv-00022-JRG Document 4-1 Filed 06/21/19 Page 5 of 27 PageID #: 52

# FIG_3



Case 1:19-cv-01806-MN Document 16-2 Filed 09/03/19 Page 156 of 312 PageID #: 5363
Case 2:19-cv-00222-JRG Document 4-1 Filed 06/21/19 Page 6 of 27 PageID #: 53

# FIG_4



Case 1:19-cv-01606-MN Document 16-2 Filed 09/03/19 Page 157 of 312 PageID #: 764
Case 1:19-cv-00222-JRC Document 4-1 Filed 06/21/19 Page 7 of 27 PageID #: 54



FIG_5

## FIG_6





FIG_7

Case 1:19-cv-01526-MN Document 16-1 Filed 09/03/19 Page 160 of 312 PageID #: 767
Case 2:19-cv-00222-JRG Document 41 Filed 06/21/19 Page 90 of 272 PageID #: 57

## FIG_8





FIG_9



Case 1:19-cv-01686-MN Document 16-1 Filed 09/03/19 Page 163 of 312 PageID #: 570
Case 2:19-cv-00222-JRG Document 41 Filed 06/21/19 Page 93 of 272 PageID #: 60



U.S. Patent        Jun. 25, 2013        Sheet 12 of 13        US RE44,325 E



Case 1:19-cv-01836-MN Document 16-1 Filed 09/03/19 Page 165 of 312 PageID #: 672
Case 2:19-cv-00222-JRG Document 2-1 Filed 06/21/19 Page 65 of 272 PageID #: 62



US RE44,325 E

**1**

## METHOD OF PROVIDING A REMOTE POWER FEED TO A TERMINAL IN A LOCAL AREA NETWORK, AND CORRESPONDING REMOTE POWER FEED UNIT, CONCENTRATOR, REPEATER, AND TERMINAL

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

### CROSS REFERENCE TO RELATED APPLICATIONS

*The present application is a reissue of U.S. Pat. No. 6,715, 087 which is based on application Ser. No. 09/703,654, filed Nov. 2, 2000.*

The present invention relates generally to a data processing local area network, for example an Ethernet network. To be more precise, the invention relates to a method of providing a remote power feed to a terminal in a data processing local area network and also to a remote power feed unit, a concentrator, a repeater (also known as a hub), and a terminal adapted to implement the method.

### BACKGROUND OF THE INVENTION

FIG. **1** is a diagram showing, by way of illustrative and non-limiting example only, an Ethernet data processing local area network which includes a local area network server **1**, a switch **2**, a [repeater] *concentrator* **3** and N terminals [**4**₁ to **4**ₙ] *4-1 to 4-N* which include telephones operating in Voice over IP (VoIP) mode. The server **1** is connected to the Internet **0** and receives packets complying with the Internet protocol (TCP/IP). The packets of a given call are routed via the switch **2** and the [repeater] *concentrator* **3** to a terminal such as the telephone [**4**₁] *4-1* which is connected to the repeater by a 8-wire line L terminated with RJ45 connectors.

The terminals connected to a data processing local area network (for example personal computers, printers, etc.) are conventionally connected locally to the mains electrical power supply. 110 V or 220 V power cords independent of the data connections are therefore used to supply power to the terminals. This solution makes installation of the local area network more difficult:

Using two cables causes problems of congestion which can additionally impede the free movement of persons.

It creates electrical hazards.

In the case of a telephone, a local connection to the mains electrical power supply has the additional drawback that the telephone is out of service in the event of a mains power outage, in particular in the event of a fire or natural disaster. This is why conventional telephones receive a remote power feed from their local exchange, which includes emergency batteries.

It is therefore desirable for some of the terminals connected to a data processing local area network to be provided with a remote power feed via the same connection as is used to send and receive data. It is also desirable to be able to install the remote power feed unit anywhere on the line L (either inside or outside a repeater **3**), to enable easy addition to an existing network.

One way of transmitting a remote power feed current is to use two of the eight wires of the line L: four other wires form two pairs of wires respectively used to transmit and to receive

**2**

data. Another method, referred to as a phantom circuit, connects the two terminals of a power supply generator in the remote power feed unit to respective center-taps of a winding of a transformer connected to the pair for receiving data and a winding of another transformer connected to the pair for sending data. At the terminal, the supply voltage is obtained between respective center-taps of a winding of a transformer connected to the pair for receiving data and a winding of another transformer connected to the pair for sending data.

In both cases, providing a remote power feed to the terminal via the data processing local area network has the disadvantage that the remote power feed unit supplies power to a terminal "blind". The RJ45 connector at the end of the line L could be plugged into a terminal other than a telephone (for example a personal computer, a printer, etc.). There is a risk of damaging the electrical circuits of that terminal. The RJ45 connector of a terminal is generally used in the following manner:

Four of the eight wires are separated into two pairs for respectively sending and receiving data. The terminal includes a transformer having one winding connected to the receive pair and a transformer having one winding connected to the send pair, each of these windings having a center-tap which can be connected to a reference potential via a low-resistance resistor.

Four other wires are not used and are grounded, often via a combination of resistors and capacitors, to eliminate any crosstalk induced by the data signals in the first four wires and to reduce unwanted electromagnetic emission. If a relatively high remote power feed voltage, for example 48 volts, is applied to that combination of resistors and capacitors, or to the resistors connected to the center-taps of the transformers, the resistors can be destroyed by the current flowing in them.

### OBJECTS AND SUMMARY OF THE INVENTION

The invention therefore aims to solve this problem by proposing a method of providing a remote power feed to a terminal in a data processing local area network and systems for implementing the method which prevent all risk of damage if a terminal is plugged in which is not one of the terminals adapted to receive a remote power feed via the network.

The invention firstly provides a method of providing a remote power feed to a terminal in a local area network, the method entailing:

producing at least one [detection] *test* signal on at least two conductors of a line for connecting the local area network to a remote terminal, that signal having an energy such that the terminal cannot be damaged under any circumstances,

detecting the presence of a remote terminal adapted to receive a remote power feed by detecting the presence of predetermined impedance in the remote terminal on the basis of a current created by the test signal in that line, and

sending a power supply current in that line when the presence of a terminal adapted to receive a remote power feed is detected.

The above method prevents all risk to the terminals because the remote power feed current is sent only if the terminal has been identified as one which is adapted to receive a remote power feed. The intensity and duration of the [detection] *test* signal are chosen so that the operation of detecting the terminal cannot cause any damage if the terminal is not one which is adapted to receive a remote power feed.

**3**

In one particular embodiment of the invention, to detect a predetermined impedance in the remote terminal, the presence of a capacitor in the remote terminal is detected.

The resulting method is particularly simple to implement. The capacitance of the capacitor is chosen so that it is significantly different from that of the line. Measuring a capacitive impedance then indicates a terminal adapted to receive a remote power feed. The capacitor can shunt two conductors used for the remote power feed without affecting transmission of the remote power feed current, which is a direct current.

In another particular embodiment of the invention, to detect a predetermined impedance in the remote terminal, the presence of a short-circuit in the remote terminal is detected.

The resulting method is particularly simple to implement, and therefore advantageous, when the short-circuit can be applied between two conductors of the line which are chosen so that the short-circuit does not impede either the remote power feed or sending and receiving data.

In a preferred embodiment of the invention, to detect the presence of a capacitor in the remote terminal:

an alternating current test signal is applied to the line and it is verified that the remote terminal does not behave like an open circuit for that signal,

a direct current test signal is applied to the line and it is verified that the remote terminal behaves like an open circuit for that signal, and

the method concludes that a terminal adapted to receive a remote power feed is present if the results of both tests are positive.

In one particular implementation of the invention a remote power feed method is suited to a line including two pairs for sending/receiving data and each enabling the transmission of a remote power feed current in common mode and other conductors which can also be used for a remote power feed. In the method, detecting a remote terminal adapted to receive a remote power feed entails:

performing a first test to detect if the terminal is adapted to receive a remote power feed via the two pairs for sending/receiving data,

performing a second test to detect if the terminal is adapted to receive a remote power feed via the other conductors that can also be used for a remote power feed,

sending a remote power feed current in the two pairs for sending/receiving data only if the first test shows that the terminal is adapted to receive a remote power feed via those two pairs, and

sending a remote power feed current in the other conductors that can also be used for a remote power feed only if the second test shows that the terminal is adapted to receive a remote power feed via those other conductors.

In one particular embodiment of the invention the first test consists of detecting the presence of a first predetermined impedance in the terminal on the basis of a current created by a first test signal in the two pairs for sending/receiving data and the second test consists of detecting the presence of a second predetermined impedance in the terminal on the basis of a current created by a second test signal in the other conductors.

One of the two predetermined impedances is preferably a short-circuit and the other predetermined impedances is preferably a capacitance.

The resulting method enables the remote power feed current to be increased, because it enables up to eight conductors of an Ethernet line to be used and can discriminate between several types of terminal adapted to receive a remote power feed that have different power consumptions. For example:

**4**

If it detects that the terminal is not one which is adapted to receive a remote power feed via the available conductors in an Ethernet line, but is adapted to receive a remote power feed via a phantom circuit using the pairs for sending and receiving data, this means that the terminal has a low power consumption, in which case it is possible and sufficient to send a remote power feed current via the phantom circuit.

If it detects that the terminal is adapted to receive a remote power feed via the available conductors in an Ethernet line and is also adapted to receive a remote power feed via a phantom circuit using the pairs for sending and receiving data, this means that the terminal has a high power consumption, in which case it is possible and necessary to send a remote power feed current via the phantom circuit and a remote power feed current via the available conductors.

The invention secondly proposes a terminal adapted to implement the above remote power feed method, the terminal including at least one predetermined impedance connected to at least two conductors of the line and which identifies the terminals adapted to receive a remote power feed.

The predetermined impedance preferably includes a very much higher capacitance than that of terminations routinely connected to the ends of the line in terminals that are not adapted to receive a remote power feed but are adapted to be connected to the local area network concerned.

The invention thirdly proposes a remote power feed unit for implementing the method and which includes:

means for producing at least one [detection] *test* signal on at least two conductors of a line for connecting the local area network to a remote terminal, that signal having an energy such that the terminal cannot be damaged under any circumstance,

means for detecting the presence of a remote terminal adapted to receive a remote power feed by detecting the presence of a predetermined impedance in the remote terminal on the basis of a current created by the test signal in that connection, and

means for sending a power supply current in the line when the presence of a terminal adapted to receive a remote power feed is detected.

One particular advantage of the above remote power feed unit is that it can be installed anywhere on the line (inside or outside a repeater), because it can operate entirely independently of the units of a repeater.

Another object of the present invention is to propose a repeater and a concentrator which can be inserted (separately or together) between a remote power feed unit and a terminal (or another equipment unit adapted to receive a remote power feed, such as a repeater or a concentrator) without interfering with discrimination or the remote power feed.

The present invention fourthly proposes a repeater adapted to receive a remote power feed and adapted to be included between a network equipment unit including a remote power feed unit and another network equipment unit in a local area network,

the repeater including a power supply unit powered by a remote power feed and whose input is connected in parallel with the power supply input of the other network equipment unit to the conductors of the line that provide the remote power feed, and

the power supply unit having an input impedance whose modulus is very much higher than the modulus of the input impedance of the power supply unit which is char-

US RE44,325 E

5

acteristic of equipment units adapted to receive a remote power feed likely to be connected downstream of that repeater.

The resulting repeater does not interfere with discriminating between an equipment unit that is adapted to receive a remote power feed and an equipment unit that is not adapted to receive a remote power feed, because the power supply input impedance detected by an upstream remote power feed unit remains approximately the same when the power supply input impedance of the repeater is connected in parallel with that of another network equipment unit. Also, the other network equipment unit and the repeater both receive a remote power feed from the upstream remote power feed unit, because their respective power supply inputs are connected in parallel to the conductors of the line that provide the remote power feed.

The present patent application fifthly proposes a concentrator adapted to be inserted into a line between a network equipment unit including a remote power feed unit and at least one other network equipment unit in a local area network,

the concentrator including, for each of its ports adapted to be connected to another network equipment unit, a remote power feed unit which includes:

means for producing at least one [detection] test signal on at least two conductors of a line for connecting the concentrator to another network equipment unit, that signal having an energy such that the other network equipment unit cannot be damaged under any circumstances,

means for detecting the presence of another equipment unit adapted to receive a remote power feed by detecting the presence of a predetermined impedance in that other equipment unit on the basis of a current created by the test signal in the line, and

means for sending a power supply current in the line when the presence of another equipment unit adapted to receive a remote power feed is detected.

The resulting concentrator provides a remote power feed to downstream equipment units that are adapted to receive a remote power feed and does not provide a remote power feed to equipment units that are not adapted to receive a remote power feed because it includes an additional remote power feed unit specific to each of its ports, that additional remote power feed unit operating in a similar manner to but independently of the upstream remote power feed unit in a network equipment unit such as an Ethernet switch or another concentrator.

In a preferred embodiment of the invention, the concentrator is itself adapted to receive a remote power feed and includes at least one predetermined impedance connected to at least two conductors of the line connected to the upstream network equipment unit and which is characteristic of the power supply input of equipment units that are adapted to receive a remote power feed.

The resulting concentrator can be inserted into a line without compromising the advantages for that line of the remote power feed, because it can itself be detected as adapted to receive a remote power feed and therefore receive a remote power feed.

BRIEF DESCRIPTION OF THE DRAWINGS

Other features and advantages of the present invention will become more clearly apparent on reading the following description, which is given with reference to the corresponding accompanying drawings, in which:

6

FIG. **1**, already commented on, is a diagram showing the architecture of an Ethernet local area network in which the method of the invention can be used.

FIG. **2** is a block diagram of a first embodiment of a remote power feed unit located in a concentrator and of a first embodiment of a terminal receiving a remote power feed, where the remote power feed is provided via a common mode phantom circuit on the pairs for sending and receiving data.

FIG. **3** shows the principle of detecting a terminal adapted to receive a remote power feed.

FIG. **4** is a block diagram of a variant of the terminal receiving a remote power feed, that variant enabling use of a local power supply under normal circumstances and a remote power feed in the event of failure of the local power supply, in particular in the event of a mains power outage.

FIG. **5** is a more detailed block diagram of the first embodiment of the remote power feed unit shown in FIG. **2**.

FIG. **6** is a diagram showing changes of state occurring in the embodiment shown in FIG. **5**.

FIG. **7** is a block diagram of a second embodiment of a remote power feed unit located in a concentrator and a second embodiment of a terminal receiving a remote power feed, where the remote power feed is provided via a common mode phantom circuit on the pairs for sending and receiving data and simultaneously via at least one other available pair.

FIG. **8** is a more detailed block diagram of the second embodiment of the remote power feed unit shown in FIG. **7**.

FIG. **9** is a diagram showing changes of state occurring in the embodiment shown in FIG. **8**.

FIG. **10** is a block diagram of one embodiment of a repeater in accordance with the invention and shows its use in a line in which the remote power feed is provided only by a phantom circuit.

FIG. **11** is a block diagram of the same embodiment of a repeater according to the invention but this time used in a line in which the remote power feed is provided via a phantom circuit plus two available pairs.

FIG. **12** is a block diagram of one embodiment of a concentrator according to the invention adapted to receive a remote power feed and shows its use in a line where the remote power feed is provided by a phantom circuit plus two available pairs, fed with power by a remote power feed unit located in an Ethernet switch.

FIGS. **13** to **16** show preferred embodiments of parts of the embodiment shown in FIG. **8**.

MORE DETAILED DESCRIPTION

FIG. **2** is a block diagram of a first embodiment of a remote power feed unit located in a concentrator **3** and a first embodiment of a terminal **5**_1 adapted to receive a remote power feed, where the remote power feed is provided via a common mode phantom circuit on pairs for sending and receiving data. The line L**3** includes four pairs:

pairs A**1**, A**2** are not used,

pairs B**1**, B**2** are not used,

pairs C**1**, C**2** are used to send data to the network, in differential mode, and

pairs D**1**, D**2** are used to send data to the terminal, in differential mode.

The pairs C**1**, C**2** and D**1**, D**2** are also used in common mode to provide a remote power feed to the terminal **5**_1 via a phantom circuit.

The concentrator **3** includes a remote power feed unit **31** and a combiner **32**. The unit **31** is adapted to detect the presence of a terminal adapted to receive a remote power feed. The combiner **32** includes two transformers **33** and **34**

7

respectively transmitting a signal Tx to be sent to a terminal and a signal Rx received from a terminal. The transformers each have a first winding and a second winding. The first windings are respectively connected to the pairs D1, D2 and C1, C2. They each have a center-tap connected to a respective output of the remote power feed unit 31 adapted to detect the presence of a terminal adapted to receive a remote power feed. The second windings are connected to other units of the concentrator 3, not shown.

The terminal $5_1$ includes a splitter 20 and a power supply unit 22. The splitter 20 includes two transformers 41 and 40 respectively for transmitting a signal Tx' to be sent to the concentrator 3 and for transmitting a signal Rx' received by the terminal $5_1$. They each have a first winding and a second winding. The first windings are respectively connected to the pairs D1, D2 and C1, C2. They each have a center-tap connected to a respective input of the power supply unit 22.

An impedance 21 shunts the power supply input 22. The impedance 21 makes it possible to recognize the terminal as one that is adapted to receive a remote power feed. The impedance 21 and the frequency of the [detection] *test* signal are chosen so that the modulus of the impedance 21 is very much less than 75 ohms. The impedance 21 is chosen so that it does not short-circuit the DC voltage applied to the power supply 22 and is easy to distinguish from terminations routinely connected to the available conductors of the RJ45 connectors of terminals. The impedance 21 is preferably a capacitor with a capacitance of not less than 1 microfarad, for example 50 microfarads. If the power supply unit 22 is a DC-DC converter which reduces the voltage, the capacitor 21 can be the filter capacitor provided as standard at the input of a DC-DC converter, because the power supply unit 22 shunts the impedance 21. In this case, there is no need to add a component to constitute the impedance 21, which simplifies the production of the terminal.

IEEE Standard 802.3 requires the pairs for sending and receiving data to be able to withstand a common mode voltage of 25 V at a frequency up to 500 kHz, which means that a sinusoidal test signal at a voltage of a few volts and at a frequency of the order of 10 kHz does not interfere with the transmission of payload data.

FIG. 3 shows the principle of discriminating terminals that are adapted to receive a remote power feed and terminals that are not. For example, a terminal $5_1$ that is adapted to receive a remote power feed includes a capacitor 21 having a capacitance of 50 microfarads. That capacitance must be distinguished from an Ethernet line termination, for example on a personal computer PC. That termination typically includes, for each pair P1, P2 of the line, two resistors 37 and 38, each having a resistance of 75 ohms and each having one terminal connected to one conductor of the pair in question and another terminal connected to a reference potential via a capacitor 39 whose capacitance is less than or equal to 100 nanofarads. In a variant (not shown), both ends of the line are connected to a short-circuit connected to the reference potential via a 75 ohms resistor in series with a capacitor having a capacitance less than or equal to 100 nanofarads.

Each conductor of the pair P1, P2 has a resistance of the order of 20 ohms. For a sinusoidal signal at 10 kHz, for example, the modulus of the impedance $Z_{term}$ measured at the end of the line is therefore always significantly greater than 150 ohms when a conventional termination is connected to the pair. On the other hand, it is always significantly less than 150 ohms when a capacitance of 1 microfarad or more is connected to the pair. It is therefore sufficient to determine if the modulus of the impedance $Z_{term}$ is less then or greater than

8

150 ohms, for example, to determine whether a terminal adapted to receive a remote power feed is present at the end of the line or not.

In a variant, instead of providing a remote power feed via a phantom circuit, and depending on the power required by the terminal, a remote power feed can be provided:

    via A1, A2 only, or

    via B1, B2 only, or

    via A1, A2, B1 and B2 simultaneously, or

    via A1, A2, B1, B2 and the phantom circuit simultaneously.

In a variant, the unit 31 and the combiner 32 can be in a separate module and completely independent of the repeater 3, that module being simply inserted into the line L.

FIG. 4 shows the block diagram of a variant $5_2$ of a terminal according to the invention using a local power supply under normal circumstances and a remote power feed in the event of failure of the local power supply, in particular in the event of a mains power outage. The remote power feed circuit uses the available pair A1, A2, for example, but operation is exactly the same if it uses a phantom circuit supported by the pairs for sending and receiving data.

Components that are identical to those of the terminal $5_1$ are identified by the same reference numbers. The terminal $5_2$ further includes a conventional mains power supply unit 24 providing a DC voltage of 50 volts, for example, if the remote power feed voltage is 48 volts. The positive pole of the mains power supply unit 24 is connected to a positive input of the power supply unit 22 via a diode D1. The positive pole of the remote power feed circuit is connected to the positive input of the power supply unit 22 via a diode D2. In normal operation, the diode D1 conducts and the diode D2 does not conduct, because of the difference between the two supply voltages. In the event of a mains power outage, the voltage provided by the mains power supply unit 24 disappears, the diode D2 conducts and the diode D1 does not conduct. The power supply unit 22 can therefore continue to operate from the remote power feed.

A capacitor 23 shunts the diode D2 to pass an alternating current signal for detecting the terminal type. Its capacitance is chosen so that it offers a negligible impedance to the [detection] *test* signal, for example 1 microfarad. A terminal with a local power supply backed up by a remote power feed can therefore be detected as a terminal with a permanent remote power feed.

The remote power feed current can be reserved for essential functions of the terminal during mains power outages and not for other, non-essential functions which consume large quantities of energy.

FIG. 5 is a more detailed block diagram of the first embodiment of the remote power feed unit 31 shown in FIG. 2. The first embodiment includes:

    a switch 44 having three inputs and one output, which output is connected to the center-tap of the transformer 33 via a resistor R2 shunted by a capacitor C1,

    an AC test voltage generator 45 providing a sinusoidal signal at a voltage of a few volts and at a frequency of 10 kHz, for example, having one terminal connected to the center-tap of the transformer 34 and another terminal connected to a first terminal of a resistor R1; the second terminal of the resistor R1 is connected to a first terminal of the switch 44,

    a DC voltage generator 46 providing a voltage of 48 V, for example, for remote power feeding a terminal, having a negative terminal connected to the center-tap of the transformer 34 and a positive terminal connected to a first terminal of a resistor R3 via an inductor 49; the

US RE44,325 E

9

second terminal of the resistor R3 is connected to a second input of the switch 44,

a DC test voltage generator 47 producing a voltage of 5 volts, for example, having a positive terminal connected to the center-tap of the transformer 34 and a negative terminal connected to a third input of the switch 44, and

a logic circuit 43 having a first input connected to the second terminal of the resistor R1, two further inputs respectively connected to the terminals of the resistor R2 and the capacitor C1, and an output which controls the switch 44.

In the above example:

R1=75 ohms,

R2=1 ohm,

R3=10 ohms,

C1=1 microfarad.

The inductor 49 in series with the generator 46 has an inductance such that, if the generators 45 and 46 are connected to the remote terminal simultaneously, the attenuation of the AC test signal caused by the generator 46 is negligible. In other embodiments this function can be implemented by an active circuit.

The resistance of R2 is chosen to define the maximum remote power feed current in the line and the capacitance of C1 is chosen to transmit the AC [detection] test signal with negligible attenuation. The voltage of the AC generator 45 and the resistance of the resistor R1 are chosen to pass a test current that is not hazardous for any terminal that might be connected to the end of the line, in particular if it is a terminal not adapted to receive a remote power feed. The DC test voltage provided by the generator 47 is very much lower than the remote power feed voltage and is therefore not hazardous to terminals which are not adapted to receive a remote power feed. Also, it is insufficient to start up the power supply of a terminal adapted to receive a remote power feed, which is therefore seen as an open circuit during the direct current test.

FIG. 6 is a diagram showing changes of state that occur in the embodiment of the unit 31 shown in FIG. 5. When the unit 31 is started up, it is in a state S1 and performs an alternating current test to detect the presence of a terminal adapted to receive a remote power feed. The logic circuit 43 operates the switch 44 to connect only its first input to its output. The remote power feed voltage is not applied to the line L, and there is therefore no risk to a conventional terminal. The switch 44 transmits an alternating current. The logic circuit 43 compares the AC voltage at the second terminal of the resistor R1 with a threshold voltage corresponding to a modulus of the impedance $Z_{term}$ equal to 50 ohms, for example. There are two possible outcomes:

Event 102: the modulus is greater than 50 ohms, this is an open circuit for the alternating current, there is therefore no terminal connected to the end of the line and the circuit 43 remains in state S1 to continue the alternating current test.

Event 101: the modulus is less than 50 ohms, there is a short-circuit for alternating current at least, and there therefore may be a terminal adapted to receive a remote power feed connected to the end of the line, or a short-circuit between two conductors of the line; the circuit 43 goes to the state S2 for discriminating between these two possibilities, by means of a low voltage direct current test of short duration. During this test the power supply unit 22 has a high resistance because the input voltage it receives is too low to start it up.

The test conducted in state S2 has two possible outcomes:

Event 105: the resistance is greater than 50 ohms, which is an open circuit for the direct current, and there is there-

10

fore no conventional terminal connected to the end of the line; the terminal is one adapted to receive a remote power feed or a terminal with a local power supply backed up by a remote power feed. The circuit 43 goes to a state S4 to remote power feed the terminal and continues the alternating current test to detect disconnection of the terminal which has been detected.

Event 104: the modulus is less than 50 ohms, and there is therefore a short-circuit for the direct current in the terminal or on the line; there is therefore either a conventional terminal (having a termination including a short-circuit) connected to the line, or an accidental short-circuit, in which case the remote power feed current must not be sent; the circuit 43 goes to state S3 to detect disappearance of the short-circuit.

In state S3, the circuit 43 performs a low DC voltage test of short duration to detect the disconnection of a conventional terminal, for example at periods of one second. The unit 31 provides a direct current of sufficiently low amplitude and sufficiently short duration to test for the presence of a conventional terminal with no risk of damaging it. The circuit 43 operates the switch 44 to connect only its second input to its output, for a period of only 150 milliseconds. At the end of 100 milliseconds (required to enable any capacitor to charge), the circuit 43 measures the voltage across R2. If the voltage is zero, the circuit is an open circuit for the direct current. The remote power feed voltage is not applied to the line L during this test. The test voltage applied is 5 volts in this example. This does not represent any danger to the terminal. The logic circuit 43 compares the DC voltage measured across the resistor R2 with a single threshold voltage, corresponding to a resistance of 50 ohms, for example.

The test is repeated until the modulus of the impedance exceeds 50 ohms (Event 106): the circuit 41 then reverts to state S1 so that it can detect the connection of a terminal adapted to receive a remote power feed.

In state S4 the unit 31 supplies a remote power feed current to the terminal adapted to receive a remote feed that it has detected, and detects the occurrence of two events:

disconnection of the terminal adapted to receive a remote power feed which has been detected, or

failure of the line or the terminal, producing a short-circuit for direct current.

The circuit 43 operates the switch 44 to connect its first and third inputs simultaneously to its output. A remote power feed current is therefore supplied to the line L. The generator 45 provides a permanent alternating current superimposed on the remote power feed direct current to monitor the presence of the terminal adapted to receive a remote power feed that has been detected. A direct current flows in the resistor R2 for as long as the terminal adapted to receive a remote power feed that has been detected is connected to the line L. The circuit 43 monitors the voltage drop across the resistor R2. It compares the AC voltage at the second terminal of the resistor R1 with a threshold voltage corresponding to a modulus of the impedance $Z_{term}$ equal to 50 ohms. It also compares the DC voltage across R2 with a threshold voltage corresponding to a resistance of 50 ohms.

Two events can occur in state S4:

Event 107: the modulus of the alternating current impedance rises above 50 ohms, the circuit is an open circuit for the alternating current, and the terminal adapted to receive a remote power feed has therefore been disconnected; the circuit 43 reverts to state S1. Because the remote power feed voltage is no longer applied to the line, any other terminal can be connected in complete safety.

US RE44,325 E

11

Event **108**: the DC resistance is less than 50 ohms and there is therefore a short-circuit either on the line or in the terminal. The circuit **43** goes to a state S**5** in which it stops the remote power feed for 30 seconds, for example, to prevent the remote power feed current from causing any damage. It then reverts to state S**1** in which the tests previously conducted are repeated.

FIG. **7** is a block diagram of a second embodiment of the remote power feed unit **31'** located in a concentrator **3'** and a second embodiment of a terminal **5₂** adapted to receive a remote power feed. This second embodiment is used to power terminals requiring a current that is too high to be provided only by the phantom circuit using the pairs for sending and receiving data or only by the available two pairs. The remote power feed current can be divided equally between the four pairs of the line, i.e. the phantom circuit plus the available two pairs. This enables the remote power feed current to be doubled. However, it is then necessary to verify that the terminal is adapted to receive a remote power feed current on all the pairs. If the remote power feed unit were to test only the phantom circuit and were then to apply the remote power feed voltage to all the pairs, it could destroy terminations at the ends of the available pairs in terminals adapted to receive a remote power feed only via the phantom circuit.

The remote power feed unit **31'** for detecting a terminal adapted to receive a remote power feed shown in FIGS. **7** and **8** verifies that the terminal is adapted to receive a remote power feed via the phantom circuit and that the terminal is further adapted to receive a remote power feed via the available two pairs. It can therefore distinguish between terminals of three types:

a terminal which is not adapted to receive a remote power feed,

a terminal that is adapted to receive a remote power feed only via the phantom circuit, and

a terminal that is adapted to receive a remote power feed via the phantom circuit and via the two available pairs.

The skilled person knows how to adapt the unit **31'** to permutate the test on the available pairs and the test on the phantom circuit to distinguish between terminals of three types:

a terminal that is not adapted to receive a remote power feed,

a terminal that is adapted to receive a remote power feed only via the available pairs, and

a terminal that is adapted to receive a remote power feed via the phantom circuit and the two available pairs.

In this example the unit **31'** has four ports. Two ports are connected to the center-taps of respective transformers **33** and **34**. The common mode phantom circuit uses the two pairs C**1**, C**2** and D**1**, D**2** for sending and receiving data. A third port is connected to the available conductors A**1** and B**1**. A fourth port is connected to the available conductors A**2** and B**2**.

In the terminal **5₂**, the ends of the conductors A**1** and B**1** are connected together to a first port of the power supply **22** and are connected via a short circuit **51** to the center-tap of the transformer **41**, i.e. to one terminal of the phantom circuit. The ends of the conductors A**2** and B**2** are connected together to a second port of the power supply unit **22** and are connected via a short circuit **52** to the center-tap of the transformer **40**, i.e. to the other terminal of the phantom circuit. As previously, a capacitor **21** shunts the two ports of the power supply unit **22**.

The unit **31'** sends half the remote power feed current via the phantom circuit and the other half via the pairs A**1**, A**2**, B**1**, B**2**. The AC test signal is superimposed on the remote power feed current.

12

FIG. **8** is a more detailed block diagram of the second embodiment of the remote power feed unit shown in FIG. **7**. The remote power feed unit **31'** for detecting terminals adapted to receive a remote power feed includes, in addition to the components constituting the unit **31** previously described:

a resistor R**4** connected at one end to the common point of the resistor R**3** and the inductor **49**, and

a second switch **48** having one input, one output and one control input.

The logic circuit **43** is replaced by a logic circuit **43'** which controls the switches **44** and **48**. The input of the switch **48** is connected to a second end of the resistor R**4**. R**4** has the same resistance as R**3**; R**3** and R**4** divide the remote power feed current equally between the phantom circuit and the circuit via the pairs A**1**, A**2**, B**1**, B**2**. The output of the switch **48** is connected to the conductors A**2** and B**2** of the line L. The conductors A**1** and B**1** are connected to the common point of the generator **45**, the generator **47**, the generator **46** and the center-tap of the transformer **34**.

FIG. **9** is a diagram showing changes of state occurring in the embodiment shown in FIG. **8**. On start-up, and until the terminal has been identified as adapted to receive a remote power feed via the phantom circuit and via the available pairs, the input of the switch **48** is not connected to its output. The generator **46** therefore does not apply any voltage to the terminal. The states are the same as for the unit **31**, except that event **105**, which detects an open circuit for direct current which indicates that the terminal is a terminal adapted to receive a remote power feed via the phantom circuit (or has a local power supply backed up by the remote power feed), is not followed immediately by state S**4** in which the terminal receives the remote power feed.

The unit **31'** goes to a state S**4a** in which the circuit **43'** carries out a short duration low DC voltage test to test also the available pairs A**1**, A**2**, B**1**, B**2**. It operates the switch **44** to connect only its second input to its output for only 150 milliseconds. The logic circuit **43'** verifies that there is a DC voltage on the conductors A**2**, B**2**.

Event **111**: The circuit **43'** has detected a return DC voltage on the conductors A**2**, B**2** because the phantom circuit (at the center-tap of the transformer **40**) is connected to those conductors in the terminal by the short-circuit **52**. This means that the terminal is also adapted to receive a remote power feed via the available pairs. The circuit **43'** operates the switch **48** so that it connects its input and its output. The generator **46** therefore applies a remote power feed voltage to the available pairs. The circuit **43'** then goes to a state S**4b** analogous to the state S**4** previously described, in which it provides a remote power feed to the terminal via the phantom circuit in addition to the remote power feed via the available pairs.

Event **110**: The circuit **43'** has not detected a DC voltage on the conductors A**2**, B**2** because the phantom circuit is not connected to those conductors in the terminal. This means that the terminal is not adapted to receive a remote power feed via the available pairs. The circuit **43'** leaves the switch **48** open. The generator **46** therefore applies no remote power feed voltage to the available pairs and there is no risk of damaging the terminal. The circuit **43'** then goes to a state S**4b** identical to the state S**4** previously described, in which it provides a remote power feed to the terminal via the phantom circuit only.

FIG. **10** is a block diagram of one embodiment of a repeater RP**1** according to the invention, and shows its use in a line in which the remote power feed is provided only via a phantom circuit. In a repeater **3**, each port includes a remote power feed

US RE44,325 E

13

unit **31** as previously described and providing the remote power feed and detection functions. The port connection in this example is connected to a terminal **4**₁ via the repeater RP**1**, which is necessary because of the length of the line. The concentrator **3** is connected to the repeater RP**1** by a line section L**1**. The terminal **4**₁ is connected to the repeater RP**1** by a line section L**2** and includes: a splitter consisting of two transformers **40** and **41**, a power supply unit **22** and a capacitor **21** shunting the input terminals of the power supply unit **22**, as previously described.

The repeater RP**1** includes:

a splitter **139** and a combiner **132**,

a power supply unit **122**, and

two regenerators **35** and **36**.

The combiner **132** includes two transformers **133** and **134** respectively transmitting a signal to be sent to the terminal **4**₁ and a signal received from the terminal **4**₁. Each has a first winding and a second winding. The first windings are connected to respective data transmission pairs of the line L₂. Each has a center-tap. The second winding of the transformer **133** is connected to differential outputs of the regenerator **35**. The second winding of the transformer **134** is connected to differential inputs of the regenerator **36**.

The splitter **139** includes two transformers **140** and **141** respectively transmitting the signal to be sent to the concentrator **3** and the signal received from the concentrator **3**. Each has a first winding and a second winding. The first windings are connected to respective data transmission pairs of the line L₁. The center-tap of the first winding of the transformer **140** is connected to a first input of the power supply unit **122** and to the center-tap of the transformer **133**. The center-tap of the first winding of the transformer **141** is connected to a second input of the power supply unit **122** and to the center-tap of the transformer **134**. The second winding of the transformer **141** is connected to differential outputs of the regenerator circuit **36**. The second winding of the transformer **140** is connected to differential outputs of the regenerator circuit **35**.

The connections between the center-taps of the transformers **140**, **141**, **133**, **134** enable the phantom circuit of the section L**1** to be connected directly to the phantom circuit of the section L**2** to carry the remote power feed direct current and test signals (direct current and alternating current). There is no capacitor connected to the input of the power supply unit **122** of the repeater. The power supply unit is designed to have an input impedance whose modulus is very much higher than 50 ohms during the alternating current test. The repeater RP**1** must receive a remote power feed from the remote power feed unit **31** only when a terminal **4**₁ adapted to receive a remote power feed is actually connected to the repeater RP**1**. The repeater RP**1** on its own must therefore not be detected as a terminal adapted to receive a remote power feed. The skilled person knows how to design a power supply unit **122** having an input impedance very much higher than 50 ohms for the alternating current test signal. For example, the input stage of the power supply unit can include an inductor or an active circuit equivalent to an inductor.

During the alternating current test (state S**1**, FIG. **6**), the remote power feed unit **31** detects a closed circuit for alternating current if and only if a terminal **4**₁ adapted to receive a remote power feed is connected, by means of the capacitor **21** in the terminal **4**₁. Thereafter, during the direct current test (state S**2**), the power supply unit **122** and the power supply unit **22** each have a high resistance because they receive an input voltage which is too low to start them. If the remote power feed unit **31** finds that there is no direct current short-circuit, it concludes that a terminal adapted to receive a

14

remote power feed is connected. The repeater is therefore transparent vis-à-vis the remote power feed unit **31**.

FIG. **11** is a block diagram of the same embodiment of a repeater according to the invention, but showing its use in a line where the remote power feed is provided by a phantom circuit plus two available pairs A**1**, A**2** and B**1**, B**2**. The two available pairs are used only in the line section L**1** because they provide the surplus energy corresponding to the requirements of the circuits of the repeater RP**1**. The two conductors A**1** and A**2** together connect the center-tap of the transformer **33** to the center-tap of the transformer **140**. The two conductors B**1** and B**2** together connect the center-tap of the transformer **34** to the center-tap of the transformer **141**.

FIG. **12** is a block diagram of one embodiment of a concentrator **3'** according to the invention. In an Ethernet switch **2'**, a remote power feed unit **231** and a combiner consisting of two transformers **201** and **202** analogous to those previously described for a concentrator **3** provide the remote power feed and detection functions for the port in question of the switch **2'**. The concentrator **3'** is connected to that port. It has N ports connected to N respective terminals **5**₁, . . . , **5**_N by individual lines L.

The concentrator **3'** is adapted to receive a remote power feed, and it receives its remote power feed via a phantom circuit on two pairs D**1**, D**2**, C**1**, C**2** plus two available pairs B**1**, B**2**, A**1**, A**2** of the line to the switch **2'** powered by the remote power feed unit **231** in the switch **2'**.

In the concentrator **3'**, each port includes a respective remote power feed unit **231**₁, . . . , **231**_N analogous to the unit **31** previously described and a respective combiner **232**₁, . . . , **232**_N, analogous to the combiner **32** previously described; they provide the remote power feed and detection functions. The concentrator **3'** further includes:

a splitter **240**,

a power supply unit **222**,

a capacitor **221** shunting the input of the power supply unit **222**, and

a conventional concentrator **200**.

For example, the combiner **232**₁ includes two transformers **233** and **234** respectively transmitting a signal to be sent to a terminal **6**₁ and a signal received from the terminal **6**₁. They each have a first winding and a second winding. The first windings are connected to respective data transmission pairs of the line L to the terminal **6**₁. Each has a center-tap. The second winding of the transformer **233** is connected to differential outputs of the concentrator circuit **200**. The second winding of the transformer **234** is connected to differential inputs of the concentrator circuits **200**.

The splitter **239** includes two transformers **240** and **241** respectively transmitting the signal received from the concentrator **2'** and the signal to be sent to the concentrator **2'**. They each have a first winding and a second winding. The first windings are connected to respective data transmission pairs D**1**, D**2**, C**1**, C**2**. The center-tap of the first winding of the transformer **240** is connected to a first input of the power supply unit **222**, a first input of each remote power feed unit **231**₁, . . . , **231**_N and the available wires A**1**, B**1**. The center-tap of the first winding of the transformer **241** is connected to a second input of the power supply unit **222**, a second input of each remote power feed unit **231**₁, . . . , **231**_N and the available wires A**2**, B**2**. The second winding of the transformer **141** is connected to differential outputs of the concentrator **200**. The second winding of the transformer **240** is connected to differential inputs of the concentrator **200**.

The concentrator **3'** requires a remote power feed regardless of the terminals to which it is connected. Even if none of those terminals is adapted to receive a remote power feed,

15

they require the concentrator **3'** in order to be able to operate. The concentrator **3'** is detected by the remote power feed unit **231** as being a terminal adapted to receive a remote power feed, because of the capacitor **121** (whose capacitance is at least equal to one microfarad). This capacitor can be the filter capacitor conventionally included at the input of a power supply unit.

FIG. **13** shows part of the block diagram of a variant of the embodiment shown in FIG. **8**. Of the three switches **44**, the one which is connected to the resistor **R3**, on the one hand, and to the resistor **R2**, on the other hand, preferably consists of an electronic circuit **44'** shown in FIG. **16**. The switch **48** which is connected to the resistor **R4**, on the one hand, and to the conductors **A2** and **B2**, on the other hand, preferably consists of an electronic circuit **48'** identical to the switch **44'**. The inductor **49** is preferably replaced with an electronic circuit **49'** for blocking an alternating current, namely the respective circuits **49'**a and **49'**b shown in FIGS. **14** and **15**.

FIG. **14** is the block diagram of a preferred first embodiment **49'**a of the electronic circuit **49'** for blocking an alternating current. This example includes three silicon diodes D5, D6, D7. The alternating current test signal generator applies to the terminals of the circuit **49'**a an AC voltage which in this example is equal to 1.2 volts. The current/voltage characteristic of any silicon diode is non-linear and has a threshold of approximately 0.6 volt. Beyond that threshold, the dynamic resistance is negligible. The diodes D5, D6, D7 have a combined threshold of approximately 1.8 volts. They therefore have a negligible conductance for the alternating current test signal when the remote power feed current is not flowing through them.

That signal is therefore not absorbed by the DC voltage generator **46** if no terminal adapted to receive a remote power feed is connected to the line. If a terminal adapted to receive a remote power feed is connected to the line, the alternating current test signal is absorbed but this is of no importance because at this time the test signal does not need to be used to detect the disconnection of a terminal. The skilled person knows how to adapt the number of semiconductor diodes to suit the voltage of the alternating current test signal.

FIG. **15** is the block diagram of a preferred second embodiment **49'**b of the electronic circuit **49'** for blocking an alternating current, which includes at least one transistor behaving as a direct current generator. The electronic circuit **49'**b includes a bipolar transistor T1 whose collector and emitter constitute respective terminals of the circuit **49'**b. The base is connected to a bridge made up of two resistors **R6** and **R7** connected between these two terminals. A capacitor **C4** is connected between the base and the emitter. The time constant of the circuit **49'**b as a whole is made very much greater than the period of the alternating current test signal. It can be shown by calculation that the circuit then has a negligible conductance for the alternating current signal.

FIG. **16** is the block diagram of a preferred embodiment of the electronic switching circuits **44'** and **48'**. Each includes, in addition to at least one active component:

means for turning it on and off to activate or deactivate the remote power feed current, and

means for controlling it in such manner as to limit the remote power feed current to a predetermined current that is not hazardous to the line or the generator **46**.

To be more precise, in this example, the circuit **44'** or **48'** includes:

a port **71** which is coupled to the conductors D1 and D2 (FIG. **8**), respectively A2 and B2,

a control port **72** connected to the control circuit **43'** (FIG. **8**),

16

a port **73** which is connected to the resistor **R3**, respectively **R4**,

an MOS transistor T4 whose drain is connected to the port **71** and whose source is connected to the port **73** via a resistor **R11**,

an NPN bipolar transistor T3 whose collector is connected to the gate of the transistor T4, whose emitter is connected to a supply voltage –V via a resistor **R9**, and whose base is connected to the control port **72**,

an NPN bipolar transistor T5 whose collector is connected to the gate of the transistor T4, whose emitter is connected to the port **73**, and whose base is connected to the drain of the transistor T4, and

a resistor **R10** connecting the gate of the transistor T4 to the port **73**.

A binary control signal is applied to the port **72**. When it turns off the transistor T3, the transistor T4 is turned off and the remote power feed is cut off. When it saturates the transistor T3, the transistor T4 conducts and the remote power feed is applied. The voltage drop in the resistor **R11** caused by the remote power feed current turns on the transistor T5 when it reaches a threshold voltage. The transistor T5 then reduces the conductance of the transistor T4. This current regulation limits the remote power feed current to a maximum current essentially determined by the resistance of the resistor **R11**, the ratio of the resistances of the resistors **R9** and **R10**, and the voltage –V. To complete the protection of the generator **46** against short-circuits, a fuse can be inserted as close as possible to the positive terminal of the generator **46**.

In a variant, the circuit **44'**, **48'** further includes means for controlling the active component so that it has a negligible conductance for the test alternating current. For example, a capacitor **C5** can be connected between the gate of the transistor T4 and the port **73**. The transistor T4 then behaves as a direct current generator, presenting a high impedance to the alternating current test signal generator, in particular when the transistor T5 is not turned on. The time constant of the circuit as a whole is chosen so that the transistor T4 has a negligible conductance vis-à-vis the alternating current test signal. There is then no longer any need for the blocking device **49** or **49'**.

What is claimed is:

**1**. A method of providing a remote power feed to a terminal in a local area network, the method comprising:

producing [at least one detection] *an alternating current test* signal on at least two conductors of a line for connecting the local area network to a remote terminal, [that] *the test* signal having an energy such that the terminal cannot be damaged under any circumstances,

detecting the presence of a remote terminal adapted to receive a remote power feed by detecting the presence of predetermined impedance in the remote terminal on the basis of a current created by the test signal in [that] *said* line, and

sending a power supply current in [that] *said* line when the presence of a terminal adapted to receive a remote power feed is detected.

**2**. A remote power feed method according to claim **1**, wherein, to detect a predetermined impedance in the remote terminal, the method detects the presence of a capacitor in the remote terminal.

**3**. A remote power feed method according to claim **2**, wherein, to detect the presence of a capacitor in the remote terminal:

**17**

[an] *said* alternating current test signal is applied to the line and it is verified that the remote terminal does not behave like an open circuit for [that] *the alternating current test* signal,

a direct current test signal is applied to the line and it is verified that the remote terminal behaves like an open circuit for [that] *the direct current test* signal, and

the method concludes that a terminal adapted to receive a remote power feed is present if the results of both tests are positive.

**4**. A remote power feed method according to claim **1**, wherein, to detect a predetermined impedance in the remote terminal, the method detects the presence of a short-circuit in the remote terminal.

**5**. A remote power feed method according to claim **1**, suited to a line including two pairs for sending/receiving data and each enabling the transmission of a remote power feed current in common mode and other conductors which can also be used for a remote power feed, wherein detecting a remote terminal adapted to receive a remote power feed comprises:

performing a first test to detect if the terminal is adapted to receive a remote power feed via the two pairs for sending/receiving data,

performing a second test to detect if the terminal is adapted to receive a remote power feed via the other conductors that can also be used for a remote power feed,

sending a remote power feed current in the two pairs for sending/receiving data only if the first test shows that the terminal is adapted to receive a remote power feed via those two pairs, and

sending a remote power feed current in the other conductors that can also be used for a remote power feed only if the second test shows that the terminal is adapted to receive a remote power feed via those other conductors.

**6**. A remote power feed method according to claim **5**, wherein the first test comprises [of] detecting the presence of a first predetermined impedance in the terminal on the basis of a current created by a first test signal in the two pairs for sending/receiving data and the second test comprises [of] detecting the presence of a second predetermined impedance in the terminal on the basis of a current created by a second test signal in the other conductors.

**7**. A remote power feed method according to claim **6**, wherein one of the two predetermined impedances is a short-circuit and the other predetermined impedance is a capacitance.

**8**. A remote power feed unit for implementing the method according to claim **1**, wherein the unit includes:

means for producing [at least one detection] *said alternating current test* signal on at least two conductors of a line for connecting the local area network to a remote terminal, [that] *the test* signal having an energy such that the terminal cannot be damaged under any circumstance,

means for detecting the presence of a remote terminal adapted to receive a remote power feed by detecting the presence of a predetermined impedance in the remote terminal on the basis of a current created by the test signal in [that connection] *said line*, and

means for sending a power supply current in [the] *said* line when the presence of a terminal adapted to receive a remote power feed is detected.

**9**. A [system] *remote power feed unit* according to claim **8**, wherein the means for detecting a predetermined impedance in the remote terminal include means for detecting the presence of a capacitor in the remote terminal.

**10**. A [system] *remote power feed unit* according to claim **8**, wherein the means for detecting a predetermined imped-

**18**

ance in the remote terminal include means for detecting the presence of a direct current short-circuit in the remote terminal.

**11**. A [system] *remote power feed unit* according to claim **9**, wherein the means for detecting the presence of a capacitor in the remote terminal include:

means for applying [an] *said* alternating current test signal to the line and verifying that the remote terminal does not behave like an open circuit for [that] *the alternating current test* signal,

means for applying a direct current test signal to the line and verifying that the remote terminal behaves like an open circuit for [that] *the direct current test* signal, and

logic means for concluding that a terminal adapted to receive a remote power feed is present if the results of both tests are positive.

**12**. A [system] *remote power feed unit* according to claim **10**, wherein the means for detecting the presence of a short-circuit in the remote terminal include:

means for applying a direct current test signal to the line, and

means for detecting if the remote terminal behaves like a short-circuit for [that] *the direct current test* signal and concluding that a terminal adapted to receive a remote power feed is present if the result of the test is positive.

**13**. A [system] *remote power feed unit* according to claim **8**, further including:

means for detecting disconnection of the terminal adapted to receive a remote power feed, and

means for interrupting the remote power feed current in response to detection of disconnection of the terminal.

**14**. A [system] *remote power feed unit* according to claim [8] *13*, wherein means for detecting disconnection of a terminal adapted to receive a remote power feed include:

means for applying an alternating current test signal to the line, and

means for verifying if the terminal behaves like an open circuit for [that] *the alternating current* test signal.

**15**. A [system] *remote power feed unit* according to claim **8**, further including:

means for detecting a short-circuit for the [remote] power [feed direct] *supply* current on the line after sending the [remote] power [feed] *supply* current, and

means for interrupting the sending of the [remote] power [feed] *supply* current for a predetermined time and then sending a [remote] power [feed] *supply* current again if a short-circuit is detected for the power supply [direct] current.

**16**. A [system] *remote power feed unit* according to claim **8**, further including:

means for concluding that a terminal that is not adapted to receive a remote power feed or a direct current short-circuit is present if the remote terminal does not behave like an open circuit for the alternating current test signal and does not behave like an open circuit for [the] *a* direct current test signal,

means for then applying a *further* direct current test signal to the line to verify that the remote terminal or the short-circuit is still connected, and

means for concluding that the terminal that is not adapted to receive a remote power feed or the short-circuit has been disconnected and if the result of the direct current test is negative, then the means for concluding:

applies [an] *a further* alternating current test signal to the line and verifies that the remote terminal does not behave like an open circuit for [that] *the further alternating current* signal,

**19**

applies a *further* direct current test signal to the line and verifies that the remote terminal behaves like an open circuit for [that] *the further direct current test* signal, and

concludes that a terminal adapted to receive a remote power feed is present if the results of both tests are positive.

**17**. A [system] *remote power feed unit* according to claim **8**, suitable for a line including two pairs for sending/receiving data each enabling the common mode transmission of a remote power feed current, and other conductors that can also be used for a remote power feed, wherein the means for detecting a remote terminal adapted to receive a remote power feed include:

means for performing a first test to detect if the terminal is adapted to receive a remote power feed via the two pairs for sending/receiving data,

means for performing a second test to detect if the terminal is adapted to receive a remote power feed via the other conductors that can also be used for a remote power feed,

means for sending a remote power feed current in the two pairs for sending/receiving data only if the first test shows that the terminal is adapted to receive a remote power feed via those two pairs, and

means for sending a remote power feed current in the other conductors that can also be used for a remote power feed only if the second test shows that the terminal is adapted to receive a remote power feed via those other conductors.

**18**. A [system] *remote power feed unit* according to claim **17**, wherein:

the means for performing the first test include means for detecting the presence of a first predetermined impedance in the terminal on the basis of a current created by a test signal in the two pairs for sending/receiving data, and

the means for performing the second test including means for detecting the presence of a second predetermined impedance in the terminal on the basis of a current created by a test signal in the other conductors.

**19**. A [system] *remote power feed unit* according to claim **18**, wherein one of the two predetermined impedances is a short-circuit and the other predetermined impedance is a capacitance.

**20**. A [system] *remote power feed unit* according to claim **10**, wherein the means for detecting the presence of a direct current short-circuit in the remote terminal include means for limiting the duration of the test signal so that the energy dissipated in the terminal cannot damage [it] *the terminal* under any circumstances.

**21**. A remote power feed unit according to claim **8**, wherein the means for sending a power supply current in the line include a direct current supply in series with a circuit for blocking an alternating current.

**22**. A remote power feed unit according to claim **21**, wherein the circuit for blocking an alternating current includes at least one semiconductor diode which is conducting in the direction of the remote power feed direct current.

**23**. A remote power feed unit according to claim **21**, wherein the circuit for blocking an alternating current includes at least one transistor behaving like a direct current generator.

**24**. A remote power feed unit according to claim **8**, wherein the means for sending a power supply current in the line include a DC voltage supply in series with at least one electronic switching circuit including an active component and:

**20**

means for turning it on and off to [active] *activate* or deactivate the remote power feed current, and

means for controlling it so as to limit the remote power feed current.

**25**. A remote power feed unit according to claim **24**, further including means for controlling the active component so that it has a negligible conductance for the test alternating current.

**26**. A terminal adapted to be connected to a local area network and to receive a remote power feed via a line, wherein the terminal includes at least one predetermined impedance connected to at least two conductors of the line and which identifies terminals adapted to receive a remote power feed, wherein the predetermined impedance is a very much higher capacitance than that of terminations routinely connected to the ends of the lines in terminals that are not adapted to receive a remote power feed but are adapted to be connected to the local area network.

**27**. A repeater adapted to receive a remote power feed and adapted to be included in a line between a network equipment unit including a remote power feed unit and another network equipment unit in a local area network,

the repeater including a power supply unit powered by a remote power feed and whose input is connected in parallel with the power supply input of the other network equipment unit to the conductors of the line that provide the remote power feed, and

the power supply unit having an input impedance whose modulus is very much higher than the modulus of the input impedance of the power supply unit which is characteristic of equipment units adapted to receive a remote power feed likely to be connected downstream of that repeater.

**28**. A concentrator adapted to be inserted into a line between a network equipment unit including a remote power feed unit and at least one other network equipment unit in a local area network,

the concentrator including, for each of its ports adapted to be connected to another network equipment unit, a remote power feed unit which includes:

means for producing [at least one detection] *an alternating current test* signal on at least two conductors of a line for connecting the concentrator to another network equipment unit, [that] *the test* signal having an energy such that the other network equipment unit cannot be damaged under any circumstances,

means for detecting the presence of another equipment unit adapted to receive a remote power feed by detecting the presence of a predetermined impedance in that other equipment unit on the basis of a current created by the test signal in the line, and

means for sending a power supply current in the line when the presence of another equipment unit adapted to receive a remote power feed is detected.

**29**. A concentrator according to claim **28**, adapted to receive a remote power feed, the concentrator including at least one predetermined impedance which is connected to at least two conductors of the line and is characteristic of network equipment units adapted to receive a remote power feed.

**30**. A method of providing a remote power feed to a terminal in a local area network, the method comprising:

producing at least first and second test signals on at least two conductors of a line for connecting the local area network to a remote terminal, the test signals having an energy such that the terminal cannot be damaged under any circumstances,

detecting the presence of a remote terminal adapted to receive a remote power feed by detecting the presence of

US RE44,325 E

**21**

predetermined impedance in the remote terminal in compliance with a predetermined impedance threshold, on the basis of a current created by at least one of the test signals in said line, and

sending a power supply current in said line when the presence of a terminal adapted to receive a remote power feed is detected.

31. A remote power feed method according to claim 30, wherein the first and second test signals are different electrical signals.

32. A remote power feed method according to claim 31, wherein one of said first and second test signals is an AC signal.

33. A remote power feed method according to claim 31, wherein one of said first and second test signals is a DC signal.

34. A remote power feed method according to claim 32, wherein the other of said first and second test signals is a DC signal.

35. A remote power feed method according to claim 30, wherein said step of detecting the presence of a remote terminal adapted to receive a remote power feed further comprises detecting the presence of predetermined impedances in the remote terminal on the basis of currents created by each of said first and second test signals.

36. A remote power feed method according to claim 35, wherein the first and second predetermined impedances are different types of impedance.

37. A remote power feed method according to claim 35, wherein said predetermined impedances comprise a low impedance to one of said first and second test signals and a higher impedance to the other of said first and second test signals.

38. A remote power feed method according to claim 37, wherein said one of said first and second test signals is an AC test signal and the other of said first and second test signals is a DC test signal.

39. A remote power feed method according to claim 35, wherein said predetermined impedances comprise an impedance in a first range detected on the basis of a current created by said first test signal and an impedance in a second range detected on the basis of a current created by said second test signal.

40. A remote power feed method according to claim 39, wherein said first and second ranges of impedances comprise impedances below and above respective impedance level thresholds.

41. A remote power feed method according to claim 40, wherein said impedance level thresholds are different from one another.

42. A remote power feed method according to claim 36, wherein one of the first and second predetermined impedances is capacitive impedance and the other is a resistive impedance.

43. A remote power feed method according to claim 35, wherein each of said predetermined impedances is a resistance.

44. A remote power feed method according to claim 43, wherein said first test signal is an AC test signal and said second test signal is a DC test signal.

45. A method of providing a remote power feed to a terminal in a local area network, the method comprising:

producing at least one test signal on at least two conductors of a line for connecting the local area network to a remote terminal, the test signal having an energy such that the terminal cannot be damaged under any circumstances,

**22**

detecting the presence of a remote terminal adapted to receive a remote power feed by detecting the presence of predetermined impedance in the remote terminal on the basis of a current created by the test signal in said line, and

sending a power supply current in said line when the presence of a terminal adapted to receive a remote power feed is detected;

said method further comprising the step of subsequently producing a disconnect test signal superimposed on the power supply current provided over said line to detect the removal of said remote terminal adapted to receive a remote power feed.

46. A method of providing a remote power feed according to claim 45, wherein the disconnect test signal is an AC signal and the said step of detecting the removal of said remote terminal includes detecting an impedance in response to the AC disconnect signal.

47. A method of providing a remote power feed according to claim 45, wherein said step of producing at least one test signal comprises producing first and second test signals on said at least two conductors, and said step of detecting the presence of a remote terminal adapted to receive a remote power feed comprises detecting the presence of first and second impedances in response to said first and second test signals.

48. A method of providing a remote power feed to a terminal in a local area network, the method comprising:

producing at least one test signal on at least two conductors of a line for connecting the local area network to a remote terminal, the test signal having an energy such that the terminal cannot be damaged under any circumstances,

detecting the presence of a remote terminal adapted to receive a remote power feed by detecting the presence of predetermined impedance in the remote terminal on the basis of a current created by the test signal in said line, and

sending a power supply current in said line when the presence of a terminal adapted to receive a remote power feed is detected;

wherein the step of detecting the presence of predetermined impedance includes detecting predetermined capacitive impedance.

49. A method of providing a remote power feed according to claim 48, wherein said step of detecting the presence of predetermined impedance further includes detecting predetermined resistive impedance.

50. A method of providing a remote power feed to a terminal in a local area network, the method comprising:

producing at least first and second test signals on at least two conductors of a line for connecting the local area network to a remote terminal, the test signals having an energy such that the terminal cannot be damaged under any circumstances,

detecting the presence of a remote terminal adapted to receive a remote power feed by detecting the presence of first predetermined impedance and second predetermined impedance in the remote terminal on the basis of a current created by at least one of the test signals in said line, and

sending a power supply current in said line when the presence of a terminal adapted to receive a remote power feed is detected.

**23**

*51. A method of providing a remote power feed according to claim 50, wherein one of said first predetermined impedance and second predetermined impedance is a capacitive impedance.*

*52. A method of providing a remote power feed according to claim 50, wherein one of said first predetermined impedance and second predetermined impedance is a resistive impedance.*

*53. A method of providing a remote power feed according to claim 51, wherein the other of said first predetermined impedance and second predetermined impedance is a resistive impedance.*

*54. A method of providing a remote power feed according to claim 50, wherein one of said first and second test signals is a DC signal.*

*55. A method of providing a remote power feed according to claim 54, wherein the other of said first and second test signals is an AC signal.*

*56. A method of providing a remote power feed according to claim 53, wherein one of said first and second test signals is a DC signal.*

*57. A method of providing a remote power feed to a terminal in a local area network, the method comprising:*

*producing at least one test signal on at least two conductors of a line for connecting the local area network to a remote terminal, the test signal having an energy such that the terminal cannot be damaged under any circumstances,*

**24**

*detecting the presence of a remote terminal adapted to receive a remote power feed by (i) detecting the presence of first predetermined impedance in the remote terminal on the basis of a current created by the test signal in said line, and (ii) detecting the presence of a second predetermined impedance, and*

*sending a power supply current in said line when the presence of a terminal adapted to receive a remote power feed is detected.*

*58. A remote power feed method according to claim 57, wherein one of said first and second predetermined impedances is a resistive impedance.*

*59. A remote power feed method according to claim 58, wherein the other of said first and second predetermined impedances is a capacitive impedance.*

*60. A remote power feed method according to claim 58, wherein said resistive impedance is a resistance in a range of resistance values.*

*61. A remote power feed method according to claim 60, wherein said range of resistance values is resistance values below a threshold resistance value.*

*62. A remote power feed method according to claim 59, wherein said capacitive impedance reflects a capacitance in a range of capacitance values.*

*63. A remote power feed method according to claim 62, wherein said range of capacitance values is capacitance values above a threshold capacitance value.*

\* \* \* \* \*

# EXHIBIT 2

US008416892B2

(12) **United States Patent**　(10) **Patent No.:**　**US 8,416,892 B2**
**Mauritz**　(45) **Date of Patent:**　**Apr. 9, 2013**

(54) **METHOD AND APPARATUS OF TRANSMITTING A RANDOM ACCESS PREAMBLE**

(75) Inventor: **Oskar Mauritz**, Stockholm (SE)

(73) Assignee: **Huawei Technologies Co., Ltd.,** Shenzhen (CN)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/291,727**

(22) Filed: **Nov. 8, 2011**

(65) **Prior Publication Data**

US 2012/0051292 A1　Mar. 1, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/605,616, filed on Oct. 26, 2009, which is a continuation of application No. PCT/CN2008/070768, filed on Apr. 22, 2008.

(30) **Foreign Application Priority Data**

Apr. 30, 2007　(CN) .......................... 2007 1 0074200

(51) **Int. Cl.**
*H03D 1/00*　(2006.01)
(52) **U.S. Cl.**
USPC ............ **375/343**; 375/146; 375/147; 375/267
(58) **Field of Classification Search** ................. 375/314, 375/246, 253, 240.247
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,963,600 B1 | 11/2005 | Fan et al. | |
| 7,720,161 B1 * | 5/2010 | Dogan et al. ................. | 375/259 |

| | | | | |
|---|---|---|---|---|
| 7,738,356 B2 | 6/2010 | Kim | | |
| 7,778,151 B2 * | 8/2010 | Bertrand et al. ............. | 370/208 |
| 7,792,212 B2 * | 9/2010 | Lee et al. ..................... | 375/295 |
| 8,098,745 B2 * | 1/2012 | Bertrand et al. ............. | 375/260 |
| 2004/0001529 A1 | 1/2004 | Cai | | |
| 2005/0103168 A1 | 5/2005 | Wei | | |
| 2008/0235314 A1 | 9/2008 | Lee | | |
| 2010/0074372 A1 | 3/2010 | Huang | | |

FOREIGN PATENT DOCUMENTS

CN　　　1297628 A　　5/2001

OTHER PUBLICATIONS

English Translation of the Written Opinion of the International Search Authority for International application No. PCT/CN2008/070768,mailed Jul. 31, 2008, total 3 pages.
International Search Report for International application No. PCT/CN2008/070768,mailed Jul. 31, 2008, total 4 pages.
QUALCOMM European,"RACH Sequence Structure and Evaluation," 3GPP TSG-RAN WG1;R1-062048 Tallinn Estonia,Aug. 28-Sep. 1, 2006,4 pages.
LGE ,"RACH Sequence Design Based on Repetition Method",3GPP TSG RAN1 LTE WG1 Meeting #46bits; R1-062556;Seoul,Korea,Oct. 9-13, 2006,8 pages.

(Continued)

*Primary Examiner* — Daniel Washburn
*Assistant Examiner* — Qutbuddin Ghulamali

(57)　　　**ABSTRACT**

Method and apparatus are provided for transmitting a random access preamble in a mobile communication system. The preamble is selected from a set of random access preambles provided with Zero Correlation Zones of length $N_{CS}-1$, where $N_{CS}$ is a cyclic shift increment selected from a set of cyclic shift increments $\{0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, 419\}$, and transmitted.

**20 Claims, 3 Drawing Sheets**



# US 8,416,892 B2
Page 2

## OTHER PUBLICATIONS

European Patent Office Communication including,pursuant to Rule 62 EPC,the supplementary European search report (Art. 153(7)EPC)and the European search opinion for application No. 0873126.9.dated Jul. 6, 2010,total 6 pages.

Huawei,"Specification of restricted set of cyclic shifts of root Zadoff-Chu sequences",TSG RAN WG1 meeting #48bis; R1-071408,St. Julian's, Malta, Mar. 26-30, 2007,4 pages.

Panasonic,"RACH sequence indication method on BCH",3GPP TSG RAN WG1 Meeting #48bis;R1-071519,St. Julians, Malta, Mar. 26-30, 2007,3 pages.

LG Electronics Inc.,"Design for restricted set of cyclic shifts",3GPP TSG RAN WG1 #48bis;St. Julians, Malta, Mar. 26-30, 2007,3 pages.

First Examination Report issued by IP Australia for application No. 2008247204,dated Jul. 26, 2010,1 page.

"Outstanding Issues in Random Access Preamble Design for E-UTRA" St.Julian's,Malta,Mar. 26-30, 2007;3GPP TSG RAN WG 1 #48bits;pp. 1-6.

"3rd Generation Partnership Project :Technical Specification Group Radio Access Network;Physical Channels and Modulation(Release 8)",3GPP Organizational Partners;3GPP TS 36.211 v1.0.0(Mar. 2007);pp. 1-30.

"On Construction and Signaling of RACH Preambles",Nokia, Siemens,St.Julian's,Malta,Mar. 26-30, 2007;3GPP TSG RAN WG 1 #48bits;R1-071661;pp. 1-2.

Qingmei Liang et al.: "A Novel Spreading Sequence Set Applied in Qua si2synchronous CDMA Systems," dated May 2006, 5 pages total.

Office action issued in corresponding U.S. Appl. No. 12/605,616, dated Sep. 19, 2012, 20 pages total.

Branislav M. Popovic, "Generalized Chirp-Like Polyphase Sequences with Optimum Correlation Properties," IEEE Transactions on Information Theory, Vol. 38, No. 4, July 1992, total 4 pages.

Branislav M. Popovic, "Efficient Matched Filter for the Generalized Chirp-Like Polyphase Sequences", IEEE Transactions on Aerospace and Electronic Systems, Vol. 30, No. 3, July 1994, total 9 pages.

* cited by examiner



S101

The length of the root sequence is determined

S102

A set of ZCZ lengths is selected so that, for any cell radius, the maximum number of preambles obtained from a ZCZ length which is selected from the selected set of ZCZ lengths, and is applicable to the cell and capable of determining a maximum number of preambles, is closest to the maximum number of preambles obtained from a ZCZ length which is selected from the set of all integers, and is applicable to the cell and capable of determining a maximum preamble number, wherein the maximum number of preambles is determined from the length of a root sequence and a ZCZ length selected.

**Fig. 1**



**Fig. 2**



**Fig. 3**



**Fig. 4**



**Fig. 5**

US 8,416,892 B2

**1**

### METHOD AND APPARATUS OF TRANSMITTING A RANDOM ACCESS PREAMBLE

#### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/605,616, filed on Oct. 26, 2009, which is a continuation of International Patent Application No. PCT/CN2008/070768, filed on Apr. 22, 2008, which claims priority to Chinese Patent Application No. 200710074200.1, filed on Apr. 30, 2007, all of which are incorporated by reference herein in their entireties.

#### TECHNICAL FIELD

The disclosure relates to the technology of mobile communication, and more particularly, to a method, an apparatus and a mobile communication system of selecting and transmitting a Random Access Preamble (RAP).

#### BACKGROUND

In a mobile communication system, a Random Access Preamble is normally transmitted to a base station by a mobile terminal to initiate the random access procedure and to enable synchronization of the mobile terminal with the base station.

There are 64 preambles in each cell in the document entitled "3GPP TS 36.211 v1.0.0—Physical Channels and Modulation" which was published in March 2007. When initiating a random access procedure, a mobile terminal transmits one of the 64 preambles. A message is transmitted to a base station by the mobile terminal selecting a particular preamble.

Before transmitting the preamble, a mobile terminal must synchronize to the carrier frequency and the frame timing of a base station to become downlink synchronized. Although the mobile terminal is downlink synchronized, there is uncertainty when a signal transmitted by the mobile terminal arrives at the base station. This is because a mobile terminal far away from the base station will receive downlink signals with a larger delay than a mobile terminal close to the base station, and the transmitted signals in the uplink will take a longer time to propagate to the base station for a mobile terminal which is far away from the base station compared to the signals from a mobile terminal close to the base station. The uncertainty in round trip time causes interference between uplink signals transmitted by different mobile terminals into uplink synchronization is performed before data transmission in uplink.

The transmission of any of the RAPs allows a base station to estimate the time of arrival of an uplink signal. The base station can then, based on the time of arrival estimate, transmit a time advance command to a mobile terminal to ensure uplink synchronization. Hence, once a preamble is transmitted by a mobile terminal, the base station may detect which preamble has been transmitted and estimate the time of arrival.

To obtain good detection properties of the preambles, or to accurately estimate the time of arrival of the uplink signal, the set of preambles should be designed to have good autocorrelation and cross-correlation properties.

The set of RAPs in Evolved UTRA (E-UTRA) is defined from one or several root sequences. A subset of the preambles $x_{u,v}(k)$ is generated from the $u^{th}$ order root Zadoff-Chu (ZC) sequence $x_u(k)$ by cyclic shifts of a plurality of the shift

**2**

increments $N_{CS}$. Specifically, $x_{u,v}(k)$ may be generated according to the equation below:

$$x_{u,v}(k)=x_{u,v}((k+vN_{CS})\bmod N_{ZC}) \qquad (1)$$

where v is an integer, and $N_{ZC}$ is the length of the ZC sequence

$$x_u(k)=W^{uk(k+1)/2}, k=0,1,\ldots,N_{ZC}-1, W=e^{-j2\pi/N_{ZC}}, j=\sqrt{-1} \qquad (2)$$

The number of preambles that may be generated from a single root sequence is $N_{pre}=\lfloor N_{ZC}/N_{CS}\rfloor$, where $\lfloor n\rfloor$ denotes the largest integer not greater than n. If $N_{pre}<64$, then several preamble subsets generated from different root sequences are required to obtain 64 preambles in a cell. The cross-correlation between different root sequences is small but still larger than the cross-correlation between sequences generated by a single root sequence. Thus it is beneficial for the detection performance to have $N_{pre}=64$ if $N_{pre}$ could not be set greater.

The number of ZC sequences contained in each set of ZC sequences with length of $N_{ZC}$ is $N_{ZC}-1$. If the number of root sequences for obtaining the 64 preambles of a cell is $N_r$, $N_r=\lceil 64/N_{pre}\rceil$, where $\lceil n\rceil$ denotes the minimal integer not smaller than n, then the number of disjoint sets is $N_D=\lfloor (N_{ZC}-1/N_r\rfloor$. Different cells in a network should make use of preambles obtained from disjoint sets of root sequences, so that the base station knows whether a transmitted preamble is intended for a certain cell or not. The larger the number of root sequences $N_r$ that is needed for obtaining 64 preambles in a cell, the smaller is the number of disjoint sets of RAPs $N_D$. Thus, from a network planning perspective, it is desirable to have $N_{pre}=64$, and if that is not possible, to have as high value as possible of $N_{pre}$.

A subset of preambles generated with equation (1) is a set of so-called Zero-Correlation Zone (ZCZ) sequences. The definition for a set of ZCZ sequences is as follows: a set of M sequences $\{d_v(k)\}$, v=0, 1, . . . , M-1, k=0, 1, . . . , N-1, of length N, is said to be a set of ZCZ sequences, if all the sequences in the set satisfy the following autocorrelation and cross-correlation properties:

The periodic autocorrelation function $\Sigma_{k=0}^{N-1}d_v(k)d_v*((k+p)\bmod N)$ is zero for all p such that $0<|p|\leqq T$, and the periodic cross-correlation function $\Sigma_{k=0}^{N-1}d_v(k)d_w*((k+p)\bmod N)$ is zero for all p such that $|p|\leqq T$ (including p=0), where T is the length of the ZCZ.

A ZC sequence has ideal periodic autocorrelation when, for example, $\Sigma_{k=0}^{N-1}x_u(k)x_u*((k+p)\bmod N)$ is zero for all nonzero p. Thus the set of preambles defined as cyclic shifts of the root sequence according to equation (1) is a set of ZCZ sequences, where the ZCZ length is $T=N_{CS}-1$.

Based on $N_{pre}=\lfloor N_{ZC}/N_{CS}\rfloor$, $N_{CS}$ should be as small as possible in order to make $N_{pre}$ be as great as possible. But the value of $N_{CS}$ should not be too small. In a base station a bank of correlators are used when receiving RAPs, so that there is one correlator for each preamble. Each correlator outputs time of arrival from 0 to $T\times T_S=(N_{CS}-1)\times T_s$, where $T_s$ is the symbol period of the sequence. The ZCZ property of the set of preambles implies that the correlator for any preamble will give a zero output if any other preamble is transmitted as long as the sum of the round trip time and delay spread in the cell is less than or equal to the product of the length of ZCZ and $T_s$ (i.e., $T\times T_s$). The maximum round trip time $T_r$ in a cell is given by the cell radius R: $T_r=2R/c$, where c is the speed of light. Thus, the minimum value of the length of ZCZ and the minimum value of $N_{CS}$ length for a certain cell increase with the cell radius. Therefore, the value of the selected $N_{CS}$ should be large enough to ensure that the conditions mentioned above are satisfied.

Since the cell radius to be supported in E-UTRA is from 1 km to 100 km, and since $N_{CS}$ should be as small as possible

US 8,416,892 B2

3

for any given cell, there is a need for multiple values of $N_{CS}$. The value of an $N_{CS}$ in a cell is broadcast to a mobile terminal by a base station. Of course, the base station may broadcast the length of ZCZ to the mobile terminal, so that the mobile terminal knows how to generate preambles. It is desirable to have as small amount of signaling as possible on the broadcast channel to save overload. Therefore, to achieve low signaling overload, there should be a limited predefined set of values of $N_{CS}$ or a set of lengths of ZCZ.

It is proposed in the 3GPP Tdoc "R1-071661—On construction and signaling of RACH preambles" disclosed in March 2007 that, the cyclic shift increment value $N_{CS}$ in the cell was proposed to be signalled to the UE but there was no restriction on the values of the cyclic shift increment, which would then give rise to a substantial amount of signalling. An alternative proposal is given in the 3GPP Tdoc "R1-071471— Outstanding issues in random access preamble design for E-UTRA" disclosed in March 2007, which is to have 11 values of $N_{CS}$ without specification how to select the values. However, it is not described in these documents how to select the lengths of ZCZ. Currently there is no feasible scheme for selecting an appropriate limited set of ZCZ lengths, in order to ensure a small and limited signaling overload.

SUMMARY

In one aspect, an embodiment of the disclosure provides a method of selecting and transmitting a random access preamble in a mobile communication system. A random access preamble is selected from a set of random access preambles and transmitted, wherein the set of random access preambles is provided with Zero Correlation Zones of length $N_{CS}$−1, the $N_{CS}$ is a cyclic shift increment selected from a set of cyclic shift increments {0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, 419}.

In another aspect, an embodiment of the disclosure provides an apparatus that includes a processor configured to select a random access preamble from a set of random access preambles and transmit the selected random access preamble, wherein the set of random access preambles is provided with Zero Correlation Zones of length $N_{CS}$−1, the $N_{CS}$ is a cyclic shift increment selected from a set of cyclic shift increments {0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, 419}.

In another aspect, an embodiment of the disclosure provides a method of receiving a random access preamble in a mobile communication system. The method provides for receipt of an uplink signal that includes a random access preamble, estimating a time of arrival of the uplink signal, and transmitting a time advance based on the time of arrival, wherein the random access preamble is selected from a set of random access preambles provided with Zero Correlation Zones of length $N_{CS}$−1, where $N_{CS}$ is a cyclic shift increment selected from a set of cyclic shift increments {0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, 419}.

In another aspect, an embodiment of the disclosure provides an apparatus that includes a processor configured to receive an uplink signal having a random access preamble, estimate a time of arrival of the uplink signal and transmit a time advance based on the time of arrival. The random access preamble is selected from a set of random access preambles provided with Zero Correlation Zones of length $N_{CS}$−1, wherein $N_{CS}$ is a cyclic shift increment selected from a set of cyclic shift increments {0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, 419}.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a flow chart illustrating an method embodiment of the disclosure;

4

FIG. 2 is a diagram illustrating the relationship between the maximum number of preambles and the cell radius according to an embodiment of the disclosure;

FIG. 3 is a diagram illustrating the value of maximum relative difference in the cell radius interval k according to an embodiment of the disclosure;

FIG. 4 is a block diagram of the base station according to an embodiment of the disclosure; and

FIG. 5 is a diagram illustrating the mobile communication system according to an embodiment of the disclosure.

DETAILED DESCRIPTION

The general solution of an embodiment of the disclosure is described first, incorporating FIG. 1. As illustrated in FIG. 1, the embodiment includes:

Step 101: The length of the root sequence is determined;

Step 102: A set of ZCZ lengths is selected so that, for any cell radius, the maximum number of preambles determined from a ZCZ length is selected from the selected set of ZCZ lengths, is applicable to the cell and capable of determining a maximum number of preambles, is closest to the maximum number of preambles obtained from a ZCZ length which is selected from the set of all integers, and is applicable to the cell and capable of determining a maximum number of preambles, wherein the maximum number of preambles is determined from the length of the root sequence and a ZCZ length selected.

In an embodiment of the disclosure, it should be ensured that the product of a ZCZ length and the symbol period of the sequence is greater than the sum of the round trip time and the delay spread of a cell, i.e., $T \times T_s > T_r + T_d$, in which, T is the length of ZCZ, $T_s$ is the symbol period, $T_r$ is the round trip time, and $T_d$ is the delay spread.

Since the maximum round trip time $T_r$ in a cell is determined by the cell radius R, i.e., $T_r$=2R/c, where c is the speed of light, $T \times T_s > T_r + T_d$ may be rewritten as $T \times T_s > 2R/c + T_d$.

Furthermore, since $T = N_{CS}$−1, $T \times T_s > 2R/c + T_d$ may be rewritten as $(N_{CS}$−1$) \times T_s > 2R/c + T_d$. Therefore, $N_{CS} > 1 + (2R/c + T_d)/T_s$.

Additionally, since $N_{pre} = \lfloor N_{ZC}/N_{CS} \rfloor$, $N_{pre} < \lfloor N_{ZC}/(1+(2R/c+T_d)/T_s) \rfloor$. Thus, $N_{pre}$ may be a function of the cell radius R. Of course, the cell radius may also be varying; and the value of $N_{pre}$ decreases as the value of $N_{CS}$ increases.

In an embodiment of the disclosure, a limited set of $N_{CS}$ values is constructed, i.e., for a certain cell radius, the $N_{pre}$ corresponding to the minimum $N_{CS}$ value which is selected from the limited set and is applicable to the cell, is closest to the $N_{pre}$ corresponding to the minimum $N_{CS}$ value which is selected from the set of all integers and is applicable to the cell. Furthermore, a maximum relative difference may be constructed from $N_{pre}$. This maximum relative difference is between the $N_{pre}(R)$, which is determined from the minimum $N_{CS}$ value selected from the set of integers and is applicable to the cell, and the $N_{pre}(R)$, which is determined from the minimum $N_{CS}$ value selected from the limited set and is applicable to the cell. If the finally determined or selected limited set is such a set that the maximum relative difference between the $N_{pre}(R)$, which is determined from the minimum $N_{CS}$ value selected from the set of integers and is applicable to the cell, and the $N_{pre}(R)$, which is determined from the minimum $N_{CS}$ value selected from the limited set and is applicable to the cell, is minimized in a cell of any radius.

As illustrated in FIG. 2, curve A indicates that for any one cell radius, an integer from the set of all integers may be selected as $N_{CS}$ of the cell, wherein a maximum number of preamble sequences may be generated based on the integer

US 8,416,892 B2

5

selected, and the generated preamble sequences are applicable to the cell. Curve B indicates a set of $N_{CS}$ including a limited number of $N_{CS}$. When the limited number of $N_{CS}$ is applied in cells of all radii, within a certain interval of cell radii, a same $N_{CS}$ will be used for all cell radii. Thus, the $N_{CS}$ should be determined according to the maximum cell radius in the interval of cell radii. Compared with A, the preamble number generated according to B decreases.

Under these conditions, if the selected limited set ensures that the maximum relative difference between the $N_{pre}(R)$ determined from a $N_{CS}$ value selected from any integer and the $N_{pre}(R)$ determined from a $N_{CS}$ value selected from the limited set is minimized, and it is assumed that the $N_{pre}(R)$ determined from a $N_{CS}$ value selected from any integer is $A(R)$ and the $N_{pre}(R)$ determined from a $N_{CS}$ value selected from the limited set is $B(R)$, then $A(R)$ and $B(R)$ are respectively illustrated in FIG. 2.

As seen from FIG. 2, there is a small deviation between $A(R)$ and $B(R)$. For a certain cell radius R, the deviation of $B(R)$ from $A(R)$ for some cell radius R may increase the number of required root sequences for that cell radius R. The increase of the number of root sequences becomes very important for large cell radii where $N_{pre}$ is small. For example, if $A(R)=3$ and $B(R)=2$, the number of root sequences increases significantly, from $\lceil 64/3 \rceil=22$ to $\lceil 64/2 \rceil=32$. An appropriate measure of the deviation of B from A should therefore weigh the difference A-B with higher weight for small $N_{pre}$, e.g., by considering the maximum relative difference between $A(R)$ and $B(R)$, i.e., $[A(R)-B(R)]/A(R)$. We will adopt the maximum relative difference between $A(R)$ and $B(R)$ over all cell radii as the measurement of the deviation of $B(R)$ from $A(R)$, and find a set of $N_{CS}$ values that minimizes this measurement. This set may consist of one $N_{CS}=0$ and $K+1$ non-zero $N_{CS}$ values. The total number of $N_{CS}$ values in the set is $K+2$.

For example, in a relatively small cell, it would be possible to generate 64 ZCZ preambles from a single root sequence if $N_{CS}=\lfloor N_{ZC}/64 \rfloor$. This value is the smallest value in the set $N_{CS}(k)$.

The maximum value, $N_{CS}(K)$, is the one that allows for having 2 ZCZ sequences from a set single root sequence, so it is $\lfloor N_{ZC}/2 \rfloor$.

For the largest cells there is only one RAP generated from each root sequence. Therefore, $N_{CS}(K+1)=0$.

The maximum relative difference between $A(R)$ and $B(R)$, i.e., $[A(R)-B(R)]/A(R)$, is non-increasing with radius R within the interval of $[(r(k-1), r(k)]$ and the interval being k, as illustrated in FIG. 2. In FIG. 2, $r(k)$ denotes the kth cell radius arranged orderly from small ones to large ones. The reason is that $B(R)$ is constant in the interval, whereas A is inversely proportional to the smallest possible $N_{CS}$ for given R. This value of $N_{CS}$ increases with the round trip time and hence with R.

If it is assumed that the maximum number of preamble sequences of the set $A(R)$ is $N_{pre}(k-1)-1$ in the cell radius interval of $[(r(k-1), r(k)]$, the maximum number of preamble sequences of the set $B(R)$ generated in this interval associate with the cell radius $r(k)$, i.e., the maximum number of preamble sequences is $N_{pre}(R)$. The maximum relative difference $D_k$ in the interval k may be obtained from the following equation:

$$D_k = \frac{N_{pre}(k-1) - 1 - N_{pre}(k)}{N_{pre}(k-1) - 1}$$

6

If $D_k$ and $N_{pre}(k-1)$ are given, $N_{pre}(k)$ may be obtained by rearranging the above equation, i.e.:

$$N_{pre}(k) = (1-D_k)(N_{pre}(k-1)-1)$$

The maximum relative difference $D_{max}$ for all cell radii may be given by $D_{max}=\max \{D_k\}_{k=1}^K$.

For $N_{pre}(k)$, we will first allow $N_{pre}(k)$ to be a real number, and then round the result to the nearest integer. Additionally, $N_{pre}(0)$ and $N_{pre}(K)$ are fixed.

Then $D_{max}$ is minimized if all $D_k$ are equal, i.e. $D_k=D$, $k=1$, $2, \ldots, K$, as will be proved in the following.

A set of values, $\{N_{pre}{}^{(1)}(k)\}_{k=0}^K$, is constructed with the constraint that $N_{pre}{}^{(1)}(k)=N_{pre}(k)$ for $k=0$ and $k=K$, so that $D_k{}^{(1)}=D$, $k=1, 2, \ldots, K$. For this set, $D_{max}=D$.

Next, another set of values, $\{N_{pre}{}^{(2)}(k)\}_{k=0}^K$, is constructed with the constraint that $N_{pre}{}^{(2)}(k)=N_{pre}(k)$ for $k=0$ and $k=K$, so that $D_{max}<D$, i.e. $D_k{}^{(2)}<D_k{}^{(1)}$, $k=1, 2, \ldots, K$.

When $k=1$, since $D_k{}^{(2)}<D_k{}^{(1)}$ and $N_{pre}{}^{(2)}(0)=N_{pre}{}^{(1)}(0)=N_{pre}{}^{(1)}(1)>N_{pre}{}^{(1)}(1)$ is obtained according to $N_{pre}(k)=(1-D_k)(N_{pre}(k-1)-1)$.

When $k=2$, since $D_2{}^{(2)}<D_2{}^{(1)}$ and $N_{pre}{}^{(2)}(1)>N_{pre}{}^{(1)}(1)$, $N_{pre}{}^{(2)}(2)>N_{pre}{}^{(1)}(2)$ is obtained according to $N_{pre}(k)=(1-D_k)(N_{pre}(k-1)-1)$.

Similarly, for all k, since $N_{pre}{}^{(2)}(K)=N_{pre}{}^{(1)}(K)=N_{pre}(K)$, $N_{pre}{}^{(2)}(k)>N_{pre}{}^{(1)}(k)$ is impossible.

Thus, it is impossible to construct a set of values $N_{pre}(k)$ such that $D_{max}<D$, which proves that $D_{max}$ is minimized if all $D_k$ are equal, i.e. $D_k=D$, $k=1, 2, \ldots, K$.

In this way, the set of values $\{N_{pre}(k)\}_{k=0}^K$ which minimizes $D_{max}$ may be found.

Replacing $D_k$ by D in $N_{pre}(k)=(1-D_k)(N_{pre}(k-1)-1)$ and rearranging the equation, a linear difference equation is obtained as follows:

$$N_{pre}(k) - a N_{pre}(k-1) = -a, \text{ wherein } a=(1-D).$$

By recursion, it is obtained from the above equation:

$$N_{pre}(k) = N_{pre}(0)a^k + \frac{a}{1-a}(a^k - 1) \qquad (3)$$

From the above equation and the boundary conditions $N_{pre}(0)$ and $N_{pre}(K)$, a may be determined numerically.

For example, the maximum number of preambles generated from one root sequence is 64, i.e., $N_{pre}(0)=64$. The minimum number of preamble obtained by cyclic shift is 2, for example, $N_{pre}(14)=2$. Thus, $a=0.856$ may be obtained from these two parameters, and all $N_{pre}(k)$, $k=1, 2, \ldots$ may further be obtained.

The maximum relative difference is minimized through an approximate minimization by a sub-optimal algorithm, i.e., by minimizing the maximum relative difference for fictive real-valued maximum number of ZCZ RAPs, and the maximum number of the ZCZ RAPs is thereafter quantized. The method is specified below.

By first rounding the fictive real-valued $N_{pre}(k)$ in

$$N_{pre}(k) = N_{pre}(0)a^k + \frac{a}{1-a}(a^k - 1),$$

the following equation is obtained:

$$N_{CS}(k) = \lfloor N_{ZC}/[N_{pre}(0) \times a^k + a/(1-a) \times (a^k - 1)] \rfloor \qquad (4)$$

US 8,416,892 B2

7

where $\lfloor x \rfloor$ denotes the maximum integer not greater than x, $N_{ZC}$ is the length of the root sequence, $N_{pre}(0)$ denotes the maximum number of preambles generated from the root sequence.

Still taking the above as an example, if $N_{pre}(0)$=64 and $N_{pre}(14)$=2, a=0.856 is obtained based on equation (3). Next, when $N_{ZC}$=839, $N_{CS}(k)$, k=0, 1, 2, . . . , 14 obtained based on equation (4) is illustrated in table 1:

TABLE 1

| k | $N_{CS}(k)$ |
|---|---|
| 0 | 13 |
| 1 | 15 |
| 2 | 18 |
| 3 | 22 |
| 4 | 26 |
| 5 | 32 |
| 6 | 38 |
| 7 | 46 |
| 8 | 59 |
| 9 | 76 |
| 10 | 93 |
| 11 | 119 |
| 12 | 167 |
| 13 | 279 |
| 14 | 419 |

If only one preamble sequence is obtained for a very large cell, which is the sequence itself, then $N_{CS}$=0. Adding this value into the above table, table 2 is obtained:

TABLE 2

| k | $N_{CS}(k)$ |
|---|---|
| 0 | 13 |
| 1 | 15 |
| 2 | 18 |
| 3 | 22 |
| 4 | 26 |
| 5 | 32 |
| 6 | 38 |
| 7 | 46 |
| 8 | 59 |
| 9 | 76 |
| 10 | 93 |
| 11 | 119 |
| 12 | 167 |
| 13 | 279 |
| 14 | 419 |
| 15 | 0 |

Finally, the true integer value of $N_{pre}(k)$ is obtained from $N_{pre}(k)=\lfloor N_{ZC}/N_{CS}(k) \rfloor$ that for some values of k $N_{ZC}/N_{CS}(k)$ are greater than the rounded values $N_{pre}(k)$. As illustrated in FIG. 3, when K=14, the value of $D_k$ obtained from the real number value of $N_{pre}(k)$ is D=0.144. It can be seen from FIG. 3 that the true integer values of $N_{pre}(k)$ will cause $D_k$ to deviate from D. But the deviation is still very small for all cells except the two largest cells. Thus, the selected limited set of values of $N_{CS}$ is applicable.

It should be noted that if the limited set of values of $N_{CS}$ is determined, the limited set of lengths of ZCZ may also be determined, for instance, according to T=$N_{CS}$−1.

Correspondingly, the disclosure provides an embodiment of an apparatus of determining a set of ZCZ lengths. As illustrated in FIG. 4, the apparatus includes: a length determination unit 410, configured to determine a length of a root sequence; and a set selection unit 420, configured to select such a set of ZCZ lengths that, for any cell radius, the maximum number of preambles determined from a ZCZ length

8

which is selected from the selected set of ZCZ lengths, and is applicable to the cell and capable of determining a maximum number of preambles, is closest to the maximum number of preambles determined from a ZCZ length which is selected from the set of all integers, and is applicable to the cell and capable of determining a maximum number of preambles, wherein the maximum number of preambles is determined by the length of the root sequence and a ZCZ length selected.

The set selection unit 420 may include: a module 421 adapted for the selection of a set of cyclic shift increments, wherein, the module 421 is configured to select such a set of cyclic shift increments that, for any cell radius, the maximum number of preambles determined from a cyclic shift increment which is selected from the selected set of cyclic shift increments, and is applicable to the cell, is closest to the maximum number of preambles determined from a cyclic shift increment which is selected from the set of all integers and is applicable to the cell, wherein the maximum number of preambles is determined by the root sequence length and a cyclic shift increment selected; and a module 422 adapted to obtain a set of ZCZ lengths, wherein the module is configured to obtain the set of ZCZ lengths according to the selected set of cyclic shift increments.

In the above apparatus embodiment, the cyclic shift increment selected from the selected set of cyclic shift increments is the minimum cyclic shift increment in the selected set of cyclic shift increments; and the cyclic shift increment selected from the set of all integers is the minimum cyclic shift increment in the set of all integers.

The disclosure provides an embodiment of a base station, as illustrated in FIG. 4, which includes: a length determination unit 410, configured to determine a length of a root sequence; and a set selection unit 420, configured to select such a set of ZCZ lengths that, for any cell radius, the maximum number of preambles determined from a ZCZ length which is selected from the selected set of ZCZ lengths, is applicable to the cell and capable of determining a maximum number of preambles, is closest to the maximum number of preambles determined from a ZCZ length which is selected from the set of all integers, and is applicable to the cell and capable of determining a maximum number of preambles, wherein the maximum number of preambles is determined from the length of the root sequence and a ZCZ length selected.

The disclosure further provides an embodiment of a mobile communication system, as illustrated in FIG. 5. The system comprises a base station 400 and a mobile terminal 500. The base station 400 is configured to interact with the mobile terminal 500, and to specify a ZCZ length from a set of ZCZ lengths for the mobile terminal 500; the mobile terminal 500 is configured to generate a preamble according to the ZCZ length specified by the base station 400, and to transmit an uplink signal to the base station 400 using the preamble; the set of ZCZ lengths is such a set of ZCZ lengths that, for any cell radius, the maximum number of preambles determined from a ZCZ length which is selected from the selected set of ZCZ lengths, and is applicable to the cell and capable of determining a maximum number of preambles, is closest to the maximum number of preambles determined from a ZCZ length which is selected from the set of all integers, and is applicable to the cell and capable of determining a maximum number of preambles, wherein the maximum number of preambles is determined from the length of the root sequence and a ZCZ length selected.

In the above embodiment of the mobile communication system, the cyclic shift increment selected from the selected set of cyclic shift increments is the minimum cyclic shift

US 8,416,892 B2

9

increment applicable to the cell in the selected set of cyclic shift increments, the cyclic shift increment selected from the set of all integers is the minimum cyclic shift increment applicable to the cell in the set of all integers.

In general, in embodiments of the disclosure, the selected limited set of $N_{CS}$ values should be such a set that, in a plurality of intervals of cell radii, the maximum relative difference between the maximum number of the ZCZ RAPs determined from the minimum $N_{CS}$ value of the limited set, which is applicable to the plurality of cells, and the maximum number of the ZCZ RAPs determined from a plurality of $N_{CS}$ values of a set of integers which are applicable to the plurality of cells is minimized. Furthermore, a limited set of ZCZ lengths may be selected. Of course, in a plurality of intervals of cell radii, the maximum relative difference between the maximum number of the ZCZ RAPs determined from the minimum ZCZ length of the limited set of ZCZ lengths, which is applicable to the plurality of cells, and the maximum number of the ZCZ RAPs determined from a plurality of ZCZ lengths of the set of all integers which are applicable to the plurality of cells, is minimized.

What are described above are only preferred embodiments of the disclosure. It should be noted that, for a person skilled in the art, variations and improvements may be made without deviating from the principle of the disclosure. Those variations and improvements are all regarded to be within the scope of the disclosure.

The invention claimed is:

1. A method of facilitating communication in a mobile communication system, the method comprising:
selecting, by a user equipment (UE), a random access preamble from a set of random access preambles; and
transmitting, by the UE, the selected random access preamble, wherein the set of random access preambles is provided with Zero Correlation Zones of length $N_{CS}-1$, where $N_{CS}$ is a cyclic shift increment selected from a pre-defined set of cyclic shift increments, the pre-defined set including all of the following cyclic shift increments of 0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, 419.

2. The method according to claim 1, wherein the set of random access preambles is generated from one or more than one root sequences.

3. The method according to claim 2, wherein the root sequence is a Zadoff-Chu sequence.

4. The method according to claim 3, wherein the number of preambles generated from a single root sequence is $N_{pre}=\lfloor N_{NC}/N_{CS}\rfloor$, where $\lfloor n\rfloor$ denotes the largest integer not greater than n, and $N_{ZC}$ is the length of the Zadoff-Chu sequence.

5. The method according to claim 1, wherein a subset of random access preambles $x_{u,v}(k)$ of the set of random access preambles is generated from the $u^{th}$ order root Zadoff-Chu sequence $x_u(k)$, where v is an integer.

6. The method according to claim 5, wherein the sequence $x_{u,v}(k)$ are generated according to:

$$x_{u,v}(k)=x_{u,v}((k+vN_{CS})\bmod N_{ZC}),$$

where v is an integer, and $N_{ZC}$ is the length of the Zadoff-Chu sequence $x_u(k)$ defined by:

$$x_u(k)=W^{uk(k+1)/2}, k=0,1,\dots,N_{ZC}-1, W=e^{-j2\pi/N_{ZC}}, j=\sqrt{-1}.$$

7. The method according to claim 1, wherein the number of random access preambles in the set of random access preambles is 64.

10

8. The method according to claim 1, wherein non-zero cyclic shift increments $N_{CS}(k)$ in the set of cyclic shift increments are generated from the following formula:

$$N_{CS}(k)=\lfloor N_{ZC}/[N_{pre}(0)\times a^k+a/(1-a)\times(a^k-1)]\rfloor,k=0,1,2\dots K;$$

wherein $\lfloor x\rfloor$ denotes the maximum integer not greater than x, $\lfloor x\rfloor$ denotes rounding x, a=0.856, $N_{pre}(0)=64$ and $N_{ZC}=839$.

9. The method according to claim 8, wherein the value a =0.856 is obtained from the following formula:

$$N_{pre}(k)=N_{pre}(0)a^k+\frac{a}{1-a}(a^k-1), k=1, 2\dots$$

where

$$N_{pre}(14)=2.$$

10. An apparatus operable to communicate in a wireless communications system, the apparatus comprising:
a processor; and
a non-transitory computer readable storage medium storing programming for execution by the processor, the programming including instructions that direct the processor to:
select a random access preamble from a set of random access preambles; and
transmit the selected random access preamble, wherein the set of random access preambles is provided with Zero Correlation Zones of length $N_{CS}-1$, where $N_{CS}$ is a cyclic shift increment selected from a pre-defined set of cyclic shift increments, the pre-defined set including all of the following cyclic shift increments of 0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, 419.

11. The apparatus according to claim 10, wherein the set of random access preambles is generated from one or more than one root sequences.

12. The apparatus according to claim 11, wherein the root sequence is a Zadoff-Chu sequence.

13. The apparatus according to claim 12, wherein the number of preambles generated from a single root sequence is $N_{pre}=\lfloor N_{ZC}/N_{CS}\rfloor$, where $\lfloor n\rfloor$ denotes the largest integer not greater than n, and $N_{ZC}$ is the length of the Zadoff-Chu sequence.

14. The apparatus according to claim 10, wherein a subset random access preambles $x_{u,v}(k)$ of the set of random access preambles is generated from the $u^{th}$ order root Zadoff-Chu-sequence $x_u(k)$, where v is an integer.

15. The apparatus according to claim 14, wherein the sequence $x_{u,v}(k)$ is generated according to

$$x_{u,v}(k)=x_{u,v}((k+vN_{CS})\bmod N_{ZC}),$$

where v is an integer, and $N_{ZC}$ is the length of the Zadoff-Chu sequence $x_u(k)$ defined by:

$$x_S(k)=W^{uk(k+1)/2}, k=0, 1,\dots,$$
$$N_{ZC}-1, W=e^{-j2\pi/N_{ZC}}, j=\sqrt{-1}.$$

16. The apparatus according to claim 10, wherein the number of random access preambles in the set of random access preambles is 64.

US 8,416,892 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

**17**. The apparatus according to claim **10**, wherein non-zero cyclic shift increments $N_{CS}$(k) in the set of cyclic shift increments are generated from the following formula:

$$N_{CS}(k)=\lfloor N_{ZC}/[N_{pre}(0)\times a^k+a/(1-a)\times(a^k-1)]\rfloor, k=0,1,2\ldots K;$$

wherein $\lfloor x \rfloor$ denotes the maximum integer not greater than x, [x] denotes rounding x, a=0.856, $N_{pre}$(0)=64 and $N_{ZC}$=839.

**18**. The apparatus according to claim **17**, wherein the value a=0.856 is obtained from the following formula:

$$N_{pre}(k) = N_{pre}(0)a^k + \frac{a}{1-a}(a^k - 1), k = 1, 2 \ldots$$

where

$$N_{pre}(14) = 2.$$

**19**. A method of facilitating communication in a mobile communication system, the method comprising:

receiving, by an apparatus of the mobile communication system, an uplink signal comprising a random access preamble;

estimating, by the apparatus, a time of arrival of the uplink signal; and

transmitting, by the apparatus, a time advance based on the time of arrival, wherein the random access preamble is selected from a set of random access preambles provided with Zero Correlation Zones of length $N_{CS}$−1, where $N_{CS}$ is a cyclic shift increment selected from a pre-defined set of cyclic shift increments, the pre-defined set including all of the following cyclic shift increments of 0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, 419.

**20**. An apparatus comprising:

a processor; and

a non-transitory computer readable storage medium storing programming having instructions which, upon execution by the processor, causes the processor to:

estimate a time of arrival of an uplink signal comprising a random access preamble; and

transmit a time advance based on the uplink signal time of arrival, wherein the random access preamble is selected from a set of random access preambles provided with Zero Correlation Zones of length $N_{CS}$−1, where $N_{CS}$ is a cyclic shift increment selected from a pre-defined set of cyclic shift increments, the pre-defined set including all of the following cyclic shift increments of 0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, 419.

\* \* \* \* \*

# EXHIBIT 3

US008798575B2

(12) **United States Patent**
Duan et al.

(10) Patent No.: **US 8,798,575 B2**
(45) Date of Patent: **Aug. 5, 2014**

(54) **METHOD FOR IMPROVING SERVICE DATA FLOW BASED CHARGING AND SYSTEM THEREOF**

(75) Inventors: **Xiaoqin Duan**, Shenzhen (CN); **Yajuan Wu**, Shenzhen (CN)

(73) Assignee: **Huawei Technologies Co., Ltd.**, Shenzhen (CN)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1610 days.

(21) Appl. No.: **11/558,774**

(22) Filed: **Nov. 10, 2006**

(65) **Prior Publication Data**

US 2007/0124160 A1     May 31, 2007

**Related U.S. Application Data**

(63) Continuation of application No. PCT/CN2005/000665, filed on May 12, 2005.

(30) **Foreign Application Priority Data**

May 12, 2004     (CN) ......................... 2004 1 0044433

(51) **Int. Cl.**
| | |
|---|---|
| *H04M 11/00* | (2006.01) |
| *H04L 12/14* | (2006.01) |
| *G06Q 40/02* | (2012.01) |
| *H04M 15/00* | (2006.01) |
| *H04W 4/24* | (2009.01) |

(52) **U.S. Cl.**
CPC ............ *H04L 12/14* (2013.01); *H04L 12/1467* (2013.01); *H04W 4/24* (2013.01); *H04M 2215/0108* (2013.01); *H04M 2215/22* (2013.01); *H04L 12/1485* (2013.01); *H04M 2215/0188* (2013.01); *G06Q 40/025* (2013.01); *H04M 15/58* (2013.01); *H04M 2215/204* (2013.01); *H04M 15/745* (2013.01); *H04M 15/66* (2013.01)
USPC ........................ **455/405**; 455/432.1; 455/416

(58) **Field of Classification Search**
USPC ................ 455/405, 432.1, 416; 370/392, 394
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,781,431 A | 7/1998 | Duret et al. | |
| 2007/0274522 A1* | 11/2007 | Boman et al. | 380/247 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1411305 A | 4/2003 |
| CN | 1429005 A | 7/2003 |

(Continued)

OTHER PUBLICATIONS

3GPP; 3rd Generation Partnership Project; Technical Specification Group Services and Systems Aspects; Overall High Level Functionality and Architecture Impacts of Flow Based Charging, Release 6 3GPP TS 23.15 V.6.0.0.*

(Continued)

*Primary Examiner* — Manpreet Matharu
(74) *Attorney, Agent, or Firm* — Staas & Halsey LLP

(57) **ABSTRACT**

A method for improving service data flow based charging and a system thereof are disclosed. A CRF may determine, according to input information provided by an AF or TPF, that the charging method for the current data flow service is an online or offline charging method, and provide the TPF with the charging rules with the corresponding mechanism. Moreover, the CRF may provide the TPF with the address information of an OCS or OFCS corresponding to the UE, to enable the TPF to address the corresponding OCS according to the address information of the OCS and trigger the following credit request procedure for the UE, or enable the TPF to address the corresponding OFCS according to address information of the OFCS and send collected charging data information of the UE to the OFCS. Therefore the charging procedure based on the FBC mechanism is more complete and more reasonable.

**20 Claims, 4 Drawing Sheets**



# US 8,798,575 B2
Page 2

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| EP | 0639013 A1 | 2/1995 |
| WO | WO 03/092317 A2 | 3/2003 |
| WO | WO 03/092317 A1 | 11/2003 |

OTHER PUBLICATIONS

ETSI Standards, *European Telecommunications Standards Institute*, Sophia-Antipo, FR (TS 32.015 V 3.12.0), No. V3120 (Dec. 31, 2003), pp. 1-66, XP002419212 ISSN: 0000-0001.
Technical Specification Group Services and System Aspects (TS 23.125 V6.2.0), [Online] Sep. 2004, pp. 1-47, XP002427252

Retrieved from the Internet: URL: http://www.3gpp.org/ftp/Specs/html-info/23125.html> [retrieved on Mar. 28, 2007].
3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Overall High Level Functionality and Architecture Impacts of Flow Based Charging; Stage 2(Release 6).
English Translation of the Written Opinion of the International Search Authority for International Application No. PCT/CN2005/000665, dated Sep. 15, 2005.
Chinese office action for Chinese patent application No. 200410044433.3, dated Sep. 22, 2006.
European office action for European patent application No. 05745147.8, dated Jun. 26, 2007.
European office action for European patent application No. 05745147.8, dated Nov. 28, 2007.

* cited by examiner

U.S. Patent          Aug. 5, 2014          Sheet 1 of 4          US 8,798,575 B2



FIG. 1

FIG. 2A

FIG. 2B

Case 1:19-cv-00022-JRG Document 16-3 Filed 06/21/19 Page 194 of 312 PageID #: 931



FIG. 3A

FIG. 3B



FIG. 3C



FIG. 4



FIG. 5



FIG. 6

US 8,798,575 B2

**1**

# METHOD FOR IMPROVING SERVICE DATA FLOW BASED CHARGING AND SYSTEM THEREOF

This application is a continuation of International Patent Application No. PCT/CN2005/000665, filed May 12, 2005, which claims priority to Chinese Patent Application No. 200410044433.3, filed May 12, 2004, all of which are hereby incorporated by reference.

## FIELD OF THE INVENTION

The present invention relates to charging techniques, and particularly to a method for improving service data flow based charging and a system thereof.

## BACKGROUND OF THE INVENTION

Along with the wide applications of packet data services, an accurate and appropriate charging method for packet data services is concerned by the operators.

FIG. **1** is a flowchart illustrating activation, data transmission and deactivation of Packet Data Protocol Context (PDP Context).

Step **101**: a User Equipment (UE) sends an Activate PDP Context Request to a Serving GPRS Support Node (SGSN). The Activate PDP Context Request carries the information of a Network Layer Service Access Point Identifier (NSAPI), a PDP type, an Access Point Name (APN), a required Quality of Service (QoS) parameter, a Transaction Identifier (TI) and etc. The NSAPI serves as a part of a Tunnel Identifier (TEID) between the SGSN and a Gateway GPRS Support Node (GGSN), for identifying the PDP Context. The PDP type includes a Peer-Peer Protocol (PPP) type, an Internet Protocol (IP) type and etc. The APN is provided by the UE for the SGSN, the SGSN addresses the corresponding GGSN according to the APN, the corresponding GGSN determines an external network which the UE shall access according to the APN; also, the UE may not provide the SGSN with the APN, in this case, the SGSN chooses a default APN according to the subscription information of the UE. The QoS parameter is the desired quality requirement of the packet data service designated by the UE. The TI is used for the UE to identify one PDP Context.

Step **102**: The SGSN receives the Activate PDP Context Request, performs a security check and encryption with the UE. This step is optional.

Step **103**: the SGSN resolves the address information of the GGSN according to the APN. If the SGSN is able to resolve the address information of the GGSN, a TEID is created for the PDP Context. The TEID is a combination of the International Mobile Subscriber Identity (IMSI) and the NSAPI, to identify the unique PDP Context between the SGSN and the GGSN. The SGSN sends a Create PDP Context Request to the GGSN, the Create PDP Context Request carries a PDP type, a PDP address, an APN, a QoS parameter, a TEID, a select mode, etc, wherein the PDP address is the IP address of the UE, which is an optional parameter. When the PDP address is not carried in the Create PDP Context Request, the IP address may be assigned to the UE by the GGSN or by the Packet Data Network (PDN) which establishes a connection with the UE finally. The select mode is that for the APN, indicating that the APN is selected by the UE or by the SGSN. If the SGSN is unable to resolve the address information of the GGSN according to the APN, it rejects the Create PDP Context Request initiated by the UE.

**2**

Step **104**: upon receiving the Create PDP Context Request, the GGSN determines the external PDN according to the APN, assigns the Charging ID, initiates the charging procedure and negotiates the QoS parameter. If the GGSN is able to satisfy the service quality requirement defined by the QoS parameter, it returns to the SGSN a Create PDP Context Response which carries the TEID, the PDP address, the Backbone Bearer protocol, the QoS parameter, the Charging ID and etc. If the GGSN is unable to satisfy the service quality requirement defined by the QoS parameter, it rejects the Create PDP Context Request initiated by the SGSN and the SGSN then rejects the Activate PDP Context Request initiated by the UE.

Step **105**: upon receiving the Create PDP Context Response, the SGSN inserts the NSAPI and the GGSN address information into the PDP Context to identify the PDP Context. selects the radio priority according to the QoS parameter, and then returns to the UE an Activate PDP Context Accept which carries the information of the PDP type, the PDP address, the TI, the QoS parameter, the radio priority, the PDP configuration options and etc; and the SGSN initiates the charging. Upon receiving the Activate PDP Context Accept, the UE establishes a route to the GGSN and thus a transmission tunnel to the PDN, by which the data can be transmitted.

Step **106**: the UE transmits the data via the SGSN and the GGSN to the PDN.

Step **107**: after completing the data transmission, the UE sends to the SGSN a Deactivate PDP Context Request which carries the TI.

Step **108**: upon receiving the Deactivate PDP Context Request, the SGSN performs the security examination and encryption with the UE. This step is optional.

Step **109**~Step **111**: the SGSN sends to the GGSN a Delete PDP Context Request which carries the TEID. Upon receiving the Delete PDP Context Request, the GGSN terminates the charging for the UE, deletes the PDP Context corresponding to the TEID, and sends to the SGSN a Delete PDP Context Response which carries the TEID. Upon receiving the Delete PDP Context Response, the SGSN terminates the charging for the UE, deletes the PDP Context corresponding to the TEID, and sends to the UE a Deactivate PDP Context Response which carries the TI. Upon receiving the Deactivate PDP Context Response, the UE deletes the PDP Context corresponding to the TI.

As can be seen from the procedure illustrated in FIG. **1**, in the prior GPRS charging system, the charging is set to be started when the PDP Context is activated and be terminated when the PDP Context is deleted. Thus, the charging can be implemented based on the data flow transmitted through the PDP Context or on the duration of activated state of the PDP Context. However, in practical applications, after a transmission tunnel is established between the UE and the PDN, the UE may obtain multiple services based on one activated PDP Context, such as the Email sending-receiving service, the browsing service based on Wireless Application Protocol (WAP), the file transmission service based on File Transfer Protocol (FTP) and etc. That is, when the PDN can provide multiple services, after a transmission tunnel is established between the UE and the PDN, the multiple services provided by the PDN may be borne by one activated PDP Context. However, the operators may apply different charging policies to different services. For example, an Email sending-receiving service may be charged according to the times of the triggered receiving and sending events, a WAP browsing service may be charged according to the data flow, and a file transmission service may also be charged according to the data flow, while with a charging rate different from that of the

US 8,798,575 B2

**3**

WAP surfing service. Therefore, the prior GPRS charging system is unable to apply different charging policies to different services using the same PDP Context as the bearer.

In view of the above, the 3rd Generation Partnership Project (3GPP) is now discussing how to implement Flow Based Charging (FBC). As for a packet data service which is being used by the UE, all the IP flows or IP packets sent and received by the UE are generally called Service Data Flow. The Service Data Flow is the aggregation of a plurality of IP flows, therefore, the FBC is able to reflect the resource occupation of a certain service data flow.

FBC can be regarded to be implemented by filtering the IP flows for different services borne in the same PDP context through different sieve-like "filters" and then charging for different services according to the corresponding "filters". Therefore, the "pore size" of the charging "filter" based on IP flows is much less than that based on one PDP Context. The "pore size" of the charging "filter" can be regarded as to indicate the size of a sieve hole. If the charging is based on one PDP Context, one PDP Context corresponds to one sieve hole; while if the charging is based on IP flows, one IP flow corresponds to one sieve hole and thus one PDP Context corresponds to multiple sieve holes in the FBC mode. Therefore, compared with the charging based on one PDP Context, the FBC provides more abundant charging means for operators or service providers.

The systematic configuration, function requirements and information interacting procedure of FBC are all descried in the standard of 3GPP. Referring to FIG. 2, the systematic configuration of FBC for the online charging includes an Online Charging System (OCS) **206**, a Service Data Flow Based Charging Rule Function (CRF) **203**, an Application Function (AF) **204**, and a Traffic Plane Function (TPF) **205**. The OCS **206** includes a Customized Application for Mobile Network Enhanced Logic (CAMEL) based Service Control Point (SCP) **201** and a Service Data Flow Based Credit Control Function (CCF) **202**. The CCF **202** is connected through an Ry interface to the CRF **203**, the CRF **203** is connected through an Rx interface to the AF **204** and through a Gx interface to the TPF **205**; the CCF **202** is connected through a Gy interface to the TPF **205**.

Referring to FIG. 2B, the systematic configuration of FBC for the offline charging includes a CRF **203**, an AF **204**, a TPF **205**, a Charging Gateway Function (CGF) **207** and a Charging Collection Function (CCF) **208**. The CRF **203** is connected through an Rx interface to the AF **204** and through a Gx interface to the TPF **205**, the TPF **205** is connected through a Gz interface to the CGF **207** and to the CCF **208**, respectively. Generally, the functions of the CGF **207** and the CCF **208** are implemented by one network entity, which therefore provides the charging gateway functions and the charging collection functions for offline charging and is referred to as an Offline Charging System (OFCS) hereinafter.

According to the definition in 3GPP of the FBC functions, the TPF **205** bears IP flow, and sends a Charging Rules Request to the CRF **203** through the Gx interface when an IP flow bearer is established. The Charging Rules Request carries the UE-related information, the bearer characteristics and the network-related information, wherein the UE-related information may be the Mobile Station International Integrated Services Digital Network (ISDN) Number (MSISDN), the International Mobile Subscriber Identifier (IMSI) and etc; and the network-related information may be the Mobile Network Code (MNC), the Mobile Country Code (MCC) and etc. The bearer may be modified during the transmission of the IP flow, for example, the QoS parameter may

**4**

be renegotiated, which may lead to different charging rules for the same UE service according to different QoS parameters, such as lower charging rate corresponding to lower QoS parameter. In this case, when the bearer is modified, the TPF **205** may resend a Charging Rules Request to the CRF **203** for new charging rules; the CRF **203** selects appropriate charging rules according to the input information provided by the TPF **205** described above, and returns to the TPF **205** the selected charging rules including the charging mechanism, charging type, charging keys, IP flow filter, charging rule priority and etc. The charging mechanism may be online charging or offline charging; the charging type may be duration based charging or flow based charging, the charging key is a parameter related to the charging rate, whereby the CRF **203** may provide the TPF **205** with the charging rate related parameter instead of the charging rate directly; the IP flow filter is used for indicating the IP flows that need to be filtered for the TPF **205**, and the TPF **205** charges for the filtered IP flows according to the charging rules. The IP flow filter may include IP5 vector which may include the information of the source/destination IP address, the source/destination Port Number, the Protocol ID and etc. For example, the CRF **203** may instruct the TPF **205** to filter the IP flow with the source address of 10.0.0.1, the destination address of 10.0.0.2, the source/destination Port Number of 20 and the protocol type of the Transmission Control Protocol (TCP), and then charge for the filtered IP flows according to the charging rules. Finally, when the bearer is removed, the TPF **205** may also send a Charging Rules Request to the CRF **203** for new charging rules, in this case, the CRF **203** may instruct the TPF **205** to delete the charging rules established previously.

The CRF **203** determines the charging rules not only according to the input information from the TPF **205**, but also according to that from the AF **204** or the OCS **206**. For example, the AF **204** may notify the CRF **203** of the service type that the UE currently uses, and the CRF **203** may determine the corresponding charging rules according to the service type.

The OCS **206** includes the SCP **201** and the CCF **202**. The CCF **202** is used for credit control and used in the OCS, whose function can be implemented by adding new function entity to the prior OCS **206**. During the online charging procedure, the CCF **202** manages and controls the UE credit and provides the related information used to determine the charging rules through the Ry interface for the CRF **203**. The user of the UE may set several credit pools for different packet data services. When the UE uses a certain packet data service, the CCF **202** may authenticate the credit in the credit pool corresponding to the packet data service and provides the TPF **205** with the available UE credit. The user of the UE may also set one shared credit pool for different packet data services. When the UE uses a packet data service, the CCF **202** may authenticate the credit in the credit pool corresponding to the packet data service and provides the TPF **205** with the available UE credit.

In a GPRS network, the TPF **205** is in the GGSN, the AF is a service gateway or service server in the PDN and the CRF **203** is an added logic entity. The TPF **205** is the implementation point of the charging rules and the CRF **203** is the control point of charging rules.

As shown in FIG. 3A, the implementation procedure of issuing the charging rules when a bearer is established includes the following steps:

Step **301**A: the UE sends an Establish Bearer Service Request to the TPF, while in a GPRS network, the GGSN receives a Create PDP Context Request.

US 8,798,575 B2

5

Step **302**A: upon receiving the Establish Bearer Service Request, the TPF sends to the CRF a Charging Rules Request which carries the input information for the CRF to determine the charging rules.

Step **303**A~Step **304**A: upon receiving the Charging Rules Request, the CRF determines the appropriate charging rules according to the input information carried in the Charging Rules Request or the related input information provided by the AF, and returns to the TPF a Provision Charging Rules message which carries the determined charging rules and the operation instructions for the charging rules.

Step **305**A; upon receiving the Provision Charging Rules message, the TPF performs the corresponding operations according to the charging rules operation instructions and the charging rules determined by the CRF.

Step **306**A~Step **307**A: in the case of an online charging process, the TPF sends a Credit Request to the OCS for the UE credit information. Upon receiving the Credit Request, the OCS determines the UE credit and returns to the TPF a Credit Response, which carries the UE credit if the OCS succeeds in determining the UE credit or carries the value indicating the reason of error if the OCS fails to determine the UE credit.

Step **308**A: upon receiving the Credit Response, the TPF returns an Establish Bearer Service Accept to the UE. If the Credit Response carries the UE credit, the TPF accepts the Establish Bearer Service Request initiated by the UE and continues with the following procedure for bearer establishment; otherwise, the TPF rejects the Establish Bearer Service Request initiated by the UE.

As shown in FIG. **3**B, the implementation procedure of issuing the charging rules when a bearer is modified includes the following steps:

Step **301**B: the UE sends a Modify Bearer Service Request to the TPF, while in a GPRS network, the GGSN receives an Update PDP Context Request;

Step **302**B: upon receiving the Modify Bearer Service Request, the TPF sends to the CRF a Charging Rules Request which carries the input information for the CRF to determine the charging rules.

Step **303**B~Step **304**B: upon receiving the Charging Rules Request, the CRF determines the appropriate charging rules according to the input information carried in the Charging Rules Request or the related input information provided by the AF, and returns to the TPF a Provision Charging Rules message which carries the determined charging rules and the operation instructions for the charging rules.

Step **305**B: upon receiving the Provision Charging Rules message, the TPF performs the corresponding operations according to the charging rules operation instructions and the charging rules determined by the CRF.

Step **306**B~Step **307**B: in the case of an online charging process, the TPF sends a Credit Request to the OCS for the UE credit information. Upon receiving the Credit Request, the OCS determines the UE credit and returns to the TPF a Credit Response, which carries the UE credit if the OCS succeeds in determining the UE credit or carries the value indicating the reason of error if the OCS fails to determine the UE credit.

Step **308**B: upon receiving the Credit Response, the TPF returns a Modify Bearer Service Accept to the UE. If the Credit Response carries the UE credit, the TPF accepts the Modify Bearer Service Request initiated by the UE and continues with the following procedure for bearer modification; otherwise, the TPF rejects the Modify Bearer Service Request initiated by the UE.

6

As shown in FIG. **3**C, the implementation procedure of issuing the charging rules when a bearer is removed includes the following steps:

Step **301**C: the UE sends a Remove Bearer Service Request to the TPF, while in a GPRS network, the GGSN receives a Delete PDP Context Request;

Step **302**C: upon receiving the Remove Bearer Service Request, the TPF sends to the CRF a Charging Rules Request which carries the input information for the CRF to determine the charging rules.

Step **303**C~Step **304**C: upon receiving the Charging Rules Request, the CRF determines the appropriate charging rules according to the input information carried in the Charging Rules Request or the related input information provided by the AF, and returns to the TPF a Provision Charging Rules message which carries the determined charging rules and the operation instructions for the charging rules.

Step **305**C: upon receiving the Provision Charging Rules message, the TPF performs the corresponding operations according to the charging rules operation instructions and the charging rules determined by the CRF.

Step **306**C~Step **307**C: in the case of an online charging process, the TPF sends a Final Remaining Credit Report to the OCS to notify the OCS that the bearer established for the UE has been terminated. The Final Remaining Credit Report carries the usage information of the UE credit, such as the duration or the data flow of the packet data service used by the UE. Upon receiving the Final Remaining Credit Report, the OCS returns a Credit Report Response to the TPF.

Step **308**C: upon receiving the Credit Report Response, the TPF returns a Remove Bearer Service Accept to the UE, accepts the Remove Bearer Service Request initiated by the UE, and continues with the following bearer removing procedure.

As shown in FIG. **4**, the implementation procedure of CRF initiating to deliver the charging rules to the TPF includes the following steps:

Step **401**: the CRF receives an Internal or External Trigger Event and related information, such as an event in which the AF sends the input information to the CRF to determine the charging rules.

Step **402**: the CRF determines the appropriate charging rules according to the input information obtained. The input information may be the charging-related input information provided by the AF. For example, when a service is provided by the AF for the UE and the service is of special charging requirement, such as a charging rate different from that of other services, the AF provides the CRF with the charging input information related to the service. Besides, the input information may also be the charging-related input information provided by the TPF.

Step **403**: if the charging rules are modified, the CRF sends to the TPF a Provision Charging Rules message which may carry the determined charging rules and the operation instructions for the charging rules.

Step **404**: upon receiving the Provision Charging Rules message, the TPF performs the corresponding operations according to the charging rules operation instructions and the charging rules determined by the CRF.

Step **405**~Step **406**: in the case of an online charging process, the TPF sends a Credit Request to the OCS for the UE credit information. Upon receiving the Credit Request, the OCS determines the UE credit and returns to the TPF a Credit Response, which carries the UE credit if the OCS succeeds in determining the UE credit or carries the value indicating the reason of error if the OCS fails to determine the UE credit.

US 8,798,575 B2

**7**

As can be seen from the above description, in the implementation procedure of the online charging described in 3GPP standard, when the bearer is established or modified, the TPF requests the UE credit from the OCS and the OCS returns the UE credit to the TPF according to the Credit Request from the TPF. However, neither the triggering mechanism for the online charging nor the means by which the TPF may address the correct OCS of the UE is described in 3GPP standard.

SUMMARY OF THE INVENTION

A method for improving service data flow based charging is provided, which includes the step of: a CRF providing a TPF with the address information of a charging system.

The charging system may be an OCS or an OFCS.

The CRF may provide the TPF with the address information of a plurality of OCSs and selection priorities corresponding to the OCSs; the TPF may first request the credit information from the OCS with a highest selection priority, if not succeed, request the credit information from the next OCS in the descending order of the selection priority levels until succeeds.

The CRF may provide the TPF with the address information of a plurality of OFCSs and the selection priorities corresponding to the OFCSs; the TPF may first send the collected charging data information of the UE to the OFCS with a highest selection priority, if not succeed, send the collected charging data information of the UE to the next OFCS in the descending order of the selection priority levels until succeeds.

Also, a system for improving service data flow based charging is provided, which includes: a CRF, a TPF and a charging system, wherein the CRF provides the TPF with the address information of the charging system.

The charging system may be an OCS or an OFCS.

The CRF may provide the TPF with the address information of a plurality of OCSs and selection priorities corresponding to the OCSs; the TPF may first request the credit information from the OCS with a highest selection priority, if not succeed, request the credit information from the next OCS in the descending order of the selection priority levels until succeeds.

The CRF may provide the TPF with the address information of a plurality of OFCSs and the selection priorities corresponding to the OFCSs; the TPF may first send the collected charging data information of the UE to the OFCS with a highest selection priority, if not succeed, send the collected charging data information of the UE to the next OFCS in the descending order of the selection priority levels until succeeds.

According to the present invention, in the charging implementation procedure, the CRF may determine whether the charging method of the current packet data service is online charging method or offline charging method, according to the input information provided by the AF or the TPF, and then provide the TPF with the charging rules with the mechanism of "online charging" or "offline charging". Moreover, the CRF may provide the TPF with the address information of an OCS or OFCS corresponding to the UE, so that the TPF may address the corresponding OCS according to the address information of the OCS and trigger the following credit request procedure for the UE, or enable the TPF to address the corresponding OFCS according to address information of the OFCS and send collected charging data information of the UE

**8**

to the OFCS. Therefore the charging implementation procedure based on the FBC mechanism may be more complete and more reasonable.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a flowchart illustrating the activation, data transmission and deactivation of a PDP Context;

FIG. **2A** is a schematic diagram illustrating the FBC systematic configuration for the online charging;

FIG. **2B** is a schematic illustrating the FBC systematic configuration for the offline charging;

FIG. 3A is a flowchart illustrating the issuance of the charging rules when a bearer is established;

FIG. 3B is a flowchart illustrating the issuance of the charging rules when a bearer is modified;

FIG. 3C is a flowchart illustrating the issuance of the charging rules when a bearer is removed;

FIG. **4** is a flowchart illustrating that the CRF initiates to deliver the charging rules to the TPF;

FIG. **5** is a flowchart illustrating the online charging procedure according to an embodiment of the present invention when a bearer is established;

FIG. **6** is a flowchart illustrating the offline charging procedure according to an embodiment of the present invention when the CRF initiates to deliver the charging rules to the TPF.

EMBODIMENTS OF THE INVENTION

In order to further clarify the technical schemes and the advantages of the present invention, the present invention are hereinafter described in details with reference to the embodiments and the accompanying drawings.

In the implementation course of charging according to an embodiment of the present invention, the CRF provides the TPF with the OCS or OFCS address information corresponding to the UE, according to which the TPF addresses the corresponding OCS or OFCS, then the TPF requests the UE credit from the corresponding OCS or sends the collected charging data information of the UE to the corresponding OFCS.

After determining that the charging method for a certain data flow service is online charging, the CRF provides the TPF with the charging rules, the online charging indication to notify the TPF that the current charging method for the data flow service is online charging, and the OCS address information for the TPF to be able to address the OCS corresponding to the UE when the TPF requests the UE credit from the OCS. The OCS address information may be carried in the online charging indication.

Likewise, after determining that the charging method for a certain data flow service is offline charging, the CRF provides the TPF with the charging rules, the offline charging indication to notify the TPF that the current charging method for the data flow service is offline charging, and the OFCS address information for the TPF to be able to address the OFCS corresponding to the UE when the TPF sends the collected charging data information of the UE to the OFCS. The OFCS address information may be carried in the offline charging indication.

The OCS address information may be the address information of the Function that is able to implement the UE credit control in the OCS. For example, the CCF is a function that manages and controls the UE credit in an OCS, therefore the OCS address information may be the address information of the CCF in the OCS.

US 8,798,575 B2

9

The CRF may determine whether the charging method of the current data flow service is online charging or offline charging according to the input information provided by the AF. For example, the CRF may determine the charging method according to the service identifier in the charging rules input information provided by the AF. The CRF may also determine whether the charging method of the current data flow service is online charging or offline charging according to the UE information. For example, the CRF may determine that the user of the UE is provided with the prepaid service according to the UE identifier in the charging rules input information provided by the TPF and therefore determine that the charging method of the current packet data service is online charging; For another example, the CRF may determine that the user of the UE is provided with the post-paid service according to the UE identifier in the charging rules input information provided by the TPF and therefore determine that the charging method of the current data flow service is offline charging.

The CRF may store the OCS or OFCS address information corresponding to the UE, or obtain the OCS or OSF address information by interacting with other entities in the network. For example, the CRF may interact with the Home Location Register (HLR)/Home Subscriber Server (HSS) to obtain the OCS or OFCS address information corresponding to the UE.

Besides, there may be multiple OCSs in a network to share the working loads, and a UE may correspond to multiple OCSs. Therefore, a selection priority may be set for each of the multiple OCSs, such as the primarily selected OCS or the secondly selected OCS. The CRF may provide the TPF with multiple OCS addresses corresponding to the UE including the primary OCS address of the primarily selected OCS and the secondary OCS address of the secondly selected OCS. When the TPF fails to establish a credit request session with the primarily selected OCS, it may initiate a credit request to the secondly selected OCS to establish a credit request session with the secondly selected OCS, according to the OCS selection priorities.

Operators may also pre-configure an OCS address in the TPF for all the UEs. Therefore, when the CRF does not provide the TPF with an OCS address, in other words, when the OS address provided by the CRF for the TPF is empty, the TPF sends a Credit Request to the pre-configured OCS to establish a credit request session with the set OCS.

Likewise, there may be multiple OFCSs in a network to share the working loads, and a UE may correspond to multiple OFCSs. Therefore, a selection priority may be set for each of the multiple OFCSs, such as the primarily selected OFCS or the secondly selected OFCS. The CRF may provide the TPF with multiple OFCSS addresses corresponding to the UE, including the primary OFCS address of the primarily selected OFCS and the secondary OFCS address of the secondly selected OFCS. When the TPF fails to transmit the charging data information of the UE to the primarily selected OFCS, it may send the charging data information of the UE to the secondly selected OFCS, according to the OFCS selection priorities.

Operators may also pre-configure an OFCS address in the TPF for all the UEs. Therefore, when the CRF does not provide the TPF with an OFCS address, in other words, when the OFCS address provided by the CRF for the TPF is empty, the TPF sends the charging data information of the UE to the pre-configured OFCS.

FIG. 5 is a flowchart illustrating the online charging procedure according to the present invention when a bearer is

10

established. As shown in FIG. 5, the online charging implementation procedure when a bearer is established includes the following steps:

Step 501: the UE sends an Establish Bearer Service Request to the TPF, while in a GPRS network, the GGSN receives a Create PDP Context Request.

Step 502: upon receiving the Establish Bearer Service Request, the TPF sends to the CRF a Charging Rules Request that carries the input information for the CRF to determine the charging rules.

Step 503–Step 504: upon receiving the Charging Rules Request, the CRF firstly determines that the charging method of the current packet data service is online charging according to the input information carried in the Charging Rules Request or the related input information provided by the AF; and secondly determines the appropriate charging rules and the corresponding OCS address information according to the UE information; and thirdly returns to the TPF the Provision Charging Rules message which carries the determined charging rules and the operation instructions for the charging rules, and may further carry the online charging indication and the OCS address information.

Step 505: upon receiving the Provision Charging Rules message, the TPF performs the corresponding operations according to the charging rules operation instructions and the charging rules determined by the CRF.

Step 506–Step 507: the TPF determines according to the online charging indication that it needs to request the UE credit from the OCS, and then sends a Credit Request to the corresponding OCS according to the OCS address information. The Credit Request carries the related input information for the OCS to determine the UE credit. Upon receiving the Credit Request, the OCS determines the UE credit according to the input information provided by the TPF and returns to the TPF a Credit Response, which carries the UE credit if the OCS succeeds in determining the UE credit corresponding to the charging rules or carries the value indicating the reason of error if the OCS fails to determine the UE credit.

Step 508: upon receiving the Credit Response, the TPF returns an Establish Bearer Service Accept to the UE. If the Credit Response carries the UE credit, the TPF accepts the Establish Bearer Service Request initiated by the UE and continues with the following bearer establishment procedure; otherwise, the TPF rejects the Establish Bearer Service Request initiated by the UE.

The present invention is described above according to example of the online charging implementation procedure when a bearer is established, while the online charging implementation procedure when a bearer is modified or removed is almost the same as the procedure when a bearer is established, except for the different messages sent. Therefore, the online charging procedures will not be further described herein.

Besides, the offline charging implementation procedure when a bearer is established, modified or removed is quite similar to the corresponding online charging implementation procedure, with such differences as the determination result by the CRF on the charging method of the current packet data service being the offline charging method, the address information carried in the sent messages being the OFCS address information, and the omission of the following credit interacting procedure for the online charging. Therefore, the offline charging procedures will not be further described herein.

FIG. 6 is a flowchart illustrating the offline charging procedure according to the present invention when the CRF initiates to deliver the charging rules to the TPF. As shown in

US 8,798,575 B2

11

FIG. **6**, the offline charging implementation procedure when the CRF initiates to deliver the charging rules to the TPF includes the following steps:

Step **601**: the CRF receives an Internal or External Trigger Event and related information, such as an event in which the AF sends the input information to the CRF to determine the charging rules.

Step **602**: the CRF determines the charging method of the current packet data service as the online charging method and determines the appropriate charging rules, according to the input information obtained, and determines the corresponding OCS address information according to the UE information. The input information described above may be the charging-related input information provided by the AF, such as the corresponding service identifier provided by the AF for the CRF when the UE is provided with a certain packet data service by the AF; also, the input information may be the charging-related input information provided by the TPF, such as the UE identifier in the Charging Rules Request provided by the TPF for the CRF.

Step **603**: if the CRF determines according to the received input information that the charging rules are modified, for example, when the CRF determines according to the service identifier provided by the AF that the charging method of the current packet data service is online charging method and the UE's fee for using the current packet data service needs to be deducted in real time, or when the CRF determines according to the UE identifier provided by the TPF that the user of the UE is a post-pay user and all the current packet data services used by the UE could be charged after the use of the services, the CRF determines the new charging rules and send to the TPF a Provision Charging Rules message which carries the determined charging rules and the operation instructions for the charging rules, and may further carry the offline charging indication and the OFCS address information.

Step **604**: upon receiving the Provision Charging Rules message, the TPF performs the corresponding operations according to the charging rules operation instructions and the charging rules determined by the CRF.

Step **605**: the TPF makes the collection for the charging data information of the UE according to the offline charging indication and the filter information in the charging rules, and then sends the collected charging data information of the UE to the corresponding OFCS according to the OFCS address information.

A system for improving service data flow based charging is also provided, which includes: a CRF, a TPF and a charging system, wherein the CRF provides the TPF with the address information of the charging system.

The charging system may be an OCS or an OFCS.

After the CRF provides the TPF with the address information, the TPF may request the credit information from the OCS according to the address information, and the OCS may provide the TPF with the credit information.

The CRF may provide the TPF with the address information of a plurality of OCSs and selection priorities corresponding to the OCSs; the TPF may first request the credit information from the OCS with a highest selection priority, if not succeed, request the credit information from the next OCS in the descending order of the selection priority levels until succeeds.

After the CRF provides the TPF with the address information, the TPF may send the collected charging data information of the UE to the OFCS according to the address information.

The CRF may provide the TPF with the address information of a plurality of OFCSs and the selection priorities cor-

12

responding to the OFCSs; the TPF may first send the collected charging data information of the UE to the OFCS with a highest selection priority, if not succeed, send the collected charging data information of the UE to the next OFCS in the descending order of the selection priority levels until succeeds.

The description above is the preferred embodiments rather than limitation of the present invention, any changes and modifications can be made by those skilled in the art without departing from the spirit and scope of the present invention and therefore will be protected by the scope as the set by the appended claims.

What is claimed is:

**1**. A method for improving service data flow based charging in a communications network, comprising:
   a Charging Rules Function (CRF) determining a charging method and charging rules in response to a service request or other trigger event, and
   the CRF providing a Traffic Plane Function (TPF) with the charging rules and address information of a charging system.

**2**. The method according to claim **1**, wherein the charging system is an Online Charging System (OCS).

**3**. The method according to claim **2**, after the CRF providing the TPF with the address information, further comprising:
   the TPF requesting the credit information from the OCS according to the address information; and the OCS providing the TPF with the credit information.

**4**. The method according to claim **2**, wherein
   the CRF provides the TPF with the address information of a plurality of OCSs and selection priorities corresponding to the OCSs;
   the TPF first requests the credit information from the OCS with a highest selection priority, if not succeed, requests the credit information from the next OCS in the descending order of the selection priority levels until succeeds.

**5**. The method according to claim **3**, wherein the address information is empty, the TPF requests the credit information from an OCS according to pre-configured OCS address information.

**6**. The method according to claim **2**, wherein the address information of the OCS is configured in the CRF.

**7**. The method according to claim **2**, further comprising:
   the CRF obtaining the address information of the OCS by the interacting with other network entity before the CRF providing the TPF with the address information.

**8**. The method according to claim **1**, wherein the charging system is an Offline Charging System (OFCS).

**9**. The method according to claim **8**, further comprising;
   the TPF sending collected charging data information of the UE to the OFCS according to the address information.

**10**. The method according to claim **8**, wherein
   the CRF provides the TPF with the address information of a plurality of OFCSs and the selection priorities corresponding to the OFCSs;
   the TPF first sends the collected charging data information of the UE to the OFCS with a highest selection priority, if not succeed, sends the collected charging data information of the UE to the next OFCS in the descending order of the selection priority levels until succeeds.

**11**. The method according to claim **8**, wherein the address information of the OFCS is empty, the TPF sends the collected charging data information of the UE to an OFCS according to pre-configured OFCS address information.

**12**. The method according to claim **8**, wherein the address information of the OFCS is configured in the CRF.

US 8,798,575 B2

13

**13**. The method according to claim **8**, further comprising: the CRF obtaining the address information of the OFCS by the interacting with other network entity before the CRF providing the TPF with the address information.

**14**. The method according to claim **7**, wherein the network entity is a Home Location Register (HLR) or Home Subscriber Server (HSS).

**15**. The method according to claim **13**, wherein the network entity is an HLR or HSS.

**16**. A system for improving service data flow based charging in a communications network, comprising:

a Charging Rules Function (CRF), a Traffic Plane Function (TPF) and a charging system;

wherein the CRF is configured to determine a charging method and charging rules in response to a service request or other trigger event and to provide the TPF with the charging rules and address information of the charging system.

**17**. The system according to claim **16**, wherein the charging system is an Online Charging System (OCS);

after the CRF provides the TPF with the address information, the TPF requests the credit information from the OCS according to the address information, and the OCS provides the TPF with the credit information.

**18**. The system according to claim **16**, wherein the charging system is an OCS;

14

the CRF provides the TPF with the address information of a plurality of OCSs and selection priorities corresponding to the OCSs; the TPF first requests the credit information from the OCS with a highest selection priority, if not succeed, requests the credit information from the next OCS in the descending order of the selection priority levels until succeeds.

**19**. The system according to claim **16**, wherein the charging system is an Offline Charging System (OFCS);

after the CRF provides the TPF with the address information, the TPF sends the collected charging data information of the UE to the OFCS according to the address information.

**20**. The system according to claim **16**, wherein the charging system is an OFCS;

the CRF provides the TPF with the address information of a plurality of OFCSs and the selection priorities corresponding to the OFCSs; the TPF first sends the collected charging data information of the UE to the OFCS with a highest selection priority, if not succeed, sends the collected charging data information of the UE to the next OFCS in the descending order of the selection priority levels until succeeds.

\* \* \* \* \*

# EXHIBIT 4



US009838851B2

(12) **United States Patent** (10) Patent No.: **US 9,838,851 B2**
Huang et al. (45) Date of Patent: *Dec. 5, 2017

(54) **SUBFRAME PROCESSING METHOD AND DEVICE**

(71) Applicant: **HUAWEI TECHNOLOGIES CO.,LTD.**, Shenzhen, Guangdong (CN)

(72) Inventors: **Qufang Huang**, Shanghai (CN); **Wenji Liu**, Shanghai (CN); **Qinghai Zeng**, Shanghai (CN)

(73) Assignee: **HUAWEI TECHNOLOGIES CO., LTD.**, Shenzhen (CN)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 202 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/321,550**

(22) Filed: **Jul. 1, 2014**

(65) **Prior Publication Data**

US 2014/0313968 A1     Oct. 23, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/433,876, filed on Mar. 29, 2012, which is a continuation of application No. PCT/CN2010/077371, filed on Sep. 27, 2010.

(30) **Foreign Application Priority Data**

Sep. 29, 2009    (CN) .......................... 2009 1 0110717

(51) **Int. Cl.**
*H04W 72/12* (2009.01)
*H04W 4/06* (2009.01)
*H04W 72/00* (2009.01)

(52) **U.S. Cl.**
CPC ........... *H04W 4/06* (2013.01); *H04W 72/005* (2013.01); *H04W 72/1289* (2013.01)

(58) **Field of Classification Search**
CPC .. H04W 72/004; H04W 4/06; H04W 72/1289
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2005/0129042 A1    6/2005 Muhonen et al.
2006/0088023 A1    4/2006 Muller
(Continued)

FOREIGN PATENT DOCUMENTS

CN     101247544 A     8/2008
CN     101931881 A     12/2010
(Continued)

OTHER PUBLICATIONS

ETSI TS 136 300 V8.9.0; LTE; Evolved Universal Terrestrial Radio Access(E-UTRA) and Evolved Universal Terrestrial Radio Access Network(E-UTRAN); Overall description; Stage 2; (3GPP TS 36.300 version 8.9.0 Release 8); Jul. 2009; total 164 pages.

(Continued)

*Primary Examiner* — Luat Phung
(74) *Attorney, Agent, or Firm* — Huawei Technologies Co., Ltd.

(57) **ABSTRACT**

A subframe processing method and device are disclosed. The subframe processing method includes: if data packets that are not received by an evolved NodeB (eNB) include at least two consecutive Multimedia Broadcast Multicast Service (MBMS) data packets to be scheduled in a Dynamic Schedule Period (DSP) by the eNB, setting a subframe of the eNB that is used to transmit Dynamic Schedule Information (DSI) corresponding to the DSP to null. When the eNB finds that consecutive MBMS data packets are lost and/or that a type 0 Protocol Data Unit (PDU) group is lost, a subframe used to transmit the DSI may be set to null, thereby preventing the eNB from transmitting incorrect DSI which

(Continued)



# US 9,838,851 B2
Page 2

may interfere with other eNBs and cause incorrect data receiving of a user equipment (UE).

**8 Claims, 3 Drawing Sheets**

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2010/0027455 A1* | 2/2010 | Wang | H04W 72/005 |
| | | | 370/312 |
| 2010/0195558 A1 | 8/2010 | Koskinen | |
| 2011/0044225 A1* | 2/2011 | Rinne | H04W 72/005 |
| | | | 370/312 |
| 2011/0188436 A1* | 8/2011 | Damnjanovic | H04W 72/005 |
| | | | 370/312 |
| 2012/0182923 A1 | 7/2012 | Huang et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2008137786 A1 | 11/2008 |
| WO | 2008155332 A2 | 12/2008 |

OTHER PUBLICATIONS

3GPP TSG-RAN3 Meeting #66; R3-093331; CR on Mechanism for Consecutive Packet Loss in 36.300; CMCC, ZTE, Alcatel-Lucent Shanghai Bell, Alcatel-Lucent, CATT, Huawei, New Postcom, Samsung; Jeju, Korea, 9th-13th 2009; total 4 pages.
3GPP TS 36.300 V8.3.0; 3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Evolved Universal Terrestrial Radio Access(E-UTRA) and Evolved Universal Terrestrial Radio Access Network (E-UTRAN); Overall description; Stage 2; (Release 8); Dec. 2007; total 120 pages.
3GPP TSG-RAN WG2 Meeting #68; R2-096534; Muting DSI; Huawei;Work item code: MBMS_LTE; Nov. 9-13, 2009, Jeju, Korea; total 3 pages.
3GPP TSG-RAN WG2 Meeting #68bis; R2-100211; Agenda item: 6.3.1; Nokia Corporation, Nokia Siemens Networks; Uncaptured agreements on muting the DSI; Valencia, Spain, Jan. 18-22, 2010; total 3 pages.
3GPP TS 23.246 V9.1.0; 3rd Generation Partnership Project; Technical Specification Group Services and Architecture; Multimedia Broadcast/Multicast Service (MBMS); Architecture and functional description (Release 9); Jun. 2009; total 61 pages.
3GPP TS 25.346 V8.3.0; 3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Introduction of the Multimedia Broadcast Multicast Service (MBMS) in the Radio Access Network (RAN); Stage 2 (Release 8); Mar. 2009; total 71 pages.
3GPP TSG-RAN WG3 Meeting #65 R3-091749, "SYNC protocol for LTE", Huawei, Aug. 24-28, 2009, total 9 pages.
3GPP TSG-RAN WG3 Meeting #65 R3-091917, "Uniform packet dropping in LTE MBSFN transmission", Nokia Siemens Networks, Nokia Corporation, Aug. 24-28, 2009, total 3 pages.

* cited by examiner



FIG. 1

FIG. 2





FIG. 5



FIG. 6

US 9,838,851 B2

1

# SUBFRAME PROCESSING METHOD AND DEVICE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 13/433,876, filed on Mar. 29, 2012, which is a continuation of International Application No. PCT/CN2010/077371, filed on Sep. 27, 2010. The International Application claims priority to Chinese Patent Application No. 200910110717.0, filed on Sep. 29, 2009. All of the aforementioned patent applications are hereby incorporated by reference in their entireties.

## FIELD OF THE INVENTION

The present invention relates to the field of mobile communications technologies, and in particular, to a subframe processing method and device.

## BACKGROUND OF THE INVENTION

In a long term evolution (LTE) system, Multimedia Broadcast Multicast Service (MBMS) data may be transmitted in MBMS Single Frequency Network (MBSFN) mode. That is, multiple evolved NodeBs (eNBs) transmit radio signals carrying the same MBMS data with the same frequency at the same time from multiple cells. An area covered by the multiple eNBs that transmit the MBMS data in MBSFN mode is called an MBSFN area. User equipments (UEs) in the MBSFN area may consider that only one transmitter is transmitting radio signals and receive the MBMS data.

Data transmitted by the eNBs in the MBSFN area is the same, and the physical resources used are the same. That is, information of each eNB is synchronous. For example, a synchronization (SYNC) entity is set on the broadcast multicast-service center (BM-SC) side on the core network (CN) and an SYNC entity is set on the eNB side. The SYNC entity on the BS-SC side sets a time stamp for various MBMS data packets and provides the time stamp for all eNBs in the MBSFN area. Specifically, the BM-SC may include multiple MBMS data packets in a synchronization sequence. The SYNC entity on the BM-SC side sets the same time stamp for MBMS data packets in a synchronization sequence and transmits a type 0 control packet (namely, a type 0 Protocol Data Unit (PDU), hereinafter referred to as a type 0 PDU) after the BM-SC transmits the synchronization sequence. The type 0 PDU is used to notify the eNBs of transmission completion of the current synchronization sequence. To improve the reliability, the SYNC entity on the BM-SC side transmits a type 0 PDU group but not merely a type 0 PDU. The type 0 PDU group includes all type 0 PDUs that include the same information and are transmitted repeatedly. For example, after a synchronization sequence is transmitted, a type 0 PDU is transmitted consecutive three times. The three type 0 PDUs form one type 0 PDU group.

When receiving the MBMS data, eNB determines the time when the BM-SC starts to transmit the synchronization sequence according to the time stamp obtained by the SYNC entity on the eNB side, and determines reception completion of the synchronization sequence according to the type 0 PDU. The eNB transmits the received MBMS data packets according to the time stamp of the received MBMS data packets.

2

If the eNBs in the MBSFN area have buffered all MBMS data packets to be transmitted in a Dynamic Schedule Period (DSP) before the DSP, the eNBs can generate the same Dynamic Schedule Information (DSI) to implement the same dynamic scheduling for the same MBMS data packets. For example, the eNBs have buffered all the MBMS data packets to be transmitted in the DSP before the DSP. The eNBs determine the time for transmitting the MBMS data packets, and then generate DSI corresponding to the DSP to indicate scheduling of the DSP, for example, the start positions of data packets of different services in the DSP. In a first MBSFN subframe on a multicast channel (MCH), the eNBs transmit the DSI of the corresponding transmission channel in the DSP and transmit the data packets according to the scheduling result. A UE at the receiving end receives the DSI, knows eNB scheduling according to the DSI, and thus selects the time when the eNBs transmit data that is interesting to the UE to receive data.

In evolved MBMS, air interface resources of the MBSFN service are reserved in advance in a manner of semi-persistent scheduling. A reserved subframe that is used to transmit MBSN data is called an MBSFN subframe. To meet different quality of service (QoS) requirements of different MBSFN services, the evolved MBMS maps the MBSFN services to different MCHs, and the different MCHs adopt different Modulation Coding Schemes (MCSs) to achieve different QoS. Different MCHs do not share a reserved MBSFN subframe. To reduce scheduling overheads, the eNBs perform air-interface transmission scheduling for MBMS data in each DSP. The eNBs only schedule MB SFN data of which time stamp is earlier than the start time of the corresponding DSP. Generally, the eNBs schedule the corresponding MBSFN data in one DSP that is later than the time stamp.

In the prior art, transmission between a BS-SC and an eNB is based on the Internet Protocol (IP), which may cause loss of MBMS data packets or a type 0 PDU. If an eNB in an MBSFN area cannot normally receive at least two consecutive MBMS data packets in a synchronization sequence or all type 0 PDUs that indicate transmission completion of a synchronization sequence, the eNB generates incorrect DSI, which may interfere with other eNBs and cause incorrect data receiving of the UE.

## SUMMARY OF THE INVENTION

Embodiments of the present invention provide a subframe processing method and device.

A subframe processing method is provided, where the method includes:

if data packets that are not received by an eNB include at least two consecutive MBMS data packets to be scheduled by the eNB in a DSP, setting, by the eNB, a subframe that is used to transmit DSI corresponding to the DSP to null.

Another subframe processing method is provided, where the method includes:

if an eNB does not receive a type 0 control packet group, setting, by the eNB, a subframe that is used to transmit DSI corresponding to a DSP to null, in which the DSP is used to transmit MBMS data packets corresponding to the type 0 control packet group.

A subframe processing device is provided, where the device includes:

a first receiving unit, configured to determine whether data packets that are not received meet a first condition: the data packets that are not received include at least

US 9,838,851 B2

3

two consecutive MBMS data packets to be scheduled by a first sending unit in a DSP; and

the first sending unit, configured to set a subframe that is used to transmit DSI corresponding to the DSP to null when the determination result of the first receiving unit is yes.

Another subframe processing device is provided, where the device includes:

a second receiving unit, configured to determine that a type 0 control packet group is not received; and

a second sending unit, configured to set a subframe that is used to transmit DSI corresponding to a DSP to null when the determination result of the second receiving unit is yes, in which the DSP is used to transmit MBMS data packets corresponding to the type 0 control packet group.

In embodiments of the present invention, when an access network (AN) device (such as an eNB) finds that consecutive MBMS data packets are lost and/or a type 0 PDU group is lost, a subframe that is used to transmit DSI may be null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of a UE.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic flow chart of a subframe processing method according to an embodiment of the present invention;

FIG. 2 is a schematic diagram of a synchronization sequence transmitted by a BM-SC according to an embodiment of the present invention;

FIG. 3 is a schematic flow chart of another subframe processing method according to an embodiment of the present invention;

FIG. 4 is a schematic diagram of another synchronization sequence transmitted by a BM-SC according to an embodiment of the present invention;

FIG. 5 is a schematic diagram of a subframe processing device according to an embodiment of the present invention; and

FIG. 6 is a schematic diagram of another subframe processing device according to an embodiment of the present invention.

DETAILED DESCRIPTION OF THE EMBODIMENTS

The technical solution of the present invention will be clearly and completely described in the following with reference to the accompanying drawings. It is obvious that the embodiments to be described below are only a part rather than all the embodiments of the present invention. All other embodiments obtained by persons or ordinary skill in the art based on the embodiments of the present invention without any creative effort shall fall within the protection scope of the present invention.

An embodiment of the present invention provides a subframe processing method. According to the method, if data packets that are not received by an eNB include at least two consecutive MBMS data packets to be scheduled by the eNB in a DSP, the eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of a UE.

Another embodiment of the present invention provides a subframe processing method, as shown in FIG. 1. An eNB

4

is located in an AN; a BM-SC is located in a CN; an SYNC entity on the BM-SC side may be an independent entity that is located on the CN and is able to communicate with the BM-SC, a part of the independent entity, or a unit inside a BM-SC device. The method includes the following steps.

Step 110: The BM-SC transmits MBMS data packets to the eNB.

For example, the BM-SC transmits a synchronization sequence, which includes multiple MBMS data packets, to the eNB. Generally, MBMS data packets in one synchronization sequence belong to one MBMS service. Besides, MBMS data packets in one synchronization sequence may belong to multiple MBMS services. The SYNC entity on the BM-SC side sets the same time stamp for each MBMS data packet in the synchronization sequence, and then transmits a type 0 PDU after the BM-SC transmits all MBMS data packets in the synchronization sequence.

Further, header information of the MBMS data packets may include a "total number of octet", which indicates the total amount of data transmitted by a data source in a certain period of time. Similar to the prior art, the value of the field of "total number of octet" monotonically increases in a certain time for data of a service. The header information of the MBMS data packets may further include a "total number of packet", which indicates the total amount of packets transmitted by a data source in a certain period of time. The data source refers to the BM-SC in this embodiment.

As shown in FIG. 2, assume that four consecutive MBMS data packets transmitted by the BM-SC to the eNB are A, B, C, and D. Lengths of A, B, C, and D are 100 bytes, 50 bytes, 150 bytes, and 100 bytes respectively. The values of the "total number of octet" information in the headers of the corresponding data packets are 100 bytes, 150 bytes, 300 bytes, and 400 bytes respectively. For example, the value of the "total number of octet" in the header of D indicates the total number of octets of D and the previous MBMS data packets, namely, 400 (100+50+150+100=400) bytes. Header information of A, B, C, and D further include total number of packet information (not shown in FIG. 2), of which values are 1, 2, 3, and 4 respectively. For example, the value of the total number of packet in the header of D indicates the total number of packets, which include D and the previous MBMS data packets, that are transmitted by the BM-SC, namely, 4.

Step 120: The eNB receives the MBMS data packets that are transmitted by the BM-SC, and determines whether the following case occurs: at least two consecutive MBMS data packets to be scheduled in a DSP are lost. If at least two consecutive MBMS data packets to be scheduled in a DSP are lost, the process proceeds to step 130; and if not at least two consecutive MBMS data packets to be scheduled in a DSP are lost, the process proceeds to step 140.

The preceding case determined by the eNB whether occurs may also be described as follows. At least two consecutive MBMS data packets to be scheduled in a DSP do not reach the eNB, that is, at least two consecutive MBMS data packets to be scheduled in a DSP are not received by the eNB.

For example, according to SYNC header information of the received MBMS data packets, the eNB determines whether consecutive data packets are lost and whether the consecutively lost data packets are supposed to be scheduled in the same DSP. The eNB may implement the operation according to the prior art.

As shown in FIG. 2, assume that two consecutive DSPs in which the eNB schedules MBMS data packets are DSP1 and DSP2 respectively. The start time of DSP1 is T1, and the

US 9,838,851 B2

5

start time of DSP2 that is later than DSP1 is T2. MBMS data packets shown in FIG. 2 are included in a synchronization sequence, that is, the MBMS data packets have the same time stamp. Assume that the time indicated in the time stamp is T0. In step 120, if the eNB determines that T0 is between T1 and T2, that is, T0 is later than T1 and earlier than T2, the eNB determines that it should schedule the MBMS data packets A, B, C, and D in DSP2.

Further, assume that the eNB receives only A and D, the eNB can buffer A and D. According to the total number of octets 100 in the header of A, total number of octets 400 in the header of D, and data packet length 100 of D, the eNB may determine that MBMS data of 200 (400−100−100=200) bytes is the lost data that should have been received by the eNB but does not reach the eNB. According to the total number of packets 1 in the header of A and the total number of packets 4 in the header of D, the eNB may determine that two MBMS data packets with the total number of packets 2 and 3 in the headers exist between A and D. Through the preceding process, the eNB may determine that two consecutive MBMS data packets (B and C) are lost. It should be noted that the eNB can only determine loss of data packets and the number of the lost data packets, and cannot determine the length of each lost data packet. Therefore, if the eNB predicts the length of each MBMS data packet and generates DSI according to the prior art, the DSI may be incorrect and may be different from DSI generated by other eNBs in other MBSFN areas. Consequently, the incorrect DSI interferes with other eNBs, and a UE may incorrectly receive data or even cannot receive data.

In the preceding process, according to the SYNC header information of the received MBMS data packets, the eNB determines that consecutive data packets are lost and the MBMS data packets that are not received are supposed to be scheduled in a DSP. The process proceeds to step 130.

Step 130: The eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null.

For example, the eNB keeps mute in a subframe, the subframe being supposed to be used to transmit the DSI corresponding to the DSP. For another example, the eNB first determines whether to generate complete DSI corresponding to the DSP, and if it is determined not to generate the complete DSI corresponding to the DSP, the eNB keeps mute in a subframe, the subframe being supposed to be used to transmit the DSI corresponding to the DSP.

This step in which the eNB sets a subframe that is used to transmit the DSI corresponding to the DSP to null may also be described as follows. The eNB does not transmit any information when the eNB should transmit a subframe that carries the DSI. The DSI that should be generated is used to instruct the eNB how to dynamically schedule the MBMS data that is supposed to be transmitted in the DSP.

It should be noted that a subframe that is supposed to be used to transmit the DSI corresponding to a DSP in the embodiment of the present invention refers to a subframe X in a DSP (for example, a first subframe in a DSP). If the eNB generates DSI, the eNB is to transmit the DSI in the subframe X. In the embodiment of the present invention, the eNB does not generate DSI when the eNB determines that the data packets that are not received meet a given condition (for example, step 120). Therefore, the eNB keeps mute in the subframe X.

In this step, the eNB may transmit the MBMS data packets in the DSP. In details, if other MBMS data packets that have been received by the eNB and are to be scheduled in the DSP exist, the eNB may transmit the other MBMS data packets in other subframes in the DSP. Optionally, if a

6

subframe that is supposed to be used to transmit the DSI corresponding to the DSP is the first subframe of the DSP, the other subframes may be after the subframe that is supposed to be used to transmit the DSI corresponding to the DSP. If a subframe that is supposed to be used to transmit the DSI corresponding to the DSP is not the first subframe of the DSP, the other subframes may be before or after the subframe that is supposed to be used to transmit the DSI corresponding to the DSP. Optionally, other MBMS data packets may include: MBMS data packets of which time of transmission by the BM-SC is earlier than the time of transmission of the determined lost consecutive MBMS data packets by the BM-SC, and which belong to the same service as the determined lost consecutive MBMS data packets; and/or MBMS data packets of other services that are supposed to be scheduled before the eNB schedules a service of the determined lost consecutive MBMS data packets. In the latter case, the other MBMS data packets belong to a service different from that of the lost consecutive MBMS data packets. The time of transmission of the other MBMS data packets by the BM-SC may not be earlier than the time of transmission of the determined lost consecutive MBMS data packets by the BM-SC.

As shown in FIG. 2, the eNB has received A in step 120. According to header information of the received MBMS data packets, the eNB can know that the time when the BM-SC transmits A is earlier than the time when the BM-SC transmits the lost consecutive data packets (B and C). In addition, the eNB has also received D. The time when the BM-SC transmits D is later than the time when the BM-SC transmits the lost consecutive data packets. Therefore, in the DSP, the eNB can use a subframe after a null subframe that is supposed to be used to transmit the DSI to transmit A. The eNB can only determine the number and the total length of the lost data packets, but cannot determine the length of each lost data packet (B and C). Therefore, the eNB cannot determine the transmission position of each lost data packet and cannot determine the transmission position of D that is transmitted later than the lost data packets. As a result, the eNB cannot transmit D even when the eNB has received D.

Assume that the eNB transmits A in a manner of dynamic scheduling according to the prior art. Accordingly, a UE can read all information in the DSP when the UE does not receive the DSI corresponding to the DSP. The UE can read MBMS data packet A. Compared with the method in which the eNB transmits no data packet or transmits incorrect DSI, the method according to this embodiment enables the UE to receive more data, and enables the eNB to transmit data more efficiently.

Optionally, assume that the DSP includes a subframe being supposed to be used to transmit the DSI, other subframes that are used to transmit other MBMS data packets, and remaining subframes, the eNB may keep mute in the remaining subframes after transmitting the other MBMS data packets in the DSP. It should be noted that the subframes that form the DSP are subframes of an MCH reserved by the eNB for transmitting the MBMS data packets, and "the eNB keeps mute in the remaining subframes of the DSP" means that the eNB does not transmit any information on an MCH that is used to transmit MBMS data packets in the remaining subframes.

It is understandable by persons of ordinary skill in the art that the eNB may transmit non-MBMS data packets in the remaining subframes. These non-MBMS data packets occupy non-MCHs. For example, the eNB may transmit unicast data packets at low power in the remaining subframes. These unicast data packets are carried on a dedicated

US 9,838,851 B2

7

traffic channel (DTCH). The occupied transmission channel is a downlink shared channel (DL-SCH).

Step **140**: The eNB generates and transmits the DSI corresponding to the DSP.

In this step, the eNB can generate and transmit the DSI according to the prior art. After transmitting a subframe that carries the DSI, the eNB transmits the received MBMS data packets.

In this embodiment, the eNB may first determine whether data packets that are not received meet a given condition. For example, the eNB determines whether the data packets that are not received include at least two consecutive MBMS data packets to be scheduled by the eNB in a DSP. If the given condition is met, the eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of the UE.

Another embodiment of the present invention provides a subframe processing method. In this embodiment, if an eNB does not receive a type 0 control packet group, that is, data packets that are not received by the eNB include a type 0 control packet group, the eNB sets a subframe that is used to transmit DSI corresponding to a DSP to null. The DSP is used to transmit MBMS data packets corresponding to the type 0 control packet group. This method can prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of a UE.

Another embodiment of the present invention provides a subframe processing method, as shown in FIG. **3**. An eNB is located on an AN; a BM-SC is located on a CN; an SYNC entity on the BM-SC side may be an independent entity that is located on the CN and can communicate with the BM-SC, a part of the independent entity, or a unit inside a BM-SC device. The method includes the following steps.

Step **310**: The BM-SC transmits a synchronization sequence formed of MBMS data packets and the corresponding type 0 PDU group to the eNB.

As shown in FIG. **4**, the BM-SC transmits four synchronization sequences E, F, G, and H to the eNB. Each synchronization sequence includes several MBMS data packets. The number of the MBMS data packets included in each synchronization sequence may be the same or different. This embodiment does not restrict that the MBMS data packets in a synchronization sequence belong to one or more MBMS services. This embodiment does not restrict whether the MBMS data packets in a synchronization sequence are empty. For example, MBMS data packets in G are empty, or G does not contain any MBMS data.

In this step, the SYNC entity on the BM-SC side sets a time stamp for each MBMS data packet in each synchronization sequence. After transmitting all MBMS data packets in a synchronization sequence, the BM-SC transmits a type 0 PDU group corresponding to the synchronization sequence. Each type 0 PDU group that corresponds to a synchronization sequence may include multiple type 0 PDUs. The type 0 PDUs may have the same information and may have the same time stamp as the MBMS data packets in the corresponding synchronization sequence. Type 0 PDUs that are repeatedly transmitted by the BM-SC may form a type 0 PDU group.

As shown in FIG. **4**, a type 0 PDU group corresponding to each synchronization sequence includes three type 0 PDUs, which are marked as 1, 2, and 3 according to the sequence in each type 0 PDU group. Optionally, a type 0 PDU in a type 0 PDU group corresponding to synchronization sequence E may carry a time stamp. The time stamp is

8

the same as the time stamp of the MBMS data in synchronization sequence E. Assume that the time stamp is Te. MBMS data packets in synchronization sequence G are null, that is, G does not include MBMS data. A type 0 PDU in a type 0 PDU group corresponding to synchronization sequence G may carry a time stamp, and the time stamp may be a value in the time range of synchronization sequence H. Assume that the time stamp is Tg. In addition, assume that the time indicated by a time stamp of MBMS data packets in synchronization sequence F and the time indicated by a time stamp of MBMS data packets in synchronization sequence H are Tf and Th respectively. Header information of each MBMS data packet is not illustrated in FIG. **4**.

Further, the header information of the MBMS data packets may further include the total number of octets and the total number of packets. The header information is similar to the header information in other embodiments of the present invention, and is not described here.

Step **320**: The eNB receives the synchronization sequence transmitted by the BM-SC and determines whether the following case occurs: one type 0 PDU group is lost. If one type 0 PDU group is lost, the process proceeds to step **330**; and if no one type 0 PDU group is lost, the process proceeds to step **340**.

The preceding case may also be described as follows. A type 0 PDU group corresponding to a synchronization sequence that is received or not received by the eNB does not reach the eNB, that is, all type 0 PDUs in the type 0 group are not received by the eNB. A synchronization sequence may include multiple MBMS data packets. Time stamps of MBMS data packets in a synchronization sequence are the same, that is, multiple MBMS data packets in a synchronization sequence correspond to a type 0 PDU group, which means, each MBMS data packet has a unique type 0 PDU group. The preceding case the eNB determines whether occurs may also be described as follows. A type 0 PDU group corresponding to MBMS data packets that are received or not received by the eNB does not reach the eNB, that is, all type 0 PDUs in the type 0 group are not received by the eNB.

It should be noted that the subframe processing method provided by this embodiment is applicable to various scenarios where an eNB may determine loss of a type 0 PDU group. In details, if a type 0 PDU group is lost, an eNB may determine the type 0 PDU group that should reach the eNB but is not received by the eNB according to information related to the received MBMS data packets such as a time stamp, the total number of octets, or the total number of packets, regardless of whether all or part of synchronization sequences corresponding to the type 0 PDU group are received by the eNB, or synchronization sequences corresponding to the type 0 PDU group are empty. Therefore, the subframe processing method provided by this embodiment is applicable to various scenarios.

In this embodiment, assume that two consecutive DSPs in which the eNB schedules MBMS data packets are DSP**3** and DSP**4** respectively. The start time of DSP**3** is T**3**, and the start time of DSP**4** that is later than DSP**3** is T**4**.

As shown in FIG. **4**, in step **320**, if the eNB determines that Te, Tf, Tg, and Th are between T**3** and T**4**, that is, Te, Tf, Tg, and Th are later than T**3** and earlier than T**4**, the eNB determines that the eNB should schedule the MBMS data packets in E, F, and H in DSP**4**.

Further, the eNB may determine a range of time stamp in which each synchronization sequence is supposed to be received according to the pre-configuration. Therefore, if the eNB does not receive any type 0 PDU and the time stamp is

US 9,838,851 B2

9 10

in a range of time stamp determined according to the pre-configuration, it is determined that a type 0 PDU group is lost. If information of at least one type 0 PDU group in the preceding four type 0 PDU groups is lost, the process proceeds to step **330**.

As shown in FIG. **4**, the eNB does not receive a first type 0 PDU, a second type 0 PDU, and a third type 0 PDU corresponding to F; therefore, the eNB cannot determine the time of transmission completion of data packets in synchronization sequence F even when the eNB receives synchronization sequence F. If the eNB predicts the time of transmission completion of data packets in the synchronization sequence according to the prior art, the time is inaccurate. Therefore, DSI generated by the eNB according to the prediction result is inaccurate, and is different from DSI generated by other eNBs in other MBSFN areas. Consequently, the incorrect DSI interferes with other eNBs, and a UE may incorrectly receive data or even cannot receive data. In this embodiment, after the eNB determines that all information in a type 0 PDU group corresponding to F is lost, the process proceeds to step **330**.

If at least one type 0 PDU in each type 0 PDU group in the preceding four type 0 PDU groups is received by the eNB, the eNB may determine the time of transmission completion of each synchronization sequence. The process proceeds to step **340**.

Step **330**: The eNB sets a subframe that is used to transmit DSI corresponding to a DSP to null. The DSP is used to transmit MBMS data packets corresponding to a type 0 PDU group or MBMS data packets in a synchronization sequence that are not received by the eNB.

For example, the eNB keeps mute in a subframe, the subframe being supposed to be used to transmit DSI corresponding to the DSP. Further, for example, the eNB first determines whether to generate complete DSI corresponding to the DSP. If it is determined not to generate the complete DSI corresponding to the DSP, the eNB keeps mute in a subframe, the subframe being supposed to be used to transmit the DSI corresponding to the DSP.

This step in which the eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null may also be described as follows. The eNB does not transmit any information when the eNB should transmit a subframe that carries the DSI. The DSI that should be generated is used to instruct the eNB how to dynamically schedule MBMS data that is supposed to be transmitted in the DSP.

In this step, the eNB may transmit MBMS data packets in the DSP. In details, if other MBMS data packets that have been received by the eNB and are to be scheduled in the DSP exist, the eNB may transmit the other MBMS data packets in other subframes in the DSP. Optionally, the other MBMS data packets may include MBMS data packets of which time of transmission by the CN device BM-SC is earlier than the end time of a synchronization sequence corresponding to a lost type 0 PDU group; and/or MBMS data packets that are supposed to be scheduled by the eNB before the eNB schedules a service of MBMS data packets corresponding to a lost type 0 PDU group, and which belong to a service different from that of the MBMS data packets corresponding to the lost type 0 PDU group.

As shown in FIG. **4**, the eNB has received synchronization sequence E in step **320**, and MBMS data packets in E are to be scheduled in the DSP. In addition, according to header information of the received MBMS data packets, the eNB can know that the time of transmission of E by the BM-SC is earlier than the time of transmission of the synchronization sequence (F) corresponding to the lost type

0 PDU group. Therefore, in the DSP, in subframes after the null subframe that is supposed to be used to transmit DSI, the eNB may transmit the received MBMS data packets in synchronization sequence E. If the eNB does not receive the type 0 PDU group corresponding to synchronization sequence F, but receives some MBMS data packets in synchronization sequence F, the eNB may transmit the received MBMS data packets in synchronization sequence F after transmitting MBMS data packets in E. The eNB cannot determine whether transmission of F is completed, so the eNB cannot determine the transmission positions of MBMS data packets in G and H in the DSP even when the eNB receives synchronization sequences G and H transmitted by the BM-SC. Therefore, the eNB does not transmit the received MBMS data packets in G and H. Further, assume that the eNB transmits E in a manner of dynamic scheduling according to the prior art. Accordingly, a UE can read all information in the DSP when the UE does not receive the DSI corresponding to the DSP. The UE can read MBMS data packets in E. Compared with the method in which the eNB transmits no data packet or transmits incorrect DSI, the method provided by this embodiment enables the UE to receive more data, and enables the eNB to transmit data more efficiently.

Further, assume that the DSP includes a subframe that is supposed to be used to transmit DSI, other subframes that are used to transmit the other MBMS data packets, and remaining subframes, the eNB may keep mute in the remaining subframes after transmitting the other MBMS data packets in the DSP. It should be noted that the subframes that form the DSP are subframes of an MCH reserved by the eNB for transmitting MBMS data packets, and "the eNB may keep mute in the remaining subframes" means that the eNB does not transmit any information on an MCH that is used to transmit MBMS data packets corresponding to the lost type 0 control packet group in the remaining subframes.

It is understandable by persons of ordinary skill in the art that the eNB may transmit non-MBMS data packets in the remaining subframes. The non-MBMS data packets occupy non-MCHs. For example, the eNB may transmit unicast data packets at low power in the remaining subframes. The unicast data packets are carried on a DTCH. The occupied transmission channel is a DL-SCH.

Step **340**: The eNB generates and transmits the DSI corresponding to the DSP.

In this step, the eNB can generate and transmit the DSI according to the prior art. After transmitting a subframe that carries the DSI, the eNB transmits the received MBMS data packets.

In this embodiment, the eNB may first determine whether data packets that are not received meet a given condition. For example, the eNB determines whether data packets that are not received by the eNB include a type 0 PDU group corresponding to one or more MBMS data packets. If the given condition is met, the eNB sets a subframe that is used to transmit the DSI corresponding to the DSP to null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of the UE.

The two subframe processing methods provided by the aforementioned embodiments of the present invention may be combined to form another embodiment of the present invention. In the embodiment of the present invention, an eNB may first determine whether data packets that are not received meet a given condition. That is, the eNB determines whether data packets that are not received include two consecutive MBMS data packets to be scheduled by the eNB

US 9,838,851 B2

11

in a DSP and a type 0 PDU group corresponding to one or more MBMS data packets. The one or more MBMS data packets may be MBMS data packets that have been or have not been received by the eNB. If the given condition is met, the eNB sets a subframe that is used to transmit DSI corresponding to the DSP to null to prevent the eNB from transmitting incorrect DSI which may interfere with other eNBs and cause incorrect data receiving of a UE. In the embodiment of the present invention, the method for the eNB to determining whether data packets that are not received meet the given condition is the same as the method described in the aforementioned embodiments of the present invention, and is not described here.

In the subframe processing methods provided by the aforementioned embodiments of the present invention, the eNB is an AN device, and the BM-SC is a CN device, but the eNB device and the BM-SC device are not limited to an AN device and a CN device in embodiments of the present invention. For example, the eNB in the aforementioned embodiments of the present invention may be replaced by other devices such as a home NodeB (hNB), a microcell NodeB, or other devices on the AN in an LTE+ system; and the BM-SC may be replaced by other devices on the CN.

As shown in FIG. 5, an embodiment of the present invention further provides a subframe processing device, namely, a first device 50, which is configured to implement the subframe processing methods provided by the aforementioned embodiments of the present invention. The first device 50 includes a first receiving unit 510 and a first sending unit 520. The first receiving unit 510 is configured to determine whether data packets that are not received meet a first condition: the data packets that are not received include at least two consecutive MBMS data packets to be scheduled by the first sending unit 520 in a DSP. The first sending unit 520 is configured to set a subframe that is used to transmit DSI corresponding to the DSP to null when the determination result of the first receiving unit 510 is yes.

"The first sending unit 520 is configured to set a subframe that is used to transmit DSI corresponding to the DSP to null" may refer to any one of the following cases: the first sending unit 520 keeps mute in a subframe that is supposed to be used to transmit DSI corresponding to the DSP; or the first sending unit 520 determines whether to generate complete DSI corresponding to the DSP, and if it is determined not to generate the complete DSI corresponding to the DSP, the first sending unit 520 keeps mute in a subframe that is supposed to be used to transmit DSI corresponding to the DSP.

In this embodiment, the first receiving unit 510 may be configured to receive MBMS data packets and determine whether data packets that are not received meet the first condition according to the received MBMS data packets. For example, header information of the MBSM data packets received by the first receiving unit 510 includes the total number of octets and the total number of packets. The first receiving unit 510 determines whether data packets that are not received meet the first condition according to the total number of octets and the total number of packets.

Optionally, in this embodiment, if other MBMS data packets that have been received by the first receiving unit 510 and are to be scheduled by the first sending unit 520 in the DSP exist, optionally, the other MBMS data packets include any one or more of the following MBMS data packets: MBMS data packets of which time of transmission by the BM-SC is earlier than the time of transmission of the determined lost consecutive MBMS data packets by the BM-SC, and which belong to a same service as the deter-

12

mined lost consecutive MBMS data packets; and MBMS data packets of other services that are to be scheduled before the eNB schedules a service of the determined lost consecutive MBMS data packets. In the latter case, the other MBMS data packets belong to a service different from that of the lost consecutive MBMS data packets. The time of transmission of the other MBMS data packets by the BM-SC may not be earlier than the time of transmission of the determined lost consecutive MBMS data packets by the BM-SC.

Optionally, if a subframe that is supposed to be used to transmit DSI corresponding to the DSP is a first subframe of the DSP, the other subframes may be after the subframe that is supposed to be used to transmit DSI corresponding to the DSP. If the subframe that is supposed to be used to transmit DSI corresponding to the DSP is not a first subframe of the DSP, the other subframes can be before or after the subframe that is supposed to be used to transmit DSI corresponding to the DSP.

Optionally, the first sending unit 520 in this embodiment is further configured to keep mute in remaining subframes after transmitting the other MBMS data packets. The remaining subframes include subframes that are after the other subframes in the DSP and reserved for a transmission channel that maps a service of the consecutive MBMS data packets by the first sending unit 520.

The device according to this embodiment may be a NodeB (such as eNB) or other AN entities, such as an hNB) or microcell NodeB, or a unit that is inside a NodeB or other AN entities. The device may first determine whether data packets that are not received meet a given condition. For example, the device determines whether data packets that are not received include at least two consecutive MBMS data packets to be scheduled by the eNB in a DSP. If the given condition is met, the device sets a subframe that is used to transmit the DSI corresponding to the DSP to null to prevent the device from transmitting incorrect DSI which may interfere with other devices and cause incorrect data receiving of a UE.

As shown in FIG. 6, an embodiment of the present invention further provides another subframe processing device, namely, a second device 60, which is configured to implement the subframe processing methods provided by the aforementioned embodiments of the present invention. The second device 60 includes a second receiving unit 610 and a second sending unit 620. The second receiving unit 610 is configured to determine whether a type 0 control packet group is not received, that is, the second receiving unit 610 determines whether data packets that are not received meet a second condition that is the data packets that are not received include a type 0 control packet group. The second sending unit 620 is configured to set a subframe that is used to transmit DSI corresponding to a DSP to null, where the DSP is used to transmit MBMS data packets corresponding to the type 0 control packet group when the determination result of the second receiving unit 610 is yes.

"The second sending unit 620 is configured to set a subframe that is used to transmit DSI corresponding to the DSP to null" may refer to any one of the following cases: the second sending unit 620 keeps mute in a subframe, the subframe being supposed to be used to transmit DSI corresponding to the DSP; or the second sending unit 620 determines whether to generate complete DSI corresponding to the DSP, and if it is determined not to generate the complete DSI corresponding to the DSP, the second sending unit 620 keeps mute in a subframe, the subframe being supposed to be used to transmit DSI corresponding to the DSP.

US 9,838,851 B2

13

Optionally, in this embodiment, if other MBMS data packets that have been received by the second receiving unit **610** and are to be scheduled by the second sending unit **620** in the DSP exist, the second sending unit **620** is further configured to transmit the other MBMS data packets in other subframes in the DSP. Optionally, the other MBMS data packets may include MBMS data packets of which time of transmission by the CN device BM-SC is earlier than the end time of a synchronization sequence corresponding to a lost type 0 PDU group; and/or MBMS data packets that are supposed to be scheduled before scheduling a service of MBMS data packets corresponding to the lost type 0 PDU group, and which belong to a service different from that of the MBMS data packets corresponding to the lost type 0 PDU group.

Optionally, if a subframe that is supposed to be used to transmit DSI corresponding to the DSP is a first subframe of the DSP, the other subframes may be after the subframe is supposed to be used to transmit DSI corresponding to the DSP. If the subframe is supposed to be used to transmit DSI corresponding to the DSP is not a first subframe of the DSP, the other subframes may be before or after the subframe is supposed to be used to transmit DSI corresponding to the DSP.

Optionally, the second sending unit **620** is further configured to keep mute in remaining subframes after transmitting the other MBMS data packets. The remaining subframes include subframes that are after the other subframes in the DSP and reserved for a transmission channel that maps a service of MBMS data packets corresponding to the type 0 control packet group by the eNB.

In the embodiment of the present invention, the type 0 control packet group includes all type 0 control packets that include the same information and are transmitted repeatedly.

The device according to this embodiment may be a NodeB (such as eNB) or other AN entities, such as an hNB or microcell NodeB, or a unit that is inside a NodeB or other AN entities. The device may first determine whether data packets that are not received meet a given condition. For example, the device determines whether data packets that are not received include a type 0 PDU group corresponding to one or more MBMS data packets. If the given condition is met, the device sets a subframe that is used to transmit DSI corresponding to the DSP to null to prevent the device from transmitting incorrect DSI which may interfere with other devices and cause incorrect data receiving of a UE.

Persons of ordinary skill in the art may understand that all or part of the steps of the methods according to the embodiments of the present invention may be implemented by a program instructing relevant hardware. The program may be stored in a computer readable storage medium. The storage medium may be a Read-only Memory (ROM)/Random-access Memory (RAM), a magnetic disk or an optical disk.

The above descriptions are merely preferred embodiments of the present invention. It should be noted that persons of ordinary skill in the art can make various improvements and variations without departing from the principle of the invention. All such modifications and variations fall within the scope of the present invention.

What is claimed is:

**1**. A subframe processing method, the method comprising:

determining, by an evolved NodeB (eNB), that at least two consecutive Multimedia Broadcast Multicast Service (MBMS) data packets to be scheduled in a Dynamic Schedule Period (DSP) have not been received; and

14

setting a first subframe to null, by the eNB, if the eNB cannot determine the transmission position of the at least two consecutive MBMS data packets in the DSP, wherein the first subframe is to be used to transmit Dynamic Schedule Information (DSI) corresponding to the DSP, wherein the DSP includes at least the first subframe and subframes to be used to transmit the at least two consecutive MBMS data packets that have not been received.

**2**. The method according to claim **1**, wherein the setting the first subframe to null comprises keeping mute in the first subframe.

**3**. The method according to claim **1**, the method further comprising:

receiving other MBMS data packets that are to be scheduled in the DSP by the eNB; and

transmitting, by the eNB, the other MBMS data packets in other subframes in the DSP,

wherein the other MBMS data packets comprise at least one of:

first MBMS data packets, wherein a time of a transmission of the first MBMS data packets by a core network (CN) device is earlier than a time of a transmission of consecutive MBMS data packets by the CN device, and the first MBMS data packets belong to the same service as the consecutive MBMS data packets; and

second MBMS data packets, wherein the second MBMS data packets are to be scheduled by the eNB before the eNB schedules a service of the consecutive MBMS data packets, and the second MBMS data packets belong to a service different from that of the consecutive MBMS data packets.

**4**. The method according to claim **3**, wherein, after the eNB transmits the other MBMS data packets, the method further comprises:

keeping, by the eNB, mute in remaining subframes, wherein the remaining subframes comprise subframes being after the other subframes in the DSP and reserved for a transmission channel that maps the service of the consecutive MBMS data packets by the eNB.

**5**. A device, comprising:

one or more processors; and

a non-transitory computer-readable storage medium in communication with the one or more processors, with the computer-readable storage medium including computer-executable instructions executed by the one or more processors to:

determine at least two consecutive Multimedia Broadcast Multicast Service (MBMS) data packets to be scheduled in a Dynamic Schedule Period (DSP) have not been received; and

set a first subframe to null if the transmission position of the at least two consecutive MBMS data packets in the DSP cannot be determined, wherein the first subframe is to be used to transmit Dynamic Schedule Information (DSI) corresponding to the DSP, wherein the DSP includes at least the first subframe and subframes to be used to transmit the at least two consecutive MBMS data packets that have not been received.

**6**. The device according to claim **5**, wherein the setting the first subframe to null comprises keeping mute in the first subframe.

**7**. The device according to claim **5**, wherein the one or more processors further execute the computer-executable instructions to:

US 9,838,851 B2

15                                                    16

receive other MBMS data packets that are to be scheduled
   in the DSP; and
transmit the other MBMS data packets in other subframes
   in the DSP,
wherein the other MBMS data packets comprise at least
   one of:
   first MBMS data packets wherein a time of a transmis-
      sion of the first MBMS data packets by a core
      network (CN) device is earlier than a time of a
      transmission of consecutive MBMS data packets by
      the CN device and the first MBMS data packets
      belong to the same service as the consecutive MBMS
      data packets; and
   second MBMS data packets, wherein the second
      MBMS data packets are to be scheduled before the
      device schedules a service of the consecutive MBMS
      data packets and the second MBMS data packets
      belong to a service different from that of the con-
      secutive MBMS data packets.

**8**. The device according to claim **7**, wherein, after the
transmitting the other MBMS data packets in other sub-
frames in the DSP, the one or more processors further
execute the computer-executable instructions to:
   keep mute in remaining subframes, wherein the remaining
      subframes comprise subframes after the other sub-
      frames in the DSP and reserved for a transmission
      channel that maps the service of the consecutive
      MBMS data packets.

*   *   *   *   *

# EXHIBIT 5



US010117226B2

(12) **United States Patent**
Huang et al.

(10) Patent No.:     **US 10,117,226 B2**
(45) Date of Patent:       **Oct. 30, 2018**

(54) **METHOD, APPARATUS, AND SYSTEM FOR TRANSMISSION CONTROL OF MULTIMEDIA BROADCAST MULTICAST SERVICE DATA**

(71) Applicant: **Huawei Technologies Co., Ltd.,** Shenzhen (CN)

(72) Inventors: **Qufang Huang**, Shanghai (CN); **Mingzeng Dai**, Shanghai (CN)

(73) Assignee: **Huawei Technologies Co., Ltd.,** Shenzhen (CN)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 144 days.

(21) Appl. No.: **15/200,352**

(22) Filed: **Jul. 1, 2016**

(65) **Prior Publication Data**
US 2016/0316453 A1     Oct. 27, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/175,303, filed on Feb. 7, 2014, now Pat. No. 9,398,605, which is a (Continued)

(30) **Foreign Application Priority Data**

Aug. 8, 2011     (CN) .......................... 2011 1 0226133

(51) **Int. Cl.**
*H04H 20/71*          (2008.01)
*H04W 72/00*          (2009.01)
(Continued)

(52) **U.S. Cl.**
CPC ........... *H04W 72/005* (2013.01); *H04W 4/06* (2013.01); *H04W 72/121* (2013.01); (Continued)

(58) **Field of Classification Search**
USPC ....... 370/229, 230, 235, 236, 252, 312, 328, 370/390, 395.4, 432
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

9,191,222 B2 *  11/2015 Sun ..................... H04W 72/005
9,398,605 B2 *   7/2016 Huang ................... H04W 4/06
(Continued)

FOREIGN PATENT DOCUMENTS

CN     101686431 A     3/2010
CN     101909244 A     12/2010
(Continued)

OTHER PUBLICATIONS

"SYNCProtocol for LTE; Discussion and Decision," 3GPP TSG-RAN WG3 Meeting #65, R3-091749, Aug. 24-28, 2009, 9 pages.
(Continued)

*Primary Examiner* — Kwang B Yao
*Assistant Examiner* — Nguyen Ngo
(74) *Attorney, Agent, or Firm* — Slater Matsil, LLP

(57) **ABSTRACT**

Embodiments of the present invention disclose a method, an apparatus, and a system for transmission control of multimedia broadcast multicast data. The method includes: according to a reference time, determining a scheduling period of suspending or resuming sending MBMS service data; and suspending or resuming sending the MBMS service data in the determined scheduling period. According to the embodiments of the present invention, transmission control of the MBMS service data by a base station can be realized, which facilitates each base station in the same MBSFA range synchronously suspending or resuming sending the MBMS service data of the same service, thereby facilitating reducing interferences in the service.

**15 Claims, 14 Drawing Sheets**



# US 10,117,226 B2
Page 2

## Related U.S. Application Data

continuation of application No. PCT/CN2012/079808, filed on Aug. 8, 2012.

| | 2012/0213142 | A1* | 8/2012 | Van Lieshout | ..... H04W 72/121 |
| | | | | | 370/312 |
| | 2014/0153475 | A1 | 6/2014 | Huang et al. | |
| | 2014/0362756 | A1 | 12/2014 | Maeda et al. | |

(51) **Int. Cl.**
    *H04W 4/06*     (2009.01)
    *H04W 72/12*     (2009.01)
    *H04W 84/04*     (2009.01)

(52) **U.S. Cl.**
    CPC ... *H04W 72/1226* (2013.01); *H04W 72/1263* (2013.01); *H04W 84/042* (2013.01)

## FOREIGN PATENT DOCUMENTS

| CN | 102035794 | A | 4/2011 |
|---|---|---|---|
| EP | 2346204 | A1 | 7/2011 |
| JP | 2011511589 | A | 4/2011 |
| WO | 2005078962 | A1 | 8/2005 |
| WO | 2009078152 | A1 | 6/2009 |
| WO | 2013020503 | A1 | 2/2013 |

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| 2005/0190712 | A1* | 9/2005 | Lee | ..................... H04L 12/1881 |
| | | | | 370/312 |
| 2006/0059407 | A1 | 3/2006 | Wang et al. | |
| 2006/0067361 | A1* | 3/2006 | Lee | ...... H04W 72/005 |
| | | | | 370/466 |
| 2008/0318566 | A1* | 12/2008 | Chun | ................. H04W 48/12 |
| | | | | 455/422.1 |
| 2010/0315988 | A1 | 12/2010 | Chen | |
| 2010/0323714 | A1* | 12/2010 | Schmidt | ...... H04W 48/18 |
| | | | | 455/456.1 |
| 2011/0086608 | A1* | 4/2011 | Yamagishi | ........... G08B 27/006 |
| | | | | 455/404.1 |
| 2011/0199973 | A1* | 8/2011 | Li | ............ H04W 72/005 |
| | | | | 370/328 |
| 2011/0274025 | A1* | 11/2011 | Hsu | ...... H04W 72/005 |
| | | | | 370/312 |
| 2012/0202493 | A1* | 8/2012 | Wang | ................... H04W 60/00 |
| | | | | 455/435.1 |

## OTHER PUBLICATIONS

"3rd Generation Partnership Project; Technical Specification Group Radio Accesss Network; Evolved Universal Terrestrial Radio Access E-UTRA) and Evolved Universal Terrestrial Radio Access Network (E-UTRAN); Overall description; Stage 2 (Release 10)," 3GPP TS 36.300 V10.4.0, Technical Specification, Jun. 2011, 194 pages.
Extended European Search Report, Application No. 12821815.3, Applicant Huawei Technologies Co., Ltd., dated Jun. 27, 2014, 6 pages.
Chinese Search Report of PCT, Application No. PCT/CN2012/079808, Nov. 22, 2012, 11 pages.
"3rd Generation Partnership Project; Technical Specification Group Radio Accesss Network; Evolved Universal Terrestrial Radio Access Network (E-UTRAN); M2 Application Protocol (M2AP); (Release 10)," 3GPP TS 36.443 V10.2.0, Technical Specification, Jun. 2011, 84 pages.

* cited by examiner



FIG. 1

FIG. 2



FIG. 3a



FIG. 3b



FIG. 3c



FIG. 3d

Case 1:19-cv-01326-MN Document 16-3 Filed 09/03/19 Page 226 of 312 PageID #: 283
Case 2:19-cv-00222-JRG Document 4-5 Filed 06/21/19 Page 9 of 26 PageID #: 123

U.S. Patent          Oct. 30, 2018          Sheet 6 of 14          US 10,117,226 B2



FIG. 3e



FIG. 4



FIG. 5

Case 1:19-cv-01806-MN Document 163-3 Filed 09/02/19 Page 229 of 312 PageID #: 8826
Case 2:19-cv-00222-JRG Document 4-5 Filed 06/21/19 Page 12 of 26 PageID #: 126



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

FIG. 12

US 10,117,226 B2

1

# METHOD, APPARATUS, AND SYSTEM FOR TRANSMISSION CONTROL OF MULTIMEDIA BROADCAST MULTICAST SERVICE DATA

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 14/175,303 filed on Feb. 7, 2014, which is a continuation of International Application No. PCT/CN2012/079808, filed on Aug. 8, 2012, which claims priority to Chinese Patent Application No. 201110226133.7, filed on Aug. 8, 2011, both of which are hereby incorporated by reference in their entireties.

## TECHNICAL FIELD

Embodiments of the present invention relate to communication technologies, and in particular, to a method, an apparatus, and a system for transmission control of multimedia broadcast multicast service data.

## BACKGROUND

An MBMS mainly indicates that a network side may send multimedia service data with the same content at the same time to multiple terminals (also referred to as user equipment, abbreviated as UE), so that an air interface resource can be effectively saved, and a utilization ratio of the resource can be improved. A process of a control plane needs to be performed before MBMS service data in a long term evolution (LTE) communication system starts to be sent, so as to establish a bearer and allocate the air interface resource. In the process of the control plane, a data source triggers a control signaling along a gateway, a mobility management entity (MME), a multi-cell/multicast coordination entity (MCE), and a base station (E-UTRAN NodeB, abbreviated as eNB). Specifically, the data source sequentially informs the gateway about information such as characteristics of the service, requested resource, and expected areas to be sent to; the gateway assigns corresponding IP multicast addresses and transmits to the MME and the MCE; the MCE allocates an air interface transmission resource and informs each eNB; and the eNB joins a corresponding IP multicast group according to the IP multicast addresses assigned by the gateway, and according to the air interface resource information allocated by the MCE, updates a reserved sub-frame which is used for the MBMS transmission. After the process of the control plane ends, the MBMS service data which is of a user plane and is sent out by the data source flows through the gateway, and arrives at each eNB in the IP multicast group in a manner of IP multicast, and then is transmitted to the terminals by the eNB through the air interface.

In the LTE, the sending of the MBMS service data follows a transmission mode of multimedia broadcast multicast service single frequency network (MBSFN), that is to say, multiple eNBs in a certain area need to send the completely same MBMS service data in the same sub-frame, in this way, after the MBMS service data sent by the eNBs arrived at the terminals, the terminals cannot distinguish which eNB sends the signal, and the signals sent by the multiple eNBs may be superimposed and enhanced at the UE, thereby reducing a packet error ratio. The MCE suspends some services according to actual control needs of communication, that is, interrupts sending the MBMS service data of these services,

2

so as to achieve the purpose of saving the air interface resource and reducing the power consumption of the eNB. The service suspension is temporary; and when the conditions needed for implementing the communication control are not satisfied, the sending of the MBMS service data of the suspended services needs to be resumed. The service suspension and the service resumption are performed in a range of a multimedia broadcast multicast service single frequency network area (MBSFN Area, abbreviated as MBSFA), and generally, one service may be transmitted in multiple MBSFA ranges. Therefore, the data source generally continues sending the MBMS service data of this service for the usage of an MBSFA whose service is not suspended.

The control signaling of the MBMS service data, that is, a multicast control channel (MCCH) message, is sent cyclically, and the MCE can only modify the MCCH message at some predefined time points, where a time interval between two time points when the MCCH message may be modified is referred to as an MCCH modification period, and each eNB in the same MBSFA range uses the same MCCH modification period number. When the MCE determines that a certain service needs to be suspended or resumed in a certain MBSFA range, the MCE firstly informs all the eNBs in the MBSFA range, and updates the MCCH message from a certain MCCH modification period, thereby ensuring that all the eNBs in the same MBSFA range synchronously update the MCCH message. However, the prior art does not provide a corresponding solution for how the eNB in the same MBSFA range realizes suspension or resumption control of the MBMS service data.

## SUMMARY

The embodiments of the present invention provide a method, an apparatus, and a system for transmission control of multimedia broadcast multicast service data, so as to realize transmission control of the multimedia broadcast multicast service data.

In one aspect, an embodiment of the present invention provides a transmission control method for multimedia broadcast multicast service data, including: according to a reference time, determining a scheduling period of suspending or resuming sending multimedia broadcast multicast service data; and suspending or resuming sending the multimedia broadcast multicast service data in the determined scheduling period.

In another aspect, an embodiment of the present invention further provides another transmission control method for multimedia broadcast multicast service data, including: generating indication information including a reference time; and sending the indication information to each base station in the same multimedia broadcast multicast service single frequency network area range, so as to instruct the base station to determine, according to the reference time, a scheduling period of suspending or resuming sending the multimedia broadcast multicast service data.

In another aspect, an embodiment of the present invention provides a base station, including: a scheduling period determining module, configured to: according to a reference time, determine a scheduling period of suspending or resuming sending multimedia broadcast multicast service data; and a transmission control module, configured to suspend or resume sending the MBMS service data in the determined scheduling period.

In another aspect, an embodiment of the present invention further provides a network device, including: a generating

US 10,117,226 B2

3

module configured to generate indication information including a reference time; and a sending module configured to send the indication information to each base station in the same multimedia broadcast multicast service single frequency network area range, so as to instruct the base station to determine, according to the reference time, a scheduling period of suspending or resuming sending the multimedia broadcast multicast service data.

In another aspect, an embodiment of the present invention further provides a communication system, including the foregoing base station and the foregoing network device.

In the method, the apparatus, and the system for transmission control of multimedia broadcast multicast service data provided in the embodiments of the present invention, according to the pre-acquired reference time, the base station determines the scheduling period of starting suspending or resuming sending the MBMS service data, and suspends or resumes sending the MBMS service data in the determined scheduling period, so as to realize the transmission control of the MBMS service data by the base station. Through the embodiments of the present invention, it facilitates each base station in the same MBSFA range synchronously suspending or resuming sending the MBMS service data of the same service, thereby facilitating reducing interferences in the service.

## BRIEF DESCRIPTION OF THE DRAWINGS

To illustrate the technical solutions in the embodiments of the present invention or in the prior art more clearly, the accompanying drawings required for describing the embodiments or the prior art are briefly introduced in the following. Apparently, the accompanying drawings in the following description are merely some embodiments of the present invention, and persons of ordinary skill in the art can further derive other drawings according to these drawings without making creative efforts.

FIG. 1 is a flow chart of a transmission control method for MBMS service data according to a first embodiment of the present invention;

FIG. 2 is a flow chart of a transmission control method for MBMS service data according to a second embodiment of the present invention;

FIG. 3a is a schematic diagram of mapping MBMS service data to MCH scheduling periods according to an embodiment of the present invention;

FIG. 3b is a schematic diagram of mapping MBMS service data to MBSFN sub-frames in MCH scheduling periods according to an embodiment of the present invention;

FIG. 3c is a schematic diagram of an MCCH modification period when an MCCH message is updated according to an embodiment of the present invention;

FIG. 3d is a scenario example of suspending sending MBMS service data according to an embodiment of the present invention;

FIG. 3e is a scenario example of bringing in interferences in resuming sending MBMS service data according to an embodiment of the present invention;

FIG. 4 is a signaling interaction diagram of a transmission control method for MBMS service data according to a third embodiment of the present invention;

FIG. 5 is a first optional implementation manner example of determining a time of transmission control of MBMS service data according to a third embodiment of the present invention;

4

FIG. 6 is a second optional implementation manner example of determining a time of transmission control of MBMS service data according to a third embodiment of the present invention;

FIG. 7 is a third optional implementation manner example of determining a time of transmission control of MBMS service data according to a third embodiment of the present invention;

FIG. 8 is a signaling interaction diagram of a transmission control method for MBMS service data according to a fourth embodiment of the present invention;

FIG. 9 is an optional implementation manner example of determining a time of transmission control of MBMS service data according to a fourth embodiment of the present invention;

FIG. 10 is a signaling interaction diagram of a transmission control method for MBMS service data according to a fifth embodiment of the present invention;

FIG. 11 is a schematic structural diagram of a base station according to a sixth embodiment of the present invention; and

FIG. 12 is a schematic structural diagram of a network device according to a seventh embodiment of the present invention.

## DETAILED DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

To make the objectives, technical solutions, and advantages of embodiments of the present invention clearer, the technical solutions in the embodiments of the present invention are clearly and completely described in the following with reference to the accompanying drawings in the embodiments of the present invention. Apparently, the embodiments in the following description are merely a part of rather than all the embodiments of the present invention. All other embodiments acquired by persons skilled in the art based on the embodiments of the present invention without making creative efforts shall fall within the protection scope of the present invention.

The sequence numbers of the following embodiments of the present invention are only for description, and do not represent the embodiments are good or bad.

FIG. 1 is a flow chart of a transmission control method for MBMS service data according to a first embodiment of the present invention. The implementation subject of this embodiment may be a base station such as an eNB. As shown in FIG. 1, the transmission control method for MBMS service data according to this embodiment includes:

Step 11: According to a reference time, determine a scheduling period of suspending or resuming sending the MBMS service data.

The base station acquires the reference time before determining the scheduling period of suspending or resuming sending the MBMS service data. The reference time may be directly indicated by a network side device such as an MCE. Or, the reference time may be indirectly indicated by a network side device such as an MCE, for example, the MCE instructs the base station to update an MCCH modification period of an MCCH message, and the base station determines the reference time based on the MCCH modification period. After the base station acquires the reference time, the base station determines a certain scheduling period starting from the reference time and backwards along the time axis, and this scheduling period is taken as the scheduling period of suspending or resuming sending the MBMS service data.

US 10,117,226 B2

5

For example, the base station may start from the reference time and search backwards for an Mth scheduling period of a multicast channel (MCH) that bears the MBMS service data, where M is an integer greater than or equal to 1; and determine the found scheduling period as the scheduling period of suspending or resuming the MBMS service data. M may be a certain predetermined value, for example, a communication protocol predetermines M=1; or, M may be a certain preconfigured value, for example, a network management system configures the same M value for each base station in the same multimedia broadcast multicast service single frequency network area (MBSFA) in advance, for example, configures M to 1.

Step 12: Suspend or resume sending the MBMS service data in the determined scheduling period.

In the transmission control method for the MBMS service data according to the embodiment, the base station determines, according to the pre-acquired reference time, the scheduling period of suspending or resuming sending the MBMS service data, and suspends or resumes sending the MBMS service data in the determined scheduling period, so as to realize transmission control of the MBMS service data by the base station. Since each base station in the same MBSFA may adopt the same method provided in the embodiment of the present invention to determine the same scheduling period of suspending or resuming sending the MBMS service data of a certain service, synchronously suspending or resuming sending the MBMS service data of the same service by these base stations can be realized, thereby facilitating reducing interferences in the service.

FIG. 2 is a flow chart of a transmission control method for MBMS service data according to a second embodiment of the present invention. The implementation subject of this embodiment may be a network side device including a base station, such as an MCE. As shown in FIG. 2, the transmission control method for MBMS service data according to this embodiment includes:

Step 21: Generate indication information including a reference time.

The reference time is used for the base station to determine a scheduling period of suspending or resuming the MBMS service data, which may include, but is not limited to: a start time designated by the network side device; or, an MCCH modification period deviation value N, and N is an integer greater than or equal to 1.

Step 22: Send the indication information to each base station in the same MBSFA range, so as to instruct the base station to determine, according to the reference time, the scheduling period of suspending or resuming sending the MBMS service data.

Each base station in the same MBSFA range receives the indication information sent by the network side device such as the MCE, acquires the reference time included in the indication information, and according to the reference time, determines the scheduling period of suspending or resuming sending the MBMS service data.

For example, the reference time may be the start time designated by the network side device, for example, the start time designated by the MCE or an OAM (Operations, Administration and Maintenance), and then, each base station in the same MBSFA range may determine, according to the start time indicated by the network side device, an Mth scheduling period of the MCH that bears the MBMS service data after the start time indicated by the network side device, as the scheduling period of suspending or resuming sending the MBMS service data, and M is an integer greater than or equal to 1.

6

For example, the reference time may be an MCCH modification period deviation value N, and N is an integer greater than or equal to 1, and then, each base station in the same MBSFA range may determine, the Mth scheduling period of the multicast channel that bears the multimedia broadcast multicast service data after a start time of an Nth multicast control channel modification period after the multicast control channel modification period of updating the multicast control channel message, as the scheduling period of suspending or resuming sending the multimedia broadcast multicast service data, where M is an integer greater than or equal to 1.

In the transmission control method for MBMS service data according to this embodiment, the network device indicates the reference time for determining the scheduling period of suspending or resuming sending the MBMS service data of a certain service for each base station in the same MBSFA, and therefore, each base station in the same MBSFA may determine, according to the reference time, the same scheduling period of suspending or resuming sending the MBMS service data of this service, and synchronously suspending or resuming sending the MBMS service data of the same service by these base stations is realized, thereby facilitating reducing interferences in the service.

In the following, a transmission principle of the MBMS service data is described in detail with reference to FIG. 3a to FIG. 3e, possible reasons of generating interferences in the service in a LTE system are analyzed, and the technical essence of reducing the interferences in the service by using the technical solutions provided in the embodiments of the present invention is described.

FIG. 3a is a schematic diagram of mapping MBMS service data to MCH scheduling periods according to an embodiment of the present invention. In order to achieve the purpose of sending by an MBSFN, MCHs of the service bearers may be predetermined, and each scheduling period of each MCH includes one or more sub-frames that can be used for transmitting the MBMS service data, and this type of sub-frame is referred to as an MBSFN sub-frame. In FIG. 3a, three sub-frames are in each wireless frame and are used for MBSFN transmission, and are numbers 3, 6 and 8 sub-frames, that is, the numbers 3, 6 and 8 sub-frames are MBSFN frames. It is assumed that the MCH shown in the FIG. 3a bears the MBMS service data of services A, B and C. The scheduling periods of the MCH are numbered starting from a certain predetermined time according to the time order. The eNB maps each MBMS service data packet to a corresponding scheduling period of the MCH according to a time stamp carried by each MBMS service data packet. For example, in FIG. 3a, number 360 and number 361 MBMS service data packets of the service A and number 0 and number 1 MBMS service data packets of the service B are mapped to an Mth scheduling period of the MCH; number 2 and number 3 MBMS service data packets of the service B and number 0 and number 1 MBMS service data packets of the service C are mapped to an (M+1)th scheduling period of the MCH, where M represents the number of the scheduling period of the MCH, and is an integer greater than or equal to 1.

FIG. 3b is a schematic diagram of mapping MBMS service data to MBSFN sub-frames in MCH scheduling periods according to an embodiment of the present invention. In one scheduling period of the MCH, the MBMS service data of each service is sequentially arranged into each MBSFN sub-frame, firstly arranged according to the service, and this service sequence may be determined by the MCE and indicated to the eNB; the MBMS service data of

US 10,117,226 B2

7

the same service is arranged sequentially. If the service sequence is A, B and C, the specific transmission in the foregoing example is shown in FIG. 3b. Specifically, the number 360 MBMS service data packet of the service A is mapped to the number 3 sub-frame; if the number 3 sub-frame still has a remaining resource, the number 361 MBMS service data packet is continuously mapped to the number 3 sub-frame; and the remaining content after the number 361 MBMS service data packet being mapped to the number 3 sub-frame is mapped to the number 6 sub-frame, and so on. If the MBSFN sub-frame resource included in the current scheduling period of the MCH are exhausted, but the transmission of the MBMS service data packet of a certain number is still not completed, the eNB discards the service data that is not transmitted in the current scheduling period which is of the MCH and is the MBMS service data packet.

In the MBMS system, the MCE may suspend certain services according to actual needs of communication, so as to achieve the purpose of saving an air interface resource and reducing the power consumption of the eNB. For example, the MCE instructs each eNB to make statistics of the quantity of receivers of the MBMS service data of a certain service; if the quantity of the receivers is very few, the MCE may suspend the service. For example, when transmitting the MBMS service data of a service with a higher priority starts, if the MCE finds that the current air interface resource is insufficient, in this case, the MCE may suspend some services with low priorities.

The service suspension is usually temporary, and the suspended services need to be resumed after a period of time. For example, after suspending a certain service for a period of time, the MCE may instruct the eNB to make statistics of the quantity of receivers of the MBMS service data of this service again, and if the quantity of the receivers rises, the MCE may determine to allow the eNB to resume sending the MBMS service data of this service through the air interface. For example, when transmitting the MBMS service data of one or more other services, except the suspended services, ends, and a part of the air interface resource is empty, the MCE may instruct the eNB to resume sending the MBMS service data of the service.

Since a terminal determines, according to a control signaling of the MBMS service, that is, an MCCH message, to receive the MBMS service data, the service information indicated by the MCCH message should correspond to the MBMS service data that is actually sent. When the MCE determines to suspend or resume sending the MBMS service data of a certain service, based on the current updating mechanism of the MCCH message, it is ensured that each eNB synchronously updates the MCCH messages. Specifically, the MCCH message is sent cyclically, the MCE can only update the MCCH message at some predefined time points, and a time interval between two time points when the MCCH message is possibly updated is referred to as an MCCH modification period. Each MCCH modification period may include multiple MCCH repeat periods, as shown in FIG. 3c, each MCCH modification period may include four MCCH repeat periods. The eNB sends an MCCH message in each of the four MCCH repeat periods, and the contents of the MCCH messages sent in the four MCCH repeat periods are the same; the eNB can merely modify the content of the MCCH message, that is, update the MCCH message, at a start time of a next MCCH modification period. Each MCCH modification period in the LTE is numbered, and each eNB in the MBSFN numbers the MCCH modification period all at the same start point, so that at the same moment, each eNB in the same MBSFA range

8

uses the same MCCH modification period number. When the MCE determines that a certain service needs to be suspended or resumed in a certain MBSFA, the MCE firstly instructs all the eNBs in the MBSFA to update the MCCH message from a certain MCCH modification period. All the eNBs in the same MBSFA range update the MCCH message in the same MCCH modification period, so as to ensure that the service information indicated in the MCCH message is consistent with the MBMS data that is actually transmitted by the air interface.

Although each eNB in the same MBSFA synchronously updates the MCCH message in the same MCCH modification period, the prior art does not have a unified method used for determining the time of transmission control for the corresponding MBMS service data, so that the eNB usually randomly determines the time of transmission control for the corresponding MBMS service data, and as a result, interferences in the service may be caused. The details are described with examples as follows:

FIG. 3d is a scenario example of suspending sending MBMS service data according to an application scenario according to an embodiment of the present invention. It is assumed that the MCE determines to suspend a service A in the MBSFA 2 range, and then the MCE indicates all the eNBs, such as eNB 21 and eNB 22, in the MBSFA 2 range. Specifically, as shown in FIG. 3d, the MCE instructs all the eNBs, such as eNB 21 and eNB 22, in the MBSFA 2 range to start updating the MCCH message at the start time of the number 81 MCCH modification period: delete corresponding control information of the service A from the original MCCH message. The eNB 21 and eNB 22 synchronously update the MCCH message, but may start suspending sending data packets of the service A in different scheduling periods.

FIG. 3e is a scenario example of bringing in interferences by resuming sending MBMS service data according to an application scenario of an embodiment of the present invention. If the MCE determines to resume the service A in MBSFA 2 range, the MCE instructs all the eNBs, such as the eNB 21 and eNB 22, in the MBSFA 2 range to start updating the MCCH message at the start time of the MCCH modification period with the same number. The eNB 21 and eNB 22 synchronously update the MCCH message, but may start resuming sending the MBMS service data of the service in different scheduling periods. For example, if the eNB 21 randomly determines to resume sending the data packet of the service A in an Mth scheduling period of the MCH, the MBMS service data sent by the eNB 21 in the Mth scheduling period of the MCH is that: the number 360 and number 361 data packets of the service A, and the number 0 and number 1 data packets of the service B; if the eNB 22 randomly determines to resume sending the MBMS data of the service in an (M+1)th scheduling period of the MCH, the MBMS data sent by the eNB 22 in the (M+1)th scheduling period of the MCH is that: the number 0 and number 1 data packets of the service B. It can be seen that, in the Mth scheduling period of the MCH, the data packets sent by the eNB 21 and the eNB 22 through the air interface are different. Since the MBSFN transmission mode must ensure that all the eNBs in the same MBSFA range transmit the same content, and the eNB 21 and the eNB 22 send different MBMS service data on the air interface, interferences in the services are caused. Similarly, when the MBMS service is suspended, when different eNBs in the same MBSFA range start suspending sending the MBMS service data of the service in different scheduling periods, each eNB is caused

US 10,117,226 B2

9 | 10

to send different contents on the air interface in the same scheduling period, and interferences in the service may also be caused.

In the transmission control method for the MBMS data provided in this embodiment, according to the pre-acquired reference time, the eNB determines the time of the transmission control for the MBMS service data. Each eNB in the same MBSFA range uses the same method, and the determined time of the transmission control for the MBMS service data is the same, so that each eNB in the same MBSFA range can synchronously suspend or resume sending the same MBMS service data, thereby reducing interferences in the service.

FIG. 4 is a signaling interaction diagram of a transmission control method for MBMS service data according to a third embodiment of the present invention. A reference time in this embodiment is: a certain time of an MCCH modification period when an MCCH message is updated. As shown in FIG. 4, the method according to this embodiment includes:

Step 41: An MCE determines to suspend or resume the service A, and generates MBMS scheduling information.

If the MCE determines to suspend a service A, the MCE deletes a control signaling of the service A from the MCCH message, so as to update the MCCH message; if the MCE determines to resume the suspended service A, a control signaling of the service A is added into the MCCH message, so as to update the MCCH message.

The MCCH scheduling information includes: a parameter "an MCCH updated modification period", used to indicate the MCCH modification period when the MCCH message is updated; and the MCCH message includes a control signaling corresponding to the MBMS service data, such as information of suspending or resuming the MBMS service.

Step 42: The MCE sends the MBMS scheduling information to an eNB, where the MBMS scheduling information includes the parameter "MCCH updated modification period".

Step 43: The eNB receives the MBMS scheduling information, and updates the MCCH message in the MCCH modification period corresponding to the parameter "MCCH updated modification period" that is included in the MBMS scheduling information.

The eNB receives an MCCH message in the MCCH modification period corresponding to the parameter "MCCH updated modification period", and compares the newly received MCCH message with an MCCH message stored by the eNB (referred to as: original MCCH message). If the newly received MCCH message is in lack of the control signaling of the service A relative to the original MCCH message, the eNB learns that the MCE suspends the service A; and if the newly received MCCH message is added with the control signaling of the service A relative to the original MCCH message, the eNB learns that the MCE resumes the service A.

Step 44: The eNB determines, from a certain time of the MCCH modification period when the MCCH message is updated, a first scheduling period of the MCH that bears the MBMS service data, as a scheduling period of suspending or resuming the MBMS service data.

In the LTE system, a corresponding relationship between the service and the MCH is determined in advance, a certain service such as the MBMS data of the service A can merely be transmitted on the MCH corresponding to the service A. In the following, with reference to FIG. 5 to FIG. 8, from different times of the MCCH modification period when the MCCH message is updated optional, implementation manners of the eNB for determining the scheduling period of

starting suspending or resuming the corresponding MBMS service data are described in detail. For the ease of description, merely three MCHs, that is, an MCH 1, an MCH 2, and an MCH 3, are used as examples in FIG. 5 to FIG. 7 for description; and the examples should not be construed as a limitation to the essence of the technical solutions of the present invention.

Implementation manner 1: From a start time of the MCCH modification period when the MCCH message is updated, search backwards for a first scheduling period of the MCH that bears the MBMS service data; and determine the found scheduling period as the scheduling period of suspending or resuming the MBMS service data; and the details are shown in FIG. 5.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 1, the eNB, from a start time of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 1, that is, corresponding to a time 1 shown in FIG. 5; and determines the found first scheduling period of the MCH 1 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 2, the eNB, from a start time of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 2, that is, corresponding to a time 2 shown in FIG. 5; and determines the found first scheduling period of the MCH 2 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 3, the eNB, from a start time of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 3, that is, corresponding to a time 3 shown in FIG. 5; and determines the found first scheduling period of the MCH 3 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

Implementation manner 2: From a start time of transmitting the MCCH message for the first time in the MCCH modification period when the MCCH message is updated, search backwards for the first scheduling period of the MCH that bears the MBMS service data; and determine the found scheduling period as the scheduling period of suspending or resuming the MBMS service data.

Each MCCH modification period may include four MCCH repeat periods, and the contents of the MCCH messages transmitted in different MCCH repeat periods are the same. The MCCH message may be sent in the first or not the first MBSFN sub-frame of each MCCH repeat period. Each MCCH repeat period may include four common periods, and each common period includes a resource block of the MCH 1, the MCH 2, and the MCH 3.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH 1, the eNB, from a time of transmitting the MCCH message in a first repeat period of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH 1, that is, corresponding to a time 1 shown in FIG. 6; and determines the found first scheduling period of the MCH 1 as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

US 10,117,226 B2

11

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **2**, the eNB, from a time of transmitting the MCCH message in a first repeat period of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **2**, that is, corresponding to a time **2** shown in FIG. **6**; and determines the found first scheduling period of the MCH **2** as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **3**, the eNB, from a time of transmitting the MCCH message in a first repeat period of the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **3**, that is, corresponding to a time **3** in FIG. **6**; and determines the found first scheduling period of the MCH **3** as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

Implementation manner 3: From a start time of a second MCCH repeat period in the MCCH modification period when the MCCH message is updated, search backwards for a first scheduling period of the MCH that bears the MBMS service data; and determine the found scheduling period as the scheduling period of suspending or resuming the MBMS service data.

Each MCCH modification period may include four MCCH repeat periods, and the contents of the MCCH messages transmitted in different MCCH repeat periods are the same.

If the MCH that supports and bears the MBMS service data of the service A is predetermined to be the MCH **1**, the eNB, from a start time of the second repeat period in the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **1**, that is, corresponding to a time **1** shown in FIG. **7**; and determines the found first scheduling period of the MCH **1** as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **2**, the eNB, from a start time of the second repeat period in the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **2**, that is, corresponding to a time **2** shown in FIG. **7**; and determines the found first scheduling period of the MCH **2** as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **3**, the eNB, from a start time of the second repeat period in the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **3**, that is, corresponding to a time **3** shown in FIG. **7**; and determines the found first scheduling period of the MCH **3** as the scheduling period of suspending or resuming sending the MBMS service data of the service A.

Step **45**: The eNB suspends or resumes sending the MBMS service data of the service A in the scheduling period that is determined in step **44**.

No matter whether the eNB suspends or resumes sending the MBMS service data of the service A to the UE in the scheduling period that is determined in step **44**, a data source continues to deliver the MBMS service data of the service A through a gateway (GW). When the eNB suspends sending the MBMS service data of a certain service such as the service A, the eNB may exit an IP multicast group, and join

12

the corresponding IP multicast group again when the MCE instructs resuming the service A. In this way, the eNB does not receive the data packets of the MBMS service in the suspended period of this MBMS service. Or, the eNB may not exit the IP multicast group, in this way, the eNB does not need to join the IP multicast group again when the MCE instructs resuming the service A. If this method is adopted, the eNB continues receiving the MBMS data of the service A in the suspended period of the service A, and eNB merely needs to discard the received MBMS data of the service A.

In this embodiment, each eNB in the same MBSFA determines, according to the certain same time of the MCCH modification period when the MCCH message is updated, the same scheduling period of starting the transmission control of the MBMS service data, and suspends or resumes sending the MBMS service data of the same service in the determined scheduling period, and therefore, it is realized that the eNB synchronously suspends or resumes sending the MBMS service data of the same service, thereby reducing interferences in the service.

FIG. **8** is a signaling interaction diagram of a transmission control method for MBMS service data according to a fourth embodiment of the present invention. A reference time in this embodiment is: a start time of an Nth MCCH modification period after an MCCH modification period when an MCCH message is updated, where N represents an MCCH modification period deviation value and is an integer greater than or equal to 1. As shown in FIG. **8**, the method according to this embodiment includes:

Step **81**: An MCE determines to suspend or resume the service A, and generates MBMS scheduling information.

Step **82**: The MCE sends the MBMS scheduling information to an eNB, where the MBMS scheduling information includes a parameter "MCCH updated modification period".

Step **83**: The eNB receives the MBMS scheduling information, and updates the MCCH message in the MCCH modification period corresponding to the parameter "MCCH updated modification period" that is included in the MBMS scheduling information.

Step **84**: The eNB, from a start time of an Nth MCCH modification after the MCCH modification period when the MCCH message is updated, determines, a first scheduling period of the MCH that bears the MBMS service data, as a scheduling period of suspending or resuming the MBMS service data, where N represents the MCCH modification period deviation value and is an integer greater than or equal to 1.

The eNB pre-acquires the MCCH modification period deviation value N when determining the scheduling period of starting suspending or resuming the MBMS service data. The scheduling period deviation value N configured by each eNB in the same MBSFA range is the same.

Optionally, the MCCH modification period deviation value N may be preconfigured on the eNB. Or, the MCCH modification period deviation value N may be indicated to the eNB by a network side device such as the MCE, and the specific manner of the network side device such as the MCE indicating the MCCH modification period deviation value N to the eNB is not limited, for example, the MCCH modification period deviation value N may be carried in the MBMS scheduling information described in the foregoing step **82** and is indicated to the eNB; or, the MCCH modification period deviation value N may be carried in other M2 interface messages between the MCE and the eNB, except the MBMS scheduling information, such as an initial configuration message and an MBMS service start/end/update message.

US 10,117,226 B2

13

N=1 is taken as an example for description:

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **1**, the eNB, from a start time of a first MCCH modification period after the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **1**, that is, corresponding to a time **1** shown in FIG. **9**; and determines the found first scheduling period of the MCH **1** as the scheduling period of suspending or resuming the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **2**, the eNB, from a start time of the first MCCH modification period after the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **2**, that is, corresponding to a time **2** shown in FIG. **9**; and determines the found first scheduling period of the MCH **2** as the scheduling period of suspending or resuming the MBMS service data of the service A.

If the MCH that bears the MBMS service data of the service A is predetermined to be the MCH **3**, the eNB, from a start time of the first MCCH modification period after the MCCH modification period when the MCCH message is updated, searches backwards for a first scheduling period of the MCH **3**, that is, corresponding to a time **3** shown in FIG. **9**; and determines the found first scheduling period of the MCH **3** as the scheduling period of suspending or resuming the MBMS service data of the service A.

The implementation manner when the MCCH modification period deviation value N is an integer greater than or equal to 2 is similar to the foregoing technical solutions when N=1, which is not repeatedly described here again.

Step **85**: The eNB suspends or resumes sending the MBMS service data of the service A in the scheduling period that is determined in step **84**.

In this embodiment, each eNB in the same MBSFA uses the same reference time to determine the same scheduling period of starting the transmission control of the MBMS service data, and suspends or resumes sending the MBMS service data of the same service in the determined scheduling period, so that it can be realized that the eNB synchronously suspends or resumes sending the MBMS service data of the same service, thereby reducing interferences in the service.

FIG. **10** is a signaling interaction diagram of a transmission control method for MBMS service data according to a fifth embodiment of the present invention. A reference time in this embodiment is: a start time indicated by a network side device. As shown in FIG. **10**, the method according to this embodiment includes:

Step **101**: An MCE determines to suspend or resume a service A, and generates MBMS scheduling information.

Step **102**: The MCE sends the MBMS scheduling information to an eNB, where the MBMS scheduling information includes a parameter "MCCH updated modification period".

Step **103**: The eNB receives the MBMS scheduling information, and updates an MCCH message in an MCCH modification period corresponding to the parameter "MCCH updated modification period" that is included in the MBMS scheduling information.

Step **104**: The eNB determines, from the start time indicated by the network side device, a first scheduling period of the MCH that bears the MBMS service data, as a scheduling period of suspending or resuming the MBMS service data.

Optionally, before determining the scheduling period of starting suspending or resuming the MBMS service data, the

14

eNB may receive indication information including the reference time, where the reference time may include the start time indicated by the network side device, such as the start time indicated by the MCE. According to the start time indicated by the network side device, such as the start time indicated by the MCE, the eNB determines the scheduling period of suspending or resuming the MBMS service data. The start time which is indicated by the network side device, such as the MCE, and is acquired by each eNB in the same MBSFA range is the same.

The start time indicated by the network side device, such as the MCE, may be carried in the MBMS scheduling information described in the foregoing step **102** and is indicated to the eNB; or, the start time indicated by the network side device, such as the MCE, may be carried in other M2 interface messages between the MCE and the eNB, except the MBMS scheduling information, such as an initial configuration message and an MBMS service start/end/update message.

Step **105**: The eNB suspends or resumes sending the MBMS service data of the service A in the scheduling period that is determined in step **104**.

In this embodiment, each eNB in the same MBSFA, according to the start time indicated by the network side device, determines the same scheduling period of starting the transmission control of the MBMS service data, and suspends or resumes sending the MBMS service data of the same service in the determined scheduling period, so that it can be realized that the eNB synchronously suspends or resumes sending the MBMS service data of the same service, thereby reducing interferences in the service.

FIG. **11** is a schematic structural diagram of a base station according to a sixth embodiment of the present invention. The base station shown in FIG. **11** includes: a scheduling period determining module in and a transmission control module **112**.

The scheduling period determining module **111** may be configured to: according to a reference time, determine a scheduling period of suspending or resuming sending MBMS service data.

The transmission control module **112** may be configured to suspend or resume sending the MBMS service data in the determined scheduling period.

Based on the foregoing technical solutions, optionally, the scheduling period determining module **111** may be further configured to: according to the reference time, determine, an Mth scheduling period of a multicast channel that bears the multimedia broadcast multicast service data after the reference time, as the scheduling period of suspending or resuming sending the multimedia broadcast multicast service data; and M is an integer greater than or equal to 1.

Optionally, the reference time may include: a start time of the MCCH modification period when the MCCH message is updated. In this case, the scheduling period determining module **111** may be further configured to determine, from the start time of the MCCH modification period when the MCCH message is updated, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data. The MCCH message includes a control signaling corresponding to the MBMS service data.

Optionally, the reference time may include: a start time of transmitting the MCCH message for the first time in the MCCH modification period when the MCCH message is updated. In this case, the scheduling period determining module **111** may be further configured to determine, from the start time of transmitting the MCCH message for the first

US 10,117,226 B2

15

time in the MCCH modification period when the MCCH message is updated, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data.

Optionally, the reference time may include: a start time of a second MCCH repeat period in the MCCH modification period when the MCCH message is updated. In this case, the scheduling period determining module **111** may be further configured to determine, from the start time of the second MCCH repeat period in the MCCH modification period when the MCCH message is updated, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data.

Optionally, the reference time may include: a start time of an Nth MCCH modification period after the MCCH modification period when the MCCH message is updated, where N represents an MCCH modification period deviation value and is an integer greater than or equal to 1. In this case, the scheduling period determining module **111** may be further configured to determine, from the start time of the Nth MCCH modification period after the MCCH modification period when the MCCH message is updated, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data. Further, the base station may also include: an acquisition module **113**. The acquisition module **113** may be configured to preconfigure the MCCH modification period deviation value; or, to acquire the MCCH modification period deviation value according to received indication information including the MCCH modification period deviation value.

Optionally, the reference time may include: a start time indicated by the network side device, such as a start time indicated by the MCE. In this case, the base station may further include: an acquisition module **113**. The acquisition module is configured to receive indication information including the reference time; and the reference time includes the start time indicated by the network side device. The scheduling period determining module **111** may be further configured to determine, from the start time indicated by the network side device, such as the MCE, the Mth scheduling period of the MCH that bears the MBMS service data, as the scheduling period of suspending or resuming the MBMS service data; and M is an integer greater than or equal to 1.

According to the pre-acquired reference time, the base station provided in this embodiment may determine the scheduling period of suspending or resuming the MBMS service data, and suspends or resumes sending the MBMS service data in the determined scheduling period, so as to realize transmission control of the MBMS service data by the base station. Since each base station in the same MBSFA may use the same method provided in the embodiment of the present invention to determine the same scheduling period of starting suspending or resuming sending the MBMS service data of a certain service, so that it can be realized that these base stations synchronously suspend or resume sending the MBMS service data of the same service, thereby facilitating reducing interferences in the service. As for the working principle of the base station provided in this embodiment, reference can be made to the corresponding records of the corresponding embodiments in FIG. **1** and FIG. **4** to FIG. **10**, which is not repeatedly described here again.

FIG. **12** is a schematic structural diagram of a network device according to a seventh embodiment of the present

16

invention. The network shown in FIG. **12** includes: a generating module **121** and a sending module **122**.

The generating module **121** may be configured to generate indication information including a reference time. The reference time is used for the base station to determine the scheduling period of suspending or resuming the MBMS service data, which may include, but is not limited to, a start time designated by a network side device, for the base station to determine, according to the start time indicated by the network side device, the scheduling period of suspending or resuming sending multimedia broadcast multicast service data; or, an MCCH modification period deviation value N, for the base station to determine, according to a start time of an Nth multicast control channel modification period after an multicast control channel modification period when a multicast control channel message is updated, the scheduling period of suspending or resuming sending the multimedia broadcast multicast service data, where N is an integer greater than or equal to 1. The sending module **122** may be configured to send the indication information to each base station in the same multimedia broadcast multicast service single frequency network area range, so as to instruct the base station to determine, according to the reference time, the scheduling period of suspending or resuming sending the multimedia broadcast multicast service data.

The network device provided in this embodiment indicates the reference time for determining the scheduling period of suspending or resuming sending the MBMS service data of a certain service to each base station in the same MBSFA, so that each base station in the same MBSFA can determine, according to the reference time, the same scheduling period of suspending or resuming sending the MBMS service data of the service; which realizes that these base stations synchronously suspend or resume sending the MBMS service data of the same service, thereby facilitating reducing interferences in the service. The network device provided in this embodiment may be, but is not limited to the MCE, and as for its working principle, reference can be made to the corresponding records of the corresponding embodiments in FIG. **2** and FIG. **4** to FIG. **10**, which is not repeatedly described here again.

Further, an embodiment of the present invention further provides a communication system, and the communication system at least includes the base station as shown in FIG. **11** and the network device as shown in FIG. **12**, where the base station and the network device are in communication connection. As for the working principle of the base station, reference can be made to the corresponding records of the corresponding embodiments in FIG. **1** and FIG. **4** to FIG. **10**; and as for the working principle of the network device, reference can be made to the corresponding records of the corresponding embodiments in FIG. **2** and FIG. **4** to FIG. **10**, which is not repeatedly described here again.

It should be understood by persons of ordinary skill in the art that the accompanying drawings are merely schematic diagrams of an embodiment, and modules or processes in the accompanying drawings are not necessarily required for implementing the present invention.

Those of ordinary skill in the art should understand that the modules in the apparatuses in the embodiments may be distributed in the apparatuses of the embodiments according to the description of the embodiments, and may also be allocated in one or multiple apparatuses which are different from those described in the embodiments after corresponding changes are performed. The modules in the foregoing embodiments may be combined into one module, and may also be further split into multiple submodules.

US 10,117,226 B2

17 | 18

Finally it should be noted that the foregoing embodiments are merely intended for describing the technical solutions of the present invention other than limiting the present invention. Although the present invention is described in detail with reference to the foregoing embodiments, persons of ordinary skill in the art should understand that they can still make modifications to the technical solutions recorded in the foregoing embodiments or make equivalent replacements to some technical features in the technical solutions, and these modifications or replacements do not make the essence of the corresponding technical solutions depart from the spirit and scope of the technical solutions of the embodiments of the present invention.

What is claimed is:

**1.** A method for transmitting multimedia broadcast multicast service data, the method comprising:

receiving, by a base station, from a multi-cell/multicast coordination entity (MCE), indication information indicating a multicast control channel modification period when a multicast control channel is updated; and

sending, by the base station, multimedia broadcast multicast service data in a scheduling period determined according to the indication information,

wherein the scheduling period is a same scheduling period in which another base station resumes sending the multimedia broadcast multicast service data in a same multimedia broadcast multicast service single frequency network (MBSFN) area.

**2.** The method according to claim **1**, wherein the scheduling period is an Mth scheduling period of a multicast channel that bears the multimedia broadcast multicast service data from a start time of the multicast control channel modification period when the multicast control channel is updated, wherein M is an integer greater than or equal to 1.

**3.** The method according to claim **2**, wherein M is preconfigured by a network management system.

**4.** The method according to claim **1**, wherein the scheduling period is a scheduling period within the multicast control channel modification period when the multicast control channel is updated.

**5.** The method according to claim **1**, further comprising:

receiving, by the base station from the MCE, an instruction instructing the base station to determine a quantity of user equipment devices receiving the multimedia broadcast multicast service data, wherein the quantity of user equipment devices is used for the MCE to determine the base station to send the multimedia broadcast multicast service data; and

notifying, by the base station to the MCE, the quantity of the user equipment devices.

**6.** A base station, comprising: a receiver, a processor and a memory;

wherein the receiver is configured to receive from a multi-cell/multicast coordination entity (MCE) indication information indicating a multicast control channel modification period when a multicast control channel is updated;

wherein the memory comprises programming instructions to be executed in the processor, the programming instructions configured to:

send multimedia broadcast multicast service data in a scheduling period determined according to the indication information;

wherein the scheduling period is a same scheduling period in which another base station resumes sending the multimedia broadcast multicast service data in a same

multimedia broadcast multicast service single frequency network (MBSFN) area.

**7.** The base station according to claim **6**, wherein the scheduling period is an Mth scheduling period of a multicast channel that bears the multimedia broadcast multicast service data from a start time of the multicast control channel modification period when the multicast control channel is updated, wherein M is an integer greater than or equal to 1.

**8.** The base station according to claim **7**, wherein M is preconfigured by a network management system.

**9.** The base station according to claim **6**, wherein the scheduling period is a scheduling period within the multicast control channel modification period when the multicast control channel is updated.

**10.** The base station according to claim **6**,

wherein the receiver is further configured to receive from the MCE, an instruction instructing the base station to determine a quantity of user equipment devices receiving the multimedia broadcast multicast service data, wherein the quantity of user equipment devices is used for the MCE to determine the base station to resume sending the multimedia broadcast multicast service data; and

wherein the programming instructions is further configured to notify to the MCE, the quantity of the user equipment devices.

**11.** A multi-cell/multicast coordination entity (MCE) comprising:

a processor;

a memory storing program instructions to be executed in the processor, the instructions configured to cause the processor to generate indication information indicating a multicast control channel modification period when a multicast control channel is updated; and

a transmitter configured to send the indication information to a base station in a multimedia broadcast multicast service single frequency network (MBSFN) area, wherein the indication information is used for the base station to determine a scheduling period of sending multimedia broadcast multicast service data;

wherein the scheduling period is a same scheduling period in which another base station resumes sending the multimedia broadcast multicast service data in the same MBSFN area.

**12.** The MCE according to claim **11**, wherein the scheduling period is an Mth scheduling period of a multicast channel that bears the multimedia broadcast multicast service data from a start time of the multicast control channel modification period when the multicast control channel is updated, wherein M is an integer greater than or equal to 1.

**13.** The MCE according to claim **12**, wherein M is preconfigured by a network management system.

**14.** The MCE according to claim **11**, wherein the scheduling period is a scheduling period within the multicast control channel modification period when the multicast control channel is updated.

**15.** The MCE according to claim **11**,

wherein the transmitter is further configured to send an instruction instructing the base station to determine a quantity of user equipment devices receiving the multimedia broadcast multicast service data; and

wherein the instructions are further configured to cause the processor to determine the base station to send the multimedia broadcast multicast service data according to the quantity of user equipment devices received from the base station.

* * * * *

# EXHIBIT 20

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| HUAWEI DEVICE USA, INC., HUAWEI DEVICE CO., LTD., HUAWEI TECHNOLOGIES USA INC., HUAWEI TECHNOLOGIES CO. LTD., AND HUAWEI DEVICE (SHENZHEN) CO., LTD., | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| HARRIS CORPORATION | ) ) |
| Defendant. | ) |

CIVIL ACTION NO. 2:19-cv-00222-JRG

**JURY TRIAL DEMANDED**

## HARRIS CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO HUAWEI'S COMPLAINT[1]

Harris Corporation ("Harris") hereby responds to Huawei Device USA, Inc. ("Huawei USA"), Huawei Device Co. Ltd. ("Huawei Device"), Huawei Technologies USA Inc. ("HTUS"), Huawei Technologies Co. Ltd. ("Huawei Technologies"), and Huawei Device (Shenzhen) Co. Ltd.'s ("Huawei Shenzhen") (collectively, "Huawei") Complaint (Dkt. 4) as follows:

## NATURE OF ACTION

1.      To the extent a response to paragraph 1 is required, Harris admits that Huawei's claims purport to seek the stated relief.

---

[1] Huawei's Complaint here was originally filed as counterclaims numbered 15-19 in Case No. 2:18-cv-00439-JRG, and was severed by the Court pursuant to Harris's motion. *See* Dkt. Nos. 1-3.  For simplicity, Harris will be referred to as Defendant and Huawei as Plaintiff here.

## PARTIES

2.  Harris, on information and belief, admits the allegations in paragraph 2.

3.  Harris is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and therefore denies the same.

4.  Harris is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 and therefore denies the same.

5.  Harris is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 and therefore denies the same.

6.  In response to paragraph 6, Harris admits that, on information and belief, Huawei Technologies is a member of ETSI and 3GPP. Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 6 and therefore denies the same.

7.  Harris is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 and therefore denies the same.

8.  Admitted.

## JURISDICTION AND VENUE

9.  In response to paragraph 9, Harris admits that Huawei alleges claims that purport to invoke this Court's subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. Harris denies that Huawei is entitled to any relief. Except as expressly admitted, Harris denies the remaining allegations of paragraph 9.

10.  In response to paragraph 10, Harris responds that it will not challenge personal jurisdiction for purposes of this action only. Except as expressly admitted, Harris denies the remaining allegations of paragraph 10.

11.     In response to paragraph 11, Harris responds that it will not challenge venue for purposes of this action only.  Except as expressly admitted, Harris denies the remaining allegations of paragraph 11.

## HUAWEI PATENTS

12.     In response to paragraph 12, Harris admits that Exhibit 1 filed at Dkt. 4-1 purports to be a true and correct copy of United States Reissue Patent No. RE44,325 ("the '325 Patent"), titled "Method of Providing a Remote Power Feed to a Terminal in a Local Area Network, and Corresponding Remote Power Feed Unit, Concentrator, Repeater, and Terminal."   Harris admits that the copy of the '325 Patent attached as Exhibit 1 states on its face that it was issued by the USPTO on June 25, 2013.  Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 12, and therefore denies the same.

13.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent an answer is required, Harris denies the allegations of paragraph 13.

14.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '325 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, Harris denies the allegations of paragraph 14.

15.     In response to paragraph 15, Harris admits that Exhibit 2, filed at Dkt. 4-2, purports to be a true and correct copy of United States Patent No. 8,416,892 ("the '892 Patent"), titled "Method and apparatus of transmitting a random access preamble."  Harris admits that the copy of the '892 Patent attached as Exhibit 2 states on its face that it was issued by the USPTO

on April 9, 2013 and that Huawei Technologies was the original Assignee.  Harris is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of paragraph 15, and therefore denies the same.

16.     The allegations in this paragraph contain legal conclusions that require no answer.

To the extent an answer is required, Harris denies the allegations of paragraph 16.

17.     The allegations in this paragraph contain legal conclusions that require no answer.

To the extent the allegations in this paragraph quote from the '892 Patent, Harris responds that

the patent is the best source of the full content and denies the allegations to the extent they do

not accurately represent the patent's full content and context.  To the extent any further answer

is required, Harris denies the allegations of paragraph 17.

18.     The allegations in this paragraph contain legal conclusions that require no answer.

To the extent the allegations in this paragraph quote from the '892 Patent, Harris responds that

the patent is the best source of the full content and denies the allegations to the extent they do

not accurately represent the patent's full content and context.  To the extent any further answer

is required, Harris denies the allegations of paragraph 18.

19.     In response to paragraph 19, Harris admits that Exhibit 3, filed at Dkt. 4-3,

purports to be a true and correct copy of United States Patent No. 8,798,575 ("the '575 Patent"),

titled "Method for improving service data flow based charging and system thereof."  Harris

admits that the '575 Patent attached as Exhibit 3 states on its face that it was issued by the

USPTO on August 5, 2014 and that Huawei Technologies was the original assignee. Harris is

without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations of paragraph 19, and therefore denies the same.

20.      The allegations in this paragraph contain legal conclusions that require no answer. To the extent an answer is required, Harris denies the allegations of paragraph 20.

21.      The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '575 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, Harris denies the allegations of paragraph 21.

22.      The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '575 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, Harris denies the allegations of paragraph 22.

23.      The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '575 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, Harris denies the allegations of paragraph 23.

24.      In response to paragraph 24, Harris responds that Exhibit 4, filed as Dkt. 4-4, purports to be a true and correct copy of United States Patent No. 9,838,851 ("the '851 Patent"), titled "Subframe Processing Method and Device." Harris admits that the '851 Patent attached as Exhibit 4 states on its face that it was issued by the USPTO on December 5, 2017 and that Huawei Technologies was the original assignee. Harris is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of paragraph 24, and therefore denies the same.

     25.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent an answer is required, Harris denies the allegations of paragraph 25.

     26.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '851 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, Harris denies the allegations of paragraph 26.

     27.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '851 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, Harris denies the allegations of paragraph 27.

     28.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '851 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, Harris denies the allegations of paragraph 28.

     29.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '851 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do

not accurately represent the patent's full content and context. To the extent any further answer is required, Harris denies the allegations of paragraph 29.

30.     In response to paragraph 30, Harris responds that Exhibit 5, filed at Dkt. 4-5, purports to be a true and correct copy of United States Patent No. 10,117,226 ("the '226 Patent"), titled "Method, Apparatus, and System for Transmission Control of Multimedia Broadcast Multicast Service Data." Harris admits that the '226 patent as attached at Exhibit 5 states on its face that it was issued by the USPTO on Oct. 30, 2018 and that the original assignee was Huawei Technologies. Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 24, and therefore denies the same.

31.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent an answer is required, Harris denies the allegations of paragraph 31.

32.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '226 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context. To the extent any further answer is required, Harris denies the allegations of paragraph 32.

33.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '226 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context. To the extent any further answer is required, Harris denies the allegations of paragraph 33.

34.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '226 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, Harris denies the allegations of paragraph 34.

35.     The allegations in this paragraph contain legal conclusions that require no answer. To the extent the allegations in this paragraph quote from the '226 Patent, Harris responds that the patent is the best source of the full content and denies the allegations to the extent they do not accurately represent the patent's full content and context.  To the extent any further answer is required, Harris denies the allegations of paragraph 35.

36.     Harris denies that Huawei has offered a license to the Huawei Asserted Patents on fair, reasonable, and non-discriminatory terms.  Harris admits that on December 5, 2018 and December 21, 2018, Huawei sent Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE and Power over Ethernet and including no information about offered license terms.  Harris admits that on December 21, 2018, Huawei identified certain Huawei patents to Harris's licensing representative, including only one of the Huawei Asserted Patents.  Harris admits that on March 31, 2019, Huawei sent a letter to Harris stating that a worldwide FRAND license would be available but included no information about offered license terms.  Harris responded to the March 31, 2019 letter on April 3, 2019 in conjunction with communication about Harris's patents and further stated a willingness to include discussion of Huawei's patents in ongoing discussions.  Harris further arranged a phone call with Huawei representatives and further responded on April 12, 2019 that Harris would provide more details concerning Huawei's March 31, 2019 letter.  On April 22, 2019, Harris

emailed Huawei to ask if they could set up a call that week.  Huawei did not respond.  Instead, Huawei asserted its counterclaims for infringement on April 26, 2019 despite Harris's good faith responses and without having communicated specific offered license terms.  To the extent not expressly admitted, Harris denies the allegations of paragraph 36.

## HARRIS'S ALLEGEDLY INFRINGING PRODUCTS AND ACTIVITIES

37.     Harris admits that it has produced for certain worldwide markets the Harris RF-7800W-IU200 Network Interface Unit, the Harris RF-7800W-PS104 Rugged Power Supply, and the Harris Falcon III RF-7850A-TM001 Roll-on/Roll-off Airborne System.  Harris further responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 37 and therefore denies the same.

38.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38 and therefore denies the same.

39.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains language that is vague, ambiguous,

undefined and/or susceptible to multiple different interpretations, and as a result, Harris is
without knowledge or information sufficient to form a belief as to the truth of the remaining
allegations in paragraph 39 and therefore denies the same.

40.     Harris is without knowledge or information sufficient to form a belief as to the
truth of certain allegations in paragraph 40 and therefore denies the same.  Harris further
responds that this paragraph contains legal conclusions that require no answer and/or language
that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and
as a result, Harris is without knowledge or information sufficient to form a belief as to the truth
of the remaining allegations in paragraph 40 and therefore denies the same.

41.     Harris admits that it has produced for certain worldwide markets certain products
that may, in certain configurations, communicate with an LTE communications network.  Harris
further responds that this paragraph contains legal conclusions that require no answer and/or
language that is vague, ambiguous, undefined and/or susceptible to multiple different
interpretations, and as a result, Harris is without knowledge or information sufficient to form a
belief as to the truth of the remaining allegations in paragraph 41 and therefore denies the same.

42.     Harris admits that it has produced for certain worldwide markets certain products
that may, in certain configurations, communicate with an LTE communications network.  Harris
further responds that to the extent the allegations in this paragraph quote from or characterize
the referenced documents, Harris responds that the documents are the best source of the full
content and denies the allegations to the extent they do not accurately represent the documents'
full content and context.  This paragraph further contains legal conclusions that require no
answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple
different interpretations, and as a result, Harris is without knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in paragraph 42 and therefore denies the same.

## FIRST CAUSE OF ACTION
## (ALLEGED INFRINGEMENT OF U.S. REISSUE PATENT NO. RE44,325)

43.     Harris realleges and incorporates by reference the responses in the foregoing paragraphs.

44.     Harris admits that it has produced for certain worldwide markets the Harris RF-7800W-IU200 Network Interface Unit, the Harris RF-7800W-PS104 Rugged Power Supply, and the Harris Falcon III RF-7850A-TM001 Roll-on/Roll-off Airborne System.  Harris further responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 114 and therefore denies the same.  To the extent an answer is required, Harris denies the remaining allegations of this paragraph.

45.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 115 and therefore denies the same.  To the extent an answer is required, Harris denies the remaining allegations of this paragraph.

46.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 116 and therefore denies the same.  To the extent an answer is required, Harris denies the remaining allegations of this paragraph.

47.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 117 and therefore denies the same.  To the extent an answer is required, Harris denies the remaining allegations of this paragraph.

48.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different

interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 118 and therefore denies the same.  To the extent an answer is required, Harris denies the remaining allegations of this paragraph.

49.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied

50.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

51.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

52.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

53.     Harris admits that on December 5, 2018, Huawei sent Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to Power over Ethernet.  This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris denies the allegations of this paragraph.

54.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

55.     Harris admits that Huawei purports to seek recovery of monetary damages through this action.  Otherwise Harris denies the allegations in paragraph 125.

### SECOND CAUSE OF ACTION
### (ALLEGED INFRINGEMENT OF U.S. PATENT NO. 8,416,892)

56.     Harris realleges and incorporates by reference the responses in the foregoing paragraphs.

57. Harris admits that it has produced for certain worldwide markets products designated XL-185M, XL-185P, RF3590, and XL-200P. Harris further responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 127 and therefore denies the same. To the extent an answer is required, Harris denies the remaining allegations of this paragraph.

58. To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context. This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 128 and therefore denies the same. To the extent an answer is required, Harris denies the allegations of this paragraph.

59. To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context. This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 129 and therefore denies the same. To the extent an answer is required, Harris denies the allegations of this paragraph.

60.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

61.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

62.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 132 and therefore denies the same.  To the extent an answer is required, Harris denies the allegations of this paragraph.

63.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

64.     Harris admits that on December 5, 2018, Huawei sent Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE.  This paragraph contains legal conclusions that require no answer and/or allegations for which Harris is without knowledge or information sufficient to form a belief as to truth and therefore denies the allegations.  To the extent an answer is required, Harris denies the allegations of this paragraph.

65.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

66.     Harris admits that Huawei purports to seek recovery of monetary damages
through this action.  Otherwise Harris denies the allegations in paragraph 136.

### THIRD CAUSE OF ACTION
### (ALLEGED INFRINGEMENT OF U.S. PATENT NO. 8,798,575)

67.     Harris realleges and incorporates by reference the responses in the foregoing
paragraphs.

68.     Harris denies that it produces or sells products designated as "Evolved Packet
Cores."  Harris is without knowledge or information sufficient to form a belief as to whether
Cisco Packet Data Network (PDN) Gateway (P-GW) products or other third-party products
practice and comply with the LTE standard.  Harris further responds that this paragraph
contains legal conclusions that require no answer and/or language that is vague, ambiguous,
undefined and/or susceptible to multiple different interpretations, and as a result, Harris is
without knowledge or information sufficient to form a belief as to the truth of the remaining
allegations in paragraph 138 and therefore denies the same.  To the extent an answer is required,
Harris denies the allegations of this paragraph.

69.     To the extent the allegations in this paragraph quote from or characterize the
referenced documents, Harris responds that the documents are the best source of the full content
and denies the allegations to the extent they do not accurately represent the documents' full
content and context.  This paragraph further contains legal conclusions that require no answer
and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different
interpretations, and as a result, Harris is without knowledge or information sufficient to form a
belief as to the truth of the remaining allegations in paragraph 139 and therefore denies the
same.  To the extent an answer is required, Harris denies the allegations of this paragraph.

70.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

71.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

72.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 142 and therefore denies the same.  To the extent an answer is required, Harris denies the allegations of this paragraph.

73.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

74.     Harris denies that Huawei sent it an email on December 5, 2012.  Harris admits that on December 5, 2018, Huawei sent Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE.  This paragraph contains legal conclusions that require no answer and/or allegations for which Harris is without knowledge or information sufficient to form a belief as to truth and therefore denies the allegations.  To the extent an answer is required, Harris denies the allegations of this paragraph.

75.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

76.     Harris admits that Huawei purports to seek recovery of monetary damages through this action.  Otherwise Harris denies the allegations in paragraph 146.

### FOURTH CAUSE OF ACTION
### (ALLEGED INFRINGEMENT OF U.S. PATENT NO. 9,838,851)

77.     Harris realleges and incorporates by reference the responses in the foregoing paragraphs.

78.     Harris admits that it has produced for certain worldwide markets certain products referred to as Tactical 4G LTE Radios.  Harris further responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 148 and therefore denies the same.

79.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 149 and therefore denies the same.  To the extent an answer is required, Harris denies the allegations of this paragraph.

80.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer

and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 150 and therefore denies the same. To the extent an answer is required, Harris denies the allegations of this paragraph.

81. To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context. This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 151 and therefore denies the same. To the extent an answer is required, Harris denies the allegations of this paragraph.

82. This paragraph contains legal conclusions that require no answer. To the extent an answer is required, Harris responds as follows: Denied.

83. This paragraph contains legal conclusions that require no answer. To the extent an answer is required, Harris responds as follows: Denied.

84. To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context. This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in paragraph 154 and therefore denies the same. To the extent an answer is required, Harris denies the allegations of this paragraph.

85.     This paragraph contains legal conclusions that require no answer. To the extent an answer is required, Harris responds as follows: Denied.

86.     Harris admits that on December 5, 2018, Huawei sent Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE. Harris further admits that on December 21, 2018, Huawei sent Harris's licensing representative a list of patents which included a listing of the '851 patent. This paragraph contains legal conclusions that require no answer and/or allegations for which Harris is without knowledge or information sufficient to form a belief as to truth and therefore denies the allegations. To the extent an answer is required, Harris denies the allegations of this paragraph.

87.     This paragraph contains legal conclusions that require no answer. To the extent an answer is required, Harris responds as follows: Denied.

88.     Harris admits that Huawei purports to seek recovery of monetary damages through this action. Otherwise Harris denies the allegations in paragraph 158.

**FIFTH CAUSE OF ACTION
(ALLEGED INFRINGEMENT OF U.S. PATENT NO. 10,117,226)**

89.     Harris realleges and incorporates by reference the responses in the foregoing paragraphs.

90.     Harris admits that it has produced for certain worldwide markets certain products referred to as Tactical 4G LTE Radios. Harris further responds that this paragraph contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 160 and therefore denies the same.

91.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 161 and therefore denies the same.  To the extent an answer is required, Harris denies the allegations of this paragraph.

92.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 162 and therefore denies the same.  To the extent an answer is required, Harris denies the allegations of this paragraph.

93.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context.  This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different

interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 163 and therefore denies the same. To the extent an answer is required, Harris denies the allegations of this paragraph.

94.     This paragraph contains legal conclusions that require no answer. To the extent an answer is required, Harris responds as follows: Denied.

95.     This paragraph contains legal conclusions that require no answer. To the extent an answer is required, Harris responds as follows: Denied.

96.     To the extent the allegations in this paragraph quote from or characterize the referenced documents, Harris responds that the documents are the best source of the full content and denies the allegations to the extent they do not accurately represent the documents' full content and context. This paragraph further contains legal conclusions that require no answer and/or language that is vague, ambiguous, undefined and/or susceptible to multiple different interpretations, and as a result, Harris is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 166 and therefore denies the same. To the extent an answer is required, Harris denies the allegations of this paragraph.

97.     This paragraph contains legal conclusions that require no answer. To the extent an answer is required, Harris responds as follows: Denied.

98.     Harris admits that on December 5, 2018, Huawei sent Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE. This paragraph contains legal conclusions that require no answer and/or allegations for which Harris is without knowledge or information sufficient to form a belief as to truth and therefore denies the allegations. To the extent an answer is required, Harris denies the allegations of this paragraph.

99.     This paragraph contains legal conclusions that require no answer.  To the extent an answer is required, Harris responds as follows:  Denied.

100.    Harris admits that Huawei purports to seek recovery of monetary damages through this action.  Otherwise Harris denies the allegations in paragraph 170.

### RESPONSE TO HUAWEI'S DEMAND FOR JURY TRIAL

Huawei's demands for a trial by jury does not state any allegation that requires a response by Harris.

### RESPONSE TO HUAWEI'S PRAYER FOR RELIEF

In response to Huawei's prayer for relief, Harris denies that Huawei is entitled to any relief sought in its claims.

### AFFIRMATIVE DEFENSES

101.    Pursuant to Federal Rule of Civil Procedure 8(c), Harris alleges and asserts the following defenses in response to the allegations in Huawei's Complaint, undertaking the burden of proof only as to those defenses required by law, regardless of how such defenses are denominated herein.  To the extent each of its defenses relate to specific Harris counterclaims on the same or similar issues, Harris repeats and incorporates by reference the allegations contained in those counterclaims as if fully set forth with respect to those defenses.  Harris reserves the right to assert any other defenses and counterclaims as discovery progresses.

### FIRST AFFIRMATIVE DEFENSE
### (FAILURE TO STATE A CLAIM)

102.    Huawei's Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
### (STANDING)

103.    Huawei entities lack standing to bring suit for alleged patent infringement.

## THIRD AFFIRMATIVE DEFENSE
### (INVALIDITY)

104.     U.S. Patent Nos. RE44,325 ("the '325 Patent"), 8,416,892 ("the '892 Patent),

8,798,575 ("the '575 Patent), 9,838,851 ("the '851 Patent) and 10,117,226 ("the '226 Patent)

(collectively, "the Huawei Asserted Patents") are invalid, void and/or unenforceable for failure

to comply with one or more of the conditions for patentability set forth in Title 35 of the United

States Code, including without limitation, for example, Sections 101, 102, 103, 112, 116, and/or

132.

## FOURTH AFFIRMATIVE DEFENSE
### (NON-INFRINGEMENT)

105.     Harris does not infringe and has not infringed, induced infringement of, or

contributed to infringement of any valid and enforceable claim of Huawei's Asserted Patents,

literally or under the doctrine of equivalents, willfully or otherwise.

## SIXTH AFFIRMATIVE DEFENSE
### (PROSECUTION HISTORY ESTOPPEL)

106.     Huawei is estopped, based on statements, representations, and admissions made

during prosecution of the applications that led to the Huawei Asserted Patents, from asserting

any interpretation of the claims of those patents that would be broad enough to cover any

accused equipment or methods alleged to infringe those patents, either literally or under the

doctrine of equivalents.

## SEVENTH AFFIRMATIVE DEFENSE
### (EQUITABLE DEFENSES)

107.     Huawei's claims are barred, either whole or in part, by the doctrine of laches,

waiver, estoppel, patent misuse, and/or unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE
## (STATUTORY LIMITATION ON DAMAGES)

108.    Any claim by Huawei for damages is limited by 35 U.S.C. §§ 252, 286, 287, or

307. Huawei is barred by 35 U.S.C. § 288 from recovering costs associated with this action.

## NINTH AFFIRMATIVE DEFENSE
## (NO WILLFUL INFRINGEMENT)

109.    Huawei is not entitled to enhanced damages under 35 U.S.C. § 284 because

Huawei has failed to meet, and cannot meet as a matter of law, the requirements for willful

infringement.

## TENTH AFFIRMATIVE DEFENSE
## (STATUTORY LIMITATION)

110.    To the extent certain equipment or software accused of infringing the Huawei

Asserted Patents are used by and/or manufactured for the United States Government, Huawei's

claims involving Harris equipment or software supplied to the Government and for authorized

Foreign Military Sales may not be pursued in this Court and are subject to other limitations

pursuant to 28 U.S.C. § 1498.

## ELEVENTH AFFIRMATIVE DEFENSE
## (NON-COMPLIANCE WITH SSO UNDERTAKINGS AND OBLIGATIONS)

111.    Huawei's claims for relief are limited and/or barred, in whole or in part, by its

undertakings and obligations to standards-setting organizations.

## TWELFTH AFFIRMATIVE DEFENSE
## (CONTRACTUAL LIMITATION ON DAMAGES – FRAND)

112.    Huawei's claims for monetary relief are limited by its obligation to license the

Huawei Asserted Patents on fair, reasonable, and non-discriminatory terms.

## THIRTEENTH AFFIRMATIVE DEFENSE
## (PATENT EXHAUSTION AND LICENSE)

113.     Upon information and belief, Huawei's claims for relief are barred, in whole or in part, as a result of patent exhaustion and/or a license to the Huawei Asserted Patents.  To the extent Harris's vendors have entered into patent license agreements with Huawei, Harris's use of network equipment or software from those vendors during the terms of those agreements is authorized under those agreements.

## FOURTEENTH AFFIRMATIVE DEFENSE
## (NON-COMPLIANCE WITH LICENSING OBLIGATION)

114.     Huawei's claims for relief are barred, in whole or in part, by its failure to comply with its obligation to offer to license the Huawei Asserted Patents on FRAND terms, including its refusal to offer licensing terms for each of the Huawei Asserted Patents.

## FIFTEENTH AFFIRMATIVE DEFENSE
## (UNENFORCEABILITY)

115.     One or more of Huawei's Asserted Patents are unenforceable against Harris under the equitable doctrines of estoppel, waiver, implied waiver, patent misuse, unclean hands, or other equitable doctrines.

116.     Upon information and belief, Huawei's actions, including but not limited to those set forth herein regarding Huawei's breach of what—according to Huawei's own admissions— are its FRAND commitments, equitably estop Huawei from asserting, and/or constitute waiver or implied waiver of, any rights to enforce any allegedly standard-essential patents against any entity allegedly practicing the standard, including Harris.

117.     Huawei's actions, including but not limited to those set forth herein regarding Huawei's breach of what—according to Huawei's own assertions—are its FRAND commitments, render Huawei's allegedly standard-essential patents unenforceable on grounds

of unclean hands (or other equitable doctrines) against any entity allegedly practicing the standard, including Harris.

118.    Huawei is a member of, and an active participant in, standards setting organizations such as 3GPP, ETSI, and IEEE.  Huawei Complaint at ¶ 6.  Huawei admits that it is obligated to license the Huawei Asserted Patents on FRAND terms.  Case No. 2:18-cv-00439-JRG, Dkt. 68 at 1 (". . . Huawei readily acknowledges that its patents are subject to FRAND obligations . . .").  Harris was and remains a willing licensee, to the extent the Huawei Asserted Patents are valid, enforceable, and infringed standard-essential patents.  Harris responded to Huawei's March 31, 2019 letter on April 3, 2019, stating a willingness to include discussion of Huawei's patents in ongoing discussions.  Harris further arranged a phone call with Huawei representatives and further responded on April 12, 2019 that Harris would provide more details concerning Huawei's March 31, 2019 letter.  On April 22, 2019, Harris emailed Huawei to ask if they could set up a call that week.  Huawei did not respond.  Instead, Huawei asserted its counterclaims for infringement on April 26, 2019 despite Harris's good faith responses and without having communicated specific offered license terms.  Filing counterclaims for infringement against a willing licensee without having communicated terms of a FRAND offer breached Huawei's obligations and constituted standard-setting misconduct. Further facts detailing Huawei's standard-setting misconduct are given below with respect to Harris's counterclaims.

119.    The described actions and conduct by Huawei constitute standard-setting misconduct, threatening continued harm to Harris and relevant third-parties, rendering the patents unenforceable.

## SIXTEENTH AFFIRMATIVE DEFENSE
## (NO INJUNCTIVE RELIEF)

120.    Huawei's remedies at law are adequate, and its alleged injury is not immediate or irreparable, such that equitable relief would be inappropriate for any determined infringement of Huawei's Asserted Patents.  Further, according to Huawei's admissions, it has made binding commitments to license Huawei's Asserted Patents on FRAND terms and conditions, thereby knowingly surrendering its right to injunctive or other exclusionary relief.  By virtue of not having offered Harris, a willing licensee, a license on FRAND terms and condition, Huawei has no legal right to injunctive relief.

## HARRIS CORPORATION'S COUNTERCLAIMS

Defendant and Counterclaimant Harris Corporation ("Harris") hereby asserts the following counterclaims in response to the Complaint filed by Huawei Device USA, Inc. ("Huawei USA"), Huawei Device Co. Ltd. ("Huawei Device"), Huawei Technologies USA Inc. ("HTUS"), Huawei Technologies Co. Ltd. ("Huawei Technologies"), and Huawei Device (Shenzhen) Co. Ltd. ("Huawei Shenzhen") (collectively, "Huawei") (Dkt. 4) as follows:

## PARTIES

121.    In its Complaint, Huawei avers that Huawei USA is a Texas corporation with a place of business in Plano, Texas; Huawei Device is a Chinese company with a place of business in Dongguan, People's Republic of China; HTUS is a Texas corporation with a place of business in Plano, Texas; Huawei Technologies is a Chinese company with a place of business in Shenzhen, People's Republic of China; Huawei Shenzhen is a Chinese company with a place of business in Shenzhen, People's Republic of China.

122.     Harris Corporation is a Delaware corporation duly organized and existing under the laws of the state of Delaware with its principal place of business at 1025 West NASA Boulevard, Melbourne, Florida.

## JURISDICTION AND VENUE

123.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338(a), 1338(b), 1367 as Harris counterclaims against Huawei pursuant to the patent laws of the United States, Title 35, United States Code, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. An actual, substantial and continuing justiciable controversy exists between Harris and Huawei based on Huawei having filed its Complaint alleging infringement of the Huawei Asserted Patents.

124.     Huawei has submitted to personal jurisdiction of this Court through the filing of its Complaint against Harris, and is additionally subject to personal jurisdiction of this Court for the reasons given in Harris's Amended Complaint, Case No. 2:18-cv-00439-JRG, Dkt. 13 at ¶ 8.

125.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b), (c), (d) and 1400(b) because Huawei USA and HTUS are Texas corporations located in this judicial district, and additionally for the reasons given in Harris's Amended Complaint, Case No. 2:18-cv-00439-JRG, Dkt. 13 at ¶ 9.

## STANDARDS SETTING ORGANIZATIONS

126.     Standard development organizations and/or Standards Setting Organizations ("SSOs") are any organizations (e.g., Institute of Electrical and Electronics Engineers or IEEE, Third Generation Partnership Project or 3GPP, or European Telecommunications Standards Institute or ETSI) which are active in the development of standards.  Standards play an

important role in the development of wireless data and telecommunications. Standards facilitate the development, improvement, and advancement of technology and products that interoperate with one another.

127. Industry standards are typically drafted by members of a standard's organization as a matter of consensus.

128. Because standardization promotes a market-wide use of SEPs, patent owners are incentivized to propose technologies covered by their patent rights such that every implementer who wishes to utilize interoperability must take a license to their patents to avoid infringement liabilities.

129. Once a standard has been adopted, patents that are essential to the adopted standard, *i.e.*, those that claim technologies selected by the participants in the standards development process for inclusion in a standard, gain undue significance that they would not have had but for the adoption of the standard.

130. The inclusion of patented technology into a standard enables the holders of the patented technology essential to the standard, if not otherwise constrained, to extract monopoly rents from implementers of a standard and/or prevent others from implementing the standard by refusing to license the patents on terms that would enable its implementation.

131. In order to reduce the likelihood that implementers of standards will be subject to abusive practices by patent holders, SSOs have adopted rules, policies, and procedures that control the disclosure and licensing of patents that implementers may require in order to practice the standard under consideration. These rules, policies, and/or procedures are set out in the intellectual property rights policies ("IPR policies") of the SSOs. IPR policies generally require patent owners of essential patents to commit to license those patents on fair, reasonable,

and non-discriminatory terms ("FRAND"). These FRAND terms are intended to prevent patent owners of essential patents from acquiring too much of the market power that would otherwise be inherent in owning an essential patent.

132. It is important for SSOs to consider whether an entity that claims rights over a proposed technology has committed to make that technology available on FRAND terms and conditions.

133. IPR policies facilitate an informed comparison of the members of the SSOs and their technologies.

## IEEE STANDARDS BODY AND IPR POLICY

134. The Institute of Electrical and Electronics Engineers Standards Association ("IEEE-SA") is the standard setting arm of the Institute of Electrical and Electronics Engineers ("IEEE"), the IEEE-SA promulgates technical standards in a variety of fields, including telecommunications. Under the IEEE-SA's IPR policy, when individuals participating in IEEE standards development come to believe that a company, university, or other patent holder owns patents or patent applications that might be essential to implement IEEE standard under development, IEEE-SA requests Letters of Assurance ("LOA") from those entities.

135. The letters of assurance sought by IEEE provide either a general disclaimer that the patentee would not enforce the patent(s), or a promise by the patentee that it would license the patent(s) to an unrestricted number of applicants at either no cost or under reasonable terms and conditions that are demonstrably free of any unfair discrimination (*i.e.*, on FRAND terms). Moreover, letters of assurances, once provided, are irrevocable and shall be in force at least until the standard's withdrawal. Moreover, any subsequence assignee and transferee of the patent(s) must agree to abide by any assurances in place.

-31-

136.    Further, according to IEEE's IPR policy, if the letters of assurance have not been provided for essential patents, the IEEE working group either will revise the standard so that compliance can be achieved without infringing the patent(s), or would discontinue work on the standard altogether.

**ETSI AND 3GPP STANDARDS BODIES AND IPR POLICIES**

137.    ETSI is an independent, non-profit SSO that produces globally-accepted standards for the telecommunications industry.  ETSI has more than 700 members from more than 60 countries across five continents.  In addition to its own activities, ETSI is also one of the SSOs that are organizational partners of the 3rd Generation Partnership Project ("3GPP"), which exists to unite the SSOs in the development of worldwide standards for the telecommunications industry. Together, ETSI and its members have developed common technical standards that often become mandatory as, in some cases, national or international regulatory bodies require adherence to particular ETSI standards.  3GPP produces and maintains the world's most widely adopted cellular standards such as the Long Term Evolution ("LTE") standard.

138.    3GPP develops these standards through an open voluntary consensus-based process.

139.    Mobile standards, such as for third-generation ("3G") technologies and fourth generation ("4G") technologies, consist of voluminous sets of requirements and protocols that must be followed for mobile devices to connect to the mobile network.

140.    On information and belief, Huawei employees participate in 3GPP standardization, at least in part, through Huawei's membership in ETSI.

141.    ETSI recognizes that standards rely on technical contributions from various sources that may contain patented technologies and other protected rights which are commonly known as Intellectual Property Rights ("IPRs").

142.    3GPP produces technical specifications that are adopted as standards by Organizational Partners, such as ETSI.   3GPP was created to oversee work on global 3G cellular specifications and has subsequently worked on creating 4G specifications.  The 3GPP Organizational Partners agreed that members of a particular Organizational Partner would be bound by the IPR policy of that Organizational Partner when participating at 3GPP.

143.    ETSI has adopted an Intellectual Property Rights ("IPR") Policy, incorporated as Annex 6 of the ETSI Rules of Procedure.   The ETSI IPR Policy is governed by the laws of France, and provides that "[a]ny right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature."

144.    Among other requirements, the ETSI IPR Policy imposes on members an obligation to disclose patents and patent applications to ETSI and its members that a member believes are or may become essential to an ETSI standard.  Once such a disclosure is made, the member is requested to submit an irrevocable undertaking confirming its willingness to license the IPRs it has disclosed on FRAND terms and conditions.

145.    Specifically, Clause 4.1 of the ETSI IPR Policy provides as follows regarding the disclosure obligation at ETSI:

> Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely

fashion. In particular, a MEMBER submitting a technical
proposal for a STANDARD or TECHNICAL
SPECIFICATION shall, on a bona fide basis, draw the
attention of ETSI to any of that MEMBER's IPR which might
be ESSENTIAL if that proposal is adopted.

146.     In its second sentence, Clause 4.1 imposes a "particular" requirement on members

submitting a technical proposal to disclose the existence of any potentially essential IPR before

the proposal is adopted.

147.     The disclosure requirement under Clause 4.1 of the ETSI IPR Policy is intended to

ensure that when ETSI members (or participants at 3GPP) are deciding upon the functionality to

include in a standard specification, they have an understanding of the existence of IPR that may

potentially be implicated by the standard.   This knowledge allows members to make choices

about the standard with a better understanding of the consequences of their choices for

implementation of the standard.  ETSI and its members rely on the safeguards of the disclosure

and FRAND licensing obligation to ensure the viability and commercial potential of the

standards adopted by ETSI.

148.     The ETSI IPR Policy further requests that SEP owners submit an irrevocable

written undertaking that they are prepared to grant irrevocable licenses on "fair, reasonable, and

non-discriminatory" or FRAND terms and conditions.  Clause 6.1 states:

When an ESSENTIAL IPR relating to a particular STANDARD or
TECHNICAL SPECIFICATION is brought to the attention of ETSI, the
Director-General of ETSI shall immediately request the owner to give
within three months an irrevocable undertaking in writing that it is
prepared to grant irrevocable licenses on fair, reasonable and non-
discriminatory ("FRAND") terms and conditions under such IPR to at
least the following extent:

● MANUFACTURE, including the right to make or have made
customized components and sub-systems to the licensee's own design for
use in MANUFACTURE;

● sell, lease, or otherwise dispose of EQUIPMENT
so MANUFACTURED;
● repair, use, or operate EQUIPMENT; and
● use METHODS.

The above undertaking may be made subject to the condition that those
who seek licences agree to reciprocate.

149.    ETSI's IPR Policy was designed to benefit all ETSI members, as well as all other

parties that implement an ETSI standard.  In particular, the Policy described in Clause 3.1 that it

has the objective to "reduce the risk" to those implementing the standards or other technical

specifications "that investment in the preparation, adoption and application of the

STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or

TECHNICAL SPECIFICATION being unavailable."

150.    Through disclosure of potentially essential IPRs and obtaining FRAND

commitments for them, ETSI is able to include technology in its standards that may be covered

by IPRs with confidence that hold-up tactics by owners of declared SEPs will not undermine the

subsequent widespread adoption of the standards.  If a FRAND undertaking is not made, the

IPR Policy provides ETSI an opportunity, during the development of the standard, to ensure that

the standard avoids the patent or patent application in question.

**ALCATEL LUCENT DISCLOSURES TO IEEE**

151.    On May 19, 2008, Barbara Landmann, acting on behalf of the corporation known

as Alcatel Lucent, submitted a Letter of Assurance ("LOA") to the IEEE-SA, publicly available

at https://standards.ieee.org/content/dam/ieee-

standards/standards/web/governance/patcom/loas/loa-802_3at-alcatel-19May2008.pdf.  The

letter of assurance was specifically limited to the 802.3at standard for "Local & Metropolitan

Area Networks – Specific Requirements Part 3: - CSMA/CD Access Method & Phy Layer Spec Amendment: DTE Power via the MDI Enhancements."

152.    Pursuant to the letter of assurance, Alcatel Lucent declared that it "may own, control, or have the ability to license Patent Claims that might be or become Essential Patent Claims," and whereby it agreed to "grant a license under reasonable rates to an unrestricted number of applicants . . . with reasonable terms and conditions that are demonstrably free of unfair discrimination."

153.    The Alcatel Lucent LOA is a "Blanket Letter of Assurance.  As such, all Essential Patent Claims that the Submitter may currently or in the future have the ability to license shall be available under the terms as indicated in part D.1"  At the time Alcatel Lucent submitted this LOA, Alcatel-Lucent was the owner of U.S. Patent No. 6,715,087 which later reissued as the asserted '325 patent.

154.    The Alcatel Lucent LOA further agreed:

The Submitter agrees (a) to provide notice of a Letter of Assurance either through a Statement of Encumbrance or by binding any assignee or transferee to the terms of such Letter of Assurance; and (b) to require its assignee or transferee to (i) agree to similarly provide such notice and (ii) to bind its assignees or transferees to agree to provide such notice as described in (a) and (b).

155.    According to assignment records from the USPTO public database, Huawei acquired the rights to the '325 Patent on December 31, 2015.

156.    In this litigation, Huawei has taken the position that the '325 patent is essential to the IEEE 802.3at standard.  In this litigation, Huawei has also admitted that it is obligated to

license the Huawei Asserted Patents on FRAND terms.  Case No. 2:18-cv-00439-JRG, Dkt. 68

at 1 (". . . Huawei readily acknowledges that its patents are subject to FRAND obligations . . .").

Accordingly, Huawei has a contractual obligation to license the '325 patent on FRAND terms in

accordance with Alcatel-Lucent's LOA and the IEEE-SA policy.

<u>**HUAWEI DISCLOSURES TO 3GPP**</u>

157.    Harris is informed and believes that Huawei is a member of, and an active

participant in, standards setting organizations such as 3GPP and ETSI.  Huawei Complaint at ¶

6.  Huawei admits that it is obligated to license the Huawei Asserted Patents on FRAND terms.

Case No. 2:18-cv-00439-JRG, Dkt. 68 at 1 (". . . Huawei readily acknowledges that its patents

are subject to FRAND obligations . . .").

158.    Huawei violated its obligation as a member of ETSI to timely disclose the Huawei

Asserted Patents (or patents or patent applications within the same families) in accordance with

the requirements of the ETSI IPR Policy.

159.    As early as 1994, Clause 4.1 of the Policy required that "[e]ach MEMBER shall

use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of.

In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona

fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be

ESSENTIAL if that proposal is adopted."

160.    Huawei was bound by the ETSI IPR Policy during its participation at ETSI and

also at the 3rd Generation Partnership Project (3GPP), of which ETSI is an organizational

member.  ETSI and its members rely on the disclosure requirements to safeguard the standard-

setting process and ensure that decisions regarding what technology to standardize are made

with an understanding of the potential implications for those decisions on licensing patents that may be claimed essential to those technologies.

161.     Huawei failed to disclose the existence of its Huawei Asserted Patents or family members of its Huawei Asserted Patents during the standardization of cellular standards at ETSI and 3GPP, while participating in the development of technologies that it apparently believed were covered by patents now asserted against Harris.

162.     Huawei's failure to timely disclose IPRs constitutes at least a waiver of its rights to enforce any claimed-essential patents against any entity practicing the standard and renders the patents unenforceable.  Alternatively, this conduct estops Huawei from asserting the patents and/or bars Huawei's infringement claims through the doctrine of unclean hands.

### '892 PATENT

163.     On, November 8, 2011 Huawei filed U.S. patent application 13/291,727, which issued on April 9, 2013 as U.S. Patent No. 8,416,892.  The '892 patent claims priority to Chinese Patent Application No. 200710074200 filed on April 30, 2007 and PCT Application No. PCT/CN2008/070768 filed on April 22, 2008.  The '892 patent lists Oskar Mauritz as the named inventor.

164.     Huawei has alleged that the '892 patent is essential to practicing 3GPP technical specification 3GPP TS 36.211 version 8.1.0 and later, which was developed by 3GPP working group RAN 1.  Huawei participated in working group RAN 1 and the development of 3GPP TS 36.211, including participation in various discussions related to Zadoff-Chu sequences.  For example, on information and belief, Huawei submitted R1-071408 at the RAN WG1 meeting #48bis, from Mar. 26-30, 2007.  At RAN Working Group 1, Meeting #49, from May 7-11, 2007, Huawei submitted R1-072325 and submitted R1-072324 with Panasonic.  Huawei

submitted proposal R1-072899 at RAN Working Group 1 Meeting #49bis, from June 25-29, 2007. Huawei further participated in email discussions through at least Oct. 8-12, 2007 as noted in R1-074026. Huawei further participated in TSG RAN1#50bis meeting in Shanghai, China between Oct. 8-12, 2007, where discussions continued regarding changes to version 8.0.0 of the standard.

165. At the opening of the TSG RAN1#50bis meeting, the Chairman drew attention to Members' obligations under the 3GPP Partner Organizations' IPR policies. Noting that every Individual Member organization is obliged to declare to the Partner Organization or Organizations of which it is a member any IPR owned by the Individual Member or any other organization which is or is likely to become essential to the work of 3GPP.

166. On information and belief, the named inventor of the '892 patent, Oskar Mauritz, was present at the TSG RAN1#50bis meeting. See R1-07504 attendee list.

167. On November 21, 2007, Change Request 0002 to version 8.0.0 of the 36.211 standard was submitted by Ericsson to reflect decisions taken at RAN1#50bis, including changes to sections 5.7.2. This change request was adopted and became part of the 36.211 version 8.1.0 which was uploaded on Dec. 20, 2007.

168. Despite the inventor's presence and participation at the RAN1#50bis meeting, Huawei did not submit any IPR declaration related to the '892 patent family until March 4, 2009, more than a year after the RAN1#50bis meeting and nearly two years after Huawei filed its Chinese application. ISLD-200904-001.

## '575 PATENT

169. On November 10, 2006, Huawei filed U.S. patent application 11/558,774, which issued on August 5, 2014 as U.S. Patent No. 8,798,575. The '575 patent claims priority to

Chinese Patent Application No. 200410044433 filed on May 12, 2004 and PCT Application No. PCT/CN2005/000665 filed on May 12, 2005. The '575 patent lists Xiaoqin Duan and Yajuan Wu as the named inventors.

170.    In its infringement contentions in this case, Huawei has alleged that the '575 patent is essential to practicing 3GPP technical specification 3GPP TS 23.203 versions 8.4.0 and later. Huawei has only submitted IPR declarations that claim the '575 patent is or may be essential to 3GPP TS 23.125, which is a parent specification to the 3GPP TS 23.203 and was developed by 3GPP working group SA2. Huawei and the named inventors of the '575 patent participated in working group SA2 and the development of 3GPP TS 23.125. Minutes of the SA2 #40 meeting, Draft 01, 3GPP TSG-SA2 #40, May 17-21, 2004 (June 4, 2004); Minutes of the SA2 #40 meeting, Draft 04, 3GPP TSG-SA2 #40, May 17-21, 2004 (Aug. 25, 2004); Minutes of the SA2 #41 meeting, Draft 01, 3GPP TSG-SA2 #41, August 16-20, 2004 (Aug. 26, 2004); Minutes of the SA2 #41 meeting, 3GPP TSG-SA2 #41, August 16-20, 2004 (Oct. 25, 2004); List of Registered Attendees at 3GPP TSG-SA2 #40; List of Registered Attendees at 3GPP TSG-SA2 #41; List of tdocs from 3GPP TSG-SA2 #40; List of tdocs from 3GPP TSG-SA2 #41; Tdoc S2-041930, 3GPP TSG-SA2 #40, May 17-21, 2004; Tdoc S2-042781, 3GPP TSG-SA2 #41, August 16-20, 2004. 3GPP froze TS 23.125 on December 16, 2004.

171.    At least one of the named inventors on the '575 patent, Yajuan Wu, attended 3GPP TSG-SA2 #40 meeting in Sophia Antipolis, France between May 17-21, 2004, where Huawei proposals were made, and where the chair drew the attention of 3GPP Individual Members (IMs) organizations to their obligations under the 3GPP Partner Organizations' IPR policies. Every IM is obliged to declare to the 3GPP Partner Organization or Organizations of

which it is a member, any IPR owned by the respective IM or by any other organization which is or is likely to become essential to the work of 3GPP.

172.     Both named inventors on the '575 patent, Yajuan Wu and Xiaoqin Duan, attended 3GPP TSG-SA2 #41 meeting in Montreal between August 16-20, 2004, where Huawei proposals were made, and the Chairman reminded Individual Members and the persons making the technical proposals about their obligations under their respective Organizational Partners IPR Policy.

173.     Huawei did not disclose the '575 patent or any member of the '575 patent's family to ETSI or 3GPP prior to the freeze date for TS 23.125.  In fact, Huawei failed to disclose that any member of the '575 patent family was believed to be essential to TS 23.125 until August 29, 2005, (ISLD 200509-005) over a year after Huawei inventors attended 3GPP TSG-SA2 meeting #41, over eight months after the freeze date of TS 23.125 and over 15 months after Huawei filed its Chinese application.

## '851 PATENT

174.     On July 1, 2014, Huawei filed U.S. patent application 14/321,550, which issued on Dec. 5, 2017 as U.S. Patent No. 9,838,851.  The '851 patent claims priority to Chinese Patent Application No. 20091110717 filed on Sept. 29, 2009 and PCT Application No. PCT/CN2010/077371 filed on Sept. 27, 2010.  The '851 patent lists Qufang Huang, Wenji Liu, and Qinghai Zeng as the named inventors.

175.     Huawei has alleged that the '851 patent is essential to practicing 3GPP technical specification 3GPP TS 36.300, versions 9.3.0 and later, which was developed by 3GPP RAN Working Group 2.  Huawei and the named inventors of the '851 patent participated in the RAN WG2 and the development of 3GPP TS 36.300.

176.     On November 9, 2009, Huawei submitted a Change Request 0160, R2-096534 to the 3GPP TSG-RAN WG2 Meeting #68, proposing changes to clause 15.3.3 of the 3GPP TS 36.300 specification version 9.1.0.  After discussion at the meeting, on November 11, 2009, Huawei and LG Electronics Inc. submitted a Change Request R2-097264 to the 3GPP TSG-RAN WG2 Meeting #68, proposing changes to clause 15.3.3, among others, of the 3GPP TS 36.300 specification version 9.1.0.

177.     During the 3GPP TSG-RAN WG2 Meeting #68, the TSG RAN WG2 chairman made the following call for IPRs and reminded the delegates of their obligations with respect to IPRs:

> The attention of the delegates of this Working Group is drawn to the fact that 3GPP Individual Members have the obligation under the IPR Policies of their respective Organizational Partners to inform their respective Organizational Partners of Essential IPRs they become aware of.
> The delegates were asked to take note that they were hereby invited:
> •     to investigate whether their organization or any other organization owns IPRs which were, or were likely to become Essential in respect of the work of the work of 3GPP.
> •     to notify their respective Organizational Partners of all potential IPRs, e.g., for ETSI, by means of the IPR Statement and the Licensing declaration forms (http://webapp.etsi.org/Ipr/).

178.     Eleven Huawei delegates, including one of the named inventors, Dr. Qinghai (Steven) Zeng, attended the 3GPP TSG-RAN WG2 Meeting #68 where the above proposals from Huawei were discussed and approved and where the chairman made the call for IPRs.  *See* R2-100826 Participants list.

179.     On January 20, 2010, Huawei, Nokia Corporation, Nokia Siemens Networks and ZTE submitted CR 0185 to 36.300 ver. 9.2.0, requesting "correction" to 15.3.3.

180.     Huawei did not submit an IPR declaring the '851 or its patent family as allegedly

essential until July 13, 2010, (*see* ISLD-201007-004) nearly 10 months after Huawei filed its

Chinese application.

### '226 PATENT

181.     On July 1, 2016, Huawei filed U.S. patent application 15/200,352, which issued

on Oct.30, 2018 as U.S. Patent No. 10, 117, 226.  The application claims to be a continuation of

U.S. application Ser. No. 14/175,303 filed on Feb. 7, 2014, which is a continuation of

International Application No. PCT/CN2012/079808, filed on Aug. 8, 2012, which claims

priority to Chinese Patent Application No. 201110226133.7, filed on Aug. 8, 2011.  The '226

patent lists Qufang Huang and Mingzeng Dai as named inventors.

182.     The 3GPP technical specification TS 36.300 version 10.4.0 was released at least

by June 24, 2011 and is prior art to the '226 patent.

183.     In August 22, 2011, Huawei and Samsung submitted a change request (CR 0403)

at the 3GPP TSG-RAN WG2 #5 meeting in Athens, Greece.  See R2-114827.  This proposed

modification was a "correction" to section 15.3.7 of the TS 36.300 version 10.4.0 standard. *See*

R2-114827.  The proposed correction was approved at the TSG RAN WG2 meeting #53 in

Fukuoka, Japan.  *See* RP-111287, RP-111723.  At the TSG RAN WG2 meeting #53, the RAN

chairman made a call for IPRs and reminded the delegates of their obligations with respect to

IPRs.  *See* RP-111723 Report at 14.  At least four representatives from Huawei were at the TSG

RAN WG2 meeting #53 where R2-114827 was approved.  *See* RP-111723 Report Participant

List.

184.     Although the "correction" in CR 0403 was incorporated into the TS 36.300

version 10.5.0 standard, the 3GPP technical specification TS 36.300 version 10.4.0 is the

current version for release 10. Thus, the "correction" incorporated by CR 0403 is not part of the functional freeze for Release 10. *See* https://portal.3gpp.org/#/55934-releases Release 10 end date "2011-06-08 (SA#52)".

185.     Huawei, nonetheless, through briefing in this case and through its infringement contentions served on Harris, alleges that products complying with TS 36.300 version 10.5.0 and later infringe the '226 patent, including by compliance with section 15.3.7 of that standard.

186.     Despite its apparent contribution to the change request to section 15.3.7, and despite its allegation here that the '226 patent is allegedly essential to practicing TS 36.300 version 10.5.0, released in October of 2011, Huawei, on information and belief, has not submitted a declaration to 3GPP or ETSI alleging this patent, or any member of its family, to be standard essential in accordance with the 3GPP or ETSI IPR policies.

## HUAWEI'S NEGOTIATIONS WITH HARRIS AND BREACH OF FRAND OBLIGATIONS

187.     Harris is informed and believes that Huawei is a member of, and an active participant in, standards setting organizations such as 3GPP, ETSI, and IEEE. Huawei Complaint at ¶ 6. Huawei admits that it is obligated to license the Huawei Asserted Patents on FRAND terms. Case No. 2:18-cv-00439-JRG, Dkt. 68 at 1 (". . . Huawei readily acknowledges that its patents are subject to FRAND obligations . . .").

188.     A party that has made a FRAND commitment has committed that it will be prepared to license its patents. That requires being prepared to propose specific licensing terms to a potential licensee.

189.     On information and belief, Huawei was aware of the impropriety of bringing an action for infringement after a party had expressed willingness to negotiate for a license on FRAND terms, but before offering such a license with specific terms including a royalty rate.

190.     In ITC litigation with Complainant InterDigital in 2012 (337-TA-800), Huawei

recognized that FRAND-committed patents could be declared "void and unenforceable" where

the patent holder initiated litigation against a party without proposing FRAND terms, arguing in

its Response to the Third Amended Complaint: "The Asserted Patents are void and

unenforceable by reason of the equitable doctrine of unclean hands based (among other things)

on . . . their failure to comply with the rules and obligations of ETSI, 3GPP, and other SSOs

including TIA by undertaking to grant but failing to propose RAND or FRAND terms for

licensing the Asserted Patents they claim are essential."   Likewise, in the same litigation,

Huawei recognized and argued in Respondents' July 15, 2013 Petition for Review that "a

FRAND obligation requires more than good faith efforts, and actually requires an SEP holder to

grant FRAND licenses."

191.     In a decision in litigation between Huawei and ZTE in the European Court of

Justice, the Court required that "after the alleged infringer has expressed its willingness to

conclude a licensing agreement on FRAND terms, it is for the proprietor of the SEP to present

to that alleged infringer a specific, written offer for a license on FRAND terms, in accordance

with the undertaking given to the standardisation body, specifying, in particular, the amount of

the royalty and the way in which that royalty is to be calculated."  *Huawei Tech. v. ZTE Corp.*,

C-170/13 (E.C.J. July 16, 2015) at ¶ 63.

192.     In recent litigation with PanOptis in this Court, Huawei argued that a patent

owner could be barred from asserting its ETSI and 3GPP standard FRAND-committed patents

for "failing to offer and grant FRAND terms and conditions for licensing the Asserted Patents."

*Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-CV-00123-JRG-RSP, Dkt. 70 at 31-

32.  Huawei further argued that: "The Asserted Patents are void and unenforceable by reason of

the equitable doctrine of unclean hands based on (among other things) PanOptis' (or its predecessors-in-interest's) participation in ETSI and 3GPP, its commitments to license the Asserted Patents on FRAND terms and conditions, and its failure to offer FRAND terms and conditions for licensing the Asserted Patents." *Id.*, Dkt. 70 at 32. Huawei argued for (*id.* at Dkt. 179 at 17) and obtained a ruling from this Court that trial was needed to resolve factual questions, such as whether "offers made during negotiations … are consistent with the FRAND obligation." *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-CV-00123-JRG-RSP, 2018 WL 3375192, at *6 (E.D. Tex. July 11, 2018). Huawei argued that pre-litigation offers there were inconsistent with FRAND obligations despite the patent owner having negotiated with Huawei over the royalty rate for three years before filing suit. *Optis*, No. 2:17-CV-00123-JRG-RSP, Dkt. 153 at 1. On information and belief, Huawei was aware of the impropriety of bringing its counterclaims for infringement prior to having even proposed a royalty rate to Harris.

193.    Harris was and remains a willing licensee of the Huawei Asserted Patents to the extent they are valid, enforceable, and infringed standard-essential patents.

194.    On December 5, 2018 and December 21, 2018, Huawei sent Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE and Power over Ethernet and including no information about offered license terms. On December 21, 2018, Huawei identified certain Huawei patents to Harris's licensing representative, including only one of the Huawei Asserted Patents. On March 31, 2019, Huawei sent a letter to Harris stating that a worldwide FRAND license would be available but included no information about offered license terms and no further identification of patents (that would be asserted or otherwise).

-46-

195.    Harris responded to Huawei's March 31, 2019 letter on April 3, 2019 stating a

willingness to include discussion of Huawei's Asserted Patents in ongoing discussions.  Harris

further arranged a phone call with Huawei representatives and further responded on April 12,

2019 that Harris would provide more details concerning Huawei's March 31, 2019 letter.  On

April 22, 2019, Harris emailed Huawei to ask if they could set up a call that week.  Huawei did

not respond.  Instead, Huawei asserted its counterclaims for infringement on April 26, 2019

despite Harris's good faith responses and without having communicated specific offered license

terms.  On May 1, 2019, after Huawei's counterclaims were filed, Harris again emailed Huawei

seeking to set up the requested call.

196.    Contrary to the obligations expressed in its representations to Harris, Huawei did

not make an offer to license Huawei's Asserted Patents on FRAND terms and conditions to

Harris or otherwise negotiate a FRAND license in good faith before filing its counterclaims for

patent infringement and to date it has not done so.  Huawei did not communicate terms,

including economic terms, to Harris.  Huawei brought its counterclaims before even making any

offer to Harris to license the Huawei Asserted Patents, and since initiating this suit Huawei has

yet to provide FRAND terms to Harris for the Huawei Asserted Patents.

## THE FEDERAL TRADE COMMISSION'S ENFORCEMENT ACTIONS FOR SSO MISCONDUCT

197.    The Federal Trade Commission ("FTC") has recognized that the type of SSO

misconduct Huawei has committed violates Section 5 of the Federal Trade Commission Act, 15

U.S.C. § 45 ("FTC Act") which prohibits "unfair or deceptive acts or practices in or affecting

commerce."

198.    First, the FTC has recognized that an SSO member's failure to disclose the

existence of intellectual property rights relevant to an industry standard violates Section 5 of the

FTC Act.  For example, in a complaint against Dell Computer Corporation, the FTC alleged that Dell's deception of an SSO regarding the existence of patents relating to the standard and subsequent assertion of those patents against implementers of the standard constituted unfair methods of competition that "restrained competition" in violation of Section 5.

199.     Second, the FTC has recognized that reneging on FRAND commitments can violate Section 5 of the FTC Act.  In 2008, the FTC filed a complaint against Negotiated Data Solutions LLC in which it alleged that Negotiated Data "and its predecessor in interest, Vertical Networks, Inc. ('Vertical'), engaged in unfair acts or practices and unfair methods of competition through which it sought to break a licensing commitment that its predecessor, National Semiconductor ('National'), made to the Institute of Electrical and Electronics Engineers ('IEEE'), a standard setting organization, in 1994."  Specifically, the FTC alleged that although National had committed to license patents essential to an IEEE standard for $1,000, Vertical sought to rescind that commitment and sought licensing royalties at a "substantial increased over National's commitment to license the NWay technology for a one-time fee of one thousand dollars."

200.     The FTC concluded that this breach of a licensing commitment caused or threatened to cause substantial harm to competition and consumers, including "increased royalties (or other payments) associated with the manufacture, sale, use or importation of products that implement an IEEE standard enabling autonegotiation by or with 802.3 compliant products," "increases in price and/or reductions in the use or output of products that implement an IEEE standard enabling autonegotiation by or with 802.3 compliant products," "decreased incentives on the part of semiconductor chip and LAN equipment manufacturers to produce products that implement IEEE standards enabling autonegotiation by or with 802.3 compliant

products," "decreased incentives on the part of semiconductor chip and LAN equipment

manufacturers and others to participate in IEEE or other standard setting activities," and "both

within and outside the semiconductor chip and LAN equipment industries decreased reliance, or

willingness to rely, on standards established by industry standard setting organizations."

**COUNT I**
**(DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '892 PATENT)**

201.    Harris repeats and incorporates by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

202.    On April 26, 2019, Huawei filed counterclaims[2] naming Harris as counter-

defendant.

203.    Huawei's counterclaims allege that Huawei infringes the '892 Patent, even though

Harris has not infringed, contributed to the infringement of, or induced infringement of any

valid and enforceable claim of the '892 Patent.

204.    An actual, continuing and justiciable controversy exists between Harris and

Huawei as to Harris's non-infringement of the '892 Patent as evidenced by Huawei's

counterclaims and Harris's Answer, as set forth above.  Absent a declaration of non-

infringement, Huawei will continue to wrongfully assert the '892 Patent against Harris and will

continue to cause Harris injury and damage.

205.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Harris

requests a judicial determination and declaration that Harris does not and has not infringed,

contributed to the infringement of, or induced infringement of any valid and enforceable claim

---

[2] Huawei's April 26, 2019 "counterclaims" numbered 15-19 as discussed here and below
correspond to its First through Fifth Cause of Action in its Complaint here.

of the '892 Patent either literally or under the doctrine of equivalents, willfully, or in any other manner.

## COUNT II
## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '575 PATENT)

206.   Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

207.   On April 26, 2019, Huawei filed counterclaims naming Harris as counter-defendant.

208.   Huawei's counterclaims allege that Huawei infringes the '575 Patent, even though Harris has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '575 Patent.

209.   An actual, continuing and justiciable controversy exists between Harris and Huawei as to Harris's non-infringement of the '575 Patent as evidenced by Huawei's counterclaims and Harris's Answer, as set forth above.  Absent a declaration of non-infringement, Huawei will continue to wrongfully assert the '575 Patent against Harris and will continue to cause Harris injury and damage.

210.   Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Harris requests a judicial determination and declaration that Harris does not and has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '575 Patent either literally or under the doctrine of equivalents, willfully, or in any other manner.

## COUNT III
## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '851 PATENT)

211.  Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

212.  On April 26, 2019, Huawei filed counterclaims naming Harris as counter-defendant.

213.  Huawei's counterclaims allege that Huawei infringes the '851 Patent, even though Harris has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '851 Patent.

214.  An actual, continuing and justiciable controversy exists between Harris and Huawei as to Harris's non-infringement of the '851 Patent as evidenced by Huawei's counterclaims and Harris's Answer, as set forth above.  Absent a declaration of non-infringement, Huawei will continue to wrongfully assert the '851 Patent against Harris and will continue to cause Harris injury and damage.

215.  Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Harris requests a judicial determination and declaration that Harris does not and has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '851 Patent either literally or under the doctrine of equivalents, willfully, or in any other manner.

## COUNT IV
## (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '226 PATENT)

216.  Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

217.     On April 26, 2019, Huawei filed counterclaims naming Harris as counter-defendant.

218.     Huawei's counterclaims allege that Huawei infringes the '226 Patent, even though Harris has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '226 Patent.

219.     An actual, continuing and justiciable controversy exists between Harris and Huawei as to Harris's non-infringement of the '226 Patent as evidenced by Huawei's counterclaims and Harris's Answer, as set forth above.  Absent a declaration of non-infringement, Huawei will continue to wrongfully assert the '226 Patent against Harris and will continue to cause Harris injury and damage.

220.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Harris requests a judicial determination and declaration that Harris does not and has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '226 Patent either literally or under the doctrine of equivalents, willfully, or in any other manner.

<u>**COUNT V**</u>
<u>**(DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '325 PATENT)**</u>

221.     Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

222.     On April 26, 2019, Huawei filed counterclaims naming Harris as counter-defendant.

223.     Huawei's counterclaims allege that Huawei infringes the '325 Patent, even though Harris has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '325 Patent.

224.    An actual, continuing and justiciable controversy exists between Harris and

Huawei as to Harris's non-infringement of the '325 Patent as evidenced by Huawei's

counterclaims and Harris's Answer, as set forth above.  Absent a declaration of non-

infringement, Huawei will continue to wrongfully assert the '325 Patent against Harris and

continue to cause Harris injury and damage.

225.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Harris

requests a judicial determination and declaration that Harris does not and has not infringed,

contributed to the infringement of, or induced infringement of any valid and enforceable claim

of the '325 Patent either literally or under the doctrine of equivalents, willfully, or in any other

manner.

## COUNT VI
## (DECLARATORY JUDGMENT OF INVALIDITY OF '892 PATENT)

226.    Harris repeats and incorporates by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

227.    An actual, continuing and justiciable controversy exists between Harris and

Huawei as to the validity of the claims of the '892 Patent as evidenced by Huawei's

counterclaims and Harris's Answer, as set forth above.  Absent a declaration of invalidity,

Huawei will continue to wrongfully assert the '892 Patent against Harris and will continue to

cause Harris injury and damage.

228.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Harris

requests a judicial determination and declaration that the claims of the '892 Patent are invalid

for failure to comply with one or more of the statutory requirements for patentability set forth in

Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119

and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT VII
## (DECLARATORY JUDGMENT OF INVALIDITY OF '575 PATENT)

229.     Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

230.     An actual, continuing and justiciable controversy exists between Harris and Huawei as to the validity of the claims of the '575 Patent as evidenced by Huawei's counterclaims and Harris's Answer, as set forth above.  Absent a declaration of invalidity, Huawei will continue to wrongfully assert the '575 Patent against Harris and will continue to cause Harris injury and damage.

231.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Harris requests a judicial determination and declaration that the claims of the '575 Patent are invalid for failure to comply with one or more of the statutory requirements for patentability set forth in Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119 and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT VIII
## (DECLARATORY JUDGMENT OF INVALIDITY OF '851 PATENT)

232.     Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

233.     An actual, continuing and justiciable controversy exists between Harris and Huawei as to the validity of the claims of the '851 Patent as evidenced by Huawei's counterclaims and Harris's Answer, as set forth above.  Absent a declaration of invalidity, Huawei will continue to wrongfully assert the '851 Patent against Harris and will continue to cause Harris injury and damage.

234.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Harris requests a judicial determination and declaration that the claims of the '851 Patent are invalid for failure to comply with one or more of the statutory requirements for patentability set forth in Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119 and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT IX
## (DECLARATORY JUDGMENT OF INVALIDITY OF '226 PATENT)

235.     Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

236.     An actual, continuing and justiciable controversy exists between Harris and Huawei as to the validity of the claims of the '226 Patent as evidenced by Huawei's counterclaims and Harris's Answer, as set forth above.  Absent a declaration of invalidity, Huawei will continue to wrongfully assert the '226 Patent against Harris and will continue to cause Harris injury and damage.

237.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Harris requests a judicial determination and declaration that the claims of the '226 Patent are invalid for failure to comply with one or more of the statutory requirements for patentability set forth in Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119 and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT X
## (DECLARATORY JUDGMENT OF INVALIDITY OF '325 PATENT)

238.     Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

239.    An actual, continuing and justiciable controversy exists between Harris and

Huawei as to the validity of the claims of the '325 Patent as evidenced by Huawei's

counterclaims and Harris's Answer, as set forth above.  Absent a declaration of invalidity,

Huawei will continue to wrongfully assert the '325 Patent against Harris and will continue to

cause Harris injury and damage.

240.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Harris

requests a judicial determination and declaration that the claims of the '325 Patent are invalid

for failure to comply with one or more of the statutory requirements for patentability set forth in

Title 35 of the United States Code, including without limitation §§ 101, 102, 103, 112, 116, 119

and/or 120, and the requirements of The Code of Federal Regulations.

## COUNT XI
## (BREACH OF CONTRACT)

241.    Harris repeats and incorporates by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

242.    Harris is informed and believes that Huawei has declared at least the '892, '575,

and '851 patent families as allegedly essential to the 3GPP and/or ETSI standards and has

agreed to license these patents and the other Huawei Asserted Patents on FRAND terms.

243.    Harris is informed and believes that Huawei has submitted a general IPR licensing

declaration whereby it has agreed to license any IPRs that it believes are essential to any ETSI

Standards and Technical Specifications in accordance with Clause 6.1 of the ETSI IPR Policy.

244.    Huawei has a contractual obligation to license the '325 patent on FRAND terms

in accordance with Alcatel-Lucent's LOA and the IEEE-SA policy.

245.    Harris is informed and believes that Harris has entered into express or implied

contractual commitments, in accordance with the applicable rules and intellectual property

rights policies of the applicable SSOs, to grant licenses to each of the Huawei Asserted Patents on fair, reasonable and nondiscriminatory ("FRAND") terms and conditions. These FRAND obligations are found in Intellectual Property Policies adopted by ETSI, 3GPP and the bylaws adopted by IEEE-SA, including but not limited to clause 6.1 of the ETSI IPR Policy, Article 5, and Clause 6.2 of the IEEE-SA IPR Policy.

246. Initially, as an independent breach of its contractual obligations to ETSI, 3GPP, and to Harris, Huawei failed to timely disclose its allegedly essential patents in accordance with the requirements of the ETSI IPR Policy.

247. As described above, by eventually committing to license its declared-essential patents on FRAND terms to all parties practicing the ETSI/3GPP standards, Huawei entered into contractual commitments with ETSI and/or 3GPP obligating it to license 3GPP and/or ETSI's members and suppliers of products that support the standard (as third-party beneficiaries) on FRAND terms. Huawei's FRAND commitments impose ongoing, continuing contractual obligations on Huawei.

248. By initiating litigation against Harris before making any FRAND compliant licensing offer, Huawei has breached its FRAND commitment to be prepared to license the Huawei Asserted Patents.

249. In addition, by failing to provide Harris with FRAND license terms for each of the Asserted Patents—even after bringing its counterclaims for infringement—Huawei has breached its FRAND commitments specific to each of the Huawei Asserted Patents.

250. As a result of these multiple contractual breaches, Harris has been injured, including in its business or property. Harris has been forced to defend groundless infringement claims and has incurred substantial expense in doing so.

Case 2:19-cv-00222-JRG Document 5 Filed 06/25/19 Page 58 of 68 PageID #: 198

## COUNT XII
## (DECLARATORY JUDGMENT THAT HUAWEI HAS NOT MADE A FRAND OFFER)

251.    Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

252.    There is a dispute between the parties concerning whether Huawei has complied with its FRAND obligations to offer Harris a license on fair, reasonable and nondiscriminatory terms. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

253.    Huawei has failed to offer license terms conforming to applicable legal and equitable requirements or provide a date certain by which it will make such an offer.

254.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Harris requests a judicial determination and declaration that Huawei has not offered license terms to Harris conforming to applicable legal and equitable requirements.

## COUNT XIII
## (BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING)

255.    Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

256.    There is an implied duty of good faith and fair dealing in every contract. This duty applies to FRAND commitments no less than to any other contract.

257.    Huawei has failed to comport with the implied duty of good faith and fair dealing inherent in every contract, including by failing to make a FRAND offer conforming to applicable legal and equitable requirements and by filing suit against Harris before making any FRAND offer.

258.     As a result of Huawei's breach of the implied covenant of good faith and fair dealing, Harris has been injured in its business and is threatened by loss of profits, customers, goodwill and product image.

## COUNT XIV
## (PROMISSORY ESTOPPEL)

259.     Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

260.     Harris is informed and believes that Huawei has entered into express or implied contractual commitments, in accordance with the applicable rules and IPR policies of the applicable SSOs, to grant licenses to the Huawei Asserted Patents on FRAND terms and conditions.

261.     Huawei's declarations and representations of essentiality constitute an express or implied contractual commitment with ETSI, 3GPP, IEEE-SA and its members, affiliates and adopters.

262.     Each third party that would potentially implement the technologies covered by those standards was and is an intended beneficiary to those contracts.

263.     The intended purpose of Huawei's (and/or its predecessor in interest's) promises was to induce reliance.  Huawei (and/or its predecessor in interest, Alcatel Lucent) knew or should have reasonably expected that this promise would induce companies producing products incorporating the standards to develop products compliant with the relevant standards.

264.     Huawei asserts that Harris, Harris's vendors, and third-parties have developed, marketed and/or used products and services that allegedly incorporate the standards.  Any such demonstrated incorporation was done in reliance on Huawei's promises.

265.    Huawei is estopped from reneging on these promises to 3GPP, ETSI, IEEE-SA and/or their Organizational Partners and third-party beneficiaries under the doctrine of promissory estoppel.

266.    Harris has been and continues to be harmed as a result of its reasonable reliance on Huawei's (and/or its predecessor in interest, Alcatel Lucent's) promises and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

267.    Harris will suffer irreparable injury by reason of the acts and conduct of Huawei alleged above unless and until the court enjoin such acts, practices and conduct.

## <u>COUNT XV</u>
### <u>(WAIVER)</u>

268.    Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

269.    Harris is informed and believes that Huawei has entered into express or implied contractual commitments, in accordance with the applicable rules and IPR policies of the applicable SSOs, to grant licenses to the Huawei Asserted Patents on FRAND terms and conditions.

270.    Huawei's declarations and representations of essentiality constitute an express or implied contractual commitment with ETSI, 3GPP, IEEE-SA and its members, affiliates and adopters.

271.    Each third party that would potentially implement the technologies covered by those standards was and is an intended beneficiary to those contracts.

272.    Through this express statement, Huawei (and/or its predecessor in interest, Alcatel Lucent) voluntarily and intentionally waived its rights to obtain compensation for any allegedly

essential patents for 3GPP, ETSI, and IEEE Standards other than at reasonable rates and on
non-discriminatory terms.

273.    Harris will suffer irreparable injury by reason of the acts and conduct of Huawei
alleged above until and unless the court enjoins such acts, practices, and conduct.

## COUNT XVI
## (DECLARATORY JUDGMENT THAT PATENTS ARE UNENFORCEABLE)

274.    Harris repeats and incorporates by reference the allegations contained in the
preceding paragraphs as if fully set forth herein.

275.    There is a dispute between the parties concerning whether Huawei has complied
with its FRAND obligations to offer Harris a license on fair, reasonable and nondiscriminatory
terms.  The dispute is of sufficient immediacy and reality to warrant the issuance of a
declaratory judgment.

276.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Harris
requests a judicial determination and declaration that Huawei's Asserted Patents are
unenforceable due to its conduct with respect to SSO standardization efforts described above
and/or its conduct with respect to Harris described above.

## COUNT XVII
## (VIOLATION OF TEXAS UNFAIR COMPETITION LAW)

277.    Harris repeats and incorporates by reference the allegations contained in the
preceding paragraphs as if fully set forth herein.

278.    The FTC has recognized that reneging on FRAND commitments can violate
Section 5 of the FTC Act.  *In re Motorola Mobility LLC*, Docket No. C-4410;  *In re Negotiated
Data Solutions LLC*, Docket No. C-4234.

279.     Huawei has reneged on the FRAND commitments to which its Huawei Asserted Patents are subject.

280.     Huawei's unfair and fraudulent business acts and practices are a direct and proximate cause of injury to the public and Harris.

281.     Huawei's unlawful, anticompetitive, and unfair conduct constitutes unfair competition under Texas law and has interfered or threatens to interfere with competition and Harris's ability to conduct its business.

282.     Huawei has committed unlawful and unfair acts that constitute violations of Section 5 of the FTC Act, including: (a) failing to timely disclose the existence of patent or patent applications related to the Huawei Asserted Patents in accordance with the requirements of the 3GPP and/or ETSI IPR Policy, and (b) failing to abide by its FRAND commitments, including initiating this lawsuit without negotiating with Harris and refusing to license the Huawei Asserted Patents on FRAND terms and conditions.

283.     For example, Huawei's failure to disclose the existence of patents or patent applications in accordance with the IPR policies is an unfair and deceptive trade practice that violates at least Tx. Bus. & Com. Code §17.46(b)(24) for failing to disclose information concerning services which was known at the time of the transaction because such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

284.     As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, there is a significant threat of injury to downstream price, quality, innovation, and consumer choice for cellular services and products, thereby causing injury to consumers in Texas and elsewhere.  These threatened injuries include the inevitable passing on

to consumers of improper royalties demanded by Huawei and decreases in innovation, quality, and consumer choice for products and services that support the standards, as well as decreased incentives to participate in standard setting generally and to support products that rely on standards.

285.    As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, Huawei has interfered with Harris's ability to do business in Texas and elsewhere by, among other things: (a) causing Harris to face a threat of loss of profits and loss of customers; and (b) being forced to expend money and other resources defending against Huawei's actions notwithstanding that Huawei has committed to license the Asserted Patents on FRAND terms.  As a result, Harris is entitled to damages, and is additionally entitled to attorneys' fees, including pursuant to Tx. Bus. & Com. Code §17.50(d).

## COUNT XVIII
## (VIOLATION OF FLORIDA UNFAIR COMPETITION LAW)

286.    Harris repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

287.    Florida's Consumer protection act, including FLA. STAT. § 501.204 states that "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  And further explains: "It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017."

288.    The FTC has recognized that reneging on FRAND commitments can violate Section 5 of the FTC Act. *In re Motorola Mobility LLC,* Docket No. C-4410; *In re Negotiated Data Solutions LLC,* Docket No. C-4234.

289.    Huawei has reneged on the FRAND commitments to which its Huawei Asserted Patents are subject.

290.    Huawei's unfair and fraudulent business acts and practices are a direct and proximate cause of injury to the public and Harris.

291.    Huawei's unlawful, anticompetitive, and unfair conduct constitutes unfair competition under Florida law and has interfered or threatens to interfere with competition and Harris's ability to conduct its business.

292.    Huawei has committed unlawful and unfair acts that constitute violations of Section 5 of the FTC Act, including: (a) failing to timely disclose the existence of patent or patent applications related to the Huawei Asserted Patents in accordance with the requirements of the 3GPP and/or ETSI IPR Policy, and (b) failing to abide by its FRAND commitments, including refusing to license the Huawei Asserted Patents on FRAND terms and conditions.

293.    As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, there is a significant threat of injury to downstream price, quality, innovation, and consumer choice for cellular services and products, thereby causing injury to consumers in Florida and elsewhere.  These threatened injuries include the inevitable passing on to consumers of improper royalties demanded by Huawei and decreases in innovation, quality, and consumer choice for products and services that support the 4G standard, as well as decreased incentives to participate in standard setting generally and to support products that rely on standards.

294.      As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, Huawei has interfered with Harris's ability to do business in Florida and elsewhere by, among other things: (a) causing Harris to face a threat of loss of profits and loss of customers; and (b) being forced to expend money and other resources defending against Huawei's actions notwithstanding that Huawei has committed to license the Asserted Patents on FRAND terms.  As a result, Harris is entitled to damages, and is additionally entitled to attorneys' fees, including pursuant to FLA. STAT. § 501.2105.

## RESERVATION OF RIGHTS

Harris Corporation expressly reserves the right to assert counterclaims or any additional defenses which may now exist or in the future may be available based on discovery and further factual investigation in this case, including doctrine of acquiescence, patent misuse, inequitable conduct, waiver, unclean hands and/or other applicable equitable doctrines.

## PRAYER FOR RELIEF

Harris respectfully requests this Court grant relief on Huawei's Complaint and Harris's counterclaims as follows:

A.   Judgment that Huawei's claims in their entirety be dismissed with prejudice;

B.   Judgment that Huawei takes nothing by its claims, including that Huawei is not entitled to an award of compensatory damages, attorneys' fees, costs, prejudgment or post-judgment interest under 35 U.S.C. §§ 284 or 285, or any applicable law;

C.   Denial of any and all of Huawei's requests for relief;

D.   Judgment that Harris has not infringed, and is not infringing, any valid and enforceable claim of the Huawei Asserted Patents.

E.   Judgment that the asserted claims of the Huawei Asserted Patents are invalid;

F.   Judgment that Huawei and/or any of its successors and attorneys, and all persons in active concert or participation with any of them, are enjoined from directly or indirectly asserting infringement or instituting any further action for infringement of the Huawei Asserted Patents against Harris, or any of Harris's customers, end-users, agents, suppliers, contractors, consultants, successors, and assigns;

G.   Judgment that Huawei has breached its contractual obligations to IEEE, ETSI and 3GPP to offer the Huawei Asserted Patents on FRAND terms;

H.   Judgment that the Huawei Asserted Patents are unenforceable;

I.   Judgment requiring Huawei to pay Harris's costs and expenses, along with pre-judgment and post-judgment interest;

J.   Judgment requiring Huawei to pay Harris's attorneys' fees pursuant to Tx. Bus. & Com. §17.50, FLA. STAT. §501.2105, or any other applicable statute;

K.   Grant to Harris such other and further relief as the Court deems just and proper.

Dated:  June 25, 2019               Respectfully Submitted,

By:  /s/ *Denise De Mory*

Henry C. Bunsow
Denise De Mory
Christina M. Finn
Robin K. Curtis
Corey Johanningmeier
Nicolas Mancuso
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063
Telephone: (650) 351-7248
Facsimile: (415) 426-4744
Email: hbunsow@bdiplaw.com
Email: ddemory@bdiplaw.com
Email: cfinn@bdiplaw.com
Email: rcurtis@bdiplaw.com
Email: cjohanningmeier@bdiplaw.com
Email: nmancuso@bdilaw.com

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
Capshaw DeRieux, LLP
114 E. Commerce Ave.
Gladewater, TX 75467
Telephone: 903-845-5770
Email: ccapshaw@capshawlaw.com
Email: ederieux@capshawlaw.com

**ATTORNEYS FOR DEFENDANT
HARRIS CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served electronically on all counsel who are deemed to have consented to electronic service.


Dated:  June 25, 2019

By: /s/ *Denise De Mory*
Denise De Mory
